UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

   - v. -                          :          **INDICTMENT**

ANILESH AHUJA, a/k/a "Neil,"       :          S1 18 Cr. 328(KPF)
and
JEREMY SHOR,                      :

     Defendants.               :

- - - - - - - - - - - - - - - - x

**COUNT ONE**
**(Conspiracy to Commit Securities Fraud)**

     The Grand Jury charges:

**Background**

The Firm and Relevant Individuals

     1.   In or about 2008, ANILESH AHUJA, a/k/a "Neil," the defendant, co-founded a New York, New York-based investment firm that managed hedge funds focused primarily on structured credit products (the "Firm"), where he was the Chief Executive Officer and Chief Investment Officer.  Before founding the Firm, AHUJA was the head of the residential mortgage-backed securities ("RMBS") group at a prominent global investment bank (the "Investment Bank").

     2.   The Firm's flagship mortgage credit fund (the "Hedge Fund") was launched in or about October 2009.  A segregated ERISA fund held the same positions as the Mortgage Credit Fund.

In 2013, the Firm launched a new fund (the "New Issue Fund") that purchased and securitized pools of mortgages that were not issued or guaranteed by a government agency. The New Issue Fund required investors to "lock-up" their funds for two years, after which investors would have the option of remaining for a third year.

3. The Firm enjoyed early success, gaining a reputation as one of the premier firms in the RMBS hedge fund industry and posting double-digit annualized returns. At various relevant times between 2008 and 2016, the Firm managed billions of dollars in assets, in excess of $5 billion at the Firm's peak. The Firm earned fees based on the amount of assets under management and its performance.

4. From in or about 2008 through in or about June 2016, Amin Majidi ("Majidi") worked at the Firm, first as the Chief Risk Officer and, beginning in or about 2014, as a partner and the portfolio manager for the Hedge Fund. Prior to joining the Firm, Majidi had worked for approximately two decades in the RMBS industry, including as head of the U.S. RMBS research business at the Investment Bank, where Majidi reported to ANILESH AHUJA, a/k/a "Neil," the defendant.

5. From in or about early 2014 through in or about March 2016, JEREMY SHOR, the defendant, was employed by the Firm as a trader, where he focused on non-agency RMBS -- *i.e.*, RMBS securities that were not issued by a government agency.

6.     From in or about 2013 through in or about June 2015, Individual-1 was a partner at the Firm, where he worked as a portfolio manager and trader with a focus on agency mortgage-backed securities.

7.     From in or about 2013 through in or about 2016, Ashish Dole ("Dole") was employed by the Firm as a junior trader assisting JEREMY SHOR, the defendant.  Prior to being recruited by Majidi to join working at the Firm, Dole worked as a risk manager at a prominent global investment bank based in New York, New York.

8.     A co-conspirator not named as a defendant herein ("CC-1") was employed by the Firm from in or about 2014 through in or about April 2016 as a trader.  Initially, CC-1 focused on the Hedge Fund.  Beginning in 2015, at the direction of ANILESH AHUJA, a/k/a "Neil", the defendant, CC-1's responsibilities shifted primarily to the New Issue Fund.

9.     At various times relevant to this Indictment, the Firm employed less than a dozen individuals with responsibility for portfolio management and/or trading. The Firm maintained a single desk (the "Desk") where traders and portfolio managers, including JEREMY SHOR, the defendant, Dole, Majidi, Individual-1 and CC-1, maintained their workstations.  While NEIL AHUJA, a/k/a "Neil," the defendant, maintained a separate office, AHUJA was also frequently present on the Desk.

10.   From in or about 2012 through in or about 2015, Frank Dinucci, Jr. ("Dinucci") worked as a salesman at a broker-dealer in New York, New York ("Broker-Dealer-1").   Thereafter, from in or about 2015 through 2016, Dinucci worked as a salesman at another broker-dealer in New York, New York ("Broker-Dealer-2").   Dinucci specialized in structured credit instruments, including RMBS.   Prior to joining the Firm, JEREMY SHOR, the defendant, had a professional relationship with Dinucci.

### The Firm's Valuation Policy and Process

11.   At all times relevant to this Indictment, the Firm calculated the net asset value ("NAV") for the Hedge Fund and the New Issue Fund at the end of each month and sent the respective NAVs to its investors.

12.   At all times relevant to this Indictment, the Firm's Valuation and Monitoring Policy and Procedure ("Valuation Policy"), which the Firm attached to offering materials and provided to potential and actual fund investors, codified its methodology to establish "fair value" marks for its investments in accordance with Generally Accepted Accounting Principles ("GAAP"). As cited in the Firm's offering materials, the relevant GAAP provision defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."

13. At all times relevant to this Indictment, the Firm's Valuation Policy required it to obtain and average security-specific quotes from broker-dealers and pricing services. For securities not listed on an exchange, the Valuation Policy indicated that the Firm would "query the pricing sources (both securities dealers and pricing vendors)" and take "the average of the prices" as the fair value of that security. The Firm's offering materials stated that securities would be "valued at the mean between the 'bid' and 'ask[.]'"

14. Consistent with the Valuation Policy, at various times relevant to this Indictment, the Firm received prices for securities from at least one third-party pricing service (the "Pricing Service") and directly from securities broker-dealers. Nothing in the Valuation Policy or offering materials indicated that the Firm used anything other than security-specific prices to compute an average price.

15. At all times relevant to this Indictment, the Firm maintained a Valuation Committee responsible for overseeing the Valuation Policy.

16. Beginning in or about 2013, the Firm employed a global accounting firm (the "Auditor") as an independent auditor. The Auditor performed year-end audits of the Firm's financial statements, as well as of the Hedge Fund and New Issue Fund.

## The Mismarking Scheme

### Overview

17.   From at least in or about January 2014 through at
least in or about April 2016, ANILESH AHUJA, a/k/a "Neil," and
JEREMY SHOR, the defendants, and others known and unknown,
including Amin Majidi, Ashish Dole and CC-1, participated in a
scheme to defraud the Firm's investors and potential investors in
the Hedge Fund and the New Issue Fund by deceptively mismarking
each month the value of certain securities held in these funds,
and thus fraudulently inflating the NAV of those funds as reported
to investors and potential investors.

18.   The Firm mismarked securities in two ways.  First,
the Firm secured fraudulently inflated quotes for particular
securities from corrupt brokers.  Second, the Firm fraudulently
calculated a so-called "imputed mid" price for particular
securities by improperly adding a so-called "sector spread" to a
bid.  By using this valuation process, the Firm also fraudulently
inflated the price of particular securities.

19.   The effect of the mismarking scheme was to
materially overstate the reported NAV -- at times by more than
$200 million across the funds managed by the Firm.  This benefitted
the Firm in at least two ways.  First, the Firm was able to charge
its investors higher management and performance fees.  Second, the
Firm was able to forestall redemptions by investors who would have

requested a return of their funds had they known the Firm's true performance and operating health.

Monthly Targets

20. The mismarking scheme evolved as a result of demands by ANILESH AHUJA, a/k/a "Neil," the defendant, and Amin Majidi, that the Firm maintain its track record of success and keep pace with the performance of peer funds, regardless of market conditions or the actual performance of the funds. To achieve the goal of posting competitive returns, AHUJA set an inflated "target" return for the Hedge Fund at the end of each month, which was based in part on the performance of peer funds. The Firm then sent monthly e-mails to all fund investors with estimates of the expected monthly NAV that were based on these "targets."

21. As part of the scheme, Amin Majidi, frequently in the presence of ANILESH AHUJA, a/k/a "Neil," the defendant, directed the members of the trading desk, including JEREMY SHOR, the defendant, Ashish Dole, CC-1, and, at times, Individual-1, that the Firm must meet its "target" performance number for the month. The traders at the Firm were then tasked with "reverse engineering" marks to meet the "targets."

22. At first, ANILESH AHUJA, a/k/a "Neil," the defendant, and Amin Majidi directed the traders to make whatever "challenges" were necessary to meet or exceed the performance targets. To "challenge," a trader would go back to the source of

a particular mark and present a case for why the mark should be higher (or lower). For example, AHUJA instructed the traders to "get in there and squeeze the dealers," which meant to pressure the pricing sources to agree to higher marks. At times, the challenges were accepted by the pricing sources.

"Challenges" Evolve To Fraudulent Mismarking

23. Where challenges were insufficient to meet the "target," Amin Majidi, and at times ANILESH AHUJA, a/k/a "Neil," the defendant, personally exerted pressure on the traders to meet the pre-determined "targets," telling the traders that if they failed to do so, investors would redeem their investments and the Firm would fail. For example, on a recorded conversation with JEREMY SHOR, the defendant, in July 2015, Majidi stated: "[w]e cannot take more NAV hits;" "we need to show performance . . . we're like the bottom third of hedge funds;" and on a recorded conversation with SHOR in October 2015, Majidi stated: "I mean, if we show down 3% this month [in one or our funds], game over . . . [the investor] would do a complete redemption." In a similar written exchange on August 11, 2015, MAJIDI sent a text message to SHOR and Dole in which he instructed. "Here's what we need to do tomorrow. Go through challenges as they come back and see what else we need to do . . . . If we push this to the end and have to take a big hit, it's game over for [the Firm]." When Individual-1 confronted AHUJA and Majidi, in the presence of SHOR and others,

8

about their pressuring him to inflate marks, AHUJA instructed Individual-1 to "put on your big boy pants" and obtain the marks needed to meet the fraudulent targets.

24.   To carry out the mismarking scheme, ANILESH AHUJA, a/k/a "Neil," and JEREMY SHOR, the defendants, and others relied on one or more corrupt brokers to provide inflated marks to bridge the gap between the marks the defendants needed in order to hit their "targets" and the marks they could obtain through challenges to legitimate pricing sources. Specifically, AHUJA was aware that SHOR had access to one or more corrupt brokers, and directed SHOR, along with Dole and CC-1, to utilize those brokers as necessary to meet the imposed targets. The Firm engaged in two related types of mismarking.

### Mismarking Using Fraudulent Broker Quotes

25.   In the first type of mismarking, JEREMY SHOR, the defendant, and Ashish Dole, with the knowledge and approval of ANILESH AHUJA, a/k/a "Neil," the defendant, and Amin Majidi, secured fraudulent quotes for particular securities from one or more corrupt brokers, relying heavily on Frank Dinucci.

26.   At the end of each month, traders at the Firm provided JEREMY SHOR, the defendant, with a list of securities, the marks for which they were seeking to challenge. SHOR, at times with Ashish Dole's assistance, would "reverse engineer" the performance "targets" set by ANILESH AHUJA, a/k/a "Neil," the

defendant, and Amin Majidi, to determine the necessary inflated marks they would need to obtain from Frank Dinucci.  In furtherance of the mismarking scheme, and in violation of Firm policy, SHOR used his cellphone to call Dinucci and relay the Firm's desired inflated marks for the list of securities.  At times, SHOR and Dinucci met in person, and SHOR gave Dinucci a list of the securities and requested inflated marks.  At times, SHOR and Dole communicated explicitly about the ability of Dinucci to get them marks to reach a "target" set by AHUJA and Majidi.

27.  For example, in a July 2014 text exchange between JEREMY SHOR, the defendant, and Ashish Dole, Dole confirmed to SHOR, "I can put in prices we want from frank [Dinucci] to get to 1mm up on [the Hedge Fund]."  In a June 2015 text exchange among SHOR, Dole, and CC-1 discussing obtaining inflated markets from Dinucci, SHOR stated, "Am I gonna promise frank [Dinucci] a reach around?  Should I put pressure to get the loans marked?"  The next month, Dole told SHOR, "Neil [AHUJA] has been in touch a lot."  SHOR responded, "I'm happy to hit frank [Dinucci] up for what we need there OK?"  Dole wrote back, "Yeah mean we will need a push from frank [Dinucci] Monday."

28.  While Frank Dinucci initially resisted some of the inflated marks that JEREMY SHOR, the defendant, requested that he provide, Dinucci eventually agreed to parrot back the exact marks SHOR had requested.  In exchange for sending these inflated marks,

Dinucci expected that SHOR and the Firm would use Dinucci and his firm as a broker. This was to Dinucci's personal financial benefit, as he was compensated primarily based on trading commissions. In fact, at certain relevant times, the Firm was Dinucci's top client, accounting for more than half of Broker-Dealer-2's business.

29. Frank Dinucci made his understanding of the *quid pro quo* agreement explicit, including in encrypted WhatsApp messages he exchanged with JEREMY SHOR, the defendant, and Ashish Dole. For example, in September 2015, Dinucci wrote, "[t]ell Ashish dog to chuck me a damn trade if I keep marking up all his bonds ha." SHOR responded, "[h]e actually had just told me he feels bad asking before he pinged you."

30. Throughout in or about 2014 and in or about 2015, ANILESH AHUJA, a/k/a "Neil," the defendant, who at times referred to Frank Dinucci as "Shor's guy at [Broker-Dealer-2]," continued to pressure the Firm's traders, including JEREMY SHOR, the defendant, Ashish Dole, and Individual-1, to meet the fraudulent performance "targets." Amin Majidi discussed SHOR's access to one or more corrupt brokers with SHOR and Dole. For example, in a 2015 text message to Majidi, Dole stated, "Frank [Dinucci] can of course mark bonds anywhere we want."

31. When traders resisted meeting the fraudulent "targets" set by ANILESH AHUJA, a/k/a "Neil," the defendant, AHUJA

insisted that the mismarking continue.  For example, in a February 2015 text exchange, CC-1 told Ashish Dole, "We just told Neil we are mismarked by 400bps and he's asking for 60bps.  This has to end."  Dole replied, "This isn't going to end until June."  That same month, AHUJA sent the following text message to Dole: "No changing bid offers etc. without my approval."  In another text exchange in May 2015, Dole told AHUJA he was still waiting for marks.  AHUJA replied, "Just force it . . . Amin [Majidi] can help . . . we need to target 40," directing that the Firm show investors a four percent return that month.

### The "Lever" -- Mismarking Using Sector Spreads

32.  In the second type of mismarking, JEREMY SHOR, the defendant, Ashish Dole, and others -- again with the knowledge and approval of ANILESH AHUJA, a/k/a "Neil," the defendant, and Amin Majidi -- secured and misused "spreads" from brokers.  A "spread" is typically the difference between a bid and an ask for a given security.  But SHOR and others obtained so-called "sector spreads" from brokers for use in mismarking the Firm's positions.  Sector spreads were generally intended to take into account the differences between the bid and ask prices for all of the securities within an entire sector (e.g., non-agency RMBS), rather than the difference between the bid and ask for one specific security.  A sector spread could therefore be substantially wider than the bid-ask spread for a specific security.  The Firm used

sector spreads to fraudulently create what it called an "implied mid," or "imputed mid," for particular securities. Where a broker supplied the Firm with a bid, the Firm added half of the sector spread to "calculate" the implied mid of a bond. SHOR, DOLE, and Majidi internally referred to this use of implied or imputed mids as "the lever" -- because it could be used to inflate the NAV to meet AHUJA's targets. SHOR, Dole, and others used inflated sector spreads in order to maximize the impact on the NAV.

33. To further facilitate the mismarking scheme and meet the targets demanded by ANILESH AHUJA, a/k/a "Neil," the defendant, and Amin Majidi, JEREMY SHOR, the defendant, Ashish Dole, and others, with the knowledge of, and at the direction of, AHUJA and Majidi, often waited until late in the monthly valuation process to obtain sector spreads in order to determine what additional inputs were needed to meet the inflated targets. For example, during a recorded December 15, 2015 conversation between SHOR and an individual at the Firm not identified herein ("Individual-2"), Individual-2 explained how Broker-Dealer-2 "basically . . . hold[s] off sending us marks until we get an idea of where our marks are coming in, and then . . . they give us basically marks where we want them. Same with bid-ask spreads . . Which is very wrong." SHOR responded: "obviously."

Investors Explicitly Prohibit the Use of Spreads to Mark

34.   The Firm's use of sector spreads to calculate "implied mids" violated the Valuation Policy.  As noted above, the Valuation Policy required it to obtain and average security-specific quotes from broker-dealers and pricing services.   The Funds' offering materials added that securities would be "valued at the mean between the 'bid' and 'ask[.]'"  The Valuation Policy made no reference to, and did not permit, the Firm to create an "imputed mid" price for a security -- by taking a bid for a specific security obtained from one broker-dealer or pricing service and adding to that bid an industry or sector spread, often from another broker-dealer.   The resulting marks materially misrepresented the value of securities owned by the Hedge Fund and the New Issue Fund, as ANILESH AHUJA, a/k/a "Neil," and JEREMY SHOR, the defendants, well knew.

35.   In fact, one of the Firm's largest investors, a leading fund-of-funds ("Investor-1"), had explicitly rejected an earlier attempt by the Firm to include the use of spreads to calculate "mids" when valuing securities.  Specifically, in late 2011, as part of Investor-1's due diligence of the Firm prior to its initial investment in the Hedge Fund, the Firm proposed including the following language (the "Spread Language") in its Valuation Policy:  "In cases where we are given only a bid side

price, [the Firm] may add one half of bid/offer spreads to the bid price to establish a mid-market price."

36. On or about September 20, 2011, after reviewing this and other proposed valuation procedures, a managing director at Investor-1 sent an email to an employee of the Firm not named herein. In the email, Investor-1 asked the Firm to strike the Spread Language and stated: "This is very unusual and we have never seen in a valuation policy before. Our initial comments were to ask for less manager involvement in valuation process, not more. . . . Has this alteration of broker quotes been occurring all along? If so, this was not disclosed during the valuation discussions with either Amin or [the Firm's administrator]." In the email, Investor-1 also asked the Firm to make additional changes to the Valuation Policy to ensure that the Firm's valuation process remained objective and separate from the management of the Firm. Among other requests, Investor-1 asked the Firm to remove language that would have allowed the Firm, under certain circumstances, to "choose the price that is consistent with same or comparable bonds being offered in the market." Two minutes after receiving this email from Investor-1, the Firm employee forwarded it to ANILESH AHUJA, a/k/a "Neil," the defendant, and Amin Majidi.

37. Later the same day, in response to the specific concerns raised by Investor-1, Amin Majidi approved removing the

Spread Language from the draft valuation policy and directed that the revised policy be sent by email to Investor-1, which it was. Shortly thereafter, Investor-1 agreed to invest and did invest in excess of $100 million in the Hedge Fund. As part of its ongoing due diligence, Investor-1 periodically asked the Firm if there had been any exceptions to the Valuation Policy. None were noted. Notwithstanding Investor-1's objection to the use of sector spreads and the Firm's representation to Investor-1 that it was not using spreads, the Firm nonetheless used large sector spreads to fraudulently value securities in the Hedge Fund.

38. Consistent with Investor-1's stated concerns, the Firm's use of sector spreads resulted in an outsized impact on the value the Firm ultimately assigned to particular securities. For example, for one bond in the Firm's portfolio, the Firm received a "mid" quote from a broker of $2.63. The Firm also received a bid quote of $2.36 from a pricing service. The Firm applied a "sector spread" of $3.68 to this price, which resulted in an "imputed mid" of $4.20, or 78% above the quoted bid.

### Individual-1 Resigns

39. By the spring of 2015, Individual-1 had become increasingly uncomfortable with the pressure that ANILESH AHUJA, a/k/a "Neil," the defendant, and Amin Majidi, put on him to inflate the value of his portfolio. Individual-1 thus had a series of conversations with AHUJA, Majidi, and JEREMY SHOR, the defendant,

during which he expressed his increasing discomfort with the mismarking. In one conversation with SHOR, Individual-1 stated that he intended to tell AHUJA that the requested marks could not be justified and that he would refuse to mark his portfolio of agency RMBS any higher, and he advised SHOR that he should also refuse to mismark. SHOR, who was responsible for non-agency RMBS, responded that MAJIDI determined SHOR's bonus.

40. Shortly thereafter, Individual-1 again advised ANILESH AHUJA, a/k/a "Neil," the defendant, of his increasing discomfort with the inflated marks. In response, AHUJA threatened to demote Individual-1 from a partner in the Firm to a salaried employee. AHUJA subsequently did so and required Individual-1 to report to Amin Majidi. Individual-1 resigned.

### Investor Redemptions Result in Increased Mismarking

41. After Individual-1's resignation in 2015, the Firm's mismarking continued and, in fact, increased, as market conditions weakened.

42. In 2015, the Firm began receiving significant investor redemption requests, forcing the liquidation of positions to raise capital to meet those requests. Because securities that were over-marked could not be sold at their inflated marked prices, the Firm initially sold the more properly marked (or less inflated) securities. As a result, in order to achieve the fraudulent valuation "targets" set by ANILESH AHUJA, a/k/a "Neil," the

defendant, and Amin Majidi,   JEREMY SHOR, the defendant, with the
knowledge of AHUJA and Majidi, further mismarked the already
inflated non-agency securities that he traded.

43.   To further the mismarking scheme and avoid marking
down securities to their fair value, as the Valuation Policy
required the Firm to do, JEREMY SHOR, the defendant, with the
knowledge and approval of ANILESH AHUJA, a/k/a "Neil," the
defendant, and Amin Majidi, continued to use inflated marks for
particular securities, even after learning that those securities
could not be sold at or near the inflated mark.   For example, at
or about the end of November 2015, the Firm had marked one non-
agency bond at $55.33 (the "Mismarked Bond").   Thereafter, the
Firm sold portions of its position in the Mismarked Bond for $47
(in November 2015) and $36 (in February 2016).   Notwithstanding
these market transactions, in March 2016, the Firm marked the Bond
at the inflated price of $51.19 in an effort to prop up the NAV of
the fund.

<u>AHUJA's Efforts to Conceal the Mismarking</u>

44.   In the same late 2015 time period, ANILESH AHUJA,
a/k/a "Neil," the defendant, was particularly concerned about
showing negative returns to investors in the New Issue Fund
because, around this time, investors in that fund had the option
of redeeming the funds they had invested or maintaining their
investment for an additional year.   AHUJA employed multiple

strategies to hide the inflated valuation, retain investors, and obscure his own involvement in the mismarking scheme.

45. One such method that ANILESH AHUJA, a/k/a "Neil," the defendant, used was to fraudulently inflate the value of the so-called Interest Only loans ("IO" or "IOS") held in the New Issue Fund. For example, in an October 2015 text exchange, AHUJA updated Ashish Dole about communications he had had with a large investor in the New Issue Fund ("Investor-2"). AHUJA wrote that Investor-2 "will stay for an extra year if [we] start printing returns . . . need to show him we can make at least 6%." Dole responded, "Neil let's take the iOS back to 110%. This is not the month to mark them down since we need to show returns. That would give us 4.5mm." Neil replied, "Ok [l]et's talk later. Slowly bring them up again." In truth and in fact, the IOS held in the New Issue Fund were generating negative returns because of an acceleration of the prepayment rate, which AHUJA well knew and had discussed with others at the Firm.

46. A second method that ANILESH AHUJA, a/k/a "Neil," the defendant, used to hide the mismarking scheme involved taking short-term trading profits to "smooth" inflated bonds, including inflated IOS. AHUJA used these trading profits to slowly mark the bonds down without impacting the Firm's NAV or exposing the mismarking. For example, in a November 2015 text exchange, AHUJA and Ashish Dole discussed the use of trading gains to offset a

portion of the markdowns of bonds with inflated marks.   AHUJA direct Dole to "mark down by 1% a month on the ios."   Dole responded, "Yes and we will have a much cleaner book going into January."

47.   As ANILESH AHUJA, a/k/a "Neil," the defendant, well knew, these fraudulent practices violated the Valuation Policy. The Valuation Policy required the Firm to properly value positions at the end of each month and at no time permitted "smoothing" over of the mismarking.

### The 2015 Audit

48.   In or about October 2015, the Auditor began the audit for the Firm's 2015 fiscal year.   After reviewing a sample of the marks that the Firm used, the Auditor identified pricing differences for certain bonds, causing the Auditor concern and resulting in the Auditor engaging in a broader sampling of the Firm's marks.

49.   In or about April 2016, as a result of its review of the Firm's valuations, the Auditor informed the Firm, and ANILESH AHUJA, a/k/a "Neil," the defendant, in particular, that the Auditor would not be able to complete the 2015 audit as scheduled and that a restatement of the NAV was likely to be necessary.   As a result, in April 2016, in a letter from AHUJA, the Firm informed its investors of its intention to restate the Funds' NAVs for late 2015 and thereafter.

50.   The Firm's public restatement (the "Restatement") indicated that for the period of September 2015 through March 2016 (the "Restatement Period"), the Firm had overstated the NAV in each of its funds by between 13% and 15%.

### Scope of the Mismarking

51.   In truth and in fact, the mismarking in the Hedge Fund was even more significant than indicated in the Restatement. For the Restatement Period, the Hedge Fund was mismarked by approximately 24%, or an average of nearly $100 million each month. The mismarking also took place over a greater period of time than the Restatement Period, going back to at least January 2014.

52.   At its peak, the mismarking across all funds managed by the Firm, including the Hedge Fund, the New Issue Fund and ERISA exceeded $200 million.

### Statutory Allegations

53.   From at least in or about 2014 through in or about 2016, in the Southern District of New York and elsewhere, ANILESH AHUJA, a/k/a "Neil," and JEREMY SHOR, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

54.   It was a part and an object of the conspiracy that ANILESH AHUJA, a/k/a "Neil," and JEREMY SHOR, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

<u>Overt Acts</u>

55.   In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about October 22, 2015, in New York, New York, ANILESH AHUJA, a/k/a "Neil," the defendant, sent a text

message to Dole in reference to an investor, in which he stated, "[N]eed to show him we can make at least 6%."

      b.    On or about September 15, 2015, in New York, New York, Frank Dinucci sent an encrypted message to JEREMY SHOR, the defendant, in which Dinucci wrote, "[t]ell Ashish dog to chuck me a damn trade if I keep marking up all his bonds ha."  SHOR responded, "[h]e actually had just told me he feels bad asking before he pinged you."

      (Title 18, United States Code, Section 371.)

## COUNT TWO
### (Conspiracy to Commit Wire Fraud)

      The Grand Jury further charges:

      56.    The allegations contained in paragraphs 1 through 51 and 54 of this Indictment are repeated and realleged as if fully set forth herein.

      57.    From at least in or about 2014 through at least in or about 2016, in the Southern District of New York and elsewhere, ANILESH AHUJA, a/k/a "Neil," and JEREMY SHOR, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

      58.    It was a part and an object of the conspiracy that ANILESH AHUJA, a/k/a "Neil," and JEREMY SHOR, the defendants, and

others known and unknown, willfully and knowingly, having devised

and intending to devise a scheme and artifice to defraud, and for

obtaining money and property by means of false and fraudulent

pretenses, representations, and promises, would and did transmit

and cause to be transmitted by means of wire, radio, and television

communication in interstate and foreign commerce, writings, signs,

signals, pictures, and sounds for the purpose of executing such

scheme and artifice, in violation of Title 18, United States Code,

Section 1343.

    (Title 18, United States Code, Section 1349.)

### COUNT THREE
### (Securities Fraud)

    The Grand Jury further charges:

    59. The allegations contained in paragraphs 1 through

51 and 54 of this Indictment are repeated and realleged as if fully

set forth herein.

    60. From at least in or about 2014 through in or

about 2016, in the Southern District of New York and elsewhere,

ANILESH AHUJA, a/k/a "Neil," and JEREMY SHOR, the defendants,

willfully and knowingly, directly and indirectly, by use of the

means and instrumentalities of interstate commerce, and of the

mails, and the facilities of national securities exchanges, used

and employed, in connection with the purchase and sale of

securities, manipulative and deceptive devices and contrivances,

in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, AHUJA, MAJIDI, and SHOR fraudulently deceived investors and potential investors by causing the Firm to report fraudulently inflated NAVs for the Hedge Fund and the New Issue Fund, and by falsely representing the manner in which the Firm would price securities for purposes of calculating these NAVs.

(Title 15, United States Code, Sections 78j(b) & 78ff; 17 Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT FOUR
### (Wire Fraud)

The Grand Jury further charges:

61.   The allegations contained in paragraphs 1 through 52 and 55 of this Indictment are repeated and realleged as if fully set forth herein.

62.   From at least in or about 2014 through in or about 2016, in the Southern District of New York and elsewhere, ANILESH AHUJA, a/k/a "Neil," and JEREMY SHOR, the defendants, willfully

and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, AHUJA and SHOR fraudulently deceived investors and potential investors by causing the Firm to report fraudulently inflated NAVs for the Hedge Fund and the New Issue Fund, and by falsely representing the manner in which the Firm would price securities for purposes of calculating these NAVs, using interstate wires.

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATIONS

63.   As a result of committing the offenses alleged in Counts One through Four of this Indictment, ANILESH AHUJA, a/k/a "Neil," and JEREMY SHOR, the defendants, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code Section 2461, any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One through Four of this Indictment, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendants personally obtained.

### Substitute Assets Provision

64.   If any of the above-described forfeitable property, as a result of any act or omission of ANILESH AHUJA, a/k/a "Neil," and JEREMY SHOR, the defendants,

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the court;

d.   has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

        (Title 18, United States Code, Section 981(a)(1)(C);
           Title 21, United States Code, Section 853(p);
           Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
AUDREY STRAUSS
*Attorney for the United*
*States, Acting Under*
*Authority of 28 U.S.C. § 515*

28

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

ANILESH AHUJA, a/k/a "Neil,"
and
JEREMY SHOR,

Defendants.

## INDICTMENT

S1 18 Cr. 328 (KPF)

(15 U.S.C. §§ 78j(b) & 78ff;
17 C.F.R. § 240.10b-5; and
18 U.S.C. §§ 1349, 1343, 371, & 2.)

A TRUE BILL

FOREPERSON

AUDREY STRAUSS
*Attorney for the United States,*
*Acting Under Authority of 28 U.S.C. § 515*

4/22/19 - Filed Superceding