**Patterson Belknap Webb & Tyler LLP**

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

May 29, 2019

Daniel Ruzumna
Partner
(212) 336-2034
Direct Fax (212) 336-1205
druzumna@pbwt.com

**By ECF**

Honorable Katherine Polk Failla
United States District Court
Southern District of New York
40 Foley Square, Room 2103
New York, NY 10007

    Re: *United States v. Ahuja, et al.,*
      <u>18 Cr. 328 (KPF)</u>

Dear Judge Failla:

  During the conference yesterday, the Government for the first time argued that statements by Defendant Jeremy Shor in the second half of 2015 in which he raised concerns about Premium Point's valuation practices to the Firm's Chief Compliance Officer and his superiors are inadmissible hearsay because they do not qualify for the "state of mind" exception under Federal Rule of Evidence 803(3). The Government did not raise this argument in its motion *in limine* and the parties did not brief the issue in their submissions. Nevertheless, the Court relied on this argument in precluding Mr. Shor from introducing at trial audio recordings that reflect his stated concerns or cross-examining the Government's witnesses about this topic. At the conclusion of the hearing, the Court said that it may reconsider this issue. In light of these circumstances and the critical nature of this evidence, we respectfully request that the Court accept this letter in further support of Mr. Shor's opposition to the Government's motion. As set forth below, Mr. Shor's statements to Premium Point's Chief Compliance Officer and his superiors are not hearsay and should not be precluded.

  The statements Mr. Shor seeks to admit are not hearsay because they are not being offered for the truth of the matter asserted.[1] *See* Fed. R. Evid. 801(c)(2). Rather, they are

---

[1] During yesterday's hearing, the Court referenced two cases as informing its decision: *United States v. Kuthuru*, 665 F. App'x 34 (2d Cir. Nov. 6, 2016), and *United States v. Al Fawwaz*, 98 Crim. 1023 (LAK), 2014 U.S. Dist. LEXIS 20742 (S.D.N.Y. Feb. 18, 2014). *Kuthuru*, a non-precedential summary order, simply noted that certain types of statements, namely "[q]uestions and commands" and "threats," are non-hearsay verbal acts "not offered for the truth of the matter asserted." 665 F. App'x at 38. *Kuthuru* did not suggest that verbal acts evidence must fall into one of these categories. *Al Fawwaz* involved a plainly self-serving statement the defendant wanted to offer to "show[] that he did not pledge *bayat* to [Osama] bin Laden." 2014 U.S. Dist. LEXIS 20742 at *16. As explained in this letter, the recordings Mr. Shor seeks to submit are not self-serving pronouncements of innocence. Judge Kaplan noted in dicta in *Al Fawwaz* that "verbal acts are limited to statements that have independent legal significance, such as contractual offers or inter vivos gifts." *Id.* (citation omitted). But by no means is verbal act evidence

being offered because the fact that Mr. Shor raised concerns with Premium Point's Chief Compliance Office and his superiors is fundamentally inconsistent with the Government's allegation that Mr. Shor conspired with others to defraud investors. Mr. Shor seeks to introduce statements he made during the height of the alleged conspiracy to show that he raised valuation issues to his superiors (including individuals not alleged to be co-conspirators) when the market started to deteriorate in the second half of 2015. In December 2015, he brought the specific valuation practices the Government has charged as fraudulent to the attention of the Chief Compliance Officer, who also is not alleged to be a co-conspirator. ***To be clear, Mr. Shor will not seek to offer self-serving statements, and we are open to an appropriate limiting instruction explaining that the jury should not consider his statements for their truth. Mr. Shor is also prepared to identify those portions of the recorded statements that he would offer so that the Government can object if it believes the statements are being offered for their truth***.

### A. The Government's Allegations and Mr. Shor's Defense

The Government has alleged that from January 2014 through April 2016, Defendants engaged in a mismarking scheme in which they "fraudulently inflated quotes for particular securities from corrupt brokers" and improperly added a "sector spread" to bid-level broker quotes to inflate the price of particular securities. (S1 Indictment, ¶ 18.) According to the Indictment, the scheme evolved such that Mr. Ahuja and the Firm's Portfolio Manager, Amin Majidi, set inflated monthly "target" returns for the funds and directed members of the trading desk, including Mr. Shor, to meet the target performance. (*Id.*, ¶¶ 20, 21.) Mr. Ahuja and Mr. Majidi allegedly "personally exerted pressure on the traders to meet the pre-determined 'targets.'" (*Id.*, ¶ 23.) To reach the targets, according to the Indictment, Mr. Shor and others relied on "one or more corrupt brokers to provide inflated marks," including Frank Dinucci, who worked at Angel Oak Capital starting in mid-2015. (*Id.*, ¶¶ 24, 25.) The second method of mismarking—referred to as the "lever" in the Indictment—was to "secure[] and misuse[] 'spreads' from brokers." (*Id.*, ¶ 32.) According to the Indictment, "sector spreads" "could be used to inflate the NAV to meet" false targets. (*Id.*, ¶ 32.)

The statements Mr. Shor seeks to offer are fundamental to his defense; in fact, there is no more important evidence of his lack of conspiratorial and fraudulent intent. The statements prove that Mr. Shor did not conspire to defraud investors but instead sought to correct what he believed to be problems with Premium Point's valuation practices, and that is why the Government is seeking to exclude this evidence. Mr. Shor seeks to offer statements from July

---

limited to those types of evidence. As Judge Kaplan recognized in another case, "there is no independently defined category of verbal acts that is excluded from the hearsay definition. Rule 801(c) excludes from the definition of hearsay statements that are not offered to prove the truth of the matter asserted. *Verbal acts are hearsay only to the extent that they are offered to prove the truth of the matter asserted*." *United States v. Stein*, 05 Cr. 888 (LAK), 2007 U.S. Dist. LEXIS 76201, at *14-15 (S.D.N.Y. Oct. 15, 2007) (emphasis added). Accordingly, neither case provides a basis to exclude the recordings.

Hon. Katherine Polk Failla
Page 3

2015 through October 2015 demonstrating that he offered his views to his superiors,[2] including Mr. Majidi and Mr. Ahuja, that he was trading securities at values lower than Premium Point was marking its portfolio of securities.  Considering that Mr. Majidi and Mr. Ahuja were responsible for setting monthly valuations of the funds and Mr. Majidi reported the valuations to the Firm's Valuation Committee, the fact that Mr. Shor was reporting a discrepancy between the prices at which he was trading securities and where they were being marked to the Portfolio Manager, the Chief Investment Officer, and members of the Valuation Committee is relevant and admissible to show his lack of membership in the charged conspiracy and lack of criminal intent.  These statements are specifically *not* offered to prove the actual values of the particular securities at issue—something that would tend to support the Government's claims of inflated marks.  Without this evidence, the jury would be misled into believing that Mr. Shor simply went along with the aggressive valuations and sought counterparty marks to support it.  The Government should not be permitted to hide from the jury Mr. Shor's efforts to lower Premium Point's monthly valuation through his statements to superiors or cross examination of its witnesses.

    Mr. Shor's statements to the Chief Compliance Officer on December 15, 2015 identify and describe these very same issues to the person responsible for the Firm's compliance with all applicable rules and laws.  The fact that Mr. Shor raised these matters with someone not alleged to be a co-conspirator and who was in charge of Compliance during the conspiracy is relevant *not* for the *truth* of what Mr. Shor reported, but for the *fact that he reported these valuation issues* during the conspiracy to the Firm's internal watchdog.  Mr. Shor's statements are critical to disprove his membership in the charged conspiracy; indeed, Mr. Shor reported an alleged co-conspirator, Mr. Majidi, to Compliance based on the pressure Mr. Majidi imposed to reach desired results.  The statements contradict the Government's theory that Mr. Shor had the requisite specific intent to defraud investors.  As an offer of proof, Mr. Shor is prepared to prove that he made the following statements and/or asked the following questions to the Chief Compliance Officer on December 15, 2015:[3]

- "[T]here's pressure for performance" and "pressure for numbers" applied to the traders "who mark[] the actual securities" coming "from a partner," later identified as Mr. Majidi.

- "[W]e're kind of targeting a number sometimes" when trying to reach the month-end Net Asset Value ("NAV") estimate set by Firm management.

- The "bid-ask" sector spread is a "lever[]" that can be used to "[f]udge the [valuation] process."

---

[2] Mr. Shor's defense for the earlier part of the charged conspiracy does not rely on these recorded statements.

[3] These excerpts are representative; Mr. Shor is prepared to identify the precise statements that he may seek to offer in evidence by way of the recordings or through examination of witnesses.

Hon. Katherine Polk Failla
Page 4

- The application of a bid-ask sector spread to securities "is a big lever" that, when applied in a "choppy" and "illiquid" market, can lead to a situation in which "the market is going down yet your valuation is going up."

- Applying a "bid ask" of "three and apply[ing] it to securities that are [worth] three or four bucks" creates a circumstance in which PPI is "buying something at four and marking it at seven." When the resulting mark is that much higher after the application of a spread, "it might not truly be a bid to mid of three points."

- PPI obtains marks and spreads from "Angel Oak, [a] smaller broker dealer" that "wants to be helpful" and is willing to "elevat[e] quickly" PPI's challenges and requests because it "want[s] to do business with" PPI.

- In describing CUSIP marks, "what I don't know is when do—when are we pushed too far?"

- As a result of Mr. Shor's reporting his concerns, the Chief Compliance Officer acknowledged that "we need to revisit the valuation process."

When Premium Point's valuation practices did not materially change in early 2016, Mr. Shor quit, leaving behind substantial deferred compensation. Based on the Jencks Act materials, the Government may allege that Mr. Shor left Premium Point because he was unhappy with his bonus. Mr. Shor's statements reporting valuation concerns in late 2015 should be admitted to counter any such testimony.

### B. Mr. Shor's Statements Should Be Admitted in Evidence

Because Mr. Shor's statements are not being offered for their truth, they are not hearsay and Rule 803(3) does not provide the appropriate basis for analyzing their admissibility. A similar challenge was raised by the Government in the context of recorded conversations in *United States v. Mateos*, 623 F.3d 1350 (11th Cir. 2010), an opinion written by retired Supreme Court Justice Sandra Day O'Connor, sitting by designation. *Mateos* involved the prosecution of a doctor (Alvarez) and a nurse (Mateos) who were employees at an HIV treatment center that was "a front for a massive Medicare scam," which involved "diagnosing patients with a condition that would justify [medically unnecessary] treatments of . . . an expensive drug reimbursable by Medicare." 623 F.3d at 1354. While still employed by the clinic, the doctor, Alvarez, went to the FBI to raise concerns about the center's practices and, at the FBI's request, made a "surreptitious recording" (a video with audio) of a conversation between herself and colleagues discussing the alleged fraudulent scheme. *Id*. at 1355. During the recorded conversation, "Alvarez . . . told [her colleagues] that [she was] worried about the amount of money being billed under [her] provider number[], and Alvarez announced her intention to quit. At one point during the conversation, [a colleague and alleged coconspirator] said, 'there's no fraud whatsoever here, doctor,' . . . . Alvarez . . . then quit working at the clinic." *Id.* at 1358.

Alvarez was permitted to testify about her meeting with the FBI "as evidence that she had no knowledge of the scheme." *Id*. at 1359. She also sought to admit her colleague's recorded "assurances that there was no fraud at [the clinic] . . . not for their truth, but as circumstantial evidence that Alvarez was not privy to the scheme at [the clinic]." *Id.* at 1359. The district court excluded the recordings as hearsay but "some of the tape's content was admitted into evidence through witness testimony," including through cross-examination of one of the individuals on the recorded conversation who was asked about recorded conversation in detail and testified on cross that the other participant told Alvarez "there's no fraud going on at this clinic whatsoever." *Id.* at 1360. The defendant was convicted and challenged the exclusion of the recording.

The Eleventh Circuit considered the evidence and found that it was improperly excluded at trial: "[t]he district court erred when it excluded the videotape" because "[t]he relevant comment on the tape was not hearsay at all because it was not being offered for the truth of the matter asserted." *Id.* at 1363-64 (citing Fed. R. Evid. 801(c)). Writing for the court, Justice O'Connor explained that:

> Alvarez sought to admit the statement not as evidence that there was no fraud at St. Jude, a point which no defendant contested, but as evidence that she did not know of the fraud. "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."

*Id.* at 1363-64 (citing Fed. R. Evid. 801(c), Advisory Committee's Note, and 5 J. Weinstein and M. Berger, Weinstein's Federal Evidence § 801.10(2)(c) (2d ed. 2008)).

Justice O'Connor went on to explain why a Rule 803(3) state-of-mind analysis of the kind discussed by the Government at yesterday's argument was inapplicable:

> The government's response to this reasoning tracks the exact error the district court made in excluding the tape: it argues that the comment does not qualify as a coconspirator statement under Fed. R. Evid. 801(d)(2)(E), and does not fit within the 'state of mind' exception in Fed. R. Evid. 803(3). These responses are totally inapposite. If the statement is not hearsay in the first place, there is no need for it to fit within an exception to the rule against hearsay. *Cf.* Fed. R. Evid. 402 (establishing presumption that all relevant evidence is admissible). Just as the district court did, the government focuses on the fact that the statements do not fit within an exception to the rule against hearsay, thereby skipping over the prior and all-important question of whether the statement was hearsay at all.

*Id.* at 1364. Ultimately the Eleventh Circuit affirmed, but only "because the exculpatory content of the tape was effectively admitted through witness testimony" on cross examination. *Id.* Here, the Court has indicated that even cross examination on Mr. Shor's statements reporting valuation issues to superiors, the Chief Compliance Officer, and Valuation Committee members may not be permissible. But exclusion of this evidence and cross examination regarding this evidence would be improper.

Just as in *Mateos*, Mr. Shor does not seek to offer his recorded statements for their truth, but instead seeks to admit evidence to demonstrate that the statements were made. Evidence of the fact that Mr. Shor raised concerns about his firm's valuation practices to Premium Point's Chief Compliance Officer is highly probative of good faith and suggests a lack of fraudulent intent. As in *Mateos*, the statements at issue provide critical circumstantial evidence suggesting that Mr. Shor was not a participant in a fraud and lacked the specific intent to defraud. Further, the recordings include Mr. Majidi's assurance that the estimated month-end NAV was "not a target." Like the co-conspirator's assurance in *Mateos*, Mr. Majidi's statement is exculpatory, non-hearsay evidence.

The statements Mr. Shor seeks to admit are not being offered for their truth and are thus not hearsay. Fed. R. Evid. 801(c)(2). But even if the statements were somehow treated as hearsay, certain of the statements should still be admitted under Rule 803(3) as demonstrating Mr. Shor's "then-existing state of mind." As noted above, in one exchange, Majidi claimed that his monthly estimates of the NAV were "not a target," and the Chief Compliance Officer told Mr. Shor that he would look into the valuation issues he raised. These statements and those to which they were responsive, among others, should be admitted under the hearsay exception set forth in Rule 803(3).[4] *See United States v. Taglione*, 546 F.2d 194, 200-01 (5th Cir. 1977) (defendant's request for legal advice admissible as proof of defendant's state of mind under Fed. R. Evid. 803(3)).

To the extent the Government argues that Mr. Shor's recorded statements are less trustworthy because he was the one who recorded the statements, that is a matter for the parties to address through examinations of the witnesses at trial and through argument. Mr. Shor's motivation for recording the relevant conversations from late 2015 is an issue that both sides undoubtedly would ask the jury to consider if the evidence is admitted. But the potential for a non-exculpatory explanation goes to the weight, not the admissibility, of the recorded statements. *See United States v. Schultz*, 333 F.3d 393, 416 (2d Cir. 2003) ("factors which make evidence less than conclusive affect only weight, not admissibility"); *In re Air Crash Disaster at Stapleton*

---

[4] In responding to the Government's argument, not previously raised by in its briefing, counsel for Mr. Shor argued that the Rule 803(3) analysis is not necessary because the statements are not being offered for the truth and there is no need to resort to a hearsay exception. However, in the event that the Court deems the statements hearsay notwithstanding that fact, then Rule 803(3) would apply to at least some of the statements.

Hon. Katherine Polk Failla
Page 7

*Int'l Airport, Denver*, 720 F. Supp. 1493, 1498 (D. Colo. 1989) ("possible motivation or bias" or "interest" of source of out-of-court statement "goes to weight, not admiss[i]bility"); *United States v. Hadley*, 431 F.3d 484, 498 (6th Cir. 2005) ("challenges to the reliability" of out-of-court statements "would go to their weight rather than their admissibility"); *see also United States v. Di Maria*, 727 F.2d 265, 271 (2d Cir. 1984) ("truth or falsity [of statement admitted pursuant to Fed. R. Evid. 803(3) is] for the jury to determine") (Friendly, J.). *Cf. Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1465 (Fed. Cir. 1998) ("a witness's . . . interest in the outcome of a case goes to the probative weight of testimony, not its admissibility"). And as explained in earlier briefing, the admissibility of Mr. Shor's statements cannot be conditioned on his waiver of his Fifth Amendment rights. *See Malloy v. Hogan*, 378 U.S. 1, 8 (1964).

The defense is entitled to offer proof of Mr. Shor's recorded statements reporting valuation concerns as relevant, non-hearsay evidence.[5] To ensure that the Government has the opportunity to object to certain portions of the recorded statements being introduced, Mr. Shor is prepared to identify those portions of the recordings that he will seek to introduce in evidence.

                                                                 Respectfully submitted,

                                                                 Daniel S. Ruzumna

cc: Counsel of Record

---

[5] The Government compared Mr. Shor's request to offer his recorded reports of valuation issues to the defendant's attempt in *Lumiere* to offer his attempts to cooperate with the FBI as evidence of his consciousness of innocence. A consciousness of innocence defense is typically based on evidence of events that post-date the alleged crime, and is analyzed under Rules 401 and 403. *See United States v. Biaggi*, 909 F.2d 662, 690-93 (2d Cir. 1990) (defendant's decision to forego immunity offered to him after end of conspiracy based on insistence that he was innocent was relevant and probative of his "consciousness of innocence"). Here, the critical issue focuses on the hearsay rule; Mr. Shor's reporting to Compliance and others *during* the alleged conspiracy the very issues the Government charged as fraudulent are clearly relevant and its probative value is not substantially outweighed by unfair prejudice or confusion. Fed. R. Evid. 401, 403.