

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 29, 2019

BY ECF

The Honorable Katherine Polk Failla
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

        Re:    United States v. Anilesh Ahuja, et al.
                 S1 18 Cr. 328 (KPF)

Dear Judge Failla:

       The Government respectfully submits this letter in opposition to the additional motion *in limine* (the "Motion") filed by defendant Anilesh Ahuja seeking to "preclude (or, at a minimum, significantly limit) certain evidence relating to a 2011 version of PPI's valuation policy" (the "2011 Evidence"). In support of the Motion, Ahuja states that the Government provided no notice under Federal Rule of Evidence 404(b), argues that the evidence is as most "marginally relevant," and cites concern of prejudice and juror confusion. The Motion should be denied. The evidence at issue, the substance of which is alleged in the Indictment, is not 404(b) material but necessary background evidence that is inextricably intertwined with evidence of the charged crimes and probative of Ahuja's knowledge and intent.[1]

**Relevant Background**

       The Indictment alleges that from in or about 2014 through in or about 2016, defendant Ahuja,[2] along with defendant Jeremy Shor and others, participated in a scheme to mislead and defraud investors and potential investors in certain hedge funds managed by Premium Point Investments ("PPI") by providing them (a) fraudulently inflated value and performance figures for those hedge funds; and (b) inaccurate information about how securities held in those funds would be valued. With respect to the latter, the indictment alleges that the firm maintained a valuation policy which codified its methodology to establish "fair value" marks for its investments in accordance with Generally Accepted Accounting Principles ("GAAP").

---

[1] Even if the 2011 Evidence were considered as 404(b) material, the Government provided notice of the evidence well before the deadline for such material. The substance of the evidence is alleged in the original Indictment and the relevant email correspondence was produced in discovery.

[2] Both the original and superseding indictments contain these allegations.

(Indictment ¶ 12.) The Indictment further alleges that PPI's offering materials further stated that securities would be "valued at the mean between the 'bid' and 'ask' or what is commonly referred to as the "mid." (Indictment ¶ 13.) The Indictment outlines a process by which PPI would create an "imputed mid" price for a security by "taking a bid for a specific security obtained from one broker dealer or pricing service and adding to that bid an industry or sector spread, often from another broker-dealer." (Indictment ¶ 34.) At no time between 2014 and 2016 was such a process of imputing a mid through the use of a spread reflected in any valuation policy provided to investors.

Moreover, and as relevant to the Motion, in 2011, Skybridge Capital, a PPI investor, explicitly rejected an attempt by PPI to include in its valuation policy the use of spreads to calculate "mids" when valuing securities. (Indictment ¶ 35.) As outlined in detail in paragraphs 35-37 of the Indictment, in late 2011, as part of Skybridge's due diligence of PPI prior to its initial investment, PPI had provided Skybridge with a version of its valuation policy that included the following language (the "Spread Language"): "In cases where we are given only a bid side price, PPI may add one half of bid-offer spreads to the bid price to establish a mid-market price. (*Id.* ¶ 35.) On or about September 20, 2011, after reviewing this and other proposed valuation procedures, a managing director at Skybridge sent an email to an employee of PPI not named in the Indictment asking PPI to strike the Spread Language and stated: "This is very unusual and we have never seen in a valuation policy before. Our initial comments were to ask for less manager involvement in the valuation process, not more . . . . Has this alteration of broker quotes been occurring all along? If so, this was not disclosed during the valuation discussions with either Amin or [the Firm's administrator]." ((Indictment ¶ 36.) In the email, Skybridge also asked PPI to make additional changes to the valuation policy to ensure that PPI's valuation process remained objective and separate from the management of PPI. (*Id.*) Two minutes after receiving the email from Skybridge, the PPI employee not named in the Indictment forwarded the email to Ahuja and Amin Majidi. (*Id.*) Later the same day, Majidi approved removing the Spread Language from the draft valuation policy and directed that a revised policy without that language be sent to Skybridge, which it was. (Indictment ¶ 37.)

Skybridge only invested after the Spread Language was removed, and ultimately invested more than $100 million. (*Id.*) While additional iterations of the PPI's valuation policy were created, no version ever included the Spread Language, or any similar language. Skybridge invested more than $300 million, at various times between December 2011 and early 2016, ultimately becoming PPI's largest investor. Notwithstanding Skybridge's objection to the use of spreads to calculate mid prices for securities, PPI used spreads to value securities in the Hedge Fund. (*Id.*) Consistent with Skybridge's stated concern that the use of a sector spread in the valuation context would lead to too much "manager involvement" in that process, and that it represented an "alteration" of broker quotes, during the period of the charged conspiracy PPI was able to exploit the role of the sector spread in its valuation process to inflate the prices of the securities in its portfolio. (Indictment ¶ 38.)

At trial, the Government intends to call two witnesses from Skybridge, including the managing director who conducted the initial due diligence in 2011 and authored the email telling PPI that Skybridge required removal of the spread language. The emails cited above and

in the Indictment, which include as attachments the referenced versions of the valuation policy, will also be introduced.

## Applicable Law

The Second Circuit has repeatedly held that evidence of prior bad acts is admissible as direct evidence when it constitutes intrinsic or direct proof of a charged crime. As such, evidence of prior bad acts may be admitted without reference to Rule 404(b) if such evidence constitutes direct proof of charged criminal conduct, if it provides the jury with background for the events alleged in the indictment, or if it arose out of the same transaction or series of transactions as the charged offenses. *See, e.g.*, *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) (holding that background evidence may be admitted to show the circumstances surrounding the events alleged in the indictment or to furnish an explanation of the understanding or intent with which certain acts were performed). As the Second Circuit has explained:

> [E]vidence of [prior bad acts] is not evidence of "other crimes, wrongs, or acts" under Rule 404(b) if that conduct is "inextricably intertwined with the evidence regarding the charged offense." In such circumstances, the [prior bad act] evidence is necessary to "complete the story of the crime on trial," *id.*, and, thus, appropriately treated as "part of the very act charged," or, at least, proof of that act, *United States v. Concepcion*, 983 F.2d [369, 392 (2d Cir. 1992)].

*United States v. Quinones*, 511 F.3d 289 (2d Cir. 2007); *see also* Weinstein's Federal Evidence, § 404.20[2][b] (noting that evidence of other wrongs is admissible without regard to Rule 404(b) where those wrongs "were necessary preliminaries to the crime charged"); 404.20[2][c] (noting that evidence of other acts "is admitted if it contributes to an understanding of the event in question, even if it reveals crimes other than those charged, because exclusion under those circumstances would render the testimony incomplete and confusing").

Moreover, "[e]vidence of a party's consciousness of guilt may be relevant if reasonable inferences can be drawn from it and if the evidence is probative of guilt." *United States v. Perez*, 387 F.3d 201, 209 (2d Cir. 2004) (citation omitted). "Such evidence is admissible if the court (1) determines that the evidence is offered for a purpose other than to prove the defendant's bad character or criminal propensity, (2) decides that the evidence is relevant and satisfies Rule 403, and (3) provides an appropriate instruction to the jury as to the limited purposes for which the evidence is introduced, if a limiting instruction is requested." *Id.*

## Discussion

*First*, evidence that Skybridge had asked in 2011 that sector spreads not be used in the valuation process and was then told prior to investing that spreads would not be used is essential background evidence to understand the fraud on investors that took place during the period of the charged conspiracy. The evidence at trial will show that during the period of the charged conspiracy the defendants and others at PPI exploited the role of sector spreads in the firm's

Case 1:18-cr-00328-KPF   Document 194   Filed 05/31/19   Page 4 of 5

Page 4

valuation process in order to inflate valuations and deceive investors about PPI's performance. Skybridge's belief during the period of the charged conspiracy that sector spreads were not being used for valuation results directly from its dialogue with PPI in 2011, during which it made that explicit request of PPI and was told that the request had been granted. Without the background evidence from 2011 about the exchange between Skybridge and PPI and the difference between the valuation policy that PPI initially proposed to Skybridge and the valuation policy to which Skybridge agreed when it decided to invest, the testimony by the Skybridge witnesses that they understood that the valuation of PPI's securities did not involve the use of the sector spread would make no sense. For example, the jury would have no information on how or why Skybridge came to that understanding. The 2011 Evidence is therefore necessary context for the Skybridge witnesses' testimony that Skybridge would not have remained invested in PPI had it known that sector spreads were being used for valuation purposes, and that during the period of the charged conspiracy Skybridge labored under the misimpression that sector spreads were not used for valuation purposes. Such testimony is also relevant, as the sector spread became the main instrument the defendants used to manipulate the net asset value of PPI's funds. For this reason alone, the 2011 Evidence is admissible.

*Second*, the 2011 evidence, including that Ahuja was made aware of Skybridge's demand that spreads not be used for valuation, is relevant and admissible to show Ahuja's knowledge and intent to commit fraud between 2014 and 2016, by which time Skybridge had grown to be PPI's largest investor. Ahuja intends to argue that "any misconduct that took place with respect to the funds at issue in this case was conducted by others and without his knowledge; that he reasonably relied on PPI's valuation policies and procedures; and that he took appropriate steps to address valuation issues as they arose." (Ahuja Letter dated May 29, 2019 at 2). The Government will introduce evidence that Ahuja was aware of the fact that PPI was utilizing a sector spread to calculate mid prices during the time period of the charged conspiracy. As such, the 2011 evidence that Ahuja was informed that Skybridge had objected to the use of a spread for valuation will provide the jury with background information critical to their determination of whether Ahuja possessed the requisite knowledge and intent to mislead investors. Ahuja is, of course, free to argue to the jury that he never opened or considered the email advising him that Skybridge would not invest if PPI used a valuation methodology that included the application of a spread. But Ahuja should not, under the guise of Rule 401, be permitted to preclude the jury from considering this evidence in the first place.

Ahuja also argues that the 2011 Evidence should be precluded because it "poses a substantial risk of prejudice and confusion by referring to uncharged conduct that predates the charged conspiracy by more than two years, and that concerns an older valuation policy that was replaced before SkyBridge first invested in PPI funds." (Motion at 2.) This argument fails. The fact that PPI made other updates to its valuation policy after 2011 is inapposite, because at no time between when the Spread Language was removed and 2016 when Skybridge made its last investment did a PPI valuation policy ever contain the language that Skybridge insisted be removed. The Government does not believe that Ahuja has identified any risk of unfair prejudice that would arise from the introduction of the 2011 Evidence, but the risk of any prejudice could be cured by a limiting instruction reminding the jury that the defendants are charged with crimes occurring in 2014-16 and not at any time period prior to that.

Finally, the fact that the use of sector spreads to calculate imputed mid prices was not initially intended to inflate valuations but evolved into that does not negate the relevance or admissibility of the fact that Skybridge explicitly rejected the use of spreads for valuation purposes at the time that it invested, that Skybridge was led to believe that the sector spreads would not be used and continued to have that understanding during the charged conspiracy, and that Ahuja was on notice of Skybridge's position. The reason Skybridge would not invest in a firm that used a sector spread for pricing purposes was because the use of a spread would give the portfolio manager too much involvement in valuation, leading to a risk of self-serving manipulation of prices. That is exactly what happened in this case. The relevance of the 2011 Evidence is not diminished by the fact that manipulation did not begin immediately.

The Government respectfully asks that the Motion be denied.

Respectfully submitted,

AUDREY STRAUSS
Attorney for the United States,
Acting Under Authority Conferred by
28 U.S.C. § 515

By:  /s/
Andrea M. Griswold
Joshua A. Naftalis
Max Nicholas
Assistant United States Attorneys
(212) 637-1205/2310/1565

```
Having reviewed both sides' submissions on the issue of the 2011 Evidence,
the Court agrees with the Government that the evidence is admissible as
background to the charged crimes.  Defendant Ahuja's motion to preclude is
DENIED.
```

Dated: May 31, 2019
       New York, New York

SO ORDERED.

HON. KATHERINE POLK FAILLA
UNITED STATES DISTRICT JUDGE