PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

LLOYD K. GARRISON  (1946-1991)
RANDOLPH E. PAUL  (1946-1956)
SIMON H. RIFKIND  (1950-1995)
LOUIS S. WEISS  (1927-1950)
JOHN F. WHARTON  (1927-1977)

WRITER'S DIRECT DIAL NUMBER

(212) 373-3311

WRITER'S DIRECT FACSIMILE

(212) 492-0311

WRITER'S DIRECT E-MAIL ADDRESS

rfinzi@paulweiss.com

UNIT 5201, FORTUNE FINANCIAL CENTER
5 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT, BEIJING 100020, CHINA
TELEPHONE (86-10) 5828-6300

HONG KONG CLUB BUILDING, 12TH FLOOR
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, UNITED KINGDOM
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
JUSTIN ANDERSON
ALLAN J. ARFFA
ROBERT A. ATKINS
DAVID J. BALL
SCOTT A. BARSHAY
PAUL M. BASTA
JOHN F. BAUGHMAN
J. STEVEN BAUGHMAN
LYNN B. BAYARD
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
DAVID M. BERNICK
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
ROBERT BRITTON
DAVID W. BROWN
SUSANNA M. BUERGEL
JESSICA S. CAREY
DAVID CARMONA
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
YAHONNES CLEARY
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
HARRIS FISCHMAN
MARTIN FLUMENBAUM
ANDREW J. FOLEY
ANDREW J. FORMAN*
HARRIS B. FREIDUS
CHRISTOPHER D. FREY
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
NEIL GOLDMAN
CHARLES B. GOLDSTEIN
ROBERTO J. GONZALEZ*
CATHERINE L. GOODALL
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
BRIAN S. GRIEVE
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
ALAN S. HALPERIN
CLAUDIA HAMMERMAN
BRIAN S. HERMANN
MICHELE HIRSHMAN
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
JAREN JANGHORBANI
BRIAN M. JANSON
JEH C. JOHNSON
MEREDITH J. KANE
JONATHAN S. KANTER
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
BRIAN KIM
KYLE J. KIMPLER
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
JOHN E. LANGE
GREGORY F. LAUFER
BRIAN C. LAVIN
XIAOYU GREG LIU
LORETTA E. LYNCH
JEFFREY D. MARELL
MARCO V. MASOTTI
DAVID W. MAYO
ELIZABETH R. MCCOLM
JEAN M. MCLOUGHLIN
ALVARO MEMBRILLERA
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG H. OH
BRAD R. OKUN
KELLEY D. PARKER
LINDSAY B. PARKS
VALERIE E. RADWANER
JEFFREY J. RECHER
CARL L. REISNER
LORIN L. REISNER
JEANNIE S. RHEE
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JUSTIN ROSENBERG
JACQUELINE P. RUBIN
CHARLES F. "RICK" RULE*
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
BRIAN SCRIVANI
RAMNON R. SHANMUGAM*
DAVID R. SICULAR
AUDRA J. SOLOWAY
SCOTT M. SONTAG
SARAH STASNY
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
RICHARD C. TARLOWE
MONICA K. THURMOND
DANIEL J. TOAL
LAURA C. TURANO
CONRAD VAN LOGGERENBERG
LIZA M. VELAZQUEZ
MICHAEL VOGEL
RAMY J. WAHBEH
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
LINDSEY L. WIERSMA
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA TARVER MASON WOOD
JENNIFER H. WU
BETTY YAP*
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

November 13, 2019

<u>By Email</u>

The Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

*United States* v. *Anilesh Ahuja, et al.*,
18 Cr. 328 (KPF)

Dear Judge Failla:

This firm, together with John Del Monaco at Kirkland & Ellis, is counsel to Anilesh ("Neil") Ahuja in the above-referenced matter.  We write in aid of Mr. Ahuja's sentencing, scheduled for November 25, 2019 at 3:00 p.m.  For reasons set out below, we respectfully submit that a sentence of 18 months imprisonment is appropriate in this case.

In making this request, we acknowledge that the government's application of the Sentencing Guidelines—driven by an enormous loss enhancement that is notoriously poorly suited to mismarking cases—produces a much higher sentencing range.  But as demonstrated below, and without minimizing the seriousness of the conduct, both Anilesh and this case more generally lack the features typically associated with lengthy sentences in securities fraud or other types of white collar cases.  Anilesh did not steal from his

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                                    2

investors to enrich himself.  He did not lie to his investors about how or where he was investing their money.  He did not take advantage of vulnerable populations.  And he did not "borrow from Peter to pay Paul."  Indeed, and as the government acknowledges, he did not intend that his victims suffer any harm at all.

Anilesh's character, like his conduct, is similarly not deserving of the kind of sentence suggested by a mechanical application of the Guidelines.  Clearly Anilesh is not in any way a danger to society.  Other than this case—which itself covers a limited and discrete period of time—Anilesh has never had any encounters with the law of any kind. To the contrary, Anilesh spent more than twenty-five years in a highly scrutinized industry developing a reputation for integrity, ingenuity, and hard work.  Before that, he spent his childhood studying hard and respecting his elders.  Anilesh's accomplishments in life, personal and professional, are not the product of fortune or fraud.  They are the product of a commitment to work hard and to do good by others.

Even viewing the evidence in the light most favorable to the government, the proof at trial did not show a man driven by greed or a desire to line his own pockets. Anilesh was financially secure before PPI was formed and did not profit in any meaningful way from the conduct at issue; if anything, he suffered substantial financial losses (in addition to and independent of investment losses), well before there was any hint of a government investigation.  Even the government's characterization of the evidence, as reflected in its rebuttal summation, suggested that Anilesh's motive was an unwillingness to acknowledge failure rather than a desire to steal from his investors.

On a personal level, Anilesh is an involved father, husband, son, brother, and friend.  He cares for those around him—be they family, friends, or strangers—both financially and emotionally.  He is generally shy and mild-mannered, preferring quiet time with friends and family to exotic pursuits, and—notwithstanding substantial financial resources accumulated through years of hard work—he has routinely chosen time spent in quiet conversation and reflection over the excess typically attributed to Wall Street types.

Clearly Anilesh is not perfect.  No one is.  But he is also not the type of person from whom society needs to be protected in the traditional sense.  Indeed, the picture that emerges of Anilesh through the evidence heard at trial, the Presentence Report ("PSR"), and the letters submitted on his behalf is remarkably consistent, and even those who testified against him agree:  Anilesh is a soft-spoken and humble man who always believed (and continues to believe) in hard work, introspection, and commitment to family and community.  As he has done with other setbacks in his life, he has already taken steps to repair the damage his actions caused to others and to attempt to make peace with whatever comes his way.

In sum, and while we do not agree with the jury's verdict in this case, we certainly respect it, and we understand that Your Honor will in all likelihood sentence Mr. Ahuja to a term of incarceration.  Our request is that the term imposed be based on the sum of his actions (before, during, and after the offense of conviction), and the content of his character.  Viewed in this light—and even accepting the jury's verdict—we believe that a

The Honorable Katherine Polk Failla                                              3

sentence of 18 months is sufficient but not greater than necessary to meet to the objectives of 18 U.S.C. § 3553.

## ANILESH'S BACKGROUND

### A.   Anilesh's Childhood

Until the events that gave rise to this case, Anilesh's life was "a classic American immigrant success story."  (*See* Ex. 29 at 2 (Letter from Victor and Tara Menezes).)[1]  Born in New Delhi in 1968, Anilesh and his older brother Ashish grew up in a tightknit family in Mumbai.  (PSR ¶¶ 93–94.)  Anilesh's father, Ram, operated an engineering and IT business, and the Ahujas lived what in India was considered a middle class life.  (PSR ¶ 94.)

Anilesh's recollections of his childhood are overwhelmingly positive, and those who witnessed it recall Anilesh's penchant for seeing the glass half full.  (PSR ¶ 94.)  He did not notice—let alone complain about—the "dirty and green" pool where he learned to swim, or more generally about the things he did not have.  (Ex. 5 at 1 (Letter from Ram Ahuja).)  His relatives still remember Anilesh's "love for ice cream and hamburgers . . . and his infectious laughter."  (Ex. 1 at 1 (Letter from Bummy Abrol).)

Anilesh embraced India's family-centric culture.  He remained close to his mother Sarmishta until her passing three years ago, frequently traveling to India to see her even when he could not stay long.  (*See* Ex. 28 at 1–2 (Letter from Neeru Mehra).)  Anilesh has likewise remained close to his father, and notwithstanding his own legal and medical issues, assumed responsibility for Ram's medical care when Sarmishta died.  True to his character, and shortly before trial, Anilesh placed his preparation for trial on hold to be at his ailing father's side for what is likely the last time.[2]

Anilesh's parents both had several siblings, and Anilesh and his brother grew up surrounded by aunts, uncles, and cousins.  (PSR ¶ 94.)  His recollection of family "vacations" amounts to periods when the house would fill up with relatives, such that the adults got beds and the kids literally slept on the roof.  The vacation was not a trip, it was simply a gathering of extended family.

---

[1]   All exhibits referenced in this document (other than the letters submitted in support of Anilesh and the PSR) were admitted at trial, except where an exhibit is identified by bates number, rather than exhibit number.

[2]   Neil and his brother have likewise (and despite spending decades on separate continents) remained close.  (*See* Ex. 3 at 1 (Letter from Ashish Ahuja).)  Ashish describes his younger brother Neil as the person he looks to, "even today, as much as I did in my childhood for support, advice and guidance in every realm of my personal life."  (*Id.* at 2.)

The Honorable Katherine Polk Failla                                                 4

Anilesh's childhood also instilled in him a lifelong passion for the game of cricket, which in India is akin to a national sport.  Like an American boy describing youthful games of stickball, Anilesh fondly recalls playing pick-up cricket for the entirety of his childhood.  When asked where the kids played, Anilesh told us "everywhere . . . in the street, in the parks, at school, and (when it rained) in the hallway of [his] home." (Anilesh has since, and with mixed success, tried to transmit that passion to his counsel.)

With respect to day-to-day life, Anilesh's parents stressed the importance of education in addition to family.  His talents and his hard work led to extraordinary academic achievement, consistently placing Anilesh among the best students in his classes. As luck (or fate) would have it, the combination of family and education—a combination the importance of which Anilesh spent his life passing on to his children—led to what would become the most important relationship in his life.  It was at school that Anilesh, at age 10, met (through her younger brother) the woman he would later marry and start a family with.  (See Ex. 6 at 1 (Letter from Tania Vital-Ahuja).)

**B.     Anilesh's Immigration to the United States and Education at U. Penn.**

In 1982, as a 14-year old high school student, Anilesh followed his father to America to look for better educational and employment opportunities.  (See Ex. 5 at 1 (Letter from Ram Ahuja); PSR ¶ 94.)  His father's work brought them to Nashua, New Hampshire, where Anilesh was enrolled at Bishop Guertin, a Catholic high school.  (PSR ¶ 112.)  Never having been to the United States before, Anilesh and his dad sometimes "did not understand the customs of America."  (Ex. 5 at 1 (Letter from Ram Ahuja).)  Ram recalls one funny experience in which he and his son spent an hour waiting to cross a busy street because they were not familiar with crosswalks and had not thought to use one, before giving up and walking back home.  (Id.)

Anilesh was the only Indian student at the school.  In fact, there were few, if any, other minorities in the school, and in town generally.  (Id.)  Having never before lived outside of India, everything from the language to the cultural norms to the way other students dressed was entirely new and unfamiliar to Anilesh, making the initial adjustment to life in the United States difficult and, at times, isolating.  (Id.)  His difficulties in integrating were compounded by the fact that Anilesh, already slight in build, was placed in a class a year above his age level, making him younger and significantly smaller than his classmates.  (Id.)  The result was a shy kid who spent much of his time talking to his father and concentrating on his school work.  (Id.)  His life was not, unfortunately, without incidents of overt racism, like moments when he was told (including by authority figures) to "go back home."

Within a year of the move to New Hampshire, Anilesh's father (having been joined briefly by his mother) returned to India.  (Id.)  Determined that he finish his education, Anilesh stayed behind, living with a nun from the school so that he could finish high school in the United States.  (PSR ¶ 95.)  When his older brother Ashish later joined Anilesh in the United States, Anilesh, who had already been in the United States for several months, helped with the transition, becoming responsible for managing their paperwork

The Honorable Katherine Polk Failla                                                                5

and finances.  (*See* Ex. 5 at 1 (Letter from Ram Ahuja).)  Although they had each other, this was before the age of e-mail, Skype, and FaceTime, and Anilesh and Ashish at times (and perhaps inevitably) felt like "fish out of water."  Anilesh, accustomed to hard work and perseverance, dedicated himself to his studies, working on his English and excelling at school.

Anilesh's sacrifices paid off when he was accepted to the University of Pennsylvania.  (PSR ¶ 111.)  Although initially inclined to study medicine, Anilesh gravitated towards math and earned his degree in Economics in 1989.  (*See id.*; Ex. 5 at 1–2 (Letter from Ram Ahuja).)  When Anilesh enrolled in college, he had no money or family connections.  He "took out student loans, got scholarships, [and] worked hard" to make something of himself.  (Ex. 6 at 1 (Letter from Tania Vital-Ahuja).)

Those who knew Anilesh in college marvel at his "abundance of inherent talent" and "exceptionally bright" mind.  (*See* Ex. 15 at 1 (Letter from Rajiv Ghatalia).)  Despite his intellect and shyness, he was neither aloof nor entitled.  (*Id.*)  His friends and colleagues knew him to be kind and supportive, regardless of the individual's social status or importance at Penn.  Again Anilesh faced discrimination, and again he responded with hard work and ingenuity.  As one of Anilesh's college friends recalls:

> While we were both good students[,] we had limited success getting selected for on campus interviews[;] it seemed the same 20 resumes would always get picked.  Not to be deterred, we would arrive early and try and speak with the recruiters as they arrived or took breaks.  This determination and persistence served us well.  We converted a surprising number of these meetings into second interviews and succeeded in getting coveted finance jobs in an extremely competitive process.  Neil has always had this bootstrapping attitude.  It is a big factor in his self-made success.

(Ex 8 at 1 (Letter from Syed Naved Ameen).)

### C.   Anilesh's Career in the Financial Industry

Having graduated from the University of Pennsylvania in 1989, and before founding Premium Point in 2008, Anilesh held a series of jobs with increasing responsibility, distinguishing himself for his creativity and work ethic, and earning promotions earlier (and in some cases much earlier) than most.

Anilesh's first job out of college was an entry-level two-year analyst position at Prudential Securities (Ex. 38 at 1 (Letter from John Roach)), where he quickly earned the respect of his colleagues.  As one former coworker remembered, Anilesh "projected a maturity and calmness that was well beyond his years," was extremely diligent and patient, and exhibited honesty and integrity: he "believed in absolute transparency[,]

The Honorable Katherine Polk Failla                                        6

and would unfailingly alert [colleagues] to the embedded risks in a bond before [it was] offered [] to a customer with an inconsistent risk profile." (Ex. 10 at 1 (Letter from Richard Birnbaum).)

Anilesh then spent five years at Lehman Brothers working in and then leading the mortgage structuring group, and in 1997, at the age of 29, was hired by Greenwich Capital to be the head of its asset-backed mortgage business.  (PSR ¶ 119; Ex. 10 at 1 (Letter from Richard Birnbaum); Ex. 47 at 1 (Letter from Ryan Mullaney).)  By that point, he "had developed an enviable reputation of success throughout the industry." (Ex. 10 at 1 (Letter from Richard Birnbaum).)  Even then, he remained humble and soft-spoken.  "[N]otwithstanding the trajectory of his career, Neil never exhibited any of the arrogance and self-importance so frequently associated with Wall Street stereotypes." (*Id.*) Continuing the pattern developed as a child, Anilesh put his faith in hard work:

> When I first met Neil he was about 23 years [old] and it was early in his Wall Street Career.  I distinctly remember his incredible work ethic with the long hours he put in, even on weekends.  For example, Tania and Neil would come to our home in Pa (before they had kids) and Neil would be so exhausted that he would be asleep on the couch at the start of our party!

(Ex. 32 at 1 (Letter from Mario Moniz).)

In 2004, after seven years at Greenwich Capital, Anilesh was recruited personally by the future CEO of Deutsche Bank to eventually run the firm's global mortgage business.  (PSR ¶ 118.)  In that role, Anilesh oversaw more than 1,000 employees worldwide and further established a reputation for his acumen and expertise in the RMBS market.  Troy Gayeski, the CIO and senior portfolio manager at SkyBridge and a government witness, testified at trial to Anilesh's strong reputation and track-record of success, particularly at Deutsche Bank.  As Gayeski testified:

> [W]e viewed Neil's background, his pedigree, coming out of Deutsche Bank, where—people forget, but—Deutsche Bank has a lot of problems now, but at that time they were one of the few banks that didn't suffer significant losses in the crisis tied to mortgage-backed securities.  They had done a very good job there.  So he had a great reputation from that standpoint.  Their track record was fairly solid.

(Tr. 3005:9-16.)

This progression of positions is how Anilesh, over two-and-a-half decades, earned a reputation as an expert in RMBS with particular skills in math and finance.  Rajesh Garg, a retired Senior Partner at McKinsey & Company and the former CEO and President

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                              7

of Cancer Treatment Centers of America, describes Anilesh's accomplishments in the field:

> [T]he one thing that Neil's broader professional life shows is that he has worked diligently and productively on behalf of leading institutions like Greenwich Capital, Lehman Brothers, and Deutsche Bank and has contributed positively and substantially to them.  For example, at Deutsche Bank, he successfully led over 1000 people.  More recently, he has built a post-crisis housing company that has rehabilitated and increased the inventory of affordable single family housing available to those unable to buy their own home. His positive contributions to the American economy are quite significant in their totality.  It is my sincere hope that this will not be ignored.

(Ex. 14 at 1 (Letter from Rajesh Garg).)

Not content to rest on his laurels, and continuing a pattern of self-improvement, Anilesh continued to push himself, including by taking "many public speaking classes . . . and forc[ing] himself to speak in meetings and at conferences" to overcome his innate shyness and his self-consciousness about his thick Indian accent.  (Ex. 38 at 2 (Letter from John Roach).)  As a boss, he "never raised his voice (despite working in a very high-pressure environment)" and treated his employees with respect.  (*Id.*) Significantly, and as set forth in more detail below, the trial evidence itself reflects Anilesh's temperament.  He is unfailingly polite, he listens more than he speaks, he does not swear, and he is careful in being courteous to everyone he encounters.  All of those attributes are simply a part of who he is and who he will always be.

In early 2008, Anilesh began outlining an innovative investment theory based on his analysis of the RMBS market; in particular, Anilesh believed there was an opportunity to build a more granular and data-driven model of the value of the housing underlying RMBS than currently existed.  He also understood that the market was currently undervaluing RMBS based on the overall decline in the housing market.  Anilesh explained the concept to his former boss at Greenwich Capital Markets, who now ran a fund called Divco West, LLC ("Divco West" or "Divco"), and was a client of his.  Upon hearing Anilesh's idea, his former boss encouraged Anilesh to start his own firm and offered to be its anchor investor.  When Anilesh informed Deutsche Bank that he planned to leave to begin his own fund, he was asked to stay on temporarily to ensure a smooth transition to his successor.  Feeling a sense of loyalty to the operation he helped build, Anilesh offered to continue working at Deutsche Bank for another six months before leaving to establish PPI.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                          8

### D.     Anilesh Forms PPI

In June 2008, Anilesh left Deutsche Bank and formed PPI with two other experienced financial professionals, Patrick Downes and Hyung Peak.  (GX 300-B at 6670 (PPI Investment Presentation).)  Its first fund, the Market Street Fund, was set up to invest on behalf of its original anchor investor, Divco.  (Tr. 2367:2-6 (Majidi); GX 328 at 9762–63 (Dec. 20, 2011 SkyBridge Operational Due Diligence Report).)  PPI launched additional funds, including the Mortgage Credit Fund, in 2009–10.  (*See* GX 508 at 8; DX 4045 at 8.)  Anilesh was excited to start PPI; his father recalls how Anilesh took them to PPI's small office when they were visiting New York in 2009, showed them around, and introduced them to the fledgling team of founders and employees.  (*See* Ex. 5 at 2 (Letter from Ram Ahuja).)  Former portfolio manager Eli Katz recalls the PPI team sitting at one desk in a "small trading room in midtown[,]" as part of a "close knit group that got to know each other well."  (Ex. 22, (Letter from Elias Katz at 1).)

One of PPI's key points of differentiation was Anilesh's approach to identifying undervalued legacy RMBS.  PPI employees attended auctions around the country to determine the prices at which the underlying assets behind the RMBS—the homes—were being sold, and to collect detailed data on housing prices at the zip code level.  (*See* Tr. 2365:25–2367:1 (Majidi).)  PPI "gathered results from over three hundred thirty (330) [housing] auctions in various local markets across the [United States]" (GX 328 at 9771 (Dec. 20, 2011 SkyBridge Operational Due Diligence Report)); as its former Portfolio Manager noted, the data "enabled the portfolio management team to identify investment opportunities not recognized by competing firms using the widely used general models." (Ex. 22, (Letter from Elias Katz at 1).)  This meticulous strategy, which was unique to PPI, is emblematic of Anilesh's aversion to cutting corners and his belief that harder work yields better results.  Tellingly, Anilesh always avoided speculative or short-term investing.  Rather, his investment positions were the product of well-thought-out theories.

The firm's investments performed very well during its first several years, earning investors significant profits.  (*See, e.g.*, DX 5081, 5081-A (PPI Net Performance Sheet, noting an average annual return of approximately 14% for MCF in 2010 to 2013).)  Its first fund, the Market Street Fund set up for Divco, showed returns of over 180% since inception.  (DX 7176-A (PPI Net Performance Sheet).)  Likewise, PPI's MIT Fund had returns of over 57% since inception by the time it closed in early 2013.  (*Id*.)  In 2014, PPI liquidated the Market Street Fund and a fund set up for MIT at substantial profits for their investors.  (Tr. 2366:13–2367:13 (Majidi).)  As witnesses explained at trial, those substantial profits were based on the sale prices PPI received and had nothing to do with its marks.  (*Id.*)

As its funds performed well, PPI itself quickly grew in size.  What began as an operation with three founders grew to nine people within a year, and by the fall of 2015, PPI employed more than 40 professionals.  (Tr. 4195:20–23 (Lee).)  Anilesh's employees viewed him as "soft-spoken" and "quick to smile and laugh[.]"  (Ex. 9, at 1 (Letter from Joeline Bergman).)  A former portfolio manager recalls Anilesh as a "quiet[]" and "mild-

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                          9

mannered" boss who, after he found out his "team enjoyed the [] dish 'Basil Chicken,'" began ordering it for them "from his favorite Indian restaurant every Friday."  (Ex. 22, at 1 (Letter from Elias Katz).)  His executive assistant, who sat outside his door and "serve[d] as a gatekeeper to his office[,]"does not recall Anilesh ever "raising his voice at any PPI employee."  (Ex. 9, at 1 (Letter from Joeline Bergman).)

Over time, and perhaps too quickly, PPI developed into a large, professional organization with multiple business lines.  From the outset, PPI hired sophisticated and reputable advisors, including: Patton Boggs and Akin Gump as outside counsel; AIS (which became part of U.S. Bank) as an independent fund administrator; and PricewaterhouseCoopers ("PwC") and Ernst & Young ("E&Y") as independent outside auditors. (Tr. 1459:5–10, 1478:23–1479:3 (testimony of Ken McDonald); GX 328 at 9788 (describing the role of AIS); Tr. 3226:24–3227:6 (testimony of Troy Gayeski); GX 329 at 0054).)  Anilesh authorized the development of a built-out middle and back-office infrastructure, including separate finance, operations, marketing, investor relations, and legal departments.  (Tr. 4196:15–24 (Lee); DX 800 (November 2015 PPI Organizational Chart).)  For the hedge fund business, PPI had a "formal" valuation committee—comprised of, among others, its Chief Financial Officer, Chief Risk Officer, Comptroller, Head of Operations, and Head of Compliance.   (Tr. 650:11–13 (Dole); Tr. 2225:16–2225:4 (Majidi).)

PPI was a sophisticated investment manager with controls in place to manage operational and investment risks.  Certain text messages were introduced at trial that featured a few PPI employees making inappropriate and vulgar comments.  It is important to note that Anilesh was never privy to these text messages, and that their content reflects only on a small minority of PPI employees out of dozens of other highly qualified industry professionals who worked hard, behaved with the utmost integrity, and sought to achieve the best results for PPI's clients.  Those professionals included a business development group led by a Chief Operating Officer with high-level experience at major banks including UBS and Merrill Lynch; a finance unit led by a Chief Financial Officer with what investors termed a "very strong" background in the industry, including 30 years' experience with senior positions at Credit Suisse, Fortress Investments, and E&Y, and a controller, also considered to have a "strong" hedge fund industry background (GX 329 at 0046); a Chief Risk Officer with 12 years of related experience in MBS risk modeling including at Goldman Sachs, who managed a "very sophisticated" and "state-of-the-art risk infrastructure" (GX 342 at 0491, 0507–08; GX 363 at 0522); and legal professionals including a General Counsel with two decades' experience at major law firms and financial institutions (Tr. 4191:24–4192:12 (Lee)), a Chief Compliance Officer whose "background" in investment management was "strong for her position" (GX 329 at 0023–24), and her successor, a former securities enforcement attorney and assistant district attorney with 15 years' compliance experience hired in November 2015 (DX 10221-A (Resume of Evan Jay); Tr. 3911:4–3918:10 (Jay)).

As PPI expanded, Anilesh necessarily delegated more responsibility for its investment funds to others at the company.  As Elias Katz recalls, Anilesh "did not micro manage but relied on [his] highly professional staff with deep industry experience to

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                                    10

independently manage each department." (Ex. 22, at 1 (Letter from Elias Katz).)  Anilesh's former colleague from Greenwich Capital and longtime friend similarly notes that Anilesh's management style is to "trust[] and empower[] [the] senior people he hires[.]" (Ex. 47 at 1 (Letter from Ryan Mullaney).)  Anilesh also turned his attention to establishing and running PPI's other business lines, including Winwater and Residential Capital Management ("RCM").  (*See* Tr. 4196:14–4198:14 (Lee); *see also* Tr. 2270:24–2271:22 (Majidi).)  Winwater was a mortgage securitization conduit that purchased mortgage loans from mortgage originators, and packaged and securitized the loans as mortgage-backed securities.  (Tr. 2268:22–2269:9 (Majidi); Tr. 4197:2–8 (Lee); Tr. 4349:7–24 (Smith).)

In 2014, PPI purchased a majority interest in RCM, an Atlanta-based real estate company that purchased homes, renovated them, and then operated as a management company, collecting rent from the homes.  (Tr. 232:2–233:6 (Dole); Tr. 2270:24–2271:13 (Majidi); Tr. 4197:9–16 (Lee).)  RCM alone had over 100 employees.  (Tr. 4197:17–20 (Lee); DX 800 at 2 (PPI Organizational Chart, noting "+100 Additional RCM Employees").)  Anilesh saw great synergies between PPI and RCM, with PPI providing RCM "with capital markets expertise and the necessary resources to develop and expand their footprint nationally." (AHUJA00004453 at -457 (PPI Q3 2014 Newsletter).)  Anilesh believed that adding the RCM business would permit PPI to be "vertically integrated across" a number of related sectors beyond RMBS investing, including "real estate/property management, loan origination, [and] primary and secondary markets in the residential mortgage space." (*Id.*)

Anilesh took a significant interest in understanding RCM from the bottom up, and frequently visited its offices in Atlanta as well as its developments across the country.  He sought to impart his wisdom and experience on RCM's relatively young founders, including by preparing them for organizational growth and advising them on business strategy, fund raising, and capital structures.  During 2015 and 2016, Anilesh devoted as much as 65-75% of his time and attention to RCM.  (*See* Tr. 4197:9–4198:14 (Lee); *see also* Tr. 2270:24–2271:22 (Majidi) (testifying that Anilesh "spent more and more time on RCM").)  RCM's co-founder describes Anilesh as a "great mentor to younger entrepreneurs[,]" and believes RCM benefitted from Anilesh's "understanding of the housing market" and "macro level" views. (Ex. 34 at 1 (Letter from Lance Popp).)  Even after PPI's involvement with RCM came to an end (after Anilesh purchased PPI's interest to provide PPI with much-needed liquidity), RCM has continued to be a successful national company in the single-family rental space. (*Id.*)

Among those who have known Anilesh throughout his career, the conduct described in this case represents a shocking deviation from the man they know.  James McVeigh, a CEO of a registered broker dealer and a retired Naval officer who worked with Anilesh to invest in private companies, described how Anilesh approached his business ventures with the same moral compass with which he approaches his personal life:

> When companies face financial duress, investors commonly attempt to exert additional pressure to get "a better deal" for themselves. . . Anilesh never sought to take

The Honorable Katherine Polk Failla                                        11

> advantage of a company during a difficult period but instead worked with its management to address their financial challenges—even though it meant a lower financial return for himself.  When Anilesh and I discussed how to structure these transactions, Anilesh always considered the impact of what his investment would do to shareholders, the management team and employees.   Before he ever considered what the impact would be to his potential financial return, he always asked, "What's the right thing to do?"

(Ex. 27 at 1 (Letter from James McVeigh).)

Similarly, Richard Birnbaum, who recently retired from the fixed income securities industry and has known Anilesh for nearly 30 years on both a professional and personal basis, remarked that while they worked together, Anilesh "never took unfair advantage of any transactional opportunity at anyone else's expense" and is a man of "exceptional character[.]" (Ex. 10 at 1 (Letter from Richard Birnbaum).)  Anilesh's friends and longtime investors expressed similar sentiments, saying:

> We are also, personally, small investors in Neil's Residential Capital Management Fund.  We have made many small investments in other private equity funds.  We have no complaints about Neil's fund management and have found his fund reporting and transparency excellent and better than many other investments we have made.

(*See* Ex. 29 at 1 (Letter from Tara and Victor Menezes).)  That includes investors in PPI:

> "I was an investor in the Mortgage Credit Fund at [PPI], from inception up until its closing.  I chose to invest with Anilesh, not only because he is extremely talented and an expert in his field, but also because I saw first-hand how hard he works to advance his clients' interests. . . I would be glad to invest with him again if given the opportunity."

(Ex. 19 at 1 (Letter from Dr. Lawrence D. Jaeger).)

Notably, all of this success, and the qualities that fostered it, existed long before the facts giving rise to this case.  No one has (or could) allege that PPI was built on anything but good ideas and hard work, or that Anilesh somehow did not "deserve" or "earn" what he achieved.  The simple truth is that even according to the testimony of the government's own witnesses, Anilesh was an accomplished and innovative investor who succeeded "on the merits" and without having anything handed to him.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                    12

But while Anilesh's professional accomplishments have been significant, they are not what sets him apart. Many on Wall Street and in various professions work hard and succeed. What is unique to Anilesh is the way he has remained unchanged by his success, personal and professional. For reasons we do not know, success (however measured, and whether professional, social, or financial) changes some people more than others. Anilesh, who experienced success in all these areas long before he was accused of any misconduct, has not changed at all. If asked, he attributes that to four things: his parents, his wife, his children, and his extended group of family and friends.

### E.    Anilesh's Extended Family

The many letters submitted on Anilesh's behalf reflect his best qualities. Of these, one stands out as much as any other: his devotion to his family.

As noted above, Anilesh and his wife Tania have an improbable and heartwarming love story. They first met in grade school when a younger Anilesh made friends with Tania's little brother, Yuri. (PSR ¶¶ 97, 101.) Naturally shy, Anilesh was mostly quiet around her, though they remained loosely in touch when Anilesh moved to the United States for high school. When Tania later moved to the United States, she happened to intern at the same bank as Anilesh, and the two developed a friendship. (*See* Ex. 6 at 1 (Letter from Tania Vital-Ahuja).) Tania is older than Anilesh and Catholic, and in India both the age and religious differences mattered. (*Id.*)

Then tragedy struck when Tania's family lost Yuri (who was still Anilesh's best friend), to a brain aneurysm in 1991. (*Id.*; *see* PSR ¶ 101) True to his nature, Anilesh dropped everything to "rush[] to Bombay for the funeral" and "stepped into that void" to comfort Tania and her family. (Ex. 29 at 1 (Letter from Tara and Victor Menezes); Ex. 6 at 1 (Letter from Tania Vital-Ahuja).) Tania's parents had "entered into a state of depression," but Anilesh "'saved their lives.'" (PSR ¶ 101.) Anilesh handled everything, making sure he worried about the day-to-day logistics so that Tania's family did not have to. Anilesh and Tania grew closer, fell in love, and got married in January 1992. (*See id.* ¶ 97.) They have now been married for nearly three decades.

Anilesh adores his wife, a fact that does not go unnoticed by those around him. As one friend wrote, "[a]mong close friends[,] Neil's doting on his wife, Tania, is a subject of good natured humor. We all feel that Tania wouldn't move a step if Neil could do it for her." (Ex. 42 at 1 (Letter from Parag Saxena).) In time, Anilesh and Tania had three children: Yuri (his uncle's namesake), age 26; Aditi, age 23; and Avni, age 19. (PSR ¶ 97.) It is not a coincidence that all three of his children not only have excelled academically, but have chosen career paths focused on serving others. Yuri is pursuing a dual MD/PhD at Harvard Medical School and intends to focus on medical research; Aditi is attending Cornell University College of Veterinary Medicine; and Avni is earning her undergraduate degree at Anilesh's alma matter, the University of Pennsylvania, pursuing studies on the social impact of investing in low-income communities. (PSR ¶ 97.)

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                                    13

Tania is an extremely accomplished and successful woman.  She obtained a PhD in finance from New York University, served in high-level executive positions, including at Citibank, and has recently founded an artificial intelligence company that alerts media consumers to potential bias in the news they read.  Close friends of the family describe how Anilesh has always gone above and beyond to support Tania in reaching her professional goals, treating her career aspirations as equal to, if not more important than, his own:

> After staying home for [10] years during the time they had their three children, when Tania expressed a desire to join [the] work force again, Anilesh was the most supportive husband, taking practically all responsibilities (children, household, and social) and encourag[ing] [Tania] to do whatever time commitment was necessary for [her] to succeed.  Often she would come home very late (at that time they lived in the same [apartment] building as us) and his support was unconditional.  This continues to this day.

(*See* Ex. 18 at 1–2 (Letter from Anita and Ash Gupta).)  Tania remembers that when she returned to work in 2010, it was "around the clock," and Anilesh "jumped in to help run the house," to "help[] look after [her] elderly father" who had moved in with them, and to "attend[] to the needs of [their] teenage children, seeing them through the hardest years of high school and the transition to college." (Ex 6 at 2 (Letter from Tania Vital-Ahuja).)  In recent years, as Tania has started her own business, Anilesh has been encouraging and supportive, while serving as a "vital advisor and sounding board."  (*Id.* at 3.)

If asked (and often without being asked), Anilesh and Tania will describe their greatest accomplishments in terms of the values and lessons they pass on to their children.  Further highlighting family as Anilesh's "sanctuary," one longtime friend writes that "Neil truly believes that his children's happiness and success are his greatest achievement in life." (Ex. 10 at 2 (Letter from Richard Birnbaum); Ex. 25 at 1 (Letter from Preethi Krishna).)  Like their mothers and fathers had done with them, Anilesh and Tania taught their children the importance of honesty, integrity, and empathy.  As lifelong family friends recalled:

> During the final round of a [chess] tournament[,] Neil's son, Yuri, suspected his opponent of cheating and wanted to bring it to the attention of the tournament director.  Neil intervened[,] asking Yuri whether he was absolutely sure his opponent had cheated.  Yuri, who knew that he was expected to be completely honest, said he wasn't [completely sure].  Neil then asked Yuri to trust that his opponent had behaved as Yuri would have.  Yuri was six or seven at the time, a tournament victory was on the line, but the values and respect he had been raised with prevailed.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                                14

(Ex. 26 at 2 (Letter from Vikram and Fally Malkani).)  Yuri expressed a similar sentiment
himself, speaking of another anecdote about his father:

> I still remember very clearly how upset he was when I
> offhandedly mentioned in the 3rd grade that I'd gotten a
> question wrong on a multi-day standardized test, but could
> change it the next day since I remembered what number it
> was.  He made me promise to do no such thing, as rules
> were always to be followed.

(Ex. 7 at 2 (Letter from Yuri Ahuja).)

The exemplary personal traits that shine through Anilesh's children are due,
in no small part, to the principled and devoted way Anilesh and Tania raised them.  It takes
thoughtful investment of one's time to raise children who, in addition to being successful,
diligent, and honest, are well-rounded and empathetic young adults who choose to promote
good deeds and human decency in their own lives.  One of Anilesh's friends (perhaps
naively) suggests that Your Honor should speak to his children before the sentencing,
because "[o]nly a person that is honest, kind[,] and humble could raise children like his."
(*See* Ex 27 at 2 (Letter from James McVeigh).)

Their father's influence has not been lost on Anilesh's children.  Anilesh's
youngest daughter, Avni, writes that:

> In high school I played varsity sports and even though I am
> not an excellent athlete, was voted captain my senior year.
> When I asked my peers why I was elected, they
> unanimously agreed that it was due to the way I treated both
> my teammates and my opponents.  I owe this mentality
> entirely to my father, who instilled in me the attitude that
> whether you are winning or losing, graciousness should
> never be sacrificed.  Again, his view exhibited itself in the
> big things and the small things.  My father taught me that
> you always retrieve the ball if you hit last, you open the door
> for your opponent, and you acknowledge a great game no
> matter the outcome.

(Ex. 4 at 2 (Letter from Avni Ahuja).)

Appreciating the cycle of life and how values are transmitted across
generations, Anilesh worked hard to foster the relationships between his children and their
grandparents.  When Anilesh was in the early stages of his career and had just started a
family, he used the money he had saved to surprise his parents with a cruise, his mother's
dream vacation, that would stop in the United States so they could spend time with their
grandchildren.  (*See* Ex. 3 at 2 (Letter from Ashish Ahuja); Ex. 5 at 2 (Letter from Ram
Ahuja).)  Anilesh also made sure that Tania's parents comfortably stayed with them long-

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                        15

term while the children were younger, "helping to inspire respect for elders in his own children." (Ex. 6 at 3 (Letter from Tania Vital-Ahuja).) After Tania's mother passed away, Anilesh "insisted" that his father-in-law move in with the family. (*Id.*; Ex. 17 at 2 (Letter from Noah Gottdiener).) Tania and family friends recall how, in December 2015, Anilesh cared for his father-in-law "as if he were his own father," spending several hours a day with him despite being "in the midst of trying times" at work. (Ex. 17 at 2 (Letter from Noah Gottdiener); Ex. 6 at 3 (Letter from Tania Vital-Ahuja) .) These "more private circumstances involving [Anilesh's] relationships with his immediate and extended family" reveal his compassionate, insightful, and altruistic character. (Ex. 6 at 3 (Letter from Tania Vital-Ahuja).)

Throughout his children's lives, no matter how busy work or other commitments became, Anilesh similarly put them first in ways big and small. In one instance, realizing that young Yuri was interested in taking violin lessons with a specific instructor, Anilesh "drove Yuri every Saturday to New Jersey and stayed [with him] for 4 to 5 hours . . . while his son had his lessons"—all while building his business and never once complaining." (Ex. 25 at 1 (Letter from Preethi Krishna).) In their letters, each of his children recalls their father cancelling work dinners or meetings to be there for them, and each looks back, with fondness and admiration, on how he supported them in their disparate endeavors. And while it is not uncommon or unusual for parents (and particularly parents of means) to shower their children with material things, Anilesh always provided them one of the things that money cannot buy: his personal attention. Avni, for example, remembers her father learning Mandarin tones alongside her when she struggled in her sixth grade Mandarin class. (*See* Ex. 4 at 2 (Letter from Avni Ahuja).)

**F.      The Effect this Case Has Had on Anilesh's Family**

Not surprisingly given their relationship, it has been devastating for Anilesh to watch the toll this process has had on his family, and devastating for the family to see the toll the process has taken on Anilesh. But even through this most challenging period of his life, Anilesh's children describe how his devotion to his family has remained steadfast. Aditi writes that:

> [E]ven when faced with this ordeal ████████████████
> ███████████████, he still made sure to be there for me and
> my family. He has always called to check in on my life and
> my grades, he cheered loudest for me at my graduation, and
> he helped me get ready for veterinary school. He has in
> every way continued to be the selfless and supportive father
> I have always known . . . My father is not just there for us
> when things are good. He is there for us always.

(Ex. 2 at 2 (Letter from Aditi Ahuja).) Avni similarly explains that in the past year her father "sat with [her] as [she] registered for classes, read the books [she] recommend[ed] to him, and spent hours mock-interviewing [her] as [she] applied for internships." (Ex. 4 at 2 (Letter from Avni Ahuja).)

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                      16

In her letter to the Court, Aditi goes on to describe the "unbelievably painful" anguish she's been feeling throughout this process, particularly when "watching the stress and disbelief eat away at [her father]."  (Ex. 2 at 2 (Letter from Aditi Ahuja).)  Anilesh's family members have had to continuously deal with unfriendly media and unkind gossip, sometimes in their own neighborhood and extended circles.  Anilesh's name and image appear frequently in Indian news sites in connection with this case—articles that spread quickly through the Indian-American community in New York.

His family has been confronted with the unfortunate realization that only a subset of the individuals they considered their friends stuck around during the difficult times.  Other "friends" have shown their crueler side:  during the trial, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

The lives of Anilesh's family members have understandably been thrown into disarray.  With the loss of Anilesh's business and his ability to work in the industry—and facing civil lawsuits (including an SEC enforcement action) seeking many millions of dollars in damages—they have lost their financial security.  Above all, though, they no longer have their peace of mind and live in constant worry about the fate of their father and husband, and the time he will be away from them.

## G.    The Impact on Anilesh of PPI's Closing and His Conviction

Anilesh is heavily burdened by the "personal[] accountab[ility]" he feels as the CEO and founder of PPI to each of PPI's employees, partners, and investors.  (Ex. 6 at 2 (Letter from Tania Vital-Ahuja).)  Founding PPI was his dream, and the reality of what happened at PPI haunts him.

Professionally and financially, Anilesh has lost nearly everything he worked so tirelessly to build.  Anilesh will no longer be able to work in the industry that he based his professional life around.  The pristine reputation he worked for years to build is wiped out, as is all of the respect and trust that he had garnered in his field.

With PPI's demise, Anilesh lost the substantial funds he had invested in PPI's operation.  Tellingly—and while most business owners look for ways to "cash out" of their enterprises—Anilesh took every opportunity to pour more into his investment.  So, for example, in 2014 Anilesh effectively purchased all but 2.4% of Divco's interests in PPI for $19,573,000.  (*See* GX 342 at 0509 (2014 SkyBridge diligence memoranda discussing Anilesh buying out Divco).)  Earlier, Anilesh, along with PPI entities and others at PPI, had purchased his co-founder Mr. Downes's interest in PPI for $12,775,024.  As long-time PPI employee and government witness Amin Majidi explained in a 2016 text to another PPI employee, "I can see how it's possible that aa [Anilesh Ahuja] made no money at PPI. He spent all his money buying back shares from Patrick, Hyung and DIVCO." (AM00027234-35 (May 7, 2016 text from Majidi to a PPI employee)).)  In other words,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                    17

Anilesh "pocketed zero" (*id*.), because he kept on putting his money back into the business he had built.

     Anilesh also spent a substantial amount of his personal money to keep PPI operational towards the end, starting before any hint of a government investigation, in order to ensure that investors were able to make the most of an awful situation. When PPI operated at a loss in 2015-16 (*see* DX 4072-R at 4 (PPI 2015 Profit and Loss, showing a net 2015 annual income of -$4.15 million), Anilesh contributed more than $20 million of his own money to allow PPI to meet its operating expenses, including salaries and bonuses for employees, and to facilitate an orderly wind down of PPI's funds so as to best benefit their investors. (*See* DX 3054-R at 115 (Dec. 31, 2015 PPI Balance Sheet Detail, showing Anilesh's $2.9 million loan contribution to PPI in December 2015); DX 1214-R at 75 (Dec. 31, 2016 PPI Balance Sheet Detail, showing Anilesh's total unpaid loan contribution to PPI as $9.95 million); DX 1214-R at 77 (showing Anilesh's equity contribution to PPI in April 2016 as over $660,000); DX 1214-R at 77–78 (showing Anilesh's additional equity contributions to PPI from May to December 2016 as over $9.4 million).) Anilesh's personal contribution—wholly separate from any investments in PPI's funds or money used to pay for legal fees related to this action or the related SEC action—permitted PPI to respond to investor requests for an orderly liquidation of PPI's funds.

     On a purely physical level, the stress of this case has, not surprisingly, affected Anilesh's health in various ways. While no one can say for sure whether or to what extent stress was a contributing factor, Anilesh ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See* Ex. 46 at 2 (Letter from Dr. Kaliyur Venkat); Ex. 6 at 2 (Letter from Tania Vital-Ahuja).) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See* Ex. 31 at 1 (Letter from Dr. Suneet Mittal).) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 46 at 2 (Letter from Dr. Kaliyur Venkat).)

     Through it all, Anilesh has stayed true to his protective character, sheltering his family and friends from the stress and daily consequences of the investigations into PPI and the criminal proceedings.

## H.    Anilesh's Contributions to His Communities

     In his different communities and beyond, Anilesh embodies the rare quality of treating each and every person—regardless of socioeconomic status or relationship to him—with the same degree of respect. As someone who has worked directly for Anilesh for over 20 years recounts, "[i]t doesn't matter if it's an elevator operator or the owner of a hotel, [Anilesh] treats everyone he meets with respect and as an equal to himself." (Ex. 12 at 1 (Letter from Jon Cutler).) Another longtime employee shares the sentiment, noting that Anilesh "treats everybody with respect and dignity irrespective of their status and

The Honorable Katherine Polk Failla                                        18

level." (Ex. 16 at 1(Letter from George Gomes).)  Anilesh's humility and down-to-earth demeanor have never wavered, even as he became more and more successful.  In what may be the most telling passage of all of the letters sent to the Court, Yuri notes his father's penchant for striking up conversations with strangers, and the times his father gave out his phone number to cab drivers and then helped them navigate through life as new immigrants in the United States.  (*See* Ex. 7 at 1 (Letter from Yuri Ahuja).)

In a way reminiscent of Anilesh's childhood "vacations" with family, Anilesh and Tania regularly open their home to "friends from all walks of life [who] stay[] over for lunch or dinner[.]"  (Ex. 35 at 2 (Letter from Harish Raghavan).)  People "of all ages . . . know that Neil and his family will welcome them with a mattress on the floor and warm meals and companionship." (Ex. 42 at 2 (Letter from Parag Saxena).)

In addition to the impact he has on his broad circle of friends and acquaintances, Anilesh goes out of his way to help anyone in need regardless of their relationship to him.  Roughly a week after the verdict, at a time when many would be focusing on themselves, Anilesh could be heard speaking at length with a young relative of someone who worked for him, giving her advice on her upcoming career choices and course selection.  (*See* Ex. 35 at 1 (Letter from Harish Raghavan).)  In another instance, Anilesh and Tania took a woman who had been treated unfairly in a divorce proceeding under their wing, and took the time to provide resources to her children regarding career paths and internship opportunities.  (*See id.* at 2.)  Anilesh's doctor recounts Anilesh, on his own time and without ever asking anything in return, spending hours with him and his colleagues seeking "to brainstorm [] ways [] [to] scale [] efforts to help the millions of patients worldwide who suffer from" atrial fibrillation, ███████████████████ ██████████████████████████████████████████████ (Ex. 30 at 1 (Letter from Dr. Suneet Mittal).)  Anilesh also quietly provides his employees and "many other people around him" with financial, educational, and moral support "in a big way." (Ex. 16 at 1–2 (Letter from George Gomes).)  These and countless more examples further demonstrate how consistently Anilesh sacrifices his own time and resources to help those in need with absolutely no expectation of anything in return.

Anilesh's generosity and selflessness are also evidenced in the substantial time, money, and resources he contributes to numerous charities and philanthropic organizations.  Anilesh's philanthropic contributions are extraordinary.  Although Anilesh has made the United States his chosen home, becoming a naturalized citizen in May 2003, he has never forgotten his country of origin.  Recognizing the basic unmet needs in underprivileged communities in India, Anilesh has remained deeply committed to giving his time and resources to the country that played an integral role in his formative years.  He has sponsored children from impoverished communities in India so they could travel to the United States and learn how to play various musical instruments, a skill that some subsequently used to earn a living in India.  Anilesh is also a founder and dedicated supporter of SAITC, a vocational training center in India that provides training and employment opportunities for hundreds of disadvantaged youth.  (*See* Ex. 14 at 1 (Letter from Rajesh Garg); Ex. 41 at 1 (Letter from Dr. Chandranath Sen).)

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                    19

Anilesh further devotes his time and resources to the Shanti Bhavan school in India, an institution that educates children from low-income village communities; Pratham, an organization that provides "advanced education" in mathematics, science, and computer science for children of low-income families in India; and the America India Foundation, an organization that has "served hundreds of thousands of children across India—through educational and training programs that have literally changed the life trajectory of many children." (*Id.*; *see also* Ex. 41 at 1 (Letter from Dr. Chandranath Sen).) Although he would never brag about it, the programs Anilesh has championed have allowed countless children to secure education and skills they would otherwise never have access to. (*See* Ex. 14 at 1 (Letter from Rajesh Garg).)

Anilesh is also actively involved in local charities, including ones that support underserved communities and homeless children and help research cures for childhood cancer. Girish Reddy, a longtime friend who is actively involved in a non-profit supporting underprivileged immigrant children in Queens, New York called South Asian Youth Action (SAYA), explains how Anilesh has been a "one of the earliest supporters of this program" and "was one of the first to help establish a scholarship fund that provides tuition assistance to students . . . in most cases, [] ma[king] college possible for first generation college students." (Ex. 37 at 1 (Letter from Girish Reddy).) Mr. Ahuja's children—following in their parents' footsteps in their commitment to charity—are also actively involved with SAYA as well. (*Id.*) Anilesh has also, anonymously, devoted his time and resources to help struggling friends (and even strangers) and their families facing "serious crisis situations." (Ex. 46 at 2 (Letter from Dr. Kaliyur Venkat).)

As detailed in letter after letter, Anilesh gives without seeking publicity. He does so because he feels it is his duty to give back to communities in need and anyone who falls on hard times. Richard Birnbaum, a longtime friend, recalls a story that captures Anilesh's philanthropic and generous character:

> In 2009, ███████████████████████████
> ███████████████████████████████
> ████████████ Upon her full recovery, she
> established the Martha Hart Birnbaum Neurovascular
> Research Program, which is a 501(c)(3) organization to
> support the ongoing research of the surgeon who saved her
> life. When Neil learned about the fund, he overwhelmed us
> with his generosity by leaping at the opportunity to
> contribute one of the most significant contributions to the
> fund. I will never forget his response to my thanking him
> for his contribution: "I so admire your wife for giving back
> and making a difference." While I was thanking Neil, he
> was thanking us! It is that type of selflessness that makes
> Neil one of the finest people I have had the privilege of
> knowing both personally and professionally.

(*See* Ex. 10 at 2 (Letter from Richard Birnbaum).) In another instance, when a young extended family member "was raising funds to build a home in Vietnam" and sent an

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                                    20

impassioned letter to family and friends, "Neil covered the entire amount[,] ensuring that at least one home would be built from [her] efforts." (Ex. 32 at 2 (Letter from Mario Moniz).) Only a few people knew of Anilesh's generous act. (*Id.*) When Anilesh's physician friend was considering closing his practice following the 9/11 terrorist attack because the medical office was located next to the World Trade Center, Anilesh "pretty much insisted on 'giving a helping hand'" and provided a long-term loan based on a "gentleman's handshake" to revive the practice. (Ex. 46 at 2 (Letter from Dr. Kaliyur Venkat).) True to his character, Anilesh never shared his generous deed with mutual friends, and never reminded his friend of the loan or repayment. (*Id.*)

Although Anilesh has many admirable character traits, he is neither perfect nor impervious to life's stresses.



Again, our point is not that Anilesh is somehow perfect or even close to it. He would be the first to tell you about his mistakes and how there is room for improvement in every part his life. Our point is that the sum of Anilesh's life—whether viewed as his "character" or characteristics—has been overwhelmingly positive in every conceivable way. Anilesh came to this country with no money and no privileges beyond an engrained sense of hard work and fair play. He used his considerable resources to elevate the lives of those he encountered and get them a seat at the table. Nothing in Anilesh's background suggests that he is greedy or a bully or beset with the vanity that so often comes with success.

## RELEVANT SENTENCING CONSIDERATIONS

For reasons set forth in our separate memorandum on the application of the Sentencing Guidelines to this case, Probation has incorrectly calculated the Guidelines range applicable to this case. But regardless of the Guidelines range adopted by this Court, the sentence should be determined by the factors set forth in 18 U.S.C. § 3553(a). *See United States* v. *Booker*, 543 U.S. 220, 245 (2005). A sentencing judge is "in a superior position to find facts and judge their import under § 3553(a) in the individual case" because she has "access to, and greater familiarity with, the individual case and the individual defendant." *Gall* v. *United States*, 552 U.S. 38, 51 (2007).

Although Probation recommends a substantial downward variance from the Guidelines range, its recommendation is still anchored in an unreasonable Guidelines range of 21 to 27 years. The most significant driver of that range is the 22-point loss enhancement, which alone increases the Guidelines range by *nearly eleven times*. Setting aside the poor fit between the loss enhancement and mismarking cases, as Chief Judge

The Honorable Katherine Polk Failla                                        21

McMahon observed last month, the "utterly ridiculous fraud guidelines chart" is "heavily weighted toward increasing the number of enhancement points" as the loss amount increases—"a fact that has been criticized on more than one occasion by this and other courts."  Sentencing Transcript at 56, *United States* v. *Black*, 16 Cr. 370 (CM) (S.D.N.Y. Oct. 24, 2019), ECF No. 451.[3]

        For example, in *United States* v. *Lumiere*, the most recent criminal mismarking case in this District, Judge Rakoff reiterated his "serious problems with the guidelines," which are "most prominent when it comes to [the] way the guidelines approach loss calculations in white-collar cases."  Sentencing Transcript at 2, No. 16 Cr. 483 (JSR) (S.D.N.Y. May 31, 2017), ECF No. 105.  Loss enhancements can account for "as much as 60 or 70 percent of the total calculation of the offense level," which is often "grossly disproportionate to the multifaceted aspect of the crime."  *Id.*  Judge Rakoff called the proposed Guidelines sentence of eight years in that case "ridiculous, absurd, [and] barbaric," and concluded that its "draconian penalties bear no relationship . . . to any of the

---

[3]  Recent years have seen only more judges and legal academics commenting on the "widespread perception that the loss guideline is broken."  *United States* v. *Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) (Underhill, J., concurring); *see id.* at 380 ("For the small class of defendants convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense.  Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges."  (internal quotation marks and alterations omitted)); Sentencing Transcript at 56, *Black,* 16 Cr. 370 ("This [loss enhancement] chart is just so ridiculous it's incomprehensible."); *United States* v. *Johnson*, No. 16 Cr. 457-1 (NGG), 2018 WL 1997975, at *4 (E.D.N.Y. Apr. 27, 2018) ("Many in the legal community have urged the Sentencing Commission to right this grievous wrong, and today I add my name to that lengthy list of judges, practitioners, scholars, and other commentators.  The problems with the loss enhancement have been evident since the inception of the Guidelines."); Sentencing Transcript at 23, *United States* v. *Faibish*, 12 Cr. 265 (ENV) (E.D.N.Y. March 10, 2016), ECF No. 271 ("I subscribe to the views of a whole host of judges who have said so publicly and scores of others who have . . . grumbled about it privately, that the guidelines . . . are just mindlessly accelerated once you have numbers of any size added in the loss or gain table.  It just—it is the tail of the dog wags everything else," and "makes the guideline[s] for economic crimes . . . almost useless."); Sentencing Transcript at 25, *United States* v. *Levy*, No. 11 Cr. 62 (PAC) (S.D.N.Y. Feb. 19, 2014), ECF No. 371 ("[T]he higher the loss amount[,] the more distorted is the guidelines advice to sentencing judges."); *see also United States* v. *Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (while acknowledging that the sentencing court's loss calculation "complied with the Guidelines Manual," remanding the case "to permit the sentencing judge to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence").

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                           22

factors set forth in Section 3553(a)." Sentencing Transcript at 28, *Lumiere*, No. 16 Cr. 483 (JSR) (S.D.N.Y. Jun. 14, 2017), ECF No. 115.

Besides resulting in a "draconian" sentencing range that is itself far too high as an absolute number, the loss enhancement also fails to distinguish between this case and any other economic offense, a product of its "'one-shoe-fits-all' approach." *United States* v. *Parris*, 573 F. Supp. 2d 744, 750–51, 755 (E.D.N.Y. 2008). In other cases, the connection between the offense conduct and the loss may be direct; here, it is incidental. If the market for mortgage-backed securities had gone up, and not down, in 2016, Anilesh's loss enhancement, even assuming the exact same conduct, would be zero. And if Anilesh had stolen $51.8 million from investors to pay for lavish personal expenses (or to pay off earlier investors in a Ponzi scheme), he would be facing the same loss enhancement he faces now. That kind of arbitrariness should not be permitted to have such a critical effect on a sentence. Even a significant variance downwards from the calculated Guidelines range results in an unjustly long sentence that is more than necessary to achieve the goals of sentencing.

## I.   ANILESH'S HISTORY AND CHARACTERISTICS

Anilesh's "history and characteristics" militate strongly against a substantial sentence of incarceration. *See* 18 U.S.C. § 3553(a)(1). Without repeating the first 20 pages of this letter, a fair examination of Anilesh's life shows that he came to the United States in high school, stayed here alone to advance his education, and spent the rest of his life working hard. Nobody disputes that Anilesh reached the pinnacle of his profession without the help of connections or inherited wealth, and nobody can argue that his accomplishments are the product of anything but determination and hard work.

"[H]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Pepper* v. *United States*, 562 U.S. 476, 488 (2011) (internal quotation omitted). As courts have recognized, "the Guidelines must take second place to section 3553(a), which requires a court to take account of a defendant's character in imposing sentence. And how could it be otherwise, for on this day of judgment, must not one judge the man as a whole?" *United States* v. *Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012).

The conduct charged in this case stands in stark contrast to the way Anilesh has conducted himself in every facet of his life over a period of decades. Before this case, Anilesh had never had even the slightest brush with the law. He spent almost 30 years working in a heavily regulated industry without a single "blip" on his record. To the contrary, Anilesh earned the respect and admiration of those around him—including colleagues, clients, and others—not only for his intellect and acumen, but for his hard work and integrity. Over the course of decades, Anilesh developed a track record of hard-earned success that over his lifetime provided the great majority of his investors enormous returns. This success was the result of Anilesh's hard work, which came with enormous sacrifices.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                                23

But Anilesh's success in business is less interesting and less relevant than his lifelong efforts, described above, to generate what might colloquially be called "good karma." Anilesh gives selflessly and then celebrates the joys and successes of his family, friends, and community as if they were his own. He respects others, and works to transmit to his children the lessons he learned from his parents. He does good things, even when no one is watching. And while he has never been one to keep score of such things, there is no doubt that he has given others far more than he has taken from them, so that even assuming the facts are as presented by the government at trial, Anilesh has brought the world far more love and happiness than he has taken from it. Whatever his failings, personal or professional, Anilesh has made the world a better place.

## II.    <u>THE NATURE AND CIRCUMSTANCES OF THE OFFENSE</u>

Anilesh has been convicted of a serious crime. But even taking the evidence in the light most favorable to the government, that simple statement can be qualified in important ways. Anilesh did not tell his investors they were invested in X when actually they were invested in Y. He did not target the weak or the gullible. All of his investors knew how and where he was investing their money. He did not set out to cause anyone harm. He did not borrow from one investor to pay others. And he did not misappropriate investor money to buy himself or anyone else nice things.

Anilesh did not profit from the offenses of conviction, and in fact lost millions of his own money as a result of PPI's collapse. When the conduct became known to his investors, Anilesh, at substantial cost to himself, took concrete steps to address valuation issues, permit the offense conduct to be investigated, and maximize returns for investors while shutting down PPI.

As a result, and though the Guidelines in no way account for the difference, Anilesh is unlike many (and indeed even most) who appear for sentencing after being convicted of fraud.

### A.    **Anilesh Did Not Intend to Harm Investors, Nor Did He Enrich Himself.**

A defendant's motive is highly relevant at sentencing. *Wisconsin* v. *Mitchell*, 508 U.S. 476, 485 (1993). In examining Anilesh's motive here, there has been no suggestion (and certainly no proof) that Anilesh intended to harm PPI's investors, or that he sought to misappropriate their money for personal gain.

We do not raise these points to argue that Anilesh is innocent. We understand that he was convicted by the jury and that Your Honor will sentence him accordingly. We make these points to attempt to illustrate certain distinctions relevant to

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                          24

culpability—and to the appropriate sentence to impose—that the Guidelines simply do not make.[4]

Indeed, numerous actions that Anilesh took during the conspiracy period were contrary to his pecuniary interest. The proof at trial showed, for example, that during the period charged in the conspiracy Anilesh left a considerable amount of committed but un-deployed capital with New Issue Fund investors. PPI trader Ashish Dole testified that the New Issue Fund "had approximately 800 million of subscriptions and only 400 million was actually taken in," and that "PPI had the right to call [in the] additional 400 million." (Tr. 619:2–6, 682:25–683:2.) By failing to do so, PPI simply passed on approximately $24 million in fees it had every right to collect. (Tr. 688:1–7 (Dole).) And in the fall of 2015, Anilesh decided to give back $50 million to New Issue Fund investors. (Tr. 713:10–17 (Dole); DX 5055 (Anilesh stating that he wished to "give back 50mm to [PPI's] investors on 11/30.").) Again, this was money that PPI could have collected fees on by simply doing nothing, rather than returning the money to investors.

Even accepting the government's claim that the NAV was inflated by $100 million—which, as discussed below, pp. 27–28, we believe is substantially overstated—that would translate to total management fees of $1.5 million over the course of an entire year, only a portion of which would go to Anilesh, assuming the business was even operating profitably (which, in late 2015, it was not). By comparison, when Anilesh decided to return $50 million to investors, he voluntarily gave up $750,000 in management fees that PPI otherwise would have earned just by keeping that money under management.

At trial the government focused on Anilesh's increase in capital account as reflected in his 2014 Form K-1, but made no effort to identify the sources of that increase. It in fact reflected significant income from fees earned in two closed-end funds winding down that year; funds as to which there has been no suggestion of impropriety. (*See* Tr. 2366:23–2367:13 (Majidi explaining that liquidation profits for those two closed-ended funds were based on sales and not marks).) And a significant portion of Anilesh's income from PPI in 2014 was reinvested in the company as he bought out other investors. (*See* DX 4077; GX 342 at 0509.) Clearly Anilesh believed in PPI's potential for expansion in the mortgage origination and hard asset real estate businesses, and invested a substantial amount of his own money to pursue that vision. All of that money was lost when PPI collapsed. When the mortgage-backed securities market tanked in late 2015, Anilesh contributed millions of dollars to keep PPI operational. (*See* DX 1214-R at 75, 77–78.). That money too was lost when PPI collapsed.

---

[4]   Neil's Guidelines as calculated by Probation and the government are no different from an investment advisor who spent 10 years stealing 50 million dollars from vulnerable investors by telling them he was investing in stocks when he or she was in fact spending all of their principal on himself. Indeed, and to the extent this hypothetical thief stole the money alone, his Guidelines, unadjusted for role, would be lower.

The Honorable Katherine Polk Failla                                                    25

In the end, and as compared to the potential incremental gain Anilesh could
have personally made from inflated fees, the amount Anilesh had personally contributed
towards PPI and lost—well over $40 million—was orders of magnitude greater.

**B.    Anilesh Took Concrete Steps to Benefit Investors.**

In 2016, rather than distance himself from the growing problems at PPI,
Anilesh chose another course.  After being told in late February 2016 that losses from
selling off PPI's securities were "going to be substantially more" than Majidi had
previously told him (Tr. 2427:23–2428:19 (Majidi)), Anilesh took several steps.  First, he
immediately spoke to Todd Lee, PPI's General Counsel, and together they immediately
retained outside counsel at Morgan Lewis to advise on next steps and then to investigate
issues surrounding Jeremy Shor's departure from PPI and the pricing and marking of PPI's
books.  (Tr. 4217:1–8, 4219:5–17 (Lee); DX 4111.)[5]

In an effort to continue to conceal the mismarking and avoid crystalizing
PPI's losses, Majidi suggested that PPI's funds be "gated" to prevent investors from
redeeming their investments.  (Tr. 2431:3–2432:9 (Majidi).)   Anilesh refused.  (Tr.
2432:10–17 (Majidi).)

In May 2016, PPI made the decision to liquidate its funds.  Paying them out
of his own pocket, Anilesh asked various employees, including Ashish Dole and Todd Lee,
to help wind PPI down its funds in an orderly manner and maximize returns for investors.
(Tr. 1192:17–21 (Dole); Tr. 4192:20–4193:2 (Lee).)   Anilesh also worked with E&Y to
restate PPI's books.  (*See* Tr. 2921:6–11 (Ansbacher); GX 446; GX 447.)   Finally,
beginning in late 2016, Anilesh facilitated PPI's repayment to investors of management
fees they had paid in late 2015 and early 2016 based on the difference between the original
fund values and the funds as valued through the restatement.

All in, Anilesh spent substantially more than $20 million of his own money
on PPI from late 2015 through 2016—with most of that money being used to employ the
personnel and resources needed to liquidate PPI's assets at the best possible prices for
investors.

Ultimately, Anilesh's efforts to return to investors as much money as he
could were successful.  Anilesh, who had not personally traded bonds in the market for
years, sat at a Bloomberg terminal and worked hard to negotiate the best possible sales of
PPI's illiquid assets.  To maximize the value of securities in the New Issue Fund, PPI
worked with ratings agencies to re-package components of certain subordinate bonds in a
process known as a "re-remic."  (Tr. 4370:12–19 (Smith).)   When PPI finally sold the assets

[5]    In late 2015 and early 2016, PPI was already in the process of bringing in additional
independent pricing services (as distinct from broker-dealers) to value its securities,
and Neil did nothing to hinder that process.  (Tr. 3939:9–3945:15 (Jay).)

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                    26

in the New Issue Fund in August 2016 at a competitive auction, it produced a gain of $24 million above then-existing marks.  (Tr. 4371:17–4372:10 (Smith).)[6]

Again, and at the risk of repeating ourselves, we do not offer this evidence as proof of Anilesh's innocence, but rather to provide insight into his motivations and the degree of his culpability, which in turn are relevant to imposing an appropriate sentence.

### C. The Evidence Reflects a Shorter, and Less Significant, Period of Mismarking than Initially Asserted.

Applying the same caveat, and for the reasons described in more detail in the accompanying memorandum responding to the PSR, we submit that the evidence at trial showed that PPI assigned reasonable and fair values to its bonds for all of 2014 and at least half of 2015, that its practice of applying "sector spreads" to "bid" prices was not itself improper or secret, and that the magnitude of the mismarking was considerably less than had initially been alleged.

**Duration of Mismarking.**  Notwithstanding a higher burden of proof, the government charged a conspiracy considerably broader than the one charged by the SEC. Specifically, the government charged a conspiracy period from January 2014 through April 2016, whereas the SEC alleged that the mismarking at PPI took place from "at least September 2015 through March 2016."  Amended Complaint ¶ 2, *SEC* v. *Premium Point Investments LP*, 18-cv-04145-AJN (S.D.N.Y. Nov. 19, 2018), ECF No. 24.

The record does not support the conclusion that mismarking occurred prior to September 2015.  PPI's independent outside auditor, E&Y, issued unqualified audit opinions for year-end 2014 for each PPI fund at issue in this case.  (*See* GX 508 (MCF); DX 4045 (ERISA); DX 4046 (NIOF).)  When E&Y helped prepare the restatement of PPI's funds' NAVs in 2015, that restatement was limited to September through December 2015 after E&Y tested PPI's valuations for the second quarter and determined that no restatement was necessary.  (*See* Tr. 2978:7–2979:11 (Ansbacher).)  Consistent with the auditor's determinations, Amin Majidi testified that it was only in the second half of

---

[6]   The auction vindicated Neil's belief that the New Issue Fund would improve its performance over time.  The New Issue Fund was a closed-ended fund with a three-year "locked up" period that would expire in 2016 unless investors agreed to an extension.  Although the New Issue Fund's returns since inception had been subpar, Neil advocated for an extension—even though extending the New Issue Fund for a year "would have actually resulted in a loss" to PPI.  (Tr. 4367:7–17 (Smith)).  The firm was operating at a deficit (Tr. 2397:2–7 (Majidi)), and given the New Issue Fund's prior performance, was "exceedingly unlikely" to earn performance fees by extending it for another year (Tr. 4365:19–4367:3, 4367:9–17 (Smith)).  Rather, Neil viewed extending its term as the best option to maximize investors' returns.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                    27

2015—beginning in "July to September"—that the prices became "out of whack" with their fair value.  (Tr. 2717:9–2719:19 (Majidi).)

      **Sector Spreads.**  The record evidence reflected that PPI's use of sector spreads was not improper until around the same time period.  Since 2009, PPI used sector spreads to value its assets—and disclosed that methodology to, among others, its outside counsel, at least two different independent outside auditors, brokers, potential investors, and its fund administrator responsible for verifying that PPI's valuations were determined in accordance with its valuation policy.  (*See* DX 4049 (E&Y), DX 8082 (KPMG), DX 6153 (Citibank), DX 10901 (Amherst), DX 8053 (E&Y), DX 4003 (AIS/US Bank), DX 1400 (same), DX 6147 (Fauchier); *see also* Tr. 2522:1–18 (Majidi).)

      Recognizing that witnesses from two of PPI's investors testified they were unaware of the use of sector spreads, there was no evidence—including from the cooperating witnesses—that its use was deliberately concealed from its investors, much less that Anilesh took any steps to do so.  Indeed, even though investors were frequently permitted to meet with PPI operational staff with responsibility for and exposure to PPI's valuations, Majidi said that no one at PPI was ever instructed not to discuss sector spreads with investors, as would be expected if their existence was part of a fraud.  (Tr. 2524:13–23.)

      PPI's outside auditors from two prominent accounting firms, with full awareness of PPI's use of sector spreads, provided unqualified audit opinions for every single one of PPI's funds through 2014, concluding as to each fund that its financial statements accurately reflected its performance.  PPI's outside administrator, AIS (and later U.S. Bank), was similarly fully aware of PPI's use of sector spreads, used it on a monthly basis to replicate PPI's calculation of the NAV, and repeatedly verified that PPI was in compliance with its valuation policy.  (*E.g.*, DX 4003 (September 2014 U.S. Bank Transparency Report).)

      Several PPI employees whom the government called as witnesses testified that sector spreads could be used to arrive at fair value for pricing securities and were not *per se* improper.  (Tr. 1071:17–20 (Dole); Tr. 1743:19–23 (Nimberg); Tr. 2717:9–24 (Majidi).)  As Majidi explained, PPI's sector spread methodology had worked to achieve fair value since near its founding in 2009—and as he told a potential investor in 2012, PPI's "pricing inclusive of the bid/ask adjustment seem[ed] to be spot on."  (DX 6147.)  Majidi himself acknowledged that the methodology was only used to "move the marks" in the second half of 2015.  (Tr. 2526:24–2527:15, 2717:9–2718:2.)

      **Magnitude of Mismarking.**  Finally, the amount of the actual mismarking was far less than the figure of over $100 million calculated by the government and provided to Probation.  (PSR ¶ 65.)  As an initial matter, the notion that there is a single, precise "fair value" for any given RMBS bond, such that one can determine with any certainty what it "should" be valued, is incorrect.  (*See, e.g.*, Tr. 2623:10–2624:11 (Majidi); Tr. 2877:18–23 (Ansbacher); Tr. 3898:15–20 (Jay).)  The "fair value" of any RMBS bond may differ significantly from the value assigned to it by any one broker or trader—as well as from the

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                              28

price at which the bond is sold.  (Tr. 2415:17–2416:18 (Majidi).)[7]  The government's witnesses testified that there was "quite a bit of dispersion" between the marks assigned by different brokers or dealers to various bonds in PPI's portfolio (Tr. 1189:19–1190:13, 1191:12–1192:7 (Dole testifying about marks in the spreadsheet he created, GX 1579-A, in March 2016)), which could be "quite extreme," even in a more liquid market.  (Tr. 1900:17–1904:9 (Nimberg testifying about dispersions in PPI's January 2015 pricing matrix, GX 965).)

Ultimately, the government's $100 million loss figure was based largely on a spreadsheet created by Ashish Dole (GX 1579-A), which the government claims shows the extent to which PPI's books were mismarked.  This spreadsheet should be afforded little, if any, weight in assessing the magnitude of mismarking.

The spreadsheet was prepared not by experienced professionals, but by an admittedly junior and inexperienced trader providing his subjective opinions as to the price at which he believed PPI's highly illiquid non-agency bonds could be *sold* in a deteriorating and highly illiquid market.  And, although the government displayed the Dole spreadsheet to numerous witnesses in an effort to establish the extent to which PPI withheld its mismarking, at no point did the government attempt—much less succeed—in establishing that Dole's prices in the spreadsheet reflected of fair value.  To the contrary, Dole's spreadsheet listed a number of third-party quotes from independent brokers that were significantly higher than Dole's subjective valuations, *sometimes by over 500 percent*.  (*See* GX 1579-A.)  The government did not prove (or attempt to prove) why Dole's numbers were more "correct" than those provided by third-party, non-corrupt brokers/pricing services.

---

[7]    Indeed, the PSR (and the S1 Indictment) cite as an example of PPI's mismarking, a bond (CUSIP 1248MEAB5) that had been sold at $36 in February 2016 and marked at a mid price of $51.19 in March 2016.  (*See* PSR ¶ 56.)  Yet, Bank of America's *bid* price for that bond in February 2016 was $45.11 (DX 1425), even though Bank of America was the counterparty to the February 2016 trade at $36.  (DX 1003.)  That meant its *mid* price would be even closer to PPI's price.  Similarly, JPM's Pricing Direct service provided a mid price for that same bond of $47.29 in February 2016, well above the $36 sale price.  (GX 978.)

As the government's own example illustrates, the sale price, particularly in an illiquid market, is not necessarily representative of the "true" value of the bond, and even independent brokers often marked bonds above the prices at which they transacted. Indeed, despite being cited as an example of a mismarked security, this CUSIP was also marked well within the range of acceptable values that E&Y assigned to the bond as of December 2015 as part of its 2015 year-end audit.  (*See* GX 522 at 13 (noting that PPI marked the bond at $49.77, and assigning a value range of $45.77–$57.86).)

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                                29

### D.     Anilesh's Relative Degree of Culpability.

Even viewed in the light most favorable to the government, the evidence reflected that other PPI employees played the primary role in any mismarking scheme. Specifically, this scheme was driven by Amin Majidi.  Notably, PPI had been a successful investment manager since 2009, but the mismarking scheme did not begin until *after* Majidi was named portfolio manager of PPI's flagship credit funds five years later.  (Tr. 2093:4–7 (Majidi).)

Majidi admitted he was largely responsible for—and most involved in— any mismarking at PPI.  (Tr. 2571:20–24, 2573:17–2574:13).  The evidence showed that PPI's traders—under substantial pressure from Majidi, and without any instruction from Anilesh—reached out to "corrupt" brokers.  (Tr. 2100:24–2101:7, 2106:1–13 (Majidi); *see also* Tr. 3279:14–16, 3679:25–3680:9 (Dinucci testifying that he worked directly with PPI traders, and that he never met with or spoke to Anilesh).)  The evidence with respect even to his knowledge of the use of corrupt brokers—the heart of the alleged scheme—was sparse and based largely on testimony surrounding Anilesh's supposed reference to "Shor's boys" or "Shor's guys."  And in 2015, PPI traders—at Majidi's direction—began using sector spreads to inflate valuations.  (Tr. 2208:7–23, 2209:13–25 (Majidi).)

In fact, the government's witnesses admitted that Anilesh was deceived about the scope of the mismarking, and continually surprised by the amount of losses PPI was suffering when selling bonds.  (Tr. 2864:23–2865:21 (Majidi); DX 6374 (March 2016 text message in which Majidi tells a colleague "I lied [to Mr. Ahuja] on purpose.").)  As late as February 24, 2016, just before the end of the government's conspiracy period, Majidi was texting with other PPI employees about who had drawn the "short straw" of telling Anilesh that their losses were going to be "substantially more" than Anilesh had previously been told.  (Tr. 2428:2–2429:14 (Majidi).)  When he resigned two weeks later, Jeremy Shor told Anilesh that he felt "information is not relayed to you always accurately or fully."  (DX 1810-A1 (transcript of March 14, 2016 recording).)

Even relying on the government's interpretation of the evidence, these facts show that Anilesh was not in control of or directly implementing mismarking at PPI.

## III.     THE PROPOSED SENTENCE PROVIDES A JUST PUNISHMENT AND ACHIEVES THE GOALS OF SENTENCING

A sentence of 18 months imprisonment provides for "just punishment," protects the "public from further crimes of the defendant," and is sufficient to adequately deter criminal conduct.  18 U.S.C. § 3553(a)(2).  "A punishment is just insofar as it fits the crime and reflects the gravity of the defendant's conduct."  *Simon* v. *United States*, 361 F. Supp. 2d 35, 43 (E.D.N.Y. 2005) (internal quotation marks and citations omitted).  Although the "sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense," it "should not be unreasonably harsh under all the circumstances of the case and should not differ substantially from the

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                                    30

sentence given to another similarly situated defendant convicted of a similar offense under similar circumstances."  S. Rep. No. 98-225 at 3259 (1983).

Here, we respectfully submit that a "just" sentence is a term of approximately 18 months.  First, Anilesh has already suffered devastating consequences from the criminal and civil cases filed against him, and will suffer consequences of the conviction and resulting period of incarceration for as long as he lives.  Second, he poses no risk of re-offending, both because his conviction is such that he will never again manage other people's money and because the nature of the offense was such that it is exceedingly unlikely to re-occur.  Third, the imposition of an 18-month term of imprisonment—on top of the other punishment Anilesh has faced and will continue to face—is sufficient to further the goal of general deterrence and provide just punishment for the offense, especially when considered in the context of prior civil and criminal sanctions in mismarking cases.

### A.    Anilesh Has Already Suffered Greatly From PPI's Collapse.

Anilesh's life, personal and professional, has been turned upside down. Having spent two decades building a spotless reputation in the financial industry, he grew PPI from a three-person firm to a company employing well over fifty professionals and investing over a billion dollars.  Along the way, he formed deep relationships with employees and investors, for whom he delivered years of positive returns.

His plan—already underway by 2014—was to diversify PPI away from the securities business by expanding into mortgage origination and housing.  When PPI investment funds started suffering negative performance in 2015, Anilesh still thought PPI's future was bright, and he contributed millions of dollars to the operating business to make up the deficit and pay employees' salaries and bonuses.

After major investors pulled their money in spring 2016, Anilesh decided to unwind PPI's assets and liquidate its funds.  None of the new businesses Anilesh hoped to spearhead would launch.  He continued to pour money into PPI—well over $20 million in total—to pay for the employees and expenses needed to maximize the returns investors would receive from the liquidation.  All of that money is gone.  Even so, Anilesh personally facilitated the repayment of fees to investors.

Anilesh has also incurred great expense defending himself in the criminal prosecution, and will continue to incur substantial costs while facing civil actions brought by SkyBridge Capital, which seeks many millions of dollars in damages, and an enforcement action brought by the SEC.

At over 50 years old, Anilesh has lost his career that he loved.  His criminal conviction will almost surely result in a lifetime industry bar, and PPI's collapse and Anilesh's arrest, prosecution, and conviction have all received significant publicity. Anilesh's rise from an immigrant with limited resources to a storied career at multiple financial institutions will be cast aside, and he will forever be known for this indictment and conviction.  His personal reputation has been irreparably tarnished.  "[T]he impact of

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                          31

the situation in which he now finds himself has been brutally shameful, punishing and ruinous" and he has "been disgraced personally and professionally." (*See* Ex. 20 at 1–2 (Letter from Ajit Jain).)

   The end of PPI and his career have taken a significant toll on Anilesh's health. ███████████████████████████████████████████████████████████████ ████████████████████████████ As his wife explains, "Anilesh has paid a huge price already." (Ex. 6 at 2 (Letter from Tania Vital-Ahuja).)

   Above all else, however, Anilesh has had to witness the suffering his family endured as a result of this criminal case. Their lives suddenly appear far more precarious. They have received unwanted publicity, especially within their small Indian-American community, and some they considered friends have abandoned them.

  **B.**  **Anilesh Poses No Risk of Recidivism.**

   The sentencing goals of specific deterrence and protection of the public do not warrant a significant custodial term. There is no reasonable risk of Anilesh violating the law at any point in the future and, as a result, no need for specific deterrence. This case represents a significant deviation from a life and career marked by hard work and integrity.

   Anilesh has no criminal history. He has spent decades in the financial services industry and has, throughout his career, shown nothing but the utmost respect for the law and for the well-being of his clients. Former colleagues go out of their way to explain that Anilesh "believed in absolute transparency" and "never took unfair advantage" of customers or clients. (Ex. 10 at 1 (Letter from Richard Birnbaum). Friends and neighbors who have invested with him have also commended his transparency and integrity. (*See* Ex. 29 at 1 (Letter from Tara and Victor Menezes); Ex. 19 at 1 (Letter from Lawrence Jaeger).) Up to this point, he has maintained a number of securities licenses without incident, and has been involved with numerous for-profit and non-profit organizations whose members attest to his probity and ethical leadership. As Probation stated, "[h]e has the ability to . . . once again[] become a productive member of society." (PSR at 42.)

   Anilesh will also likely never again be in a position to invest other peoples' money. His career as an investment manager is over. No financial institution will hire him—indeed, financial institutions have refused to even let him bank with them, much less be associated with them, as a result of just being charged in this case. Courts have recognized that specific deterrence will not be furthered by a substantial sentence of incarceration where the defendant simply has no ability to perpetrate a similar crime. *See United States* v. *Emmenegger*, 329 F. Supp. 2d 416, 428 (S.D.N.Y. 2004) (noting that a securities fraud defendant "yielded to a temptation and committed a crime particularly adapted to his chosen career. That career is over, and his potential to commit this particular type of crime has been eliminated."). And where a defendant with no previous criminal history loses their livelihood at this advanced age, the chances of future threat to the public

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                    32

are even further diminished.  *See United States* v. *Carmona-Rodriguez*, No. 04 Cr. 667 (RWS), 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (imposing below-Guidelines sentence in part because defendant was 55 years old and a first-time offender).

**C.      The Proposed Sentence Serves the Goal of General Deterrence.**

Similarly, the proposed sentence of 18 months imprisonment is sufficient to promote general deterrence.  Indeed, *any* custodial sentence is likely to serve to deter financial professionals from engaging in mismarking.  *See Gupta*, 904 F. Supp. 2d at 355 ("[C]ommon sense suggests that most business executives fear even a modest prison term to a degree that more hardened types might not.  Thus, a relatively modest prison term . . . is 'sufficient, but not more than necessary' for (general deterrence) purpose[s]."), *aff'd*, 747 F.3d 111 (2d Cir. 2014); *see also United States* v. *Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (citing Richard Frase, *Punishment Purposes* 58 Stan. L. Rev. 67, 80 (2005) (recognizing the "strong deterrent effect" of any custodial sentence "on prospective 'white collar' offenders"); Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J. 485, 492 (1998)), *aff'd*, 301 F. App'x 93 (2d Cir. 2008).

In fact, general deterrence has likely already been achieved through Anilesh's well-publicized indictment and conviction, the SEC action filed against Anilesh, and SkyBridge's civil action seeking over $70 million in damages.  This follows closely in the footsteps of the *Lumiere* prosecution—brought in June 2016 just months after PPI shut down—for mismarking fixed-income securities through the use of purportedly independent brokers at another New York hedge fund manager.  By charging criminally acts frequently the subject of civil enforcement actions, *see infra* Section III.D, the government has sent a clear message to the industry about the valuation of over-the-counter asset-backed securities.  Fund managers, traders, brokers, and investors are all on notice. While adding months or years to a period of incarceration will greatly impact Anilesh and his family, it will do little (if anything) to promote the principles of general deterrence.

**D.      A Sentence of 18 Months Provides Just Punishment and Avoids Unwarranted Sentencing Disparities**

In light of the specific (and somewhat unique) characteristics of the offense conduct in this case, and against the backdrop of Anilesh's life, the collateral consequences of his conviction, and the types of sentences imposed in other mismarking cases, a sentence of 18 months reflects the seriousness of the conduct, provides just punishment, and avoids unwarranted sentencing disparities.

In many mismarking cases, the conduct has not resulted in any criminal charges, but rather, has been the subject of SEC or CFTC enforcement actions, subjecting the participants only to civil sanctions, including in circumstances where the conduct was more serious or pervasive, and/or where the individuals held supervisory roles.  For example:

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                        33

- *In re Swapnil Rege*, Investment Advisers Act Release No. 5303, Investment Company Act Release No. 33561 (July 18, 2019). Rege, a portfolio manager, allegedly used deceptive valuation methods to inflate the value of asset-backed securities for nearly a year, and covered up his mismarking by engaging in "package" trades and submitting doctored communications to his employer. Rege's conduct resulted in inflated NAVs and generated over $11.5 million in excess incentive fees. Rege was ordered to disgorge $600,000 and pay a $100,000 civil monetary penalty.

- *In re Deer Park Road Management Co., LP and Scott Burg*, Investment Advisors Act Release No. 5245 (June 4, 2019). Deer Park, a hedge fund, and Burg, a Deer Park portfolio manager and primary trader, failed to have policies and procedures to address the risk that traders were undervaluing mortgage-backed securities and then inflating values and selling for a profit when needed. Deer Park traders also provided inaccurate information to a pricing vendor and used the prices they got back to value bonds. Burg was ordered to pay a $250,000 civil monetary penalty and Deer Park was ordered to pay a $5,000,000 civil monetary penalty.

- *In re Jacob Bourne*, CFTC Docket No. 18-51 (Sept. 28, 2018). Bourne, a managing director and trader, mismarked the valuations for swap instruments in an attempt to hide from his employer estimated trading losses of more than $16 million. When confronted, Bourne attempted to conceal his misconduct. Bourne was ordered to pay a $350,000 civil monetary penalty and permanently prohibited from trading.

- *In re AlphaBridge Capital Management, LLC, Thomas Kutzen, and Michael Carino*, Investment Advisers Act Release No. 4135, Investment Company Act Release No. 31700 (July 1, 2015). Kutzen, the founder, Chief Executive Officer and Chief Investment Officer of AlphaBridge, and Carino, the firm's Chief Compliance Officer, engaged in a four-to-five-year scheme to inflate the valuations of mortgage-backed securities held by AlphaBridge funds. Kutzen and Carino told investors and their auditor that they obtained independent price quotes from broker-dealers for securities when they instead gave internally derived valuations to broker-dealers to pass off as their own. Carino drafted memoranda to AlphaBridge's auditor containing lies about its valuation practices, and secretly crafted responses on behalf of a purportedly independent broker to valuation inquiries from the auditor and the fund's Valuation Group. AlphaBridge ultimately had to write down its total NAV by more than 65%. Respondents, jointly and

severally, were ordered to pay $4,025,000 in disgorgement. Alphabridge was censured and ordered to pay a civil monetary penalty of $725,000. Kutzen was censured and ordered to pay a $50,000 civil monetary penalty, and Carino received a three-year industry bar and was ordered to pay a $200,000 civil monetary penalty.

- *S.E.C.* v. *Edward O'Connor*, No. 08 Cv. 9961 (S.D.N.Y. 2008), ECF No. 128. O'Connor was one of the co-founders of Optionable, a brokerage firm. His co-defendants, Kevin Cassidy and David Lee, were charged criminally. Lee, a trader at a bank, often provided marks to O'Connor, who then forwarded Lee's marks virtually unchanged to the bank's risk management department as if they were Optionable's independent quotes. At the height of the scheme, O'Connor also defrauded Optionable shareholders by selling millions of dollars of Optionable stock to unknowing purchasers, who lost their money when the scheme was revealed. O'Connor was ordered to pay a civil penalty of $150,000 plus disgorgement of $550,000, which represented his profits.

- *S.E.C.* v. *Beacon Hill Asset Management, LLC et al.*, 02 Cv. 8855 (S.D.N.Y. 2004), Litigation Release No. 18950 (Oct. 28, 2004). Four principals at Beacon Hill Asset Management implemented a mismarking scheme that resulted in hedge fund investors losing more than $300 million. The scheme included misrepresenting and manipulating valuation procedures to maintain the appearance of positive returns and hide losses. Each principal was given a civil penalty ranging from $200,000 to $500,000 and had to pay disgorgement ranging from approximately $200,000 to over $1 million each.

The sentences imposed in the relatively few instances where mismarking offenses have resulted in criminal prosecution also reflect that 18 months would provide just punishment in this case and would serve to avoid unwarranted disparities. We are aware of the following mismarking cases in this Circuit (involving non-cooperating defendants) in the last ten years:

- *United States* v. *Lumiere*. The defendant, a hedge fund portfolio manager, was sentenced to 18 months imprisonment following his conviction at trial for deceiving investors for more than two years about the fund's NAV. According to the government, Lumiere used "corrupt" brokers to obtain sham quotes and traded securities at inflated prices to increase the valuations for the fund's debt securities. Gov't Sentencing Mem. at 3, No. 16 Cr. 483 (JSR) (S.D.N.Y. May 16, 2017), ECF No. 98. As noted above, Judge

The Honorable Katherine Polk Failla                                    35

Rakoff used gain (*i.e.*, excess fees paid to the fund based on the inflated NAV) rather than loss to calculate the advisory Guidelines range, yielding a range of 87 to 108 months, and then imposed a sentence substantially lower than that.  Sentencing Transcript at 2, *United States* v. *Lumiere*, No. 16 Cr. 483 (JSR) (S.D.N.Y. June 14, 2017), ECF No. 115.

- *United States* v. *Balboa*.  The defendant, a hedge fund portfolio manager, was sentenced to 48 months imprisonment following his conviction at trial for fraudulently mismarking the fund's securities and then attempting to conceal his scheme.  Gov't Sentencing Mem., No. 14-2394, 2015 WL 3940706, at *3–4, 13 (2d Cir. June 24, 2015).  The Court found that the scheme caused investor losses of $390 million, resulting in a Guidelines range of life imprisonment.

- *United States* v. *Hochfeld.* The defendant, a manager at hedge fund Hochfeld Capital Management, was sentenced to 2 years imprisonment for providing investors with fraudulently inflated NAVs *and* misappropriating more than $2 million from over twenty investors to pay for extravagant personal expenses.  *See* Gov't Sentencing Mem. at 2, *United States* v. *Hochfeld*, 13 Cr. 21 (PAC) (S.D.N.Y. July 23, 2013), ECF No. 25, Sentencing Transcript at 22, *United States* v. *Hochfeld*, 13 Cr. 21 (S.D.N.Y. Aug. 5, 2013), ECF No. 28.  The Guidelines range was initially determined to be 78–97 months, but noting the "harsh result," Judge Crotty opted instead to use an older version of the Guidelines for crimes involving frauds, which resulted in a modified Guidelines range of 30–37 months and a sentence of 24 months.  Sentencing Transcript at 20–21, *United States* v. *Hochfeld*, 13 Cr. 21 (PAC) (S.D.N.Y. Aug. 5, 2013), ECF No. 28.

- *United States* v. *Serageldin*.  The defendant, a managing director at Credit Suisse who supervised more than 70 employees, was sentenced to 30 months imprisonment for mismarking MBS during the financial crisis.  Gov't Sentencing Mem. at 7, *United States* v. *Serageldin*, No. 12 Cr. 90 (AKH) (S.D.N.Y. Nov. 19, 2013), ECF No. 15, Sentencing Transcript at 51, *United States* v. *Serageldin*, No. 12 Cr. 90 (AKH) (S.D.N.Y. Nov. 22, 2013), ECF No. 18. According to the government, he ordered subordinates to falsely mark bonds in a book he managed in order to reach specific profit targets, causing Credit Suisse's books to be overstated by more than $100 million.  Gov't Sentencing Mem. at 3, 11, *United States* v. *Serageldin*, No. 12 Cr. 90 (AKH) (S.D.N.Y. Nov. 19, 2013), ECF No. 15.  The Guidelines were calculated using gain instead of loss, resulting in a Guidelines range of 57–60 months and a sentence of

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                              36

> 30 months. Gov't Sentencing Mem. at 11, *United States* v. *Serageldin*, No. 12 Cr. 90 (AKH) (S.D.N.Y. Nov. 19, 2013), ECF No. 15, Sentencing Transcript at 3, 51, *United States* v. *Serageldin*, No. 12 Cr. 90 (AKH) (S.D.N.Y. Nov. 22, 2013), ECF No. 18.

- *United States* v. *Cassidy*. The defendant, a broker, was sentenced to 30 months imprisonment after his conviction for defrauding a bank by providing it with inflated valuations he had received from a trader at the bank. Gov't Sentencing Memo. at 2–3, *United States* v. *Cassidy*, No. 08 Cr. 1101 (TPG) (S.D.N.Y. Apr. 23, 2012), ECF No. 72, Sentencing Transcript at 60, *United States* v. *Cassidy*, No. 08 Cr. 1101 (TPG) (S.D.N.Y. Apr. 25, 2012), ECF No. 75. For Guidelines purposes, the Court relied on a gain of $950,000, instead of using loss, which resulted in a Guidelines range of 30 to 37 months and a sentence of 30 months. Sentencing Transcript at 4, 60, *United States* v. *Cassidy*, No. 08 Cr. 1101 (TPG) (S.D.N.Y. Apr. 25, 2012), ECF No. 75.

In a recent case in the District of New Jersey, *United States* v. *Zuck*, Peter Zuck, the Chairman and CIO of a hedge fund, was sentenced to 3 years imprisonment for participating in a mismarking scheme and separately committing tax evasion, after having been convicted previously of three separate incidents of securities fraud. *See* Judgment, *United States* v. *Zuck*, 17 Cr. 138 (JHR) (D.NJ 2017), ECF No. 13. According to the government, Zuck and his coconspirators fraudulently inflated the fund's NAV, diverted approximately $4 million of investors' funds to themselves, and secured $3.9 million in management fees to which they were not entitled. *See* Information ¶ 10, *United States* v. *Zuck*, 17 Cr. 138 (JHR) (D.N.J. 2017), ECF No. 1. Coconspirator Michael Spak, the CEO of the fund manager, was sentenced to five years of probation. *See* Judgment, *United States* v. *Spak,* 12 Cr. 642 (JHR) (D.N.J. 2017), ECF No. 21.

Each case is different, and when it comes to sentencing, no size fits all. That being said, we respectfully submit that these recent mismarking cases from this District reflect a contemporary view of just punishment, and how a sentence of 18 months in this case would avoid unwarranted disparities and reflect certain unique aspects of Anilesh and the crime.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla                                                      37

## **CONCLUSION**

For reasons set out above, we respectfully submit that a sentence of 18 months imprisonment is appropriate in this case.

Respectfully submitted,

Roberto Finzi
Richard C. Tarlowe

cc:     Counsel of Record