PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON    (1946-1991)
RANDOLPH E. PAUL     (1946-1956)
SIMON H. RIFKIND     (1950-1995)
LOUIS S. WEISS       (1927-1950)
JOHN F. WHARTON      (1927-1977)

WRITER'S DIRECT DIAL NUMBER

(212) 373-3311

WRITER'S DIRECT FACSIMILE

(212) 492-0311

WRITER'S DIRECT E-MAIL ADDRESS

rfinzi@paulweiss.com

UNIT 5201, FORTUNE FINANCIAL CENTER
5 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT, BEIJING 100020, CHINA
TELEPHONE (86-10) 5828-6300

HONG KONG CLUB BUILDING, 12TH FLOOR
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, UNITED KINGDOM
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
JUSTIN ANDERSON
ALLAN J. ARFFA
JONATHAN H. ASHTOR
ROBERT A. ATKINS
DAVID J. BALL
SCOTT A. BARSHAY
PAUL M. BASTA
JOHN F. BAUGHMAN
J. STEVEN BAUGHMAN
LYNN B. BAYARD
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
DAVID M. BERNICK
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
ROBERT BRITTON
DAVID W. BROWN
SUSANNA M. BUERGEL
JESSICA S. CAREY
DAVID CARMONA
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
YAHONNES CLEARY
RACHAEL G. COFFEY
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
HARRIS FISCHMAN
ANDREW J. FOLEY
ANDREW J. FORMAN*
HARRIS B. FREIDUS
CHRISTOPHER D. FREY
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
NEIL GOLDMAN
MATTHEW B. GOLDSTEIN
ROBERTO J. GONZALEZ*
CATHERINE L. GOODALL
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
BRIAN S. GRIEVE
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
ALAN S. HALPERIN
CLAUDIA HAMMERMAN
BRIAN S. HERMANN
MICHELE HIRSHMAN
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
JAREN JANGHORBANI
BRIAN M. JANSON
JEH C. JOHNSON
MEREDITH J. KANE
JONATHAN S. KANTER
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY

BRIAN KIM
KYLE J. KIMPLER
ALEXIA D. KORBERG
ALAN W. KORNBERG
DANIEL J. KRAMER
CAITH KUSHNER
DAVID K. LAKHDHIR
JOHN E. LANGE
GREGORY F. LAUFER
BRIAN C. LAVIN
XIAOYU GREG LIU
LORETTA E. LYNCH
JEFFREY D. MARELL
MARCO V. MASOTTI
DAVID W. MAYO
ELIZABETH R. MCCOLM
JEAN M. MCLOUGHLIN
ALVARO MEMBRILLERA
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG K OH
BRAD R. OKUN
KELLEY D. PARKER
LINDSAY B. PARKS
VALERIE E. RADWANER
JEFFREY J. RECHER
CARL L. REISNER
LORIN L. REISNER
JEANNIE S. RHEE*
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JUSTIN ROSENBERG
JACQUELINE P. RUBIN
CHARLES F. "RICK" RULE*
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
BRIAN SCRIVANI
KYLE T. SEIFRIED
KANNON K. SHANMUGAM*
DAVID R. SICULAR
AUDRA J. SOLOWAY
SCOTT M. SONTAG
SARAH STASNY
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
BRETTE TANNENBAUM
RICHARD C. TARLOWE
MONICA K. THURMOND
DANIEL J. TOAL
LAURA C. TURANO
CONRAD VAN LOGGERENBERG
LIZA M. VELAZQUEZ
MICHAEL VOGEL
RAMY J. WAHBEH
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
LINDSEY L. WIERSMA
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
AUSTIN WITT
MARK B. WLAZLO
JULIA TARVER MASON WOOD
JENNIFER H. WU
BETTY YAP*
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

April 1, 2020

**BY EMAIL/ECF**

The Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

*United States* v. *Anilesh Ahuja*, 18 Cr. 328 (KPF)

Dear Judge Failla:

    We write to briefly address certain arguments raised for the first time in the government's reply in support of its restitution submission.  Mr. Shor joins in this letter.

    ***First***, the government submitted brief summaries of its six "comparator" hedge funds obtained from BarclayHedge.  Citing these summaries, the government claims that its selected funds were "pursuing similar RMBS investment strategies" to MCF and NIOF during the relevant period.  (Gov't Reply Letter at 5.)  The BarclayHedge summaries do not support that conclusion; rather, they serve as additional evidence that the government's restitution calculation is unsound.

    As a threshold issue, it would be impossible for these six funds to pursue "similar" strategies to ***both*** MCF and NIOF.  As cooperating witness Ashish Dole explained, NIOF "had a ***different strategy***" from MCF:  NIOF invested primarily in newly issued whole loans and RMBS originated and securitized by PPI itself, whereas MCF mostly invested in legacy (*i.e.*, pre-financial crisis) RMBS sold by third parties.  (Trial Tr. 254:12-21 (emphasis added), 832:24–35:11.)  Each fund held investments with different attributes and risk profiles, including different deal terms and exposure to distinct categories of borrowers and collateral.  Unsurprisingly, the two strategies performed quite differently—prior to the restatement period beginning September 2015, MCF had positive returns, while NIOF had negative returns.  (Ahuja Restitution Letter, Ex. 7; DX 1064-A.)

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

Given their divergent strategies, one cannot use the performance of one fund as a proxy for what the other fund's performance would have been absent mismarking.  By the same logic, one cannot use the same fund (or set of funds) as a proxy for what both MCF's and NIOF's performance would have been absent mismarking.

More fundamentally, the BarclayHedge summaries contain scant information on the six identified funds, and what little information is provided suggests that they did not pursue "similar" strategies to either MCF or NIOF.[1]  Only half of the six are even categorized as "Mortgage Backed" funds, a category that includes commercial and residential mortgage-backed securities (CMBS and RMBS).  (Gov't Reply Letter, Ex. A.)  And nearly **all** of the funds' strategies include investing in non-RMBS assets such as asset-backed securities, CMBS, collateralized debt obligations, collateralized loan obligations, insurance-linked securities, consumer loans, corporate bonds, and others.  (*Id*.)  Neither MCF nor NIOF had significant holdings in **any** of these types of assets.

As with all hedge funds, the performance of PPI's funds was driven by the composition of their portfolios.  But nothing in the BarclayHedge summaries suggests that the six identified funds invested in, as the government asserts, "comparable RMBS . . . during the same period."  (Gov't Reply Letter at 2.)  Nothing suggests these funds invested primarily in a mix of subprime, agency, and pay-option adjustable-rate RMBS, as MCF did, or primarily in a mix of new-issue whole loans and subordinate and interest-only RMBS, as NIOF did.  Nothing indicates these six funds were highly exposed to leveraged legacy assets with limited "carry" (or income), like MCF was.  (Trial Tr. 2404:19-24 (Majidi).)  These were securities that PPI's employees and investors referred to as especially illiquid (Trial Tr. 2410:10-16 (Majidi), 3182:24–3183:4 (Gayeski)), and which only a "few funds" were buying in *any* quantities at the time (2411:15-18 (Majidi)).  In fact, the government's chosen funds may have avoided losses by not investing in such assets; for example, the BarclayHedge description for Metacapital states that it "focus[es] on the **senior classes** of securitization and/or those loan pools that have **lower leverage** characteristics."  (Gov't Reply Letter, Ex. A (emphases added).)[2]

---

[1]   Nor does anything in the BarclayHedge summaries indicate that the investment returns the government used for these six funds—funds perceived by a SkyBridge analyst to be using "fantasy marks"—were audited or otherwise verified.  Indeed, SkyBridge's senior portfolio manager testified that he "believe[d] there have been several SEC investigations recently on one of the firms."  (Trial Tr. 3237:8-10.)

[2]   The government contends that the cross-examination of witnesses by Mr. Ahuja's counsel shows that Mr. Ahuja understood certain of these funds to be "competitor RMBS hedge funds."  (Gov't Reply Letter at 4.)  But whether PPI viewed certain funds as competitors says nothing about whether those funds are appropriate proxies for how PPI's portfolios would have performed absent mismarking.  Mr. Ahuja explained in his restitution submission—and the government does not contest—how two different RMBS investments, like two different public stock investments, can perform very differently over the same time period, which could account for most or even all of the difference between the performance of PPI's funds and the performance of other funds.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

The BarclayHedge exhibit only further establishes that the government's proposal fails to "disentangle[] those elements" of PPI investors' losses that resulted from legitimate factors. *United States* v. *Gushlak*, 728 F.3d 184, 197 (2d Cir. 2013). While the government cites *Gushlak* to argue that it need only arrive at a "reasonable estimate" of loss, it ignores what the Second Circuit found necessary to arrive at such an estimate: a "sound methodology" that excludes losses caused by legitimate factors such as risks specific to (i) the overall market, (ii) the relevant industry, and (iii) the company itself (other than fraud). *Id.* at 201. Because it has not shown how its proposal excludes the risk of loss from non-fraud factors specific to each of the MCF and NIOF portfolios, the government's proposal does not rest on a sound methodology.

*Second*, the government with its reply submitted a new expert analysis purporting to show why one of Mr. Ahuja's proposed methods for calculating losses is deficient. In his submission, Mr. Ahuja argued that if the Court decides that "investment losses" must be part of restitution, those losses should be determined by calculating the difference between (i) PPI's original returns and (ii) PPI's restated returns. Unlike the government's proposal, this methodology would properly exclude any factors causing PPI's losses other than fraud, because it would compare the performance of PPI's portfolios with mismarking to the performance of those same portfolios without mismarking.

The government now claims this analysis is flawed because ending it one month earlier—February 2016, as opposed to March 2016—results in $38.3 million more loss. The government appears to be saying that ***all*** of MCF's negative returns in March 2016 were due to mismarking because that is when "PPI began to engage in a fire sale when the fraud began to unravel." (Gov't Reply Letter at 6–7.) But the government cites nothing to support that conjecture, and as Mr. Ahuja has shown, there is good reason to believe that much of the loss in March 2016 was due to investment performance rather than a fire sale. (Ahuja Restitution Letter at 8.) And to the extent that the government— incorrectly—argues that Mr. Ahuja's proposal is deficient because it understates losses by $38 million, it concedes that its own proposal overstates losses by over $60 million.[3]

*Finally*, the government's reply advances two new evidentiary arguments, neither of which have merit.

Citing to two exhibits that it claims show that MCF was mismarked by $100+ million, the government says that its loss estimate for MCF is "supported by the trial evidence." (Gov't Reply Letter at 2.) As Mr. Ahuja has shown, those exhibits—a March 2016 spreadsheet created by Ashish Dole and an E&Y memo—do not show that MCF was mismarked by $100+ million. Dole's spreadsheet reflected only his subjective

---

[3]  The government also asserts that Mr. Ahuja's investment loss proposal is "not logical" because it "assumes investors would have remained invested in PPI had they known about the fraud." (Gov't Reply Letter at 6.) Not so—Mr. Ahuja's proposal assumes that PPI investors would have remained invested in PPI ***if there had been no fraud.*** The proposal compares PPI's returns with mismarking to PPI's returns without mismarking to estimate how much of PPI's losses were due to fraud rather than legitimate factors. That is the goal of any sound restitution methodology. *See Gushlak*, 728 F.3d at 197; Ahuja Restitution Letter at 7 (collecting cases).

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

opinions as to where MCF's securities could be *sold*, and those opinions were unreliable, as evidenced by the independent third-party quotes in the same spreadsheet assigning far higher values to the same securities.  (Tr. 1226:21–1227:1 (Dole); GX 1579-A.)  And the E&Y memo—showing the amount of restatement, not mismarking—was not limited to MCF, but rather covered securities across **three** PPI funds.  (GX 522 at 6.)  More importantly, as the Court noted when striking the $100 million allegation from the PSRs, that figure is "not a loss" and only "confuses the loss issue."  (Shor Sentencing Tr. at 112.)  The amount of mismarking in MCF at one point in time **has no bearing on the amount that MCF investors lost.**  Their holdings had real values, no matter what marks PPI assigned securities, and those values decreased only when MCF realized actual losses.

Next, the government's bald assertion that PPI investors had no visibility into their investments is flatly contradicted by objective, indisputable evidence.  The government claims that the fact that PPI made security-level disclosures to investors is "belied by the record" (Gov't Reply Letter at 4), without explaining how.  It says that such disclosures were "first made around March 2016" (*id.*), ignoring at least two documented instances of investors reviewing materials specifically listing each individual security held by the fund in January 2016 and 2014 (Ahuja Restitution Letter at 6 n.2).  Indeed, as part of their periodic due diligence, investors reviewed valuation committee documents, which included security-level valuations.  And—as the government does not contest—PPI investors had access to detailed monthly disclosures on the composition of PPI's portfolios and the specific types of RMBS in which they were invested.  The government also contends that investors were falsely told that MCF was rotating out of subprime into agency securities.  But the government never proved this allegation.  To the contrary, as reflected in the monthly investor disclosures, there was a rotation: the percentage of MCF's portfolio allocated to (and thus investors' exposure to) subprime RMBS **decreased** and agency RMBS **increased** substantially in MCF's final months.[4]

For these reasons, we respectfully request that the Court reject the government's proposed restitution calculation.  If restitution is to be awarded, the Court should adopt one of the proposals set forth in Mr. Ahuja's February 28 letter.

Respectfully submitted,

Roberto Finzi
Richard C. Tarlowe

cc:   Counsel of Record

---

[4]   *See* Ahuja Restitution Letter, Ex. 3 at 2, DX 911-A at 2,  DX 913-A at 2 (reports reflecting that MCF's agency allocation increased nearly 12% and subprime allocation decreased 13% from September 2015 through February 2016, with a 4% agency increase and 8% subprime decrease in first two months of 2016 alone).