

Justin S. Weddle
212 - 997 - 5518 (o)
347 - 421 - 2062 (m)
jweddle@weddlelaw.com

June 19, 2020

**By ECF**

Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re:   *United States v. Ahuja and Shor*, 18 Cr. 328 (KPF)
      **Defendants' Joint Request for an Order Requiring Disclosure and for a Hearing on Brady/Giglio Violations**

Dear Judge Failla:

   We write on behalf of defendants Ahuja and Shor to request an order requiring disclosure and a hearing on new evidence that counsel for Ahuja obtained by means of a FOIA request that reveals additional *Brady/Giglio* material relating to cooperator Majidi's plea allocution. This newly-discovered information calls into question the accuracy of various representations the United States Attorney's Office made to the defense and to the Court, and justifies the relief sought in this request.

                          **Background**

   As the Court will recall, in or about May 2019, counsel for Ahuja served a Rule 17 subpoena on Majidi's counsel calling for communications with the USAO. As a result, Majidi's counsel collected and planned to produce various communications, including most notably, an email to the USAO dated October 29, 2018 and attaching a proposed allocution for Majidi's plea. Aware of counsel's intention to produce those documents, on June 5, 2019, two days into trial, the USAO turned over Majidi's proposed allocution. The next day, defendants received a production of documents from Majidi's counsel in response to the Rule 17 subpoena, which included, among other things, Majidi's proposed allocution with a cover email from his counsel.

   The cover email from Majidi's counsel showed that on October 30, 2018, AUSA Naftalis responded to counsel's email, asking "can we talk around 4:30?" Then, on October 31, 2018, Majidi appeared in Court and pled guilty, delivering an allocution that differed in significant respects from his proposed allocution. Most notably, the proposed allocution (1) stated that


Majidi "participated in a scheme to inflate the month-end net asset value of the hedge fund" and that the "scheme accelerated in the second half of 2015, as the hedge fund's performance was deteriorating," and (2) that Majidi "pressured" "the traders under [his] supervision" to meet "performance targets" (ECF 210 Ex. A). The delivered allocation, by contrast, stated: "Between 2014 and 2016, I participated in a scheme with, among others, Neil Ahuja, CEO of PPI, and Jeremy Shor, a trader at PPI, to fraudulently inflate the net asset value of the funds that PPI managed." (ECF 210 Ex. C at 31-32). Defendant Shor was not mentioned in the proposed allocation sent to the government by Majidi's counsel.

Before delivering this allocation, Majidi confirmed that he was reading from "written notes," and when the Court asked Majidi if "[t]he thoughts expressed in those notes are yours," Majidi stated "They are mine." (ECF 210 Ex. C at 31).[1]

While this exchange between Majidi's counsel and the USAO plainly consituted *Brady* and *Giglio* material that the USAO should have produced on its own; it first produced the proposed allocation only upon learning that Ahuja's counsel had subpoenaed the documents from Majidi's counsel. On June 6, 2019, the Court denied the defendants' motion to dismiss the indictment based on *Brady* violations (Tr. 465), but because of the "death by a thousand cuts that I've got here that I keep hearing every day about new things," the Court ordered the prosecution team to review its communications to make sure that all disclosable material had been produced. (Tr. 478-80). As a result of the Court's order, the prosecution produced a similar interchange between the prosecution team and counsel for Dinucci, which included a proposed allocation that stated: "During this time period—2015 and 2016—a PPI portfolio manager, and on occasion one of his colleagues, would ask me to provide marks for securities held by one of their investment funds." (ECF 210 Ex. E). By focusing only on 2015 and 2016, Dinucci's propsoed allocation aligned with Shor's defense. When Dinucci allocuted in Court, by contrast, he changed the start of the fraud to "mid-2014." (ECF 210 Ex. F at 17). Again, Dinucci's proposed allocation and the communications surrounding it were *Brady* and *Giglio* material that the prosecution should have identified and produced; instead, they were only produced as a result of the Court's specific mid-trial order to re-review the communications.

By letter dated June 9, 2019, both defendants filed letters requesting relief based on these late disclosures. Among other things, Ahuja's letter specifically requested "that the Court order the government to provide a description of *any oral communications it had with counsel concerning the content of cooperator plea allocations and any suggested modifications*

---

[1] Significantly, when the Court inquired of counsel for Majidi, counsel stated that he had no recollection of having prepared the allocation that Majidi delivered in Court (Tr. 2050-51), and that his firm did not have the final version of the allocation on its system (Tr. 2059-61).


*to those allocutions*, including those of Amin Majidi." (ECF 319 Ex. 6). Shor's letter specifically argued that:

> [a] fair reading of these documents suggests that the Government took active steps to review and then to revise the plea allocutions of Mr. Majidi and Mr. Dinucci. The reviews were not simply to ensure that the proposed allocutions satisfied the elements of the charged offenses; indeed, both proposed allocutions easily did. Rather, the Government seemingly suggested revisions—both times orally—that eliminated *Brady*/*Giglio* information for Mr. Shor and cut statements that would be used to impeach the Government's theory of prosecution.

(ECF 210 at 4). In response, the prosecution denied the argument, claiming instead that any communications were innocuous and formed no part of any litigation strategy.

On June 10, 2019, the Court discussed the issue on the record. (Tr. 753-64). The Court reiterated, and the government agreed, that Majidi's eventual allocution was "quite different from the proposed allocution." (Tr. 763). AUSA Nicholas said he did not "*specifically know how it got to be different.*" (*Id.*) The Court then addressed the Majidi allocution with AUSA Naftalis. (Tr. 765). AUSA Naftalis said he did not request the proposed allocution from Majidi's counsel, and that it was not his practice to do so. (Tr. 765-66). AUSA Naftalis said he recalled receiving the allocution and speaking with Majidi's counsel, as follows:

> The substance was, which is what I say to all defense lawyers, which is, you've given us an allocution; we're only asking you allocute to the elements and what's in the information, and that—to be clear, I don't think there's any great change in these allocutions, which is they allocute to the crime, and what they allocute to is consistent with what they told us, and what they propose in their proposed allocutions is also consistent to what they told us, meaning it's in our notes. Both of them are in our notes. We just typically say, you're a cooperator, you're going to be under oath, allocute to the elements, you're not testifying to the judge, this isn't your opportunity to blame others or, you know, this isn't your sentencing proceeding, for example. It's just allocute. . . . *I certainly do not tell people what to say*.

(Tr. 767-68) (emphasis added). AUSA Naftalis also denied that there was anything remarkable or troubling about Majidi's proposed allocution. The Court asked: "If Mr. Majidi had read into the record what was sent as a proposed allocution, would you have cared?" and


AUSA Naftalis said, "No. I think it will be consistent with his testimony. I mean – . . . Would I care? No." (Tr. 768-69).

The Court then asked: "You're representing to me as an officer of the court that in no way did you seek to shape or modify the allocution." AUSA Naftalis replied: "Correct. I don't remember exactly what I said, but *I would never suggest to a defense lawyer, this is what he should say or not say*." (Tr. 769) (emphasis added). AUSA Naftalis then added, "My colleagues are pointing out, by 'shape,' I mean to do something improper. The direction would be consistent with what the person said in the proffers." (*Id.*) The following colloquy then took place:

> THE COURT: I don't actually understand what you just said, so let's back up, please. You've said to me that it is your practice to have the cooperator hit the elements, is that correct?
>
> MR. NAFTALIS: Correct.
>
> THE COURT: Are you saying that you would never give more specific direction than that?
>
> MR. NAFTALIS: I mean, if something is factually wrong, I don't want someone allocuting that's wrong. But I don't have a specific recollection of shaping this one. I don't like the word "shape," but –
>
> THE COURT: Okay. Then let's not use the term "shape." Did you, or did anyone from the government, ask Mr. Majidi's counsel to change the names of anyone in the allocution?
>
> MR. NAFTALIS: No.
>
> THE COURT: Did you ask him to change the date?
>
> MR. NAFTALIS: Not that I can -- I don't even recall. I'd have to look at the redline. My recollection –
>
> THE COURT: Please do.
>
>      * * *


> MR. NAFTALIS: There is no change in date. There is no change in the date of Mr. Majidi. The only change is that it's shorter, and as opposed to summarizing what – I'm looking at this.
>
> THE COURT: Yes, of course.
>
> MR. NAFTALIS: I don't see any additions or subtractions.
>
> THE COURT: I do. The addition I'm seeing is Mr. Shor is not named in the first iteration and he is named in this one. Now perhaps your argument is that he's lumped in with certain traders or someone else that are mentioned in the proposed allocution. That is the change that I identified.
>
> MR. NAFTALIS: Just to be clear, his name was in the information, so this isn't like -- this isn't new to anybody. I don't recall saying, make sure you allocute to -- you didn't include Shor in the first draft, put him in when you do it in court. I don't recall that.

(Tr. 969-71). By Order dated June 10, 2019, the Court denied the defendants' request to cross examine Majidi and Dinucci about the changes to the plea allocutions or call their respective counsel as witnesses, and denied the request for an adverse inference regarding the timing of the government's disclosures. (ECF 213). The Court later questioned counsel for Majidi and Dinucci, neither of whom recalled how the proposed allocutions changed into the delivered allocutions, but both confirmed that the proposed allocutions were client-approved and prepared for delivery in Court. (Tr. 2044-63, 3134-42).

### New Evidence

On May 27, 2020, the Executive Office of United States Attorneys produced 18 documents to counsel for Ahuja in reponse to Ahuja's November 29, 2019 FOIA request for emails and documents created by AUSA Naftalis relating to allocutions. Many of these documents were redacted, but even the ones that were not are significant in that they shed important light on the prosecution team's reaction to Majidi's proposed allocution. That reaction is hard to reconcile with representations made to the defense and to the Court.

The newly-discovered documents show that upon receipt of Majidi's counsel's 4:13 p.m. email on October 29, 2018 (which attached a Word document entitled "Allocution – Approved 1029.doc"), AUSA Naftalis immediately forwarded the email to the other prosecutors (for whatever reason, the government's FOIA production showed AUSA Naftalis as the sender and AUSA Griswold as one of the recipients, but redacted AUSA Nicholas's name and email


address as a recipient). (*See* **Exhibit A**, attached hereto). Seventy-four minutes later, AUSA Nicholas emailed the other two prosecutors (again, the government mysteriously redacted the names of the recipients) "[a]ny chance you guys are free to meet about this and some other stuff tomorrow? I'm free all day after 12:30 p.m. – whatever is easiest for you guys." (*See* **Exhibit B**, attached hereto) After some back and forth, the prosecutors appear to have scheduled a meeting for 3:00 p.m. on October 30, 2018. (*See* **Exhibit C**, attached hereto). At 11:59 a.m., apparently in anticipation of their meeting scheduled for later that afternoon, AUSA Naftalis sent an email to AUSA Nicholas and AUSA Griswold with the subject line "Allocution - Draft edits." (*See* **Exhibit D**, attached hereto). The email contained no text, but did attach a Word document. The attachment—which appears to contain AUSA Naftalis's edits to the allocution, has inexplicably been withheld.

On June 11, 2020, counsel for Ahuja requested that the USAO produce the attachment to AUSA Naftalis's email. Although the Office initially undertook to respond to the request "early" this week, it then delayed, stating that it "expect[ed]" to produce the document on June 19, 2020. We have not yet received the document.

## Argument

The new evidence uncovered by the defense (not voluntarily produced by the USAO) warrants discovery and a hearing so that defendants can discover the available facts (and any recollections refreshed based on those facts) regarding the evolution of Majidi's allocution and the government's disclosures regarding the same.

Indeed, the new evidence standing by itself sheds new light on the information previously available (and, due to failures of recollection, unavailable) to the Court, and may bear on representations previously made by the government to the parties and the Court. In particular, the new evidence reveals a specific focus on the proposed allocution by the prosecution team, and the fact that the allocution was edited by the government in an as yet unseen word document. The new evidence also reveals that the revised allocution was the subject of a meeting held by the prosecution team, and provides important context for AUSA Naftalis's email to Majidi's counsel at 4:03 p.m. on October 30, 2018, immediately following the prosecutors' 3:00 pm meeting held the same day to discuss Majidi's proposed allocution. It appears that AUSA Naftalis's 4:03 p.m. email was a result of, and was part of carrying out any decisions made in, the prosecutors' 3:00 p.m. meeting on that day.

More generally, the preparation of a Word revision of the proposed allocution by AUSA Naftalis, and the distribution of that revision to the other prosecutors at 11:59 a.m. on October 30, 2018, confirms the prosecutors' concern with the allocution proposed by Majidi,


and sheds important light on the fact that Majidi's counsel was unable to locate on counsel's internal document storage system the document Majidi read from in Court. It may well be that the words delivered in court were actually written by AUSA Naftalis, circulated among the prosecutors on October 30, 2018, and handed to Mr. Majidi's counsel prior to the plea. At a minimum, these new documents may refresh the recollection of AUSA Nicholas, who previously stated that he did not "specifically recall" how the changes came about, and AUSA Naftalis, who previously stated "I don't remember exactly what I said, but I would never suggest to a defense lawyer, this is what he should say or not say. . . ." (Tr. 769.) Had the AUSAs been aware of this new evidence at the time, they may well have recalled additional facts, and might also have disclosed to the Court that the proposed allocution prompted a meeting, which apparently took place only a short time before AUSA Naftalis spoke with Majidi's counsel.

Importantly, the new evidence itself points to the existence of even more new (and as yet undisclosed) evidence. First, the government's FOIA production does not contain the attachment circulated by AUSA Naftalis in an email titled "Allocution – Draft edits." The text of the attachment is critical to confirming exactly what happened and (absent a legitimate reason why it should be withheld) should be ordered produced forthwith. Second, the withholding of this document from the government's FOIA response itself calls into question the accuracy of representations previously made to the Court. Indeed, as noted above, the defense specifically argued that the changes to the allocution were part of the prosecution's litigation strategy to bolster its theory and avoid any statements that would strengthen Shor's defense. The government denied that there was any strategy involved at all, seemingly claiming that the communications were so innocuous and routine as to be unmemorable. By withholding the document, the government has now apparently reversed course and has taken the position that AUSA Naftalis's typed revisions of Majidi's allocution are protected by the work product doctrine, which protects attorney strategies, thoughts, and opinions. *United States v. Aldman*, 134 F.3d 1194, 1196 (2d Cir. 1998) (the work product doctrine "is intended to preserve a zone of privacy in which a lawyer can develop legal theories and strategy . . . free from unnecessary intrusion by his adversaries."). The attempt should be rejected.

A conditional discovery doctrine such as the work product protection cannot overcome the fundamental constitutional due process commands embodied in the *Brady* doctrine. *See United States v. Gupta*, 848 F. Supp. 2d 491, 493, 497 (S.D.N.Y. 2012) (Rakoff, J.) (finding that prosecutors had a *Brady* obligation to review the SEC's protected work product, and that the work product protection had been overcome). And even if the work product protection doctrine applied, that protection is not absolute, but yields where there is a "substantial need" for the information and it cannot be obtained elsewhere without "undue hardship." *Aldman*,



134 F.3d at 1203. Those standards are easily met here. There is a substantial need to determine what occurred with Majidi's allocution, as the facts may impact the defendant's argument (pending before the Court of Appeals) that the order precluding cross-examination on those facts was error. Moreover, these additional facts should have been disclosed before, not after, trial. Had they been, perhaps the participants' recollections might have been refreshed or impeached when the Court conducted its inquiries, and perhaps the Court might have issued different rulings when presented with additional context. Thus, depending on a full exploration of the facts, the disclosure failure may be grounds for additional relief. And, there is no alternative means of obtaining the information without undue hardship. The Court questioned each of the AUSAs, as well as counsel for Majidi, and none was able to recall how the changes to Majidi's allocution came about, and nobody was able to locate the document that Majidi actually read from in Court. Finally, the representations made to the defendants and the Court regarding these events have squarely placed "at issue" the content of these documents, and thus constitute an "at issue waiver" of any protection that might have otherwise applied. *John Doe Co. v. United States*, 350 F.3d 299, 302 (2d Cir. 2003) ("Because the words *implied* and *waiver* both tend to suggest that the party possessing the privilege *intended* to give it up . . . the rule is perhaps more aptly described as one of forfeiture, rather than waiver." (emphasis in original)).

In addition, as noted above, the FOIA request submitted was extremely narrow, limited only to AUSA Naftalis's documents. The new evidence reveals that the entire trial team touched the issue. AUSA Nicholas appears to have read the allocution and quickly called for a meeting, AUSA Naftalis apparently drafted and circulated edits to the allocution, and all three AUSAs met together just prior to AUSA Naftalis's request to speak to Majidi's counsel about the allocution. Accordingly, we request that the Court issue an order that the USAO collect and produce any and all notes, phone logs and records, memoranda, emails, calendar entries, or documents—both paper and electronically stored information, including metadata—constituting, relating to, or reflecting:

- Any internal or external communications regarding the substance or content of any draft, proposed, or actual plea allocution relating to the scheme alleged in this case;

- Any meetings regarding cooperator allocutions in this case; and

- All versions of any draft, proposed, or actual plea allocutions relating to the scheme alleged in this case.



We request that the documents be produced as soon as possible and no later than June 26, 2020, which is more than two weeks since we first contacted the prosecutors and requested the attachment to AUSA Naftalis's email. We assume that the USAO has been investigating the matter internally, and thus likely has been collecting many of the documents responsive to the above-requested order.

Very truly yours,

Justin S. Weddle