PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

LLOYD K. GARRISON   (1946-1991)
RANDOLPH E. PAUL   (1946-1956)
SIMON H. RIFKIND   (1950-1995)
LOUIS S. WEISS   (1927-1950)
JOHN F. WHARTON   (1927-1977)

WRITER'S DIRECT DIAL NUMBER

(212) 373-3035

WRITER'S DIRECT FACSIMILE

(212) 492-0035

WRITER'S DIRECT E-MAIL ADDRESS

rtarlowe@paulweiss.com

UNIT 5201, FORTUNE FINANCIAL CENTER
5 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT, BEIJING 100020, CHINA
TELEPHONE (86-10) 5828-6300

HONG KONG CLUB BUILDING, 12TH FLOOR
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, UNITED KINGDOM
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
JUSTIN ANDERSON
ALLAN J. ARFFA
JONATHAN H. ASHTOR
ROBERT A. ATKINS
DAVID J. BALL
SCOTT A. BARSHAY
PAUL M. BASTA
J. STEVEN BAUGHMAN
LYNN B. BAYARD
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
DAVID M. BERNICK
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
ROBERT BRITTON
DAVID W. BROWN
SUSANNA M. BUERGEL
JESSICA S. CAREY
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
YAHONNES CLEARY
RACHAEL G. COFFEY
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
HARRIS FISCHMAN
ANDREW J. FOLEY
ANDREW J. FORMAN*
HARRIS B. FREIDUS
CHRISTOPHER D. FREY
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
NEIL GOLDMAN
MATTHEW B. GOLDSTEIN
ROBERTO J. GONZALEZ*
CATHERINE L. GOODALL
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
BRIAN S. GRIEVE
UDI GROFMAN
BRUCE A. GUTENPLAN
ALAN S. HALPERIN
CLAUDIA HAMMERMAN
BRIAN S. HERMANN
MICHELE HIRSHMAN
ROBERT E. HOLO
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
JAREN JANGHORBANI
BRIAN M. JANSON
JEH C. JOHNSON
MEREDITH J. KANE
JONATHAN S. KANTER
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY

BRIAN KIM
KYLE J. KIMPLER
ALEXIA D. KORNBERG
ALAN W. KORNBERG
DANIEL J. KRAMER
CAITH KUSHNER
DAVID K. LAKHDHIR
JOHN E. LANGE
GREGORY F. LAUFER
BRIAN C. LAVIN
XIAOYU GREG LIU
LORETTA E. LYNCH
JEFFREY D. MARELL
MARCO V. MASOTTI
DAVID W. MAYO
ELIZABETH R. MCCOLM
JEAN M. MCLOUGHLIN
ALVARO MEMBRILLERA
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG K. OH
BRAD R. OKUN
KELLEY D. PARKER
LINDSAY B. PARKS
VALERIE E. RADWANER
JEFFREY J. RECHER
CARL L. REISNER
LORIN L. REISNER
JEANNIE S. RHEE*
WALTER G. RICCIARDI
WILLIAM R. MARSHALL
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JUSTIN ROSENBERG
JACQUELINE P. RUBIN
CHARLES F "RICK" RULE*
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
BRIAN SCRIVANI
HARRIS B. SEIFRIED
KANNON K. SHANMUGAM*
DAVID R. SICULAR
AUDRA J. SOLOWAY
SCOTT M. SONTAG
SARAH STASNY
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
BRETTE TANNENBAUM
RICHARD C. TARLOWE
MONICA K. THURMOND
DANIEL J. TOAL
LAURA C. TURANO
CONRAD VAN LOGGERENBERG
LIZA M. VELAZQUEZ
MICHAEL VOGEL
RAMY J. WAHBEH
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
LINDSEY L. WIERSMA
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
AUSTIN WITT
MARK B. WLAZLO
JULIA TARVER MASON WOOD
JENNIFER H. WU
BETTY YAP*
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

July 6, 2020

**BY EMAIL/ECF**

The Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

*United States* v. *Anilesh Ahuja*,
18 Cr. 328 (KPF)

Dear Judge Failla:

On behalf of Anilesh Ahuja and Jeremy Shor, we write in reply to the government's letters dated June 19 and June 24, 2020, and to address additional emails disclosed by the government for the first time on June 26, 2020.

The government now concedes (as it must) that it failed in its disclosure obligations and that it misled the Court. As it did time and time again during trial, the government apologizes for this conduct, but at the same time minimizes its conduct and repeats it. In its recent letters, the government mischaracterizes the facts, makes new misrepresentations, and leaves myriad others uncorrected. The government has now admitted that it failed to correct prior representations to the Court even when it knew those representations were false, but does not explain how or why that happened. And, the government's supplemental production of emails on June 26, 2020, made after its recent letters to the Court, reveals even more disclosure failures and apparent misrepresentations. Yet, the government has

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

ignored or expressly refused to answer critical questions necessary to understand fully what happened. The government's ongoing lack of transparency, in light of what has already transpired, is both surprising and disappointing.

As set forth below, and as measured against the backdrop of the history of disclosure failures by the government and representations purporting to correct or mitigate them, the government's letters and supplemental production raise more questions than they answer. While the government's desire to brush aside these uncomfortable facts is understandable, there are many outstanding questions that need answers. On this record, where it is clear that, at best, the government either does not understand its obligations or simply has failed to honor them, it is no longer reasonable to rely on the government's unsworn representations about good faith mistakes and self-selected document reviews and productions. In this case at least, the government has lost the benefit of the doubt.

Accordingly, the relief requested in our motion, as supplemented here, should be granted.

## I.    BACKGROUND

The government committed multiple disclosure errors in this case, virtually all of which came to light only due to the efforts of defense counsel, including by issuing Rule 17(c) subpoenas to cooperating witnesses and their lawyers. On more than one occasion, the Court noted the government's failure to timely produce materials and directed the government to ensure it had thoroughly reviewed its files. (January 17, 2019 Conference Tr. 60:2–65:10, ECF 79; Trial Tr. 10:22–11:6; Trial Tr. 468:5-22; Trial Tr. 478:16–480:18.) Even while acknowledging mistakes, the government consistently recited its standard refrain that it was aware of its disclosure obligations, took them seriously and was not aware of any other materials subject to disclosure. (January 17, 2019 Conference Tr. 62:11-23, ECF 79 ("[T]he *Brady* obligation is an ongoing one, we understand that. We take it extremely seriously."); May 13, 2019 Gov't Letter, ECF 158 ("The Government has complied with its obligations under *Brady* and *Giglio*, including with respect to conversations with counsel."); Trial Tr. 11:8 ("We take our obligations very seriously."); Trial Tr. 118:12-20 ("We're trying to be extremely thorough and continue to comply with our obligations.").) Repeatedly, the government assured the Court that it had carefully and comprehensively reviewed its files.

At times, the government even chafed at the defense's persistence and expressed its indignation upon the suggestion that the government may not have fully satisfied its disclosure obligations. (Trial Tr. 107:23–108:18 ("So a lot of this is sort of stamping their feet, if only we had this . . . . Like a lot of this is ringing a fire alarm and making really bold accusations. . . . And the accusations are making a false record as to everything we do."); Trial Tr. 771:14-16, 22-25 ("The accusations that are getting lobbed in, I take personally and seriously . . . . I certainly did nothing to improperly shape testimony -- to shape [Majidi's] allocution. So again, I would urge defense counsel to choose their words, because some of this stuff is getting a little insane").) But now, as a result of a FOIA request to the Executive Office of United States Attorneys ("EOUSA") that the defense never should have had to make, we know that the government concealed significant

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

evidence, made material misrepresentations to the Court, and, months later, failed to correct them even when it was clear to the government that they were not true.

**A.**   **The Government Misled the Court About its Role in Scripting Majidi's Allocution Word-for-Word**

Following the issuance of Rule 17(c) subpoenas by defense counsel, the government belatedly disclosed (after the start of trial) that Mr. Naftalis had received a proposed allocution, titled "Allocution – Approved 1029," from Majidi's counsel, Seth Rosenberg, on October 29, 2018, two days prior to Majidi's guilty plea.  Although it was clear that the allocution Mr. Majidi delivered in Court differed from the proposed version in significant ways, the genesis of those changes was not clear.

When questioned by Your Honor, Mr. Naftalis, who handled the plea for the government, did not "recall the specifics" (Trial Tr. 767:16-17), but was adamant that he did not and "would never" tell a defense lawyer what a cooperator should or should not say.  (Trial Tr. 769:5-7.)  Instead, to the extent he spoke to Majidi's lawyer about the allocution, any potential comments would have been limited to reminding the cooperator's lawyer to "hit the elements" or to correct a factual inaccuracy.  (Trial Tr. 768:15-19; 769:21-24.)  When the Court asked whether, "as an officer of the court," he was representing that in no way did he "seek to shape or modify the allocution," Mr. Naftalis stated, "Correct." (Trial Tr. 769:2-5.)  The Court also asked Mr. Naftalis specifically about certain of the changes between the proposed and final allocution, including the addition of Mr. Shor's name and the change to the timeframe of the conduct.  (Trial Tr. 770:5, 21-25.)  Mr. Naftalis stated either that he did not recall or that he did not make the change.  (Trial Tr. 770:6-20, 771:1-5.)  The Court also asked Mr. Naftalis if he had a conversation with Majidi's lawyer regarding the allocution on the day of the plea proceeding, and he replied, "No."   (Trial Tr. 772:1-5.)   Following this colloquy, the Court characterized the prosecutors' recollections as "strong but not entirely complete," and the government confirmed that description.  (Trial Tr. 784:13-16.)

The Court thereafter declined to provide the relief sought by Mr. Shor and Mr. Ahuja with respect to the government's role in shaping the cooperating witnesses' allocutions.  Mr. Shor sought to cross-examine the government's cooperating witnesses about changes to their allocutions, and Mr. Ahuja sought to compel the government to disclose "any oral communications it had with counsel concerning the content of cooperator plea allocutions and any suggested modifications to those allocutions." (ECF 213; ECF 319, Ex. 6.)  In declining to grant the defendants' motions, however, the Court (through no fault of its own) relied on a factual premise we now know to be wrong: that the government did not tell the cooperators what to say, and that any suggestions by the government were limited to hitting the elements or correcting inaccuracies.

As the Court noted at trial, when inquiring of Majidi's counsel: "Somehow someone had to do the editing, and I don't know whether it was you or a colleague or Majidi or something else." (Trial Tr. 2058:25–2059:2.)  It is now clear that, in fact, Majidi's counsel did not do the editing.  Mr. Naftalis did.  Mr. Naftalis rewrote the

3

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

allocation, and Majidi read Mr. Naftalis's script to the Court verbatim without a single modification.

The newly discovered evidence resulting from the defense's FOIA request fills in critical gaps in the story and shows that the defense—based in large part on the government's misrepresentations—was denied the opportunity to show the jury that at least one cooperating witness swore to a version of the facts written word-for-word by a prosecutor and materially different from a version prepared by his own counsel.

Specifically, the documents show the following (bolded entries reflect emails that were *not* produced to the Court or defendants at trial):

- <u>Oct. 29, 2018 at 4:15 p.m.</u>  Majidi's counsel emails Mr. Naftalis a proposed allocation by Majidi labeled "approved."  (Ex. 1, USAO_SDNY_26400.)

- **<u>Oct. 29, 2018 at 4:17 p.m.</u>**  Mr. Naftalis forwards Majidi's proposed allocation to AUSAs Griswold and Nicholas.  (Ex. 2, USAO_SDNY_26401.)

- **<u>Oct. 29, 2018 at 5:32 p.m.</u>**  Mr. Nicholas responds to Mr. Naftalis's email forwarding the proposed allocation, asking if the prosecutors could "meet about this" and other items the next day "after 12:30 p.m."  (Ex. 3, USAO_SDNY_26408.)

- **<u>Oct. 29, 2018 at 6:08 p.m. to 9:54 p.m.</u>**  The prosecutors exchange a series of emails concerning scheduling their internal meeting, culminating in Mr. Nicholas proposing 3:00 p.m. the next day.  (*Id.*)

- **<u>Oct. 29, 2018 at 9:54 p.m.</u>**  Immediately thereafter, Mr. Naftalis forwards (again) the proposed allocation from Majidi's counsel to AUSAs Griswold and Nicholas, but this time comments that:  "This is way too detailed in my view.   Should we discuss at our team meeting?"   (Ex. 4, USAO_SDNY_26414.)

- **<u>Oct. 29, 2018 at 9:56 p.m.</u>**  Mr. Nicholas responds to Mr. Naftalis, stating: "I completely agree.  Should be bare bones just hit the elements.  Agree let's discuss at [meeting]."  (*Id.*)

- **<u>Oct. 29, 2018 at 9:58 p.m.</u>**  Mr. Naftalis sends AUSAs Griswold and Nicholas a calendar invite for a "PPI Team Meeting" scheduled from 3:00 p.m. to 4:00 p.m. on October 30, 2018.  AUSAs Griswold and Nicholas accept the meeting invitation.  (Exs. 5-7, USAO_SDNY_26415-417.)

- **<u>Oct. 30, 2018 at 11:59 a.m.</u>**  Mr. Naftalis sends an email to AUSAs Griswold and Nicholas with the subject line "Allocution – Draft edits," but no text.  Attached to the email is a redlined version of the proposed

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

> allocution with Mr. Naftalis's edits (the "Naftalis Allocution").  (Ex. 8, USAO_SDNY_26366–69.)

- Oct. 30, 2018 at 4:03 p.m.  Mr. Naftalis replies to the October 29 email from Majidi's counsel and asks if Majidi's counsel could "talk [at] around 430 [p.m.]."  (Ex. 9, USAO_SDNY_26419.)

- **Oct. 31, 2018 at 2:22 p.m.**  Mr. Naftalis emails Majidi's counsel, stating: "Let's meet in [the] hallway by Judge Failla's courtroom 10 min[ute]s early?"  At 2:46 p.m., Majidi's counsel replies, "sure."  (Ex. 10, USAO_SDNY_26423.)

- Oct. 31, 2018 at 4:00 p.m.  Majidi pleads guilty and delivers an allocution that is identical to the one Mr. Naftalis drafted and sent to the other AUSAs the prior day.  At the plea, Majidi confirmed that he was reading from "written notes," and when the Court asked Majidi if "[t]he thoughts expressed in those notes are yours," Majidi stated, "They are mine."  (Majidi Plea Tr: 31:8-11, ECF 210, Ex. C.)

Although all three members of the trial team thus received Mr. Naftalis's re-write, and even appear to have met to discuss it, neither the fact that a rewrite had occurred nor the rewritten document itself was disclosed.  The Naftalis Allocution was not part of Majidi's *Giglio* or 3500 material, and it was not brought to the Court's attention even when the Court made specific inquiries about the genesis of changes to Majidi's allocution and questioned the government lawyers and Mr. Rosenberg about it.

While the documents make clear that Mr. Naftalis wrote the allocution for Majidi, the government has not explained how that allocution made it into Majidi's hands.  Instead, the government suggests a highly suspect narrative seemingly designed to minimize and downplay its role in scripting Majidi's allocution.

Although Majidi read from a document at his plea, there is apparently no record of an email between the government and Majidi's lawyer in which anyone from the government transmitted the Naftalis Allocution to Majidi, and Majidi's lawyer has stated that there is no record on his law firm's network of the final allocution (Trial Tr. 2059:21-24).  The most logical inference therefore is that Mr. Naftalis printed it out, brought it to the plea hearing, and handed it to Majidi or his lawyer.

That handoff may have occurred when Mr. Naftalis and Majidi's lawyer met outside the courtroom ten minutes before the plea—a meeting revealed by an email first produced by the government on June 26, 2020.  The revelation of this email (and other similar emails referenced above) are not just troubling because of what they contain.  They are also troubling because, at trial, just two days before the AUSAs' colloquy with the Court on this issue, the government represented that it had "reviewed . . . all communications with attorneys for witnesses in this case."  (ECF 209.)  Indeed, in one of its recent letters, the government again asserts that, just before the June 10, 2019 colloquy, the prosecutors "reviewed their archived emails for *all communications with attorneys for*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

*witnesses in the case*, *including attorneys for cooperating witnesses*." (June 19 Gov't Letter at 1 (emphasis added).) The email exchange between Mr. Naftalis and Majidi's lawyer asking to meet ten minutes before the plea necessarily was part of that review,[1] but it was not produced, and was not mentioned to the Court or the defense. And, when, on June 10, 2019 (just days after that review), the Court specifically asked Mr. Naftalis if he had any discussion with Majidi's lawyer about the allocution on the day of the plea, he replied, "No." (Trial Tr. 772:1-5.)

The fact that the government appears to have handed a copy of the Naftalis Allocution to Majidi or his lawyer on the day of the plea raises another question that the government has declined to address: where is the electronic or hardcopy version of the document that was printed out and given to Majidi? The government has represented to us that the only version of the Naftalis Allocution in its files is the document that was attached to the email Mr. Naftalis sent to the other AUSAs. While we have not retained a forensic expert to examine the document, the "properties" in the metadata for that document reflect a "last printed" date of October 29, 2018—*before* it was edited by Mr. Naftalis. The government has not explained why it has no other version in its files; it has not said whether an electronic version existed at one point on a government computer or network and, if so, what happened to it. The government has merely noted, in response to our requests on that issue, that "[t]he versions of Microsoft Outlook and Microsoft Word that we have allow for opening and editing a Word document and then sharing it via Outlook, without also saving it separately to a network." (Ex. 11, June 28, 2020 e-mail from M. Nicholas.)

Even now, the government posits as fact an alternative scenario that is highly suspect, but also should be tested by discovery and a hearing. The government asserts, apparently with no additional information or recollection, that "AUSA Naftalis communicated the same changes that he proposed in the Redline . . . to Majidi's counsel, and that those changes were then incorporated into Majidi's allocution." (June 24 Gov't Letter at 2.) For that to be true, Mr. Naftalis would have had to "communicate the same changes" to Majidi's counsel *orally* (as there is no email transmitting the rewritten allocution to Majidi's lawyer), and Majidi's lawyer then would have had to write it down *on paper* (as no version exists on the lawyer's law firm system) *without changing a single word*. Since Majidi delivered the Naftalis-authored allocution verbatim and without stumbling over any words, it seems unlikely that he was reading from a handwritten version based on an oral "communicat[ion]" of "the same changes." But even if Mr. Naftalis did read the revisions to the allocution to Majidi's counsel slowly enough for Majidi's attorney to "incorporate" them perfectly into the allocution that Majidi read in court, that only raises the question of why Mr. Naftalis was unwilling to take the far easier approach of simply emailing the revised document to Majidi's counsel.

---

[1]   The government states in its June 19 letter that "Government trial counsel did not include in their review internal emails that were strictly between Government attorneys." (June 19 Gov't Letter at 2.) But this email was between AUSA Naftalis and Majidi's attorney, and therefore would presumably have been located and reviewed.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

The Court need not rely on speculation about what occurred. There are likely additional documents that can corroborate or disprove the government's version of events (such as phone logs, notes, or physical documents) and there are multiple witnesses with firsthand knowledge of the events in question whose recollections may be refreshed (to the extent necessary) by the newly produced documents. Those witnesses include the many people present for the plea, including the government lawyers, an FBI agent, Majidi, and two of his lawyers.[2]

> **B.** **The Government Knowingly Failed to Correct its Misstatements and Concealed Critical Evidence**

Even if the Court were to credit the government's claim that no one from the prosecution team recalled, only seven months after Majidi's plea and just two days after reviewing its own emails on this subject, that Mr. Naftalis had substantially (if not completely) rewritten the allocution, the government has now been forced to admit that it has known about the rewritten allocution (and failed to correct its misrepresentations to the Court) since at least early March 2020.

Concerned about what seemed to be missing pieces of the story, we submitted a narrowly tailored FOIA request to EOUSA on November 26, 2019, seeking emails and other documents of Mr. Naftalis related to the Majidi allocution from October 29 through October 31, 2018. According to the prosecution team, EOUSA forwarded this request to the U.S. Attorney's Office on January 27, 2020, and it was forwarded to the prosecutors on the same date. (June 19 Gov't Letter at 3.) (It is not clear why it took EOUSA two full months simply to forward our request to the Office.)[3] Mr. Naftalis then discussed the request with Associate United States Attorney John McEnany (the government did not specify the date but it appears to be January 27 or January 28), and sent Mr. McEnany the Court's June 10, 2019 Order denying the defense requests for relief related to the cooperator allocutions. (*Id.*).

The reason for the FOIA request had to have been immediately apparent to the AUSAs. Not only was Majidi's allocution subject to extensive discussion at trial, but just days before the FOIA request was forwarded to the prosecutors, Mr. Shor had filed in the Second Circuit Court of Appeals a reply brief in support of his motion for bail pending appeal, which squarely presented as a "substantial question" whether it was error to preclude cross-examination of the cooperators on the evolution of their allocutions. And when the trial team received the FOIA request in late January, they likely were (or, at least, would soon begin) preparing for oral argument scheduled for February 4, 2020 (a mere

---

[2]   We request that the prosecution team refrain from communicating with these witnesses, and we intend to cross-examine all witnesses about any such communications.

[3]   Federal agencies are required to determine whether to comply with FOIA requests within 20 business days (absent written communication to the requester for an extension based on "unusual circumstances") and "promptly" provide the requested records. Dep't of Justice Guide to FOIA at 32–33 , *available at* https://www.justice.gov/oip/page/file/1199421/download#page=32.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

eight days after the prosecution team received the FOIA request). Yet, according to the government's letters, no other activity with respect to the FOIA request took place until March 2020.

Given the obvious import of the FOIA request, it is difficult to accept that after receiving it in January, no one bothered to look for responsive documents before March. It is clear that if any one of the prosecutors had conducted even a cursory search, he or she would have turned up the Naftalis Allocution. In any event, the government does not dispute that Mr. Naftalis "identified" his rewrite of the allocution by no later than March 9, 2020 (June 19 Gov't Letter at 3), but took no steps to correct the government's prior misrepresentations to the Court or produce the relevant documents to the defense. It would have been abundantly clear from the Court's June 10, 2019 Order and the allocution written by Mr. Naftalis that a misstatement had been made. The prosecution team has not explained why no steps were taken to correct the misstatement or alert the Court or the defense.

After the March 9 date, two months passed, during which time the defendants prepared and filed appellate briefs in the Second Circuit. Like his bail motion, Mr. Shor's brief (in which Mr. Ahuja joined) challenged the Court's June 10, 2019 Order precluding cross-examination of cooperators regarding the evolution of their allocutions. The defendants' briefs necessarily contain no discussion of the false facts upon which the Order rests because the government did not disclose those facts when it produced its *Giglio* and 3500 material prior to trial; when the proposed allocutions were discovered as a result of defense counsel's Rule 17(c) subpoenas during trial; when the Court conducted extensive inquiries of the prosecutors and Mr. Rosenberg regarding the evolution of the allocutions during trial; or at any time before May 27, 2020.

On that date, EOUSA produced a response to our FOIA requests. The May 27, 2020 FOIA production included Mr. Naftalis's cover email to the other members of the prosecution team attaching the allocution he wrote for the cooperator, but not the allocution itself. (ECF 366, Ex. D.) In addition, a number of emails were redacted to obscure their senders and recipients. While the redactions listed FOIA exemptions by section number (*see, e.g.*, ECF 366, Exs. A-C), no other log or explanation was provided regarding any documents withheld or redacted.

On June 10, 2020, we followed up directly with AUSA Griswold to request the attachment to the email. Even though the significance of that document was obvious to the government (it shortly thereafter acknowledged as much in its letter to the Court), the government still did not produce it. Instead, the attachment (which turned out to be the allocution written by Mr. Naftalis and delivered verbatim by Majidi at his plea) was withheld until June 19, 2020, an additional nine days, without explanation, and provided only after the defendants filed a letter motion with this Court. Since submitting its recent June 19 and June 24 letters, the government has produced even more emails related to the allocutions that were inexplicably never before produced, either during trial or in response to the FOIA request. No explanation has been offered for that either.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

The government does not and cannot dispute that it had an obligation to produce the Naftalis Allocution and to correct prior representations made to the Court. Under Rule 3.3(a)(1) of the New York Rules of Professional Conduct, a lawyer must not "fail to correct a false statement of material fact or law" previously made to a court, and government attorneys are bound to comply with the state rules of professional responsibility by statute. 28 U.S.C. § 530B(a). Moreover, the government's *Brady* obligation did not cease upon the verdict, *see Fields* v. *Wharrie*, 672 F.3d 505, 514–15 (7th Cir. 2012), and prosecutors in criminal cases have special, heightened responsibilities to pursue justice, *see Berger* v. *United States*, 295 U.S. 78, 88 (1935); Dep't of Justice Manual 9-5.001(C).

While the government now acknowledges, as it must, that its failure to produce this document in March was a "mistake," it fails to address, much less explain, how or why that mistake happened, focusing instead on what it claims did not happen, including that "[c]onversations between AUSA Naftalis and Mr. McEnany did *not* include a discussion regarding Mr. Naftalis's representations to the Court or the need to correct them," and that "AUSA Naftalis did *not* bring" the Naftalis Allocution "to the attention of anyone else." (June 19 Gov't Letter at 3 (emphases added).) The government does not address whether Mr. Naftalis discussed the Naftalis Allocution with his supervisors or anyone else; whether he considered correcting the prior representations to the Court; or why no disclosure or correction was made. Nor does it address why Mr. Naftalis did not tell Mr. McEnany about his representations to the Court and the need to correct them, or why Mr. Naftalis declined to bring the revised allocution to anyone's attention.

In addition to the prejudice resulting from not being told of this document at trial, the defense was prejudiced, again, when the government failed to disclose the document between March 9, 2020 and June 19, 2020.

First, the Court of Appeals heard argument on the defendants' motions for bail pending appeal on February 4, 2020, more than a week *after* the government received the FOIA request from EOUSA. Mr. Shor's motion sought bail based on two arguments, one of which was a claim of error based on the Court's June 10, 2019 Order related to the changed allocutions. The government's sworn affirmation in opposition to the bail motion invoked this Court's factual finding, writing:

> [A] second premise of Shor's argument—that the final allocutions were somehow 'tailored' by the Government 'to hurt Shor' (Shor Br. 24)—is also *deeply misleading*. . . . Judge Failla found as a factual matter that there was no improper shaping of Dinucci's or Majidi's allocutions.

(Opp. Mot. at ¶ 47, *United States* v. *Shor*, 19-3936 (2d Cir. Jan. 16, 2020), ECF 58-1 (emphasis added).) We now know that the government's statement that Shor's argument was "deeply misleading" is itself deeply misleading and stands uncorrected in the record in the Court of Appeals.

Second, the government's delay spanned the very period of time in which the defendants were drafting appellate briefs. As he did in the motion for bail pending appeal, Mr. Shor focused a significant part of his appellate brief on his claim of error in the Court's

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

Order precluding cross-examination (again, Mr. Ahuja joined in this argument). That brief was filed on May 4, 2020. The government delayed producing any documents relating to Mr. Naftalis's version of the allocution until May 27, 2020, and did not produce the key document (the Naftalis Allocution itself) until June 19—six weeks after Mr. Shor's appellate brief was filed. As a result, the brief challenges a Court Order that was premised on false facts, and its argument is missing key facts relating to the significance of the proposed cross-examination.

Third, the government's delay in producing the Naftalis Allocution and other materials responsive to the FOIA request may have resulted in the loss of other relevant evidence. According to the government's June 24 letter, the government's email backup, which preserves deleted emails, extends back three years. (June 24 Gov't Letter at 3 n.1.) Because cooperator Frank Dinucci's plea took place in April 2017, emails surrounding that allocution would only have been preserved until April 2020. If the government had disclosed the Naftalis Allocution in March, the defense could have asked that relevant emails be preserved before the April 2020 deletion date. But, instead, the defense did not receive any disclosure about the Naftalis Allocution until May 27, 2020 and, by that time, emails from April 2017 would have been lost. We take no comfort from the government's claim that it has "no reason to believe" emails related to the Dinucci plea were deleted. (*Id.*)

The government also has refused to address why the May 27 FOIA production did not include documents that were obviously relevant and responsive, including the most critical document of all—the allocution rewritten by Mr. Naftalis and then forwarded by him to the other prosecutors. While the government's June 19, 2020 letter states that the EOUSA FOIA/PA Unit released "non-exempt" material to Mr. Ahuja's counsel, the government does not identify which materials were withheld. It is therefore not possible, on the current record, to ascertain what materials were provided to the EOUSA FOIA/PA Unit by the prosecutors and then withheld by that Unit (*i.e.*, which documents were found and reviewed by March 9, 2020, at the latest, but nevertheless not disclosed to the defense for months), and which materials were never transmitted to the EOUSA FOIA/PA Unit.

So, for example, the email between Mr. Naftalis and Majidi's lawyer on the day of Majidi's plea—agreeing to meet outside the courtroom ten minutes before the plea—was not part of the FOIA response, and neither were emails between Mr. Naftalis and the other prosecutors discussing the substance of the Majidi allocution. (Ex. 4, USAO_SDNY_026414; Ex. 10, USAO_SDNY_026423.) The government's letters do not indicate whether that was Mr. Naftalis's decision—*i.e.*, he saw these emails but decided not to collect them in response to the FOIA request—or the EOUSA's decision based on a FOIA exemption. Nor has the government explained the basis for any determination that the Naftalis Allocution was exempt from FOIA, or whether any members of the prosecution team were consulted about that decision. To address these issues, we asked the government to provide a log of what was withheld from the FOIA production. The government declined and instead referred us to the Office's FOIA unit or to EOUSA. (Ex. 11, June 28, 2020 e-mail from M. Nicholas.) Based on AUSA Nicholas's suggestion, we then wrote to Mr. McEnany, who exercises "general supervision" over the Office's FOIA process (June 19 Gov't Letter at 3), requesting that the Office produce the materials given

10

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

to EOUSA in response to the FOIA request, or a log.  Mr. McEnany declined and directed us to EOUSA.  The Office's refusal to share that information is not indicative of a desire to allow for a complete understanding of their mistake, how it occurred, and what it means for this case.

It is difficult to interpret the government's refusal to produce a log of the withheld pages as anything other than an attempt to conceal a material fact: which documents were identified in March 2020 and were held back from production until late May, and which were identified more recently.  The government also seeks to block the defense and the Court from evaluating whether there is a good faith explanation for withholding those documents.  Indeed, and for example, the Naftalis-authored allocution was withheld from the FOIA production, but the government has not stated on what basis it was withheld, or who participated in the decision to withhold it.  These are uncomfortable but legitimate questions, and the government would not hesitate to pursue them (and likely to assert corrupt intent) if a witness or defendant withheld a crucial document from a response to a subpoena.

The government's lack of transparency also reflects a callous disregard for the substantial harm caused to the defendants by the months- and years-long delays in disclosing the pertinent facts.  That harm is not limited to the fact that a six-week trial was conducted, in the defense's view, without full information and cross-examination, but also includes the extensive waste of resources from litigating these matters collaterally and preparing appellate briefs and arguments based on false facts.

## C.   The Government's Latest Letters Continue to Present Misleading Claims

In its letter dated June 19, 2020, the government claims that the allocution Mr. Naftalis wrote for Majidi (which differed in key respects from Majidi's proposed allocution) was "completely consistent with Majidi's statements during proffer sessions." That claim is wrong.  It is not clear if the prosecution undertook to carefully review the more than 230 pages of Majidi 3500 material (many of them handwritten) before making this bold claim.  After receiving the government's letter, we did.  The 3500 repeatedly refers to mismarking in the middle of 2015.[4]  We located only two pre-plea proffers that

---

[4]   *See, e.g.,* 3520-38 at 1 (handwritten) (May 29, 2019) ("~Jun 2015 was when mismarking in MCF got egregious"); 3520-34 at 2 (handwritten) (May 22, 2019) ("Had already told Ahuja [5%] overmarked in September 2015"); 3520-28 at 1 (handwritten) May 6, 2019) ("~Feb 2016 Ahuja and [] . . . said to sell some bonds . . . to take advantage of market conditions to explain away overmarking."); 3520-33 at 3–4 (302) (Aug. 1, 2018) ("In 2016 . . . .  Hedge fund employees were disgruntled. . . .  Ahuja was not interested in the business anymore. . . .  At this time the terms 'mismarking' and 'overmarking' were already being used when discussing the portfolio."); 3520-11 at 3 (302) (July 13, 2018) ("In the summer 2015 time period, markets widened and there was less liquidity.  In approximately the Q2, Q3, and June 2015 time period, the imputed mid became a way to move everything, rather than deal with specific counterparties."); 3520-13 at 1 (302) (July 18, 2018) ("At the end of December 2015,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

arguably point to mismarking having occurred prior to that, which appear to refer to PPI marking the New Issue Fund "aggressively" soon after that portfolio launched in late 2013. (Ex. 12, 3520-08 at 2, 6 (July 10, 2018); Ex. 13, 3520-05 at 7 (June 18, 2018).)  Notably, however, Majidi also stated that the inflated bid-ask spread methodology allegedly used to manipulate the New Issue book was not developed until mid-2015.  (Ex. 14, 3520-11 at 5 (July 13, 2018).)

Indeed, in one pre-plea proffer, Majidi said: "There was always a push on the hedge fund business to have aggressive marks.  MAJIDI did not initially believe the push in the hedge fund was material in Q1 and Q2 2015, but he could not recall.  *The push became a problem in Q2 2015*, including in April 2015 when there was a drop in rates."  (Ex. 12 at 6 (emphasis added)).  Then, in a passage that unmistakably reflects the FBI 302 version of transcribed cross-examination, the 3500 states "While there was pressure in 2014, the issues at PPI were not as major as they were later.  *It was possible mismarking began in 2014*.  It was possible there were months in 2014 when marks were being moved.  The pressure for marks was from AHUJA."  (*Id.* at 7 (emphasis added).)  Even within this very proffer, it is wrong to say that the Naftalis-authored allocation is "completely consistent" with the proffer statements—it is inconsistent with Majidi's original description, but consistent with Majidi's statements apparently shaped by close questioning about what was "possible" and who was purportedly responsible.

The government also continues to minimize its role in Majidi's allocution and to tiptoe around the facts.  Rather than submitting declarations describing what, in fact, happened, for example, the government states (in a letter apparently signed by Mr. Naftalis) that the "plain implication" from the fact that Mr. Naftalis's rewritten allocution matches Majidi's allocution verbatim is that Mr. Naftalis "must have *discussed* the proposed changes with Majidi's counsel prior to Majidi's plea."  (June 19 Gov't Letter at 3 (emphasis added).)  It is not clear why the government continues to suggest what "must have" happened rather than attesting to what did happen.  More importantly, though, "discussed" is an odd way to describe a word-for-word dictation, particularly in a letter that purports to apologize for misleading the Court about the facts.  It is an especially inapt description if indeed Mr. Naftalis handed the allocution he drafted to Majidi or his lawyer, as appears likely.  Yet, the government repeatedly uses that and other similar descriptions to downplay what really happened.  The government states, for example, that the Naftalis Allocution "shows that [Mr. Naftalis] did *discuss the changes* to the Draft Allocution that are reflected in the Final Allocution *with Majidi's counsel*."  The document does not show that at all.

_____

PREMIUM POINT INVESTMENTS (PPI) was down 22% in the hedge fund. . . . AHUJA instructed how far MAJIDI could push marks to capture performance fees. AHUJA asked, for example, 'can you get me a quarter of a point?'"); *id.* at 4 ("There were times that MAJIDI pushed back against AHUJA.  MAJIDI pushed back about two or three times in the Q4 2015 time period."); *id.*  at 5 ("In September 2015 there was a discussion at AHUJA's Premium Point house that was supposed to be about how to grow the business.  Valuation was a big part of the conversation.  PPI had received the first set of JP Morgan (JPMC) numbers, and found that the fund would be marked down 10% if JPMC marks were used.").

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

All it shows is that Mr. Naftalis is the author of Majidi's allocution.  And, as noted above, the government contends that "AUSA Naftalis *communicated* the same changes that he proposed in the Redline . . . *to Majidi's counsel*, and that those changes were *then incorporated into* Majidi's allocution."  (June 24 Gov't Letter at 2 (emphases added); *see also id.* (stating that the "differences between the final Majidi allocution and his counsel's initial draft were *prompted* by the Government" (emphasis added)).  The reality is blunter: Mr. Naftalis wrote the allocution, and Majidi read Mr. Naftalis's script word-for-word without a single modification.

Relatedly, the government insists on referring to the Naftalis Allocution as a "Redline."  It is far from likely that anyone from the prosecution dictated the allocution to Majidi's counsel word-for-word from a "redline," and it is decidedly remote that Majidi would successfully deliver verbatim the allocution written for him by reading from a redline or from notes taken from "discussion," or even dictation, taken from a redline.

### D.     New Communications About the Dole Plea Reveal Even More Disclosure Failures and Apparent Misrepresentations

The government's production on June 26, 2020, also raises questions with respect to the allocution of another cooperator, Ashish Dole, whose plea was handled by the then-Co-Chiefs of the Securities Unit.

At trial, the government advised the Court that it had checked every file or record it could "think to check," and did not "believe any allocution was provided by . . . Dole's counsel in advance of [the] plea."  (Trial Tr. 532:8–533:1.)  The government also represented that it had, at the Court's direction, searched all of its emails with witness's lawyers.  With respect to Dole, the government represented it had also consulted with both unit chiefs (one of whom had since left the Office), and that the one chief who remained with the Office checked his own files and emails.  (*Id.*)

The Court then sought to ensure that the government had also considered oral communications that may not have been memorialized:

> THE COURT:  The answer you just gave to me seems to presuppose that the communications would be provided in writing.  Does anyone on the team or the supervisors to the team have a recollection of oral discussions with counsel about the substance of the allocution?
>
> AUSA GRISWOLD:  No. . . .

(Tr. 533:2–7.)  The government said nothing about the existence of emails, reflecting that the unit chiefs in fact spoke to Dole's lawyer *on the day of his plea.*

Dole's plea was scheduled for the afternoon of November 13, 2017.  Dole appears to have surrendered for processing that morning.  At 11:29 a.m., one of the unit chiefs, Jason Cowley, emailed the FBI case agent (who apparently was at Pretrial Services with Dole), asking, "Is [Dole's] lawyer there?"  (Ex. 15, USAO_SDNY_026395.)  After the FBI

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

agent confirmed that Dole's lawyer was indeed with him, Mr. Cowley wrote, "Could you please ask him to give us a call or swing by after you guys are done over there?" (*Id.*)  At 12:54 p.m., the FBI agent wrote back to let Mr. Cowley know that "[Dole's lawyer] now said he will call at 1:15pm.  Apologies for the change, just fyi." (*Id.*)  AUSAs Naftalis and Griswold, as well as the other unit chief, Telemachus Kasulis, were all copied on the email exchange.

The next day, Mr. Kasulis wrote to Dole's lawyer (copying Mr. Cowley), stating: "It was good to see you yesterday.  Thanks for making yourself available for a few minutes before the proceeding." (Ex. 16, USAO_SDNY_026398.)  Although the Court specifically inquired about oral communications surrounding Dole's plea, none of these emails were mentioned (let alone produced) to the Court or defense.  It is fair to ask how, given the representations about the search conducted, the government failed to state, at the same time it said none of the supervisors or team members recalled any discussion, that emails indicate that there was some discussion.  It is also fair to ask the witnesses what the meeting between the supervisors and Dole's lawyer was about, and, if the witnesses do not recall that meeting, whether the documents refresh recollections about what may have occurred.

These newly discovered emails—along with emails described above with Majidi's counsel about talking on the phone and meeting before the plea—raise a broader question about the existence of so many communications between the government and counsel for cooperators for which there is no record of what was said, and for which no disclosure of what in fact was said has been made.  The government's repeated pattern of setting up calls or meetings with counsel rather than engaging in substantive communications over email suggests that the government deliberately took steps to avoid creating a documentary record of those communications.  Indeed, the Naftalis Allocution is a prime example.  Whether Mr. Naftalis read his draft to Majidi's counsel word-for-word so Majidi's lawyer could copy it down, or brought it to court on the day of the plea, Mr. Naftalis's decision to communicate his changes via either of those methods, rather than simply emailing the document to Majidi's counsel, is hard to explain otherwise.   These efforts by the government are troubling, as the prosecutors surely must know that the government "does not avoid the obligation under *Brady/Giglio* to disclose [] information by not writing it down." *United States* v. *Rodriguez*, 496 F.3d 221, 222 (2d Cir. 2007).  Together, all of these emails trigger serious concerns about whether the substance of the government's oral discussions with counsel have been appropriately disclosed.[5]

---

[5]   At trial, the defense also learned of an email where, in response to an email from Dole's counsel regarding immunity, the government requested that Dole's counsel speak with them on the phone before sending anything in writing in light of potential "*Triumph Capital* issues"—meaning obligations to disclose statements by counsel for a witness. (Trial Tr. 469.)

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

## II. THE COURT SHOULD ORDER ADDITIONAL DISCOVERY AND A HEARING TO COMPLETE THE FACTUAL RECORD AND ENSURE THAT THE DEFENDANTS HAVE RECEIVED ALL *BRADY* AND *GIGLIO* MATERIAL

In opposing the defendants' request for additional discovery and a hearing, the government contends that no fact-finding is necessary because the facts are already known. The government is wrong. As described, the government's recent letters and belated disclosures raise a host of questions that demand answers. Moreover, the government asserts that its rewrite of Majidi's allocution was "entirely proper," its misrepresentations and subsequent failure to correct those misrepresentations were not "in bad faith," and its "mistakes . . . did not prejudice the defendants at trial and do not implicate the verdict against either of them." (June 19 Gov't Letter at 1, 4.) But, the time has passed for unsworn representations about good faith mistakes and of self-selected document reviews and productions. The government's blanket claims should be tested with documents and witnesses, and the record developed fully so that the defense may seek appropriate relief.

Moreover, we do not know, given the record so far, what else is out there. The government curiously has refused to provide information, such as what it produced to EOUSA or who decided to withhold from the FOIA production the key document—the Naftalis Allocution—and why. Even beyond its explicit refusals, there is no reason to have confidence in any assurance by the government when it comes to discovery that "this is it." The government made repeated assurances along those lines during trial that were proven wrong time and again, and the defense had to make a FOIA request just to get materials that were specifically requested and should have been located and produced by the government at several different junctures. Other defense motions for disclosure were denied by the Court based on similar assurances by the government that it had complied with its obligations, but there is no reason at this point to have any confidence in those assurances. To ensure no further disclosure lapses, and because the government has shown that it either does not understand or is otherwise unable to abide by its *Giglio* and *Brady* obligations, the Court should compel disclosures that do not require or allow for exercises of discretion by the prosecutors.

### A. The Government Incorrectly Asserts That It Was "Entirely Proper" for the Government to Rewrite Majidi's Allocution Word-for-Word

The government maintains that the changes it made to Majidi's allocution were "entirely proper" because they were consistent with his proffer statements. We disagree. But, regardless, the government misses the point. The point here is not that AUSAs cannot or should not comment on proposed allocutions. The point is that if prosecutors comment on proposed allocutions, and if those comments lead to material changes in a cooperator's allocution, the defense should know, and should be given the opportunity to cross-examine the cooperator on his or her willingness to adopt those changes. This case is a perfect example: the government put specific names, dates and words in Majidi's mouth, and the defense—based in part on misrepresentations made to the Court—was not permitted to cross him on that fact.

15

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

The government's claim that its conduct was entirely proper is inconsistent with the record. At trial, the government asserted that any role it may have played in the changes to the cooperators' allocutions was proper because the government would have only made suggestions to the effect that the cooperator "hit the elements" or correct factual inaccuracies. (Trial Tr. 768–71.) In doing so, Mr. Naftalis himself seems to have taken the position that it would be *improper* to "suggest to a defense lawyer, this is what [the cooperator] should say or not say" in his allocution, and that he "would never" do that. (Trial Tr. 769:5-7.) Based on the government's representations and "strong" (albeit not entirely complete) recollection of communications with counsel for the cooperators, the Court thus found that there was no evidence that "the Government conveyed a message to [the cooperating witness's] counsel that the proposed allocution should be revised to eliminate portions that would have been favorable to [Defendants] and inconsistent with the Government's theory of the prosecution, and to replace them with statements that aligned with the Government's prosecution theory and undercut [Defendants'] defense." (June 10, 2019 Order, ECF 213 at 2 (internal quotation marks omitted).)

We now know that the government did exactly that. Yet, the government still maintains—without citation to any authority—that its actions in rewriting a cooperator's allocution to more closely align it with the government's theory of the case were entirely proper. That assertion is unsupportable.[6] Mr. Naftalis's changes to Majidi's allocution included the following:

**<u>Expanding the Time Period.</u>** The proposed allocution included no acknowledgment of mismarking in 2014. It stated that the "scheme accelerated in the second half of 2015, as the hedge fund's performance was deteriorating." (Ex. 8 at 26367–

---

[6] Even if the changes were "completely consistent" with the proffers (June 19 Gov't Letter at 4)—and setting aside that Majidi's counsel drafted, and Majidi reviewed, the proposed allocution that was rejected and re-written by the government—the government identifies no authority for the proposition that it is not "improper" to script a witness's sworn statement. (June 24 Gov't Letter.) It certainly is. *See, e.g.*, *United States* v. *Milles*, 363 F. App'x 506, 509 (9th Cir. 2010) (finding it "highly improper" for government to hand witness a Q&A sheet thirty minutes before he testified but denying relief in part because defendants were able to cross-examine witness on the document); *United States* v. *Cincotta*, 689 F.2d 238, 244–45 (1st Cir. 1982) (government document coaching witnesses on how to present testimony was "prosecutorial misconduct" but denying relief because the trial court permitted defendant to cross-examine witnesses on the documents and explained to the witnesses "in great detail why the government conduct was improper" prior to their testimony); *Maldonado* v. *Scully*, 89-cv-5483 (RWS), 1990 WL 102209, at *2 (S.D.N.Y. July 12, 1990) (noting impropriety when "prosecutor took the position that the State would entertain a plea from the co-defendants only if they allocuted to the facts as the prosecutor purported to know them to be"), *aff'd*, 932 F.2d 956 (2d Cir. 1991); *cf. In re Eldridge*, 82 N.Y. 161, 171 (1880) ("[The attorney's] duty is to extract the facts from the witness, not to pour them into him; to learn what the witness does know, not to teach him what he ought to know.").

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

68.) That sentence—and any reference to 2015—was excised from the Naftalis Allocution and replaced with a statement that Majidi participated in a scheme with Mr. Ahuja and Mr. Shor "[b]etween 2014 and 2016." (*Id.*)

The original statement that the scheme accelerated in the second half of 2015 was consistent with key defenses asserted by Mr. Ahuja and Mr. Shor. Both defendants argued throughout trial that any mismarking at PPI began in mid-2015. (Ahuja Opening, Trial Tr. 162; Shor Opening, Trial Tr. 188.) The changes by Mr. Naftalis were not necessary to make the allocution factually accurate. Majidi himself testified at trial that he thought PPI's marks were "within an acceptable range" in 2014. (Trial Tr. 2693:4-8.) Consistent with his pre-edited version of the allocution, Majidi testified that it was in the second half of 2015—beginning in "July to September"—that the prices became "out of whack" with the securities' fair value. (Trial Tr. 2716:24–2718:12.) The time frame included in Majidi's proposed allocution also matched the SEC's allegations in the parallel SEC lawsuit, which charged a scheme from "at least September 2015 through March 2016." (Amended Complaint ¶ 2, *SEC* v. *Premium Point Investments LP*, 18-cv-04145-AJN (S.D.N.Y. Nov. 19, 2018), ECF 24.)

Nor is the government correct when it asserts that the change was "completely consistent" with Majidi's proffer statements. Far from it. (*See* Section I(C), *supra*.) In fact, the proffer notes show that Majidi emphasized that the scheme accelerated in mid-to-late 2015. While Majidi suggested in his proffers—attended by the same SEC trial attorneys who only charged conduct starting in 2015—that it was "possible" that mismarking began in 2014, and made vague references to mismarking in the New Issue Fund prior to 2015 (despite disclaiming a role in the fund prior to 2015, *see* Trial Tr. 2453), Majidi stressed that it was in the "summer of 2015" that "pressure" led to "marks being materially different than the reality of where bonds could be sold in the market." (Ex. 12, 3520-08 at 7.) And it was also the "summer of 2015" when PPI traders and Majidi allegedly discovered they could manipulate bid/ask spreads. (Ex. 14, 3520-11 at 3, 5.)

Significantly, consistent with Majidi's *pre-edited* allocution, a proposed allocution prepared by Frank Dinucci's lawyer similarly referenced mismarking that began in 2015. But again, and just as with Majidi, after the government spoke to Dinucci's counsel, Dinucci changed his allocution and instead stated that he started providing improper marks to PPI "at some point after mid-2014." (ECF 210, Ex. F at 17:11-23.)

Specifically, on April 5, 2017, counsel for Dinucci sent the government a proposed allocution for Dinucci's plea hearing the following day, asking if the government would "like to discuss." (ECF 210, Ex. I at 1.) Dinucci sent his proposed allocution in response to Ms. Griswold's request on April 4, 2017, to get a copy of the document "as soon as possible." (ECF 210, Ex. H.) In his proposed allocution, Dinucci stated that he provided marks for "a PPI portfolio manager, and on occasion one of his colleagues" in the "2015 and 2016" time period. He further specified that it was only "*at some point during this time period*"—*i.e.*, 2015 and 2016—that he began to provide PPI with allegedly improper marks. (ECF 210, Ex. I at 2 (emphasis added).)

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

The next day, Dinucci's plea in front of Judge Hellerstein was materially different with respect to the time period for the alleged misconduct. Instead of what he had proposed saying, Dinucci stated that he provided allegedly improper marks starting in 2014. (ECF 210, Ex. F at 17:2-23, Ex. G at 1-2.) The change made to Dinucci's plea mirrors a change Mr. Naftalis made to Majidi's allocution a year and a half later.

**Deleting References to Majidi Pressuring Traders.** Both defendants centered their defense on Majidi's role in pressuring traders to obtain marks. Consistent with those defenses, Majidi's proposed allocution stated that "I communicated to the traders under my supervision monthly performance targets set by Mr. Ahuja and I then pressured them to meet those targets." That statement appeared in two different places in the proposed allocution. (Ex. 8 at 26367, 69.) But when Mr. Naftalis re-wrote the allocution, these references were deleted in their entirety. There was nothing factually inaccurate about the deleted statements—which had been written by Majidi's counsel and reviewed by Majidi himself. Nor were they inconsistent in any way with Majidi's proffers: Majidi told the government that he pressured the traders to achieve targets. (Ex. 12, 3520-08 at 7; *see also* 3520-13 at 3 ("Majidi tried to get to AHUJA's goal by pushing" the traders).)

**Adding Jeremy Shor.** The proposed allocution did not refer to Mr. Shor at all, referring only generally to "traders under [Majidi's] supervision." But in the Naftalis Allocution, Mr. Shor was mentioned twice: he was specifically named as a part of the fraudulent scheme lasting from 2014 to 2016, and identified as one of three named participants who "worked" to "mismark" the value of PPI's securities. (Ex. 8 at 26367– 68.) The government's revisions to highlight Mr. Shor specifically in the improper mismarking were—obviously—consistent with its theory of the case and inconsistent with Mr. Shor's defense.

**Changing "Fund" to "Funds."** Mr. Naftalis also changed references to the "Mortgage Credit Fund" (singular) to the "funds" and "portfolios" (plural). (*Id.*) For example, while the original allocution stated that Majidi was the "portfolio manager for the mortgage credit hedge fund" and "participated in a scheme to inflate the month-end net asset value of *the* hedge fund," the government revised the allocution to say that Majidi "participated in a scheme . . . to fraudulently inflate the month-end net asset value of the *funds* that PPI managed." (*Id.* (emphases added).) Similarly, while Majidi's proposed allocution stated that he knew that monthly NAVs were "inflated for the purpose of deceiving investors as to *the hedge fund's* performance," the government's revised allocution referred to "deceiving investors as to the *funds'* performance." (*Id.* (emphases added).)

The clear purpose of these changes was to capture both the Mortgage Credit Fund *and* the New Issue Fund, because the government's case relied heavily on establishing misconduct in the New Issue Fund, which Mr. Ahuja was more involved in personally. Majidi's original proposed allocution—which made no mention of fraudulent inflation in any fund other than the Mortgage Credit Fund—undermined that argument, and defense counsel was unable to cross-examine Majidi on the difference.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

    **Addition of "I knew what I was doing was wrong."**  Mr. Naftalis added a new sentence stating, "I knew what I was doing was wrong."  (*Id.* at 26368.)  Because the Naftalis Allocution had not been produced at trial, the Court and the parties were unaware that this statement had been added by the government.  The addition was not needed to establish that Majidi acted knowingly, as the original allocution already stated that Majidi "knew" that the monthly NAVs that resulted from his participation in the scheme were "inflated for the purpose of deceiving investors." (*Id.*)  Mr. Naftalis's addition, which Majidi likely saw for the first time only minutes before his plea, may have been a source of the confusion that ensued at his plea, when Majidi initially stated that he did not understand his conduct to have been illegal before having to rephrase his answer:

> THE COURT: Please be seated. Thank you. You indicated to me just a moment ago that when you were engaged in this conduct you understood that it was wrong.  Did you also understand that it was illegal?
>
> THE DEFENDANT: I did not, no.
>
> THE COURT: You did not at that time. At some point --
>
> MR. NAFTALIS: Could we --
>
> THE COURT: Yes.
>
> (Pause)
>
> THE DEFENDANT: Let me rephrase. At the time I was uncomfortable with my conduct and I knew that by inflating the net asset values for the investors I was committing something wrong and potentially illegal. And illegal, yes.

(Majidi Plea Tr. 32:14–33:2, ECF 210, Ex. C).

    Again, and for these purposes, the point is not whether it was appropriate or inappropriate for the AUSA to add the relevant language.  The point is that the Court— relying at least in part on the government's factual misstatements—did not allow the defense to cross-examine Majidi on it.

    **B.**    **The Current Record is Not Sufficient to Conclude that the Government Acted in Good Faith**

    The government made misrepresentations to the Court, failed to produce *Giglio* material that was relevant to the Court's inquiry, and failed to correct misrepresentations even after it indisputably knew they were inaccurate.  At the same time, the government baldly asserts that it acted in good faith and that misstatements made during the June 10,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

2019 colloquy with the Court were inadvertent and based on mistaken recollections. There are facts that suggest otherwise.[7]

First, Majidi's plea took place on October 31, 2018, and the colloquy with the Court took place on June 10, 2019. Thus, at the time of the colloquy, only seven months had elapsed from the time that Mr. Naftalis rewrote the allocution, circulated a redline with his edits to the prosecution team, and, in all likelihood, personally handed it off to Majidi or his lawyer. Newly disclosed emails also show that the AUSAs commented to each other about the substance of the proposed allocution when it was received (*e.g.*, "way too detailed") and the proposed allocution was significant enough to prompt one of the AUSAs to call for a team meeting the day before the plea to discuss it.[8] And, it is now beyond dispute that all three AUSAs present for the June 10, 2019 colloquy had received copies of the Naftalis Allocution in October 2018.

Second, on June 8, 2019, just two days before the June 10 colloquy, the government certified in a letter to the Court that it had reviewed "all" of the government's "communications with attorneys for witnesses in this case." (ECF 209.) It repeated that claim in one of its recent letters, stating that, just before the June 10, 2019 colloquy, the prosecutors "reviewed their archived emails for all communications with attorneys for witnesses in the case, including attorneys for cooperating witnesses." (June 19 Gov't Letter at 1.) Yet, the government's most recent production, made on June 26, 2020, includes several previously undisclosed email exchanges between the government and the cooperators' lawyers that obviously relate to the cooperators' pleas, including emails *on the day of* Dole's plea and *on the day of* Majidi's plea. The government's letters say nothing about why these documents never previously surfaced, let alone correct or withdraw their June 8, 2019 certification. Indeed, while the government claims that it failed to locate the email transmitting the Naftalis Allocution because its searches were limited to *external* communications with lawyers, and not *internal* email exchanges among the AUSAs, a number of the emails included in the June 26, 2020 production are exactly the kinds of *external* communications the government claimed to have searched prior to June 10, 2019. In other words, the government's claim invites the question of how, precisely, it searched its files in response to the Court's June 6, 2020 order—did it use search terms? Or search for particular recipients' emails? Either way, the resulting

---

[7]   Under *Brady* and its progeny, "the suppression by the prosecution of evidence" can occur "irrespective of the good faith or bad faith of the prosecution," *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963). Nor does it matter whether the government suppressed the evidence "willfully or inadvertently." *Strickler* v. *Greene*, 527 U.S. 263, 281–82 (1999).

[8]   The AUSAs emailed each other to set up a meeting at 3:00 p.m. Mr. Naftalis distributed, and AUSAs Griswold and Nicholas accepted, a calendar invite for a "PPI Team Meeting" for one hour at that time. Mr. Naftalis set up a call with Majidi's lawyer for 4:30 p.m., or thirty minutes after the scheduled end of the team meeting. The government's unsworn statement that "none of the prosecutors remember whether, one and a half years ago, they had any such meeting" (June 24 Gov't Letter at 2), only shows why additional investigation is necessary.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

representations and disclosures (or failure to disclose) are difficult to reconcile with a diligent search or accurate representations.

Moreover, those external emails, presumably located by the government by the time it filed its June 8, 2019 letter to the Court, were neither mentioned nor referred to even when Your Honor questioned the government specifically about communications with the cooperators' lawyers during the June 10 colloquy. The Court asked Mr. Naftalis, for example, whether he had spoken to Majidi's lawyer about the allocution on the day of the plea. He said no, and did not disclose the existence of an email exchange in which he requested—and Majidi's lawyer agreed—to meet outside Your Honor's courtroom ten minutes prior to the plea. Similarly, while the government represented it was not aware of oral communications with Dole's lawyer concerning his allocution, it did not disclose emails showing that the government asked to speak with (and in fact did speak with) Dole's lawyer shortly before his plea. There are two possibilities, and neither one is good. The government either did not conduct the review that it was ordered to do and certified to the Court on June 8, 2019 that it had completed, or the government did the review and knowingly misled the Court when questioned on/after June 8. The government's statements in this regard stand uncorrected.

Third, even if the government lawyers simply failed to recall the circumstances surrounding the Majidi allocution, there is no valid excuse for the government's failure to locate and produce the Naftalis Allocution during trial. That the government only searched *external* and not *internal* emails is certainly not an excuse for failing to meet its disclosure obligations. The government should have searched both, especially given the issues raised by the defense and the Court, and a specific request from Mr. Ahuja's counsel that the government "provide a description of *any oral communications it had with counsel concerning the content of cooperator plea allocutions and any suggested modifications to those allocutions*, including those of Amin Majidi." (ECF 319, Ex. 6 at 1 (emphasis added).) Of course, the defense focused on potential oral communications because it was falsely led to believe that no documents existed.

It is incumbent upon the government to search for and disclose *Brady/Giglio* material, not for the defense to drag it from the government through Rule 17(c) subpoenas and FOIA requests, and here, the Naftalis Allocution was not difficult to find. It was not somewhere else within the U.S. Attorney's Office or the FBI. It was right in the emails of all three members of the prosecution team. If any of them had simply looked at their emails from the day before the plea, or run even the most basic search, they would have easily located it. It is for the government to explain why that was not done when the government purportedly conducted its pre-trial reviews for disclosable material, let alone when this issue arose during trial and the Court made specific inquires about the allocution. Indeed, Mr. Nicholas claimed that he located and produced Majidi's proposed allocution independent of Majidi's counsel's imminent compliance with the Rule 17(c) subpoena served on him by defense counsel. Mr. Nicholas told the Court:

> On that specific point, that's not how that got disclosed. In fact, after court the other day, I went back and I -- I went back and remembered that it would be -- it was possible that his lawyers would have sent a proposed

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

> allocation.  I then undertook to see if that happened, found it and produced
> it.  That was not -- I am aware that they subpoenaed -- they sent a Rule 17
> subpoena to Majidi's lawyer and that they -- so I assume that -- I, frankly,
> don't know what the status of that subpoena is but I assume that they -- if
> they got communications, then they would -- that actually did not prompt
> this specific disclosure.  I'm not saying I shouldn't have given it over; I'm
> just saying that did not prompt that disclosure.

(Trial Tr. 469:24-470:11.)  It is difficult to imagine how Mr. Nicholas could have had some recollection that Majidi's counsel sent an allocution, "undertook to see if that happened," and *did not* find or recall the Naftalis Allocution or any of the other documents produced only recently by the government.

Moreover, even before this issue arose, it is inconceivable how all members of the prosecution team failed to recognize that *Brady* and *Giglio* required disclosure of the fact that a cooperator delivered in Court an allocution written by a prosecutor that differed from the cooperator's proposed allocution in ways that aligned it with the prosecution's theory of the case and diverged from the defense theories.  Those facts, and the allocution drafted by the prosecutor, should plainly have been disclosed to the defense well before trial.  Relatedly, as noted, the emails in this case reflect a troubling pattern of the prosecutors arranging calls and meetings with counsel in an apparent effort to avoid creating a paper trail; any such effort clearly would be inconsistent with its disclosure obligations.[9]

Finally, the government's conduct post-trial in response to our FOIA request raises similarly troubling questions.  The government acknowledges that EOUSA received our request in late November 2019, and that the prosecution team itself received our targeted FOIA request in late January 2020, which presumably would have led *someone* to conduct even a preliminary search sometime before *March*, especially given the limited scope of the request, its obvious significance, and the pending motion before the Second Circuit.  Even if the Naftalis Allocution was not identified until March, however, there is no explanation by the government for why it was not immediately produced.  Other than to say it was not discussed with Mr. McEnany and that Mr. Naftalis did not alert anyone else, the government's letters are silent as to what, if anything, was done after it was "identified," why it was not produced, and why no steps were taken to correct the prior misrepresentations to this Court and the Court of Appeals.

---

[9] Just five months before Majidi's plea, following a publicized failure to disclose exculpatory material in a case before Judge Nathan, the government claimed to have addressed the issue through "an all-hands-on-deck internal training of [its] unit chiefs," and direction that "every AUSA in the criminal division . . . receive additional training on" the Office's obligation to "scrub[ its] files" to ensure complete and timely *Brady* disclosures, "to ensure no repeat of the errors that have come before your Honor."  Hr'g Tr. at 9, 10, *United States* v. *Pizarro*, No. 17-cr-151-AJN (S.D.N.Y. May 17, 2018), ECF 135.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

Making matters worse, even when the government made its FOIA production on May 27, 2020, it did *not* include the Naftalis Allocution—the single most significant document related to any of the cooperators' allocutions of which we are aware. We do not know how that happened, and the government refuses to say. The government's claim of good faith cannot possibly be credited without these answers.

C. **The Government's Assertion that Its "Mistakes" Did Not Prejudice the Defendants or Implicate the Verdict Ignores the Significance of the Suppressed Evidence and the Government's Other Disclosure Lapses**

The government's blanket assertion that the evidence in question "did not prejudice the defendants at trial and do[es] not implicate the verdict against either of them" overlooks the significance of the suppressed evidence and the broader context of the government's repeated disclosure lapses in this case that have been brought to light only by the persistence of defense counsel.

As to the significance of the evidence withheld, the government's case relied heavily on cooperator testimony. There was no documentary evidence that Mr. Ahuja recruited, directed, or communicated with the "corrupt brokers" who purportedly provided PPI traders with inflated marks, and Mr. Ahuja was not party to the text exchanges discussing marks from Dinucci. As the government highlighted to the jury in its closing statement, "when you're considering whether Mr. Ahuja was in the dark, you would have to believe that Mr. Nimberg lied to you, Mr. Majidi lied to you, Mr. Dole lied to you . . . ." (Trial Tr. 4639:25–4640:2.) Similarly, Mr. Shor's defense was that valuations were within a defensible range until the second half of 2015, at which time Mr. Shor lodged a series of complaints with purported conspirators and non-conspirators alike, and recorded those interactions—conduct that, according to Mr. Shor, undercut a claim that he was a willing participant in a fraud.

Impeaching the credibility of those witnesses was essential to the defense. In general, the only practical way for a defendant to demonstrate that cooperating witnesses, who are especially "vulnerable to prosecutorial suggestions,"[10] have in fact been coached by the prosecution is through cross-examination. But the extent of coaching is often difficult to discern and hidden "from meaningful oversight by courts or defense counsel,"[11] and thus very difficult to establish through cross-examination.

This problem has been recognized by scholars, who have observed that defense counsel typically "has no foundation for cross-examining the cooperator about whether his

---

[10]   Bennett L. Gershman, *Witness Coaching by Prosecutors*, 23 Cardozo L. Rev. 829 (2002), p. 834, *available at* http://digitalcommons.pace.edu/lawfaculty/126/.

[11]   *Id.*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

testimony was the product of information supplied by the government."[12]  While defense counsel "will be able to elicit acknowledgment that the witness has met with the prosecution to prepare, a well-prepared witness's account of those sessions will be otherwise opaque: 'The prosecutor asked me the same questions she asked me today and told me to tell the truth.'"[13]  This leaves the jury with "little insight into the significance and nuance of the prosecutor's effectively exclusive opportunity to prepare and rehearse with the witness for what is often the crucial testimony in an accomplice case."[14]

If the government had made the disclosures it was required to make, the defense would have been able to show through objective evidence that the government took an allocution reviewed by Majidi for delivery in Court and rewrote it to exclude statements consistent with the defense and to align it with the government's theory.  We also could have shown that, even though he likely was handed the script just minutes before his plea, Majidi read it word-for-word without a single modification (indeed, Majidi emphasized that the thoughts in it "are mine" (Majidi Plea Tr. 31:8-11, ECF 210, Ex. C)), and that Majidi's statement that his conduct was "wrong" came from the government, not from him.

That concrete, stark and powerful evidence of the government's shaping of its witnesses' statements would have dovetailed with a number of the defendants' arguments.  For example, with respect to the timeframe of any mismarking, the defense would have been able to show the jury that both Dinucci and Majidi had prepared allocutions placing the mismarking squarely in 2015—consistent with the defenses of Mr. Ahuja and Mr. Shor—but that the government had them change the date to 2014 to align with its theory.  That evidence also would have substantiated the defense argument that key portions of the cooperators' testimony—which, significantly, were not corroborated by documentary evidence—were, in fact, the result of either coaching from the government or the cooperators' own eagerness to bend the testimony to support the government's theory.

In another example, the government used Dole's redirect to introduce a critical phrase—"Shor's guys"—that became central to its case against both defendants.  Those words were first uttered by the government, during Dole's re-direct examination, and not by Dole himself.  (Trial Tr. 1230:5-8.)  Asked a leading question about that phrase, Dole immediately embraced it and testified that Mr. Ahuja told him "to go to Shor's guys" for improper marks, even though the term he had actually claimed to hear Mr. Ahuja use was "Shor's boys."  (Trial Tr. 1230:5-21.)  At another point during trial, Mr. Naftalis similarly steered Dinucci to testify that Mr. Shor regularly mentioned receiving requests from his "bosses" (meaning Majidi and Mr. Ahuja) to hit inflated targets, even though Dinucci's text and chat messages demonstrated that Mr. Shor only ever used the singular term "boss" and Dinucci "always understood [Mr. Shor's] boss to be Amin Majidi" and first mentioned

---

[12]   Sam Roberts, *Should Prosecutors Be Required To Record Their Pretrial Interviews with Accomplices and Snitches?*, 74 Fordham L. Rev. 257 (2005), p. 284, *available at* https://ir.lawnet.fordham.edu/flr/vol74/iss1/7.

[13]   *Id.* at 285 (internal quotation marks omitted).

[14]   *Id.* (internal quotation marks omitted).

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

Mr. Ahuja to the government in this context, after meeting with the government many times since 2014, a mere six weeks before his trial testimony.  (Trial Tr. 3690:20–3693:18.)  Indeed, the prosecutors frequently eschewed non-leading questions and instead made liberal use of the witnesses' willingness to adopt language suggested by the prosecutors.

The suppressed evidence mattered, even standing alone.  But the government's failure to disclose that evidence must be viewed in the broader context of the serious disclosure failures that occurred regularly in this case.  *See Kyles*, 514 U.S. at 436 (courts must consider materiality of "suppressed evidence . . . collectively, not item by item"); *Wearry* v. *Cain*, 136 S. Ct. 1002, 1006 (2016) ("Evidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury.").  Here, the government has repeatedly failed to satisfy its disclosure obligations, and those failures typically have come to light only because of Rule 17(c) subpoenas, FOIA requests, or other efforts by the defense.  The government's response became a familiar refrain.  The government claims any omission or misstatement was inadvertent, acknowledges that it should not have happened, and—in the same breath—argues that the newly disclosed material is unimportant and would have altered nothing.  Your Honor's early remarks proved prescient—the government's actions did, in fact, inflict "death by a thousand cuts." (Trial Tr. 479:9-11.)

In this case, disclosure issues surfaced from early on.  The government initially claimed, in June 2018, that it was "unaware of any *Brady* material." (June 12, 2018 Gov't Letter, ECF 55, Ex. I.)  In November 2018 and January 2019, however, approximately six-to-eight months post-Indictment, and after repeated requests by the defendants, the government made *Brady* disclosures that included witness statements from as far back as the fall of 2016.  (ECF 52-14, Ex. N.)  At the January 17, 2019 conference, the Court expressed concern about the timeliness of the government's *Brady* disclosures, noting that many of the disclosures should have been produced sooner.  (Jan. 17, 2019 Hr'g Tr. at 58, 61, ECF 79.)  The Court also asked the government at that conference if it had produced all statements by attorneys for witnesses that "might be [broadly] considered exculpatory," and the government replied "yes," with the potential exception of notes from other prosecutors from a pre-indictment presentation by Majidi.  (*Id*. at 76:8-21.)  That was not accurate.

Before trial, we subpoenaed the cooperators and their lawyers for, among other things, communications between counsel for cooperators and the government.  On May 30, 2019, after counsel for Majidi contacted the government regarding the documents he planned to produce in response to our Rule 17(c) subpoena—the government produced a letter it received from counsel for Majidi over *a year prior* that plainly included statements at odds with the government's theory of the case.  (ECF 319-04.)  When questioned about its failure to produce the document earlier, the government claimed it was "simply misfiled" in a file with cover letters.  The Court explained that it was "not exactly satisfied with the explanation that this was a filing error," and inquired as to how it could have "confidence that the disclosures you've made, that the work you've done is correct."  (Trial Tr. 10:22–11:6.)  The government responded that it took its obligations "very seriously" and reassured the Court that, in addition to going over the files containing cover letters, it "went through and looked at all the files; are there other possible files here that, when we

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

went back and did our *Brady* and *Giglio* review, we didn't look at them, that they may have somehow substantive material in them, and we had satisfied ourselves that there aren't any other files."  (Trial Tr. 11:8, 13:4-11.)  The government further confirmed that it had reviewed the shared directory in its entirety.  (Trial Tr. 14:14-20.)

Yet, several days later, on June 3, the Court asked the government to provide its plea-related emails with counsel for Dole to the defense—which the defense only knew to ask about because of its communications with Dole's counsel concerning Mr. Ahuja's third-party subpoena.  (Trial Tr. 25:6–27:17.)  As a result, the government produced redlined edits to the Cooperation Agreement and the Information sent by counsel for Dole to the government on November 1, 2017.  (Trial Tr. 37:14-21.)

Two days after that, on June 5 and 6, the government produced communications between itself and counsel for Majidi, including a proposed allocution sent by counsel for Majidi to Mr. Naftalis on October 29, 2018, and a reply email from Mr. Naftalis requesting to speak with counsel on October 30, 2018.  (Trial Tr. 118:12–119:4.)  Noting the material difference between Majidi's proposed and final allocution and that the proposed allocution "should have been disclosed," the Court ordered the government "to review all of [its] attorney communications."  (Trial Tr. 472:3–479:19.)  The government conducted *another* review of its files, made *additional Brady* disclosures—including Dinucci's proposed plea allocution (which was also revised following its initial transmission to the government)— and assured the Court, *again,* that no additional *Brady* material existed in its files.  (ECF 209.)  Yet, as detailed above, that, too, was inaccurate, as the Naftalis Allocution and other critical communications were not disclosed.

At trial, the defendants moved to dismiss the Indictment based on the government's recurrent *Brady* failures and disclosure-related misconduct.  (Voir Dire Tr. 431:9-14; Trial Tr. 87:24–88:2.)  The Court recognized that disclosure failures could result in severe sanction and that repeated representations by the government that it would "do better" were not enough.  The Court ultimately denied the motion, stating: "[N]o, today I'm not dismissing the indictment.  That does not mean that I'm pleased with the disclosures." (Trial Tr. 465:14-16.)  However, we now know that the record on which the Court denied the motion was incomplete and inaccurate.

### D.    The Scope of Additional Discovery

As discussed, many questions remain unanswered regarding the plea allocutions, the government's disclosure failures, and the government's actions since receiving our FOIA request.  The government should be required to produce documents to test its claims of good faith and honest mistakes, and, just as importantly, to complete the factual record so that the defendants can evaluate what relief they may wish to seek based on the circumstances described in this letter.  The government described its most recent search as limited to "internal emails (including calendar invites), as well as internal paper and electronic files, for certain materials that would be responsive to this request," without explaining how the word "certain" limited the searchable universe.  (June 24 Gov't Letter at 2–3.)  And in the very next sentence, the government states that its search would be for

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

emails (and not, for example, internal chats, text messages or phone records),[15] and was seemingly arbitrarily limited to the two days prior to a cooperating witness's plea. (*Id.*) No indication is given of whether "internal paper" or other "electronic files" were searched. That is not sufficient.

More broadly, the government has repeatedly represented compliance with its obligations, and assured the Court and defendants that "this is it," only to be proven wrong time and again. Consequently, the government cannot be relied upon to self-police its disclosure obligations in this case. The defense made specific disclosure requests at trial that were denied based on the Court's reliance on the government's own assurances that it had satisfied its obligations. Those assurances by the government—whether made previously or now—should be tested through documents and not simply accepted at face value. And to ensure that the defendants receive all material to which they are entitled, the Court should compel disclosures that do not allow for the exercise of discretion or judgment by the prosecutors, such as a determination whether information falls within *Brady* or *Giglio* or not. In short, the government's opposition to the defense motion for disclosure and a hearing not only confirms the need for the relief requested therein, but confirms that broader disclosure should be ordered.

First, the government should be required to produce at least the following:

- Any communications or other documents (including, but not limited to, emails, text messages, internal chats, and voice mails) concerning any cooperating witness's plea hearing, plea allocution or trial testimony. For the avoidance of doubt, these documents should include not only substantive communications, but also documents that reflect or are indicative of oral communications. As indicated by its prior conduct and its searches reflected in its June 24, 2020 letter (ECF 371), the government appears to think that emails (or phone logs or records and other documents) showing communications are not disclosable (such as Mr. Naftalis's email

---

[15] On July 2, 2020, in a case before Judge Nathan, the government submitted a Court-ordered response to questions regarding late disclosures and related misstatements. The government's response, authored by Mr. McEnany, quoted from highly relevant communications among the AUSAs on "an internal chat system." Letter Reply at 10–11, *United States* v. *Nejad*, 18 Cr. 224 (AJN), ECF 354. On July 3, we asked the prosecutors in this case if they had searched its internal chats. (Ex. 17, July 3, 2020 E-mail from R. Tarlowe.) On July 6, the government responded that it did not recall discussing issues responsive to Shor's June 19 letter over the internal chat system, but after receiving our July 3 email, reached out to its IT department for assistance "in determining whether a search for internal chats can be conducted and if so how best to conduct it." (*Id.*) This only raises more concerns about the extent to which the government truly reviewed its entire "file" before this moment. This concern relates to the government's *Brady/Giglio* obligations more broadly, and not just in connection with the allocutions—the government's response nowhere says that the prosecutors do not recall using the internal chat system in connection with this case.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

> to Majidi's counsel proposing a 4:30 phone call (not disclosed until produced by Mr. Rosenberg), Mr. Naftalis's email proposing to meet ten minutes prior to the plea (not disclosed until June 24, 2020), Mr. Cowley's and Mr. Kasulis's emails indicating a meeting prior to Dinucci's plea (not disclosed until June 24, 2020)).

- All versions of any draft, proposed, or actual plea allocutions relating to the allegations in this case (including native files with metadata of all versions of any Majidi allocution).

- Any documents reflecting or memorializing meetings regarding cooperator allocutions in this case (including, but not limited to, notes, calendar entries, emails, internal chats, or other documents).

- Any documents reflecting, constituting, or memorializing any communications (including, but not limited to, emails, text messages, internal chats, and voice mails) with counsel for any government witness about the content or substance of the witness's proffer statements or actual or anticipated testimony. For the avoidance of doubt, such documents would include the documents recently produced reflecting meetings prior to the plea proceedings, voicemails, any telephone records reflecting calls between the government and defense counsel, and any internal chats relating to or reflecting any such communications.

- Any documents (including, but not limited to, emails, text messages, internal chats, and voice mails) reflecting communications with the FBI or SEC about the content or substance of a witness's proffer statements or actual or anticipated testimony.

- Any documents reflecting, constituting, or memorializing any communications (including, but not limited to, emails, text messages, internal chats, and voice mails) concerning the content or substance of any government witness's proffer statements or actual or anticipated testimony.

- Any documents (including, but not limited to, emails, text messages, internal chats, and voice mails) reflecting, constituting, or memorializing any communications between the government (including the U.S. Attorney's Office and the FBI) and any witness for the government.

- Any documents reflecting, constituting, or memorializing any communications and other documents (including, but not limited to, emails, text messages, internal chats, and voice mails) concerning the November 26, 2019 FOIA request and any response thereto.

- Copies of all documents provided by Mr. Naftalis to the Office's FOIA personnel on or about March 9, 2020, as responsive to the November 26, 2019 FOIA request.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

- Any documents reflecting, constituting, or memorializing any communications with any lawyer for any government witness concerning this case.

- Any documents reflecting, constituting, or memorializing any communications or other documents related to consideration, offers, or requests of immunity, non-prosecution or other agreement for James Nimberg.[16]

- Testimony of any law enforcement agent who referenced, described, or summarized statements of others before the grand jury (or grand juries) that returned the indictment on May 7, 2018 (ECF 2) or the superseding indictment on April 22, 2019 (ECF 121).[17]

- Any documents reflecting, constituting, or memorializing any oral or written communications in which the government or law enforcement agents advised any government witness against sending emails or text messages.

- Any documents reflecting, constituting, or memorializing information from any expert witness indicating, reflecting or supporting the proposition that PPI's marks in 2014 or any other period prior to the second half of 2015 were consistent with fair value.

- Any additional *Brady* and *Giglio* material not already produced, whether obtained or identified prior to or after the verdict in this case, and whether or not previously memorialized in writing.

---

[16] After the defense requested *Giglio* disclosures concerning a grant of immunity to Nimberg, the government produced a handwritten note with cryptic references to multiple government discussions with Nimberg or his counsel in 2018 *and* 2019, with no detail whatsoever. One disclosure simply stated "Spring 2018 – Spring 2019 USAO conversation with Nimberg counsel . . . Gov't discussion about potential of applying to Court for immunity (2018-19)." (3525-10, April 30, 2019.) Notes of another meeting simply state "immunity order." (3525-15, June 6, 2019.) Nimberg's testimony that he participated in a "scheme" with the trial defendants and others based on his claimed conduct of selectively challenging marks (a theory that was not charged and was disclaimed by the government) is also the subject of appellate arguments.

[17] There were different allegations of fact contained in the two Indictments—including on key issues—which could only have resulted from the different summaries of witness statements heard by the two grand juries. When the Court denied the defendants' motion to compel the government to produce the case agent's grand jury testimony on statements made by cooperating witnesses, it cited the government's representations about its disclosure obligations. (May 15, 2019 Order, ECF 163.)

29

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Katherine Polk Failla

Second, because much of the most critical evidence may not be available in documentary form, the Court should also receive testimony on the various issues described in this letter, including the circumstances surrounding the Majidi allocution, the colloquy with the Court on June 10, 2019, and the government's receipt of and response to the FOIA request.  We respectfully submit that the testimony should include sworn declarations from the government prosecutors, and testimony from the cooperating and immunized witnesses themselves, who should be advised that their testimony on these issues will not subject them to any adverse consequences from the government in connection with sentencing.

We do not make these requests for discovery and a hearing lightly.  However, we believe it is the only way to ensure a complete and accurate record and to obtain any reasonable degree of confidence that there isn't more undisclosed *Brady* or *Giglio* material.

Respectfully submitted,

Roberto Finzi
Richard C. Tarlowe