

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 16, 2020

BY CM/ECF

The Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    United States v. Anilesh Ahuja, et al.
                S1 18 Cr. 328 (KPF)

Dear Judge Failla:

      The Government respectfully writes in response to defendant Anilesh Ahuja's letter dated July 6, 2020 (the "July 6 Letter") in which Ahuja requests additional post-trial discovery in this case. The Government agrees to provide much of the discovery that Ahuja requests to the extent that it has not already done so, and describes in this letter the additional searches and productions that it has begun to undertake. Specifically, the Government agrees to provide additional discovery relating to the plea allocutions given by cooperating witnesses and to the Government's communications regarding the November 26, 2019 Freedom of Information Act request submitted by counsel for Ahuja (the "FOIA Request"). The Government's provision of this additional discovery does not reflect its agreement that all of these materials are discoverable under *Triumph Capital*, *Brady*, *Giglio*, or any other legal basis. Rather, it reflects the Government's acknowledgment that its searches during trial for cooperator plea allocutions were insufficiently thorough and that, when new information was identified, the Government failed to promptly correct statements it had made to the Court during trial regarding the circumstances leading up to Amin Majidi's allocution that were inaccurate, albeit not intentionally so. These mistakes make certain additional discovery appropriate. However, for the reasons discussed below, the Government respectfully submits that they do not change the correctness of the Court's June 10, 2019 decision precluding cross-examination regarding draft plea allocutions.

      The Government opposes the discovery requests in the July 6 Letter to the extent that they go beyond the issues of cooperator plea allocutions and the FOIA Request. These additional discovery demands are an attempt to use the mistakes that the Government made in this case as an opportunity to mine the entirety of the Government's communications throughout this investigation in the hopes of finding anything that might impeach the prosecution, and to re-litigate matters that have already been decided by the Court and the jury. This should not be allowed. The Government admits its mistakes, and does not oppose the requests in the July 6

Letter that actually relate to them. But they do not form a basis for Ahuja to excavate the entirety of the Government's investigation. In seeking permission to do so, Ahuja levels a number of charges on the Government's conduct and good faith in this case that are unfounded or inaccurate. In addition to describing the searches that the Government agrees to undertake, this letter seeks to address some of those charges.

### A. Agreement to Provide Additional Discovery

At pages 27-30 of the July 6 Letter, Ahuja lists a number of items on which he seeks additional discovery. The Government addresses here each of the requests as to which it intends to conduct additional searches for responsive information. The IT Department will be facilitating these searches and members of the U.S. Attorney's Office (the "USAO") who did not handle the trial will participate in the review of the materials.

**Requests Nos. 1 and 2: (1) Communications Concerning Cooperator Plea Hearings, and (2) All Versions of All Plea Allocutions**

Ahuja requests "[a]ny communications or other documents (including, but not limited to, emails, text messages, internal chats, and voice mails) concerning any cooperating witness's plea hearing, plea allocution or trial testimony. For the avoidance of doubt, these documents should include not only substantive communications, but also documents that reflect or are indicative of oral communications." (July 6 Letter at 27-28). He also requests "[a]ll versions of any draft, proposed, or actual plea allocutions relating to the allegations in this case (including native files with metadata of all versions of any Majidi allocution)." (July 6 Letter at 28).

The Government believes that it has already provided the defendants with nearly all of the materials in its possession that are responsive to these requests but, as set forth below, it will endeavor to confirm as much through additional searches. With respect to all of the additional searches described below, the Government requests that it be permitted two weeks from the date that the Court rules on the defendants' discovery motion to produce any responsive materials to the defendants and the Court.

To review, prior to trial, the Government produced to the defendants the proffer notes, cooperation agreements, and plea hearing transcripts for each of the cooperating witnesses in this case: Ashish Dole, Amin Majidi, and Frank Dinucci. During trial but prior to the testimony of Majidi and Dinucci, the Government produced to the defendants draft plea allocutions that were prepared by counsel for those witnesses and sent to the Government in advance of their respective plea hearings. On May 26, 2020, in response to the FOIA Request, the Executive Office for United States Attorneys ("EOUSA") produced to Ahuja internal emails between and among the AUSAs who handled the trial in this case scheduling a proposed meeting to discuss the draft allocution that Majidi's counsel had provided. On June 19, 2020, the Government produced to the defendants a redline showing proposed changes that AUSA Naftalis had made of Majidi's draft allocution and circulated to AUSAs Griswold and Nicholas (the "Redline"). The Redline matched the plea allocution that Majidi gave in court.[1] On June 26, 2020, the

---

[1] The Government has not located anywhere in the emails, paper files, or electronic files

Government produced to the defendants additional emails concerning Majidi's plea hearing and Dole's plea hearing, including emails reflecting that Government counsel and counsel for each of those cooperating witnesses agreed to speak on the day of the plea hearing.[2]

On July 10, 2020, in the process of conducting additional searches concerning Dinucci's plea hearing which occurred in April 2017, the Government located in its emails a second draft allocution created by counsel for Dinucci (the "second draft allocution"), which the Government produced to the defendants on July 11, 2020 together with the transmission email from Dinucci's counsel. Dinucci's counsel sent the second draft allocution to the Government on April 5, 2017 at 12:44 p.m., and it slightly revised the draft that counsel had sent to the Government approximately 30 minutes earlier that same day. The title of the transmission email accidentally spelled "allocution" as "allocuation," and the Government did not find this email in the searches of communications with outside counsel that it conducted during trial for material discoverable under *United States v. Triumph Capital*, 544 F.3d 149 (2d Cir. 2008). The Government recognizes that its searches during trial related to communications discoverable under *Triumph Capital* were not sufficiently thorough. Based on a scheduling email chain between the Government and counsel for Dinucci that the Government has identified after beginning the additional searches described in this letter, and which is being produced to the defendants today, it appears that AUSA Griswold spoke to counsel for Dinucci before the draft allocutions were provided, but not in the 30 minutes between his sending the first draft and his sending the second draft. As AUSA Griswold proffered to the Court during trial, she did speak with Dinucci's counsel after receiving a draft allocution but prior to the plea hearing, and asked counsel to consider whether a change to the allocution to broaden the timeframe of the mismarking conspiracy to begin in 2014 (instead of 2015, the earliest date in both draft allocutions) would make the allocution more accurate (Tr. 775).[3]

In order to ensure that its response to these requests in the July 6 Letter are complete, the Government proposes to conduct the following additional searches: (1) A keyword search of the emails of the three AUSAs who handled the trial in this case and the two supervisors who handled the plea hearing of Dole, spanning the two month-period preceding and the two-month period following the plea hearings of Dole, Majidi, and Dinucci, for emails containing the term "allocution," "plea, or "Rule 11;" (2) A search of the emails of the three AUSAs who handled

---

of any of the AUSAs who handled the trial in this case a "native file with metadata" of the Redline.

[2] As stated in the Government's June 24, 2020 letter, in conducting the additional searches resulting in its June 26, 2020 production, the Government had understood that the web-based backup to the Government's email server extends back three years and therefore did not encompass the date of the Dinucci plea proceeding, which occurred in April 2017. The Government has since undertaken significant additional efforts, in coordination with our IT department, to determine if a backup of April 2017 emails is accessible. While the additional searches are not yet complete, the Government believes the April 2017 emails are backed up and will be searched.

[3] During trial, Government counsel told the Court that to the best of her recollection, this conversation with Dinucci's counsel occurred in person prior to the plea proceeding. (Tr. 775). She also said that it was "possible" that she "had a phone call with [counsel] before." (Tr. 775).

the trial for all emails with counsel for cooperating witnesses during that same period of time, not limited by keyword; (3) A review of all of the text messages of the three AUSAs who handled the trial in this case for the week preceding and the week following the guilty plea hearings for Dole, Majidi, and Dinucci, in the event that text messages from those time periods were preserved and are recoverable; (4) A review of all internal chats on the USAO's instant messaging system between and among the three AUSAs who handled the trial in this case, for the week preceding and the week following the guilty plea hearings for Dole, Majidi, and Dinucci, in the event that internal chats from those time periods were preserved and are recoverable; and (5) A review of all voicemails received by the three AUSAs who handled the trial in this case for the week preceding and the week following the guilty plea hearings for Dole, Majidi, and Dinucci, in the event that voicemails from those time periods were preserved and are recoverable. The Government has also conducted a search, not limited by keyword, of all of the emails of the AUSAs who handled the trial for the three days preceding and the three days following each of the cooperating witnesses's plea hearings, and is expanding that search to seven days preceding and seven days following each of those hearings.

The Government will also search its electronic "shared drive" for this case for the terms "allocution," "Dinucci," "Majidi," and "Dole," which would capture a draft allocution in the extremely unlikely event that a prosecutor created one from scratch rather than receiving one from counsel for a cooperating witness.

### Request No. 3: Meetings Regarding Cooperator Allocutions

Ahuja requests "[a]ny documents reflecting or memorializing meetings regarding cooperator allocutions in this case (including, but not limited to, notes, calendar entries, emails, internal chats, or other documents)."  (July 6 Letter at 28). The Government has already produced emails and calendar entries that reflect the scheduling of a proposed internal meeting about the draft plea allocution provided by counsel for Majidi (produced in part by EOUSA on May 26, 2020 in response to the FOIA Request and in part by the Government on June 26, 2020), and emails reflecting that Government counsel spoke with counsel for Majidi and counsel for Dole on the days of their respective plea hearings (produced on June 26, 2020). In order to ensure that any additional materials that are potentially responsive to this request, to the extent they exist, are produced, the Government will conduct a further search, not limited by keyword, of all case-related calendar entries, emails, and internal chats of the AUSAs who handled the trial in this case for the week preceding and the week following the plea hearings of Dole, Majidi, and Dinucci, to the extent those files exist and are recoverable.

### Request No. 4: Communications Concerning the FOIA Request and Response

Ahuja requests "[a]ny documents reflecting, constituting, or memorializing any communications and other documents (including, but not limited to, emails, text messages, internal chats, and voice mails) concerning the November 26, 2019 FOIA request and any response thereto."  (July 6 Letter at 28). On May 26, 2020, EOUSA produced to Ahuja the documents that it concluded were responsive to the FOIA Request and not subject to a FOIA-related exemption. On June 26, 2020, the Government produced to the defendants the complete set of materials that AUSA Naftalis identified in March 2020 as potentially responsive to the

FOIA Request and that he provided to FOIA personnel at the USAO. The Government further intends to search for and produce any emails, text messages, internal chats, and voicemails, to the extent they exist and are recoverable, that were sent or received by the AUSAs who handled the trial in this case between November 26, 2019 and May 26, 2020 concerning the FOIA Request. The Government plans to use the search term "FOIA" to conduct this search.

### Request No. 5: Copies of Documents Provided to FOIA Personnel

Ahuja requests "[c]opies of all documents provided by [AUSA] Naftalis to the Office's FOIA personnel on or about March 9, 2020, as responsive to the November 26, 2019 FOIA request." (July 6 Letter at 28). On June 26, 2020, the Government produced to the defendants the complete set of materials that AUSA Naftalis identified as responsive to the FOIA Request. For the defendants' ease of reference, the Government will re-produce to the defendants this complete set of materials.

### Request No. 6: Additional *Brady* and *Giglio* Material

Ahuja requests "any additional *Brady* and *Giglio* material not already produced, whether obtained or identified prior to or after the verdict in this case, and whether or not previously memorialized in writing." (July 6 Letter at 29). While the Government does not believe that any unproduced *Brady* or *Giglio* material exists, the Government believes that the additional searches summarized above will ensure that any such material is identified and produced.

### B.  Ahuja's Remaining Requests for Discovery Are Unwarranted

The July 6 Letter also includes a number of discovery requests that go well beyond the issues of cooperator plea allocutions and the FOIA Request. In seeking to justify these broad requests, which would serve as a vehicle to revisit a host of issues already decided by the Court and the jury, the defendants make a series of attacks on the Government's conduct in an effort to undermine the integrity of the prosecution as a whole. Those attacks are without merit, and the Government addresses some of them here.

### 1.  The Proposed Changes to the Majidi Allocution Were Proper

Ahuja suggests that the Government acted improperly in "script[ing]" Majidi's plea allocution.[4] (*See* July 6 Letter 16-19 & n.6). It did not. First, the Government did not "script" Majidi's plea allocution, which counsel for Ahuja now terms the "Naftalis Allocution." Counsel for Majidi prepared a draft allocution and sent it to AUSA Naftalis. (Tr. 2046). AUSA Naftalis, who had attended each of Majidi's proffers, made proposed edits to the draft allocution, many of which served simply to shorten it, and others of which are addressed directly below. AUSA Naftalis sent those edits to his trial partners, and then communicated those proposed edits with Majidi's counsel (Tr. 2047-48), and not with Majidi directly (Tr. 2052-53 (Majidi's counsel

---

[4] While Ahuja purports to disclaim this argument (*see* July 6 Letter at 15), much of the July 6 Letter is in fact devoted to making it.

stating that changes between the draft and final Majidi allocutions had to have resulted from conversations between the Government and counsel)). As the Court confirmed in its colloquy with Majidi's counsel, Majidi's counsel were not compelled or pressured to accept any of the changes to the draft they had prepared, and they considered the proposed changes to be accurate and consistent with Majidi's prior statements (Tr. 2053-54). There is nothing wrong with a prosecutor conferring with counsel for a defendant, including a cooperating witness, about a plea allocution, or proposing language for counsel's consideration, and indeed this practice is common.[5] It was Majidi's decision, in consultation with his counsel, what to actually say during his plea allocution. Majidi's discussions with his counsel on whether to adopt language that counsel proposed to him, regardless of whether some of that language was initially proposed to counsel by the Government, are privileged, and he made clear under oath that the allocution he gave expressed his own thoughts. (*See* Transcript of October 31, 2018 Majidi Plea Hearing (Docket No. 61) at 31). The Government's conduct in the circumstances leading up to Majidi's plea was proper.

Ahuja also overstates the changes that the Government proposed to the Majidi allocution. In canvassing these changes, Ahuja pointedly skips over the Government's suggested deletion of the phrase that Majidi acted "[a]t the direction of Neil Ahuja" (*see* Redline (Docket No. 368-1) at USAO_SDNY_026367), as this deletion belies the notion that the changes were somehow designed to cast Ahuja in a worse light.

Ahuja principally claims that the draft allocution prepared by Majidi's counsel "included no acknowledgment of mismarking in 2014." (July 6 Letter at 16). This is simply untrue. The draft allocution stated the following: "Between *2014* and 2016, I participated in a scheme to defraud investors in the mortgage credit fund of PPI by inflating the month end net asset value of the fund through the means I previously described." (*See* Redline at USAO_SDNY_026369 (emphasis added)). Ahuja's assertion that the Government introduced the concept that the scheme began in 2014 into the allocution is therefore wrong. In any event, Majidi stated in his very first proffer with the Government that the mismarking began in 2014. (*See* Ex. A (3520-05) at 7 ("The mismarking of securities at PPI occurred from 2014 to 2016.")).

Ahuja's attempt to make hay out of the fact that the draft allocution also stated that the mismarking scheme "accelerated" in the second half of 2015 (*see* July 6 Letter at 16-17) is

---

[5] None of the cases cited by Ahuja is to the contrary or bears any resemblance to the circumstances here. *See United States v. Milles*, 363 F. App'x 506, 509 (9th Cir. Jan. 26, 2010) (memorandum) (finding it improper that prosecutors gave a trial witness 30 minutes before his testimony a sheet telegraphing the questions he would be asked and the answers he should give, but affirming conviction for lack of prejudice to the defendants); *United States v. Cincotta*, 689 F.2d 238, 244 (1st Cir. 1982) (finding it improper that prosecutors mailed to prospective witnesses a letter asking them not to speak with defense counsel and urging them not to embarrass the prosecution, but affirming conviction for lack of prejudice to the defendants); *Maldonado v. Scully*, 1990 WL 102209, at *1-2 (S.D.N.Y. July 12, 1990) (declining to "sanction[] the conduct of the prosecution" where co-defendants' pleas may have been "coerced," but denying petition for writ of habeas corpus for lack of prejudice to defendant).

misplaced, as the word "accelerated" implies that the scheme was previously in motion. Moreover, Majidi testified at trial that the scheme accelerated in the second half of 2015 (Tr. 2108 ("Magnitude [of the mismarking] was much larger in 2015, especially in the latter part of the year.")); thus to the extent Ahuja believed that this fact was helpful to his defense, he had the opportunity to argue from it in summation.

Ahuja's other claims about the changes that the Government proposed to the Majidi allocution similarly reflect nothing improper. Ahuja notes that the Government proposed removing Majidi's reference to pressuring traders. (*See* July 6 Letter at 18). There was nothing wrong with proposing to shorten Majidi's allocution by not including the mechanics of how he advanced the mismarking scheme. *See* Fed. R. Crim. P. 11(b)(3) (requiring only that allocution include a factual basis for a plea). As Majidi allocuted that he personally participated in the mismarking scheme, and as he testified at trial that part of his involvement was to pressure traders (*e.g.* Tr. 2106 ("I would push the traders")), giving Shor the opportunity to argue to the jury that he was a victim of Majidi's pressure rather than a willing perpetrator of the scheme, the suggestion was unremarkable.

The proposal to add Shor's name to the allocution as one of Majidi's co-conspirators (*see* July 6 Letter at 18) was equally unremarkable. The draft allocution said that Majidi participated in the scheme with Ahuja and "others" (*see* Redline at USAO_SDNY_026368) and that he pressured "traders" under his supervision to meet performance targets set by Mr. Ahuja (*see* Redline at USAO_SDNY_026369). Moreover, Majidi named Shor as a co-conspirator at his first proffer and consistently thereafter. (*See* Ex. A at 7 ("MAJIDI was involved in the mismarking of securities. AHUJA, SHOR, and ASHISH DOLE (DOLE) were also involved in the mismarking of securities."); Ex. B (3520-11) at 2, 5; Ex. C (3520-13) at 4; Ex. D (3520-21) at 1). The omission of Shor's name from Majidi's allocution would not, as Ahuja suggests, have been consistent with Shor's defense, as there was no requirement under Rule 11 for Majidi to name each of his co-conspirators, and as any cross-examination about the omission, even were such cross-examination appropriate,[6] would have opened the door to the introduction of myriad prior consistent statements in which Majidi named Shor as a co-conspirator.

The change from "fund" to "funds" (*see* July 6 Letter at 18) also cohered with Majidi's proffer statements going back to his first proffer. (*See* Ex. A at 7 ("Securities were mismarked in the NEW ISSUE FUND (NEW ISSUE) and the hedge fund. The same strategy applied in the hedge fund and ERISA, so both were inflated. The mismarking evolved over time. The mismarking in the NEW ISSUE portfolio, as early as the end of 2013. The phenomenon spread to the hedge fund in early 2015, as returns started to struggle in the hedge fund."); *see also* Ex. E (3520-08) at 6 ("The mismarking of securities at PPI started in NEW ISSUE to mask the negative arbitrage.")).

---

[6] As discussed further below, the Government does not believe that cross-examination on Majidi's draft allocution would have been appropriate even if the Redline had been located and disclosed to the defendants prior to Majidi's testimony.

Finally, the proposal from AUSA Naftalis to include the phrase "I knew what I was doing was wrong" (July 6 Letter at 19) simply anticipated a question that is often posed at plea allocutions.

In objecting to the way Ahuja mischaracterizes the Government's proposed edits to the Majidi allocution, the Government does not seek to minimize its mistakes. Rather, the Government wishes to make clear that the implication in Ahuja's July 6 Letter that there was anything at all improper about the Government's input with respect to Majidi's allocution is false.

### 2. The Government Did Not Use the FOIA Process to "Conceal a Material Fact"

As discussed above, the Government does not oppose additional discovery regarding the FOIA Request. However, the Government addresses below the misimpression left by the July 6 Letter that the Government somehow manipulated EOUSA's response to the FOIA Request in order to "conceal a material fact" or otherwise block a "complete understanding of [its] mistake." (July 6 Letter at 7-11).

First, the only relevance of the FOIA Request is that it prompted AUSA Naftalis to find the Redline. Once he found the Redline in March 2020, AUSA Naftalis should have recognized that his description to the Court about the circumstances leading up to Majidi's plea allocution was partially inaccurate, and should have corrected that inaccuracy immediately in the criminal case. But that obligation arises out of the Government's duties in the criminal case, and has nothing to do with the obligations of the Department of Justice to respond to FOIA requests. FOIA concerns public disclosure of agency records; it has no bearing on whether information is subject to discovery in criminal or civil cases. *See, e.g.*, *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 143 n. 10 (1975) ("The Act is fundamentally designed to inform the public about agency action and not to benefit private litigants."). Whether a document is discoverable in a criminal case is unrelated to whether it is discoverable under FOIA.[7]

The USAO did not influence when EOUSA notified it that counsel for Ahuja had made a FOIA request for AUSA Naftalis's emails. As reflected in the Government's letter dated June 19, 2020 (Docket No. 368), the USAO was notified of the FOIA Request on January 27, 2020, and the next day, AUSA Naftalis spoke about the Request with Associate U.S. Attorney John McEnany, who exercises general supervision at the USAO over FOIA requests. AUSA Naftalis provided the Associate U.S. Attorney with this Court's June 10, 2020 Order precluding cross examination on draft plea allocutions. AUSA Naftalis thereafter searched his emails for

---

[7] Consistent with the different purposes of FOIA and criminal discovery, the procedures for processing FOIA requests are governed by Department of Justice regulations, under which adverse determinations may be appealed to the Department's Office of Information Policy. 28 U.S.C. § 16.8(a). FOIA requestors ultimately may seek judicial review of the Department's FOIA determinations by filing a civil lawsuit "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(3)(B).

materials responsive to the Request, and found the Redline. On or around March 9, 2020, AUSA Naftalis sent the Redline and other materials that he identified as responsive to the Associate U.S. Attorney.[8] He did not at the time recognize that the Redline should separately have been disclosed to the Court and the defendants right away. This was, without question, a mistake. However, the absence of any bad faith is evident in AUSA Naftalis's identification of the Redline as responsive and his sending it to the Associate U.S. Attorney for potential production to Ahuja in the FOIA process.

After he produced the Redline and other materials in March 2020 to the Associate U.S. Attorney, who in turn sent them to the USAO's FOIA specialist, AUSA Naftalis did not exercise any control over the timing of the FOIA production and did not exercise any influence over what EOUSA produced. As referenced in Footnote 7 above, in the event that Ahuja wishes to seek FOIA-related relief, he would need to do so pursuant to the channels set forth in Department of Justice regulations, not in the context of this criminal case.

On June 10, 2020, Ahuja's counsel notified the Government that an attachment to one of the emails produced by EOUSA (which turned out to be the Redline) had been omitted from EOUSA's production, and asked for it. The AUSAs who handled the trial spoke with their supervisors the following morning about Ahuja's request, and ultimately informed Ahuja's counsel that they expected to produce the attachment that was omitted from the FOIA production no later than June 19. Prior to the Government filing its letter and attachment, counsel for Shor filed a letter on behalf of both defendants on June 19 asking that the Court order the Government to produce the attachment. As the Court is aware, on June 19 the Government filed its letter enclosing the Redline.

### 3. Ahuja's Allegations of Bad Faith are Unfounded

Even separate from the suggestion that the Government manipulated EOUSA's FOIA response, Ahuja uses the July 6 Letter to attack the Government's good faith, calling for sworn declarations and a hearing to test it. These accusations are unfounded. In making them, Ahuja casts in an ominous light acts which are entirely innocuous.

For example, Ahuja constructs a chronology of emails and Outlook Calendar invites to tee up the question of whether the AUSAs who handled the trial had an internal meeting about the draft allocution provided by Majidi's counsel to AUSA Naftalis. (July 6 Letter at 4-5). None of the prosecutors recall whether any such meeting actually occurred. In any event, whether a meeting occurred is of no significance to any issue in this case. The emails make clear that AUSA Naftalis sent the Redline with his proposed edits to AUSAs Griswold and Nicholas, and those are the same edits that the Government proposed to Majidi's counsel and that were incorporated into Majidi's allocution. Any internal meeting did not yield additional input from the Government on Majidi's allocution. Nor is there any reason that an internal meeting among

---

[8] Ahuja's questions in the July 6 Letter as to whether AUSA Naftalis alerted anyone else at the USAO about the discovery of the Redline were answered in the Government's letter dated June 19, 2020 (as Ahuja appears to acknowledge, *see* July 6 Letter at 9).

prosecutors would be either improper or discoverable. The July 6 Letter seeks to build suspense over a non-event.

In a similar vein, Ahuja stitches together emails showing that the Government sometimes spoke with counsel for cooperating witnesses over the phone or in person, rather than over email, to assert that the Government "deliberately took steps to avoid creating a documentary record of those communications." (July 6 Letter at 14). That is an unfair inference in a case where the Government produced well over 200 pages of Jencks Act material for each of its cooperating witnesses – the very opposite of avoiding creating a documentary record of the substance of its communications. There is nothing cloak-and-dagger about speaking with another lawyer in person. The Government does not challenge the fact that *Triumph Capital* covers those oral communications in which counsel relate to the Government their client's account of the facts, *see* 544 F.3d at 163, and as discussed above and reflected in the productions it has made to date, the Government is not opposing the discovery of even its *internal* communications regarding cooperator pleas, regardless of whether they fall within its obligations under *Brady*, *Giglio*, or *Triumph Capital*. But the invocation of the Government's occasional in-person or telephone conversations with other attorneys to raise the specter of bad faith is inappropriate.

### 4. The Lack of Prejudice to the Defendants

Although the Government does not oppose Ahuja's request for additional discovery concerning its mistakes in this case, it disputes Ahuja's assertion that those mistakes have harmed either defendant. (*See* July 6 Letter at 23-26).

The crux of Ahuja's claim of prejudice is that had the defendants known prior to Majidi's testimony about the input that the Government had on his plea allocution, they could have shown that the Government "shape[d]" its witnesses' statements. (July 6 Letter at 24). This claim presupposes that had the Government accurately described to the Court the proposed edits that it made to Majidi's draft allocution, the Court would have allowed cross-examination or other evidence regarding the differences between the plea allocutions initially drafted by counsel for cooperating witnesses and the allocutions that those witnesses gave in court. The Court excluded this evidence at trial under Federal Rule of Evidence 403. (*See* June 10, 2019 Order (Docket No. 213) (the "June 10 Order")). The Court made this ruling without the complete set of facts because the Government had not identified the Redline and did not accurately describe to the Court the circumstances leading up to the Majidi allocution. The Court should not have been put in that position. However, the Government respectfully submits that the analysis underlying the Court's June 10 Order would have applied even had the Government not made these mistakes. This is so for several reasons.

First, the Court's finding that there would be no way to cross-examine the cooperating witnesses on the changes to their plea allocutions without implicating the attorney-client privilege that each witness holds (June 10 Order at 4) remains equally applicable in light of the Redline. The Government's communications about the Majidi allocution were with counsel, not Majidi. The inputs that Majidi received, considered, and discussed regarding his allocution came from his counsel. Any inquiry into the changes in Majidi's allocution would have encroached on his privileged communications with counsel. Second, the Court's finding that cross-examination

on this topic would have required the Court to provide the jury with a tutorial on the requirements of Federal Rule of Criminal Procedure 11, which requires only that an allocution include a factual basis for a plea, and thereby create a risk of juror confusion (June 10 Order at 4), also remains true.  Third, the Court's concern that cross-examination on this topic would leave the jury with a misimpression that the Government acted improperly (June 10 Order at 3) applies with just as much force in light of the Redline as it did at the time of the Court's ruling.  As discussed above, there was nothing improper about the edits that the Government proposed to Majidi's counsel.  The risk that the jury would misperceive otherwise from cross-examination is evident in Ahuja's own frequent conflation in the July 6 Letter of the Government's failure to disclose the Redline, which was a mistake, with the Government's underlying conduct in proposing the edits in the Redline to Majidi's counsel, which was appropriate.  In short, the bases for the Court's ruling in the June 10 Order are unaffected by the Government's post-trial disclosures.

      The Government believes that the Court's exclusion of evidence regarding the alterations to Frank Dinucci's draft plea allocution (*see* June 10 Order) is instructive on this point.  Prior to Dinucci's testimony, the Government proffered to the Court that after receiving a draft allocution from Dinucci's counsel stating that he became involved in the mismarking scheme in 2015, the Government told Dinucci's counsel that based on proffer sessions with Dinucci the Government thought the accurate starting point was 2014 and asked Dinucci's counsel to consider that.  (Tr. 775).  Dinucci's allocution at his plea hearing reflected that the starting point was 2014.  The fact that the Government had this discussion with Dinucci's counsel, which was entirely proper, did not cause the Court to allow cross-examination on the changes between Dinucci's draft and actual plea allocutions.  While the Government's proposed edits to the draft allocution prepared by Majidi's counsel were more extensive than those proposed to Dinucci's counsel, the analysis should be the same.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

      For all of the foregoing reasons, the Government respectfully submits that the remainder of the discovery requests in the July 6 Letter, which concern the Government's communications with *all* witnesses and their counsel (*see* July 6 Letter at 28); communications between the Government and the FBI and the SEC (*see id.*); documents relating to the immunity agreement for James Nimberg (*see id.*); law enforcement grand jury testimony (*see id.* at 29); expert witness disclosures (*see id.*); and communications or other documents relating to actual trial testimony (*see id.* at 27), should be denied.  The additional discovery required of the Government should be tailored to (1) providing the defendants with more information about the circumstances of the cooperating witnesses' plea allocutions, so that the defendants are fully equipped to consider whether to supplement their argument that they should have been permitted to cross-examine those witnesses about the Government's input on their allocutions, and (2) allowing the

defendants to probe the Government's delay in correcting the inaccurate description it gave during trial of the circumstances leading up to Majidi's plea allocution.

        Respectfully submitted,

        AUDREY STRAUSS
        Acting United States Attorney

By:   /s/
      Andrea M. Griswold
      Joshua A. Naftalis
      Max Nicholas
      Assistant United States Attorneys
      (212) 637-1205/2310/1565

cc:     Counsel of Record (by CM/ECF)