UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
UNITED STATES OF AMERICA                :
                                        :
              - v. -                    :          DECLARATION
                                        :
ANILESH AHUJA,                          :          S1 18 Cr. 328 (KPF)
    a/k/a "Neil," and                   :
JEREMY SHOR,                            :
                                        :
              Defendants.               :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSHUA A. NAFTALIS hereby declares under penalty of perjury:

    1.    I am an Assistant United States Attorney ("AUSA") in the United States

Attorney's Office for the Southern District of New York (the "Office" or "Government").  I am

one of the AUSAs assigned to the above-captioned case.  As such, I have personal knowledge of

the facts and circumstances set forth herein.  I submit this declaration in response to the Court's

January 13, 2021 Order, as modified.  (Dkt. 424; Dkt. 426).  I have not discussed this declaration

with my trial partners, AUSAs Andrea Griswold and Max Nicholas.

    2.    The statements below are based on my recollection of the relevant events;

my recollection, as refreshed by documents I have reviewed since those events occurred; the

routine practices I have developed, based on training and experience; and, in some instances,

documents that I have no doubt are accurate, but nonetheless have not refreshed my recollection.

Where I believe it relevant to the Court's inquiry, I specify the source(s) of my knowledge, but for

ease of reading I generally do not do so.  For the same reason, I generally do not use the typical

conventions and qualifications "on or about" or "approximately" when referring to times and dates,

"in substance and in part" when referring to statements made in oral or written communications,

and similar ones.  To my mind, there are no factual or legal issues here that make such qualifications relevant.  And more importantly, I am deeply grateful for the opportunity to address the Court's concerns about my conduct and the conduct of my colleagues, and I have attempted to do so in as accessible and transparent a fashion as possible.

## I.      The Nature and Scope of My Involvement in Plea Discussions with Mr. Majidi and His Counsel

        3.      The Government's plea discussions with Amin Majidi's counsel, Seth Rosenberg and Brian Linder, Esqs., began on May 15, 2018, when AUSA Griswold and I had a telephone conversation with them.  During that call, we discussed whether Mr. Majidi would be interested in exploring cooperation with the Government.

        4.      AUSAs Griswold and I had communications with Messrs. Rosenberg and Linder over approximately the next month, as Mr. Majidi considered whether he was interested in cooperating.  For example, on May 22, 2018, I had a telephone conversation with Mr. Rosenberg on that subject.  On May 29, 2018, I sent an email to Messrs. Rosenberg and Linder, copying AUSA Griswold, asking "where things stood on your end."  On June 4, 2018, AUSA Griswold and I had a telephone call with Messrs. Rosenberg and Linder, during which an in-person meeting was scheduled for June 11, 2018.  That meeting was subsequently rescheduled to June 14, 2018.  On June 14, 2018, AUSA Griswold and I had an in-person meeting with Messrs. Rosenberg and Linder, during which we scheduled Mr. Majidi's first proffer for four days later, on June 18, 2018.

        5.      On June 18, 2018, I emailed a draft proffer agreement for Mr. Majidi to Messrs. Rosenberg and Linder, copying AUSA Griswold.  (CR0032-34).[1]  The first proffer of Mr.

---

[1]      Documents with Bates stamp "CR" refer to documents that Mr. Majidi produced to the defendants, and that the Government also produced to the defendants on June 6, 2019.  Documents

Majidi took place that afternoon.  AUSA Griswold and I, two Federal Bureau of Investigation

("FBI") Special Agents, two Securities and Exchange Commission ("SEC") attorneys, and Messrs.

Rosenberg and Linder attended.  The FBI 302 for the meeting reflects that Mr. Majidi specifically

told the Government:

> The mismarking of securities at PPI occurred from **2014 to 2016**.
> MAJIDI was involved in the mismarking of securities.  AHUJA,
> **SHOR**, and ASHISH DOLE (DOLE) were also involved in the
> mismarking of securities. . . . Securities were mismarked in the
> NEW ISSUE FUND (NEW ISSUE) and the hedge fund.  The same
> strategy applied in the hedge fund and ERISA, so both were inflated.

(Ex. A hereto (3520-05, at 7) (emphasis added)).

6.      The Government had four more proffer sessions with Mr. Majidi, on July

10, 2018, July 13, 2018, July 18, 2018, and August 1, 2018.  (3520-08; 3520-11; 3520-13; 3520-

15).  I attended all of these proffers, AUSA Griswold attended all but one, and FBI Special Agents,

SEC attorneys, and Messrs. Rosenberg and Linder attended all of them.

7.      Based on my review of documents and my practice, I believe that on August

1, 2018 or shortly thereafter, I informed Messrs. Linder and/or Rosenberg that it was likely that

AUSA Griswold and I would recommend that the Government offer a cooperation agreement to

Mr. Majidi.  I do not recall whether this conversation was in person or by telephone, or whether

AUSA Griswold joined.

---

with Bates stamp "3520" refer to Section 3500 material for Mr. Majidi that the Government
produced to the defendants.  Documents with Bates stamp "USAO_SDNY" refer to documents
that the Government produced to the defendants and the Court on June 19, 2020 or June 24, 2020.
Documents with Bates stamp "SDNY_PPI" refer to documents that the Government produced to the
defendants and the Court on September 24, 2020 in connection with AUSA Karl Metzner's
review.  "Tr." refers to the trial transcript.  I have included the relevant documents as exhibits.  I
am, of course, happy to provide any documents that would aid the Court's review.

8.      In an email sent on August 30, 2018, Mr. Rosenberg informed AUSA Griswold and me, copying Mr. Linder, that he "[w]ould like to formalize Amin[']s situation before I leave for London the 18 and Josh's paternity." I replied, "That's the goal." (CR0042).

9.      I was generally out of the office between September 6, 2018 and October 8, 2018, because I had surgery on my wrist and because I was on paternity leave.

10.     On October 9, 2018, the day I returned to work, Mr. Rosenberg sent AUSA Griswold an email that read: "I assume that Josh is [ ] by now a proud and exhausted parent. I was wondering whether there might be a way to make progress toward formalizing Amin's situation." AUSA Griswold responded, adding me to the email chain, and wrote: "Thanks for the email. In fact, Josh is back today and we are progressing on this. We'll be in touch later this week with an update." (CR0131).

11.     On October 19, 2018, I emailed Messrs. Rosenberg and Linder, copying AUSAs Griswold and Max Nicholas (who had recently joined the trial team), an approved cooperation agreement for Mr. Majidi. (CR0046-51). On October 22, 2018, Mr. Rosenberg replied: "We'll be back to you Thursday," *i.e.*, on October 25, 2018. (CR0138).

12.     My phone records reflect that I called Messrs. Rosenberg and/or Linder on October 26, 2018 at 11:17 a.m. for approximately two minutes, and that Messrs. Rosenberg and/or Linder then called me at 11:44 a.m. for approximately two minutes. (Ex. B (SDNY_PPI_00294)). While I do not recall the phone calls, I believe, based on my review of documents, that we discussed that Mr. Majidi would be accepting the cooperation agreement and the scheduling of his guilty plea.

13.     Immediately after I spoke to Messrs. Rosenberg and/or Linder on October 26, 2018, I called Chambers to schedule Mr. Majidi's guilty plea, which the Court set for October

31, 2018 at 4:00 p.m.  I then sent an Outlook calendar invite to AUSAs Griswold and Nicholas, as well as two FBI Special Agents, reflecting that the Court had scheduled Mr. Majidi's guilty plea for October 31, 2018 at 4:00 p.m.  (USAO_SDNY_026399).

14.    At the same time, *i.e.*, at 11:50 a.m. on October 26, 2018, I called Mr. Rosenberg for 11 seconds.  (Ex. B).  I do not believe that we spoke.  A minute later, I sent an email to Mr. Rosenberg, in which I wrote, "Just tried you back.  We are on for Wednesday, October 31 at 4pm before Judge Failla."  (CR139).  An hour later, Mr. Rosenberg sent me an email, copying Mr. Linder, with the subject "Majidi Cooperation Agreement," that read, "Attached[.]  See you at 4PM on Wednesday.  Talk on Monday."  A signed copy of Mr. Majidi's cooperation agreement was attached to that email.  (CR140-45).

## II.    My Communications Regarding the Substance of Mr. Majidi's Allocution[2]

15.    It is proper, common, and appropriate for counsel to a defendant, including a cooperating witness, to seek comment from the Government on a proposed allocution, and for the Government to provide comments on a proposed allocution to counsel that are consistent with the defendant's proffer statements.  Moreover, it is a regular and customary practice in this District for such communications to take place.  (*See* July 16, 2020 Gov't Ltr. 6 (Dkt. 390) ("There is nothing wrong with a prosecutor conferring with counsel for a defendant, including a cooperating witness, about a plea allocution, or proposing language for counsel's consideration, and indeed this practice is common.")).

---

[2]    Paragraphs 16 through 23 reflect my current knowledge of these communications, based on my review of documents, and do not reflect my recollection of those communications on June 10, 2019.

16.     On October 29, 2018, at 4:14 p.m., Mr. Rosenberg sent me an email, copying Mr. Linder (the "October 29 Email"), with the subject "Majidi Allocution," that read, "Proposed allocution attached," and attached a three-page Word document of a proposed allocution for Mr. Majidi (the "Draft Allocution").  (Ex. C hereto (CR0058-61)).

17.     Four minutes later, I forwarded the October 29 Email and the attached Draft Allocution to AUSAs Griswold and Nicholas for their review.   (Ex. D hereto (USAO_SDNY_026401-04)).  At 5:32 p.m. that day, AUSA Nicholas responded, "Any chance you guys are free to meet about this and some other stuff tomorrow?  I'm free all day after 12:30 p.m. — whatever is easiest for you guys."  At 6:08 p.m., AUSA Griswold responded, "Yes — wide open."  At 9:53 p.m., I responded, "I'm at the doctor in the morning for my wrist.  How about sometime after 245?"  A minute later, AUSA Nicholas responded, "Let's say 3?"  (Ex. E hereto (USAO_SDNY_026408-09)).

18.     Also at 9:54 p.m. that night, I again forwarded the October 29 Email and attached Draft Allocution to AUSAs Griswold and Nicholas and wrote, "This is way too detailed in my view.  Should we discuss at our team meeting?"  Two minutes later, AUSA Nicholas responded, "I completely agree.  Should be bare bones just hit the elements.  Agree let's discuss at mtg."  (Ex. F hereto (USAO_SDNY_026414)).  Two minutes later, I sent an Outlook calendar invite to AUSAs Griswold and Nicholas proposing a "PPI Team Meeting" for the next day, October 30, 2018 at 3:00 p.m., which they accepted.  (USAO_SDNY_026415-17).

19.     At 11:58 a.m. the next morning, I sent an email to AUSAs Griswold and Nicholas with the subject line "Allocution – Draft edits" that attached a Word document with

proposed comments to the Draft Allocution reflected in track changes.[3]   (Ex. G hereto (USAO_SDNY_026366-69) (the "Proposed Comments")).  The Proposed Comments fairly and accurately reflected what Mr. Majidi told the Government during his proffer sessions, including at his first proffer, *see supra* ¶ 5.  (*See also* June 19, 2020 Gov't Ltr. 1 (Dkt. 368); July 16, 2020 Gov't Ltr. 5-8 (Dkt. 390)).

20.     I do not recall whether I met in person with AUSAs Griswold and Nicholas as scheduled at 3:00 p.m. on October 30, 2018.  Whether we met in person or spoke by phone, I do not recall either of them raising any concerns about the accuracy of the Proposed Comments or the propriety of suggesting them to Mr. Majidi's counsel.

21.     That same day, at 4:03 p.m., I replied to the October 29 Email and wrote to Messrs. Rosenberg and Linder, "Can you talk around 430pm?"  (Ex. H hereto (CR0062) (the "4:03 p.m. Email")).  My phone records reflect that I spoke by telephone with Mr. Rosenberg later that day beginning at 4:42 p.m. for approximately ten minutes.  (Ex. B).  I do not recall the specifics of what was discussed on that call.  Based on my review of documents and the length of the call, I believe that I suggested, in substance and in part, that the Draft Allocution was too detailed and that it should just hit the elements of the offenses to which Mr. Majidi would be pleading guilty, and that I also suggested the Proposed Comments to Mr. Rosenberg for him and Mr. Linder to consider and discuss with Mr. Majidi.  I did not in any way pressure Messrs. Rosenberg and Linder (or, through them, Mr. Majidi) to accept the Government's suggestions.

---

[3]     Based on my review of these documents and my practice, I believe that I opened the Draft Allocution, made edits in track changes, and sent the Proposed Comments by email to AUSAs Nicholas and Griswold for their review, without saving a copy to my computer.

22.     As noted above, Mr. Majidi's guilty plea was scheduled for 4:00 p.m. the next day, October 31, 2018.  Approximately one and one-half hours before the plea, I sent an email to Mr. Rosenberg that said, "Let's meet in hallway by Judge Failla's courtroom 10 mins early?"  At 2:45 p.m., Mr. Rosenberg responded, "sure."  (Ex. I hereto (USAO_SDNY_026423)).  Based on my training, experience, and practice, I believe that I suggested the meeting so that Mr. Majidi's counsel could have him sign the cooperation agreement on the date of the guilty plea, which is the customary practice in this District.  Based on my review of documents, I believe that I met in person with Messrs. Rosenberg and/or Linder shortly before Mr. Majidi's guilty plea in or outside the courtroom.  I do not specifically recall the conversation, or whether AUSA Nicholas, who appeared with me for the Government at the guilty plea, was present.  Based on my review of documents, I believe that we discussed, in substance and in part, having Mr. Majidi, as well as Messrs. Rosenberg and/or Linder, sign the cooperation agreement, which they did before the plea proceeding began (Ex. J hereto (3520-16) (reflecting that Mr. Majidi and his counsel signed the cooperation agreement on Oct. 31, 2018)), and the allocution.

23.     The Court took Mr. Majidi's guilty plea shortly thereafter.  (Ex. K hereto ("Plea Tr.")).  During Mr. Majidi's allocution, I briefly consulted with Mr. Rosenberg.  Based on my review of the plea transcript, I believe that we discussed Mr. Majidi's answer to one of the Court's questions — whether Mr. Majidi knew what he was doing was "illegal" — and Mr. Majidi subsequently rephrased his answer.  (*Id.* 32-33).[4]

---

[4]     After the plea, I exchanged emails with Mr. Majidi's lawyers about their proposed redactions to the publicly filed transcript of Mr. Majidi's personal information, which the Court subsequently so-Ordered.  (Plea Tr. 38-39; Nov. 13, 2018 Court endorsement).

24.     Mr. Majidi's final allocution to the Court (the "Final Allocution") fairly and accurately reflects what he had told the Government in his proffer statements, including his first proffer with the Government, *see supra* ¶ 5.

25.     My communications with Mr. Majidi's counsel were proper, appropriate, and consistent with practice in this District (and others).  (*See* June 19, 2020 Gov't Ltr. 1 (Dkt. 368) ("the Government's communication with Majidi's counsel were entirely appropriate"); July 16, 2020 Gov't Ltr. 5-8 (Dkt. 390) ("the implication in Ahuja's July 6 Letter there was anything at all improper about the Government's input with respect to Majidi's allocution is false")).[5]

### III.     The Government's Document Collection Before Its June 8, 2019 Letter to the Court

26.     Pursuant to the Court's June 6, 2019 mid-trial instruction (Tr. 479), I searched my files for communications and documents relating to the allocutions of the cooperating witnesses in this case, specifically, Messrs. Majidi, Frank Dinucci, and Ashish Dole.  Consistent with my understanding of the Court's instruction, I searched my (a) electronic files, (b) hard copy files, and (c) archived emails sent to and received from counsel for each of the cooperating witnesses.  I conducted this search between June 6, 2019 and June 8, 2019.  As the Government advised the Court in its June 19, 2020 letter, neither I nor my colleagues searched our internal emails.  (*See* June 19, 2020 Gov't Ltr. 1-2 (Dkt. 368)).

27.     During my search, I located two emails relating to Mr. Majidi's allocution: the October 29 Email from Mr. Majidi's lawyers with the attached Draft Allocution (which I had

---

[5]     In early 2019, AUSAs Griswold, Nicholas, and I divided up responsibility for potential trial witnesses.  AUSA Nicholas took over responsibility for preparing and presenting Mr. Majidi as a witness at trial.

previously identified, and the Government had previously produced to the defendants (Ex. L hereto (SDNY_PPI_00003-07)), and the 4:03 p.m. Email that I sent to Mr. Majidi's lawyers on October 30, 2018 (which the Government then produced to the defendants (Ex. M hereto (SDNY_PPI_00079)).  Because I did not search internal emails, I did not locate the internal emails with AUSAs Nicholas and Griswold noted above in paragraphs 17 through 20, nor did I recall them at the time.

IV.   **Mid-Trial Colloquies**

      A.   **June 10, 2019 Colloquy**

          28.   In its Order dated January 13, 2021, the Court stated, among other things, that it remains at a loss to understand why incorrect information about the Government's communications with Mr. Majidi's counsel was communicated to the Court and defense counsel in June 2019.  As mentioned above, I am grateful for the opportunity to address the Court's concern.  Before addressing the specific colloquies with me and my colleagues, I think it is important to set forth the following.  First, I would never deliberately misstate facts to the Court or counsel, or in any way mislead this Court or any court, or defense counsel in any case.  Second, the colloquies at issue here were permeated with a critical dichotomy, and I respectfully suggest to the Court that an appreciation of my good faith during those mid-trial colloquies necessitates placing that dichotomy in clear relief.

          29.   On the one hand, as noted above, it is proper for the Government to speak to counsel for a defendant, including a cooperating witness, about the defendant's allocution before the guilty plea is entered.  The Court and Mr. Shor's counsel stated as much at the outset of the

critical colloquy on June 19, 2019.  (Tr. 753 (Ex. N hereto)).[6]  It is also proper for the Government to make suggestions to defense counsel about the content of the allocution, as long as the suggestions and resulting allocution are true and, perhaps most important, align with the statements the cooperating witness made in proffer sessions prior to the plea.  Here as well, the Court expressed its agreement with that view, stating as follows:

> And for me, the issue is perhaps not so much whether there is a distinction between the proposed allocution and what actually gets said in front of a judge, but whether or not what actually gets said in front of a judge can be tethered at all or traced at all to the statements that were made in prior proffer sessions with the government.

(*Id.* at 754).  Thus, if (a) a cooperating witness implicated X in crimes throughout his or her proffer sessions and stated that the crimes spanned a specified period; and (b) that witness's lawyer sends to the Government a proposed allocution that fails to mention those facts; then (c) there is nothing improper if the Government suggests to defense counsel that they be included in the allocution; and (d) nothing improper if, after defense counsel consults with his or her client, those facts are included.  (*See* July 16, 2020 Gov't Ltr. 6 (Dkt. 390)).  Indeed, in my view that is not only permissible conduct, it is good practice.

30.     On the other hand, there can be circumstances in which the Government seeks to influence a cooperating witness's allocution so it includes facts that cannot be tethered or traced to the statements that were made in prior proffer sessions with the Government.  That is not only improper, but in certain circumstances (that is, depending on the *mens rea*), it could amount to a crime.

---

[6]     I am mindful of the Court's admonition about citing the Court's prior statements; I do so only to put my answers to the Court's questions in context.

31.     I know now that in October 2018, more than seven months prior to my June 10, 2019 colloquy with the Court, I made suggestions to Mr. Majidi's counsel in the former way, that is, in a way that was proper and routine.  I also know now that certain of my statements to the Court on June 10, 2019 were incorrect.  But those incorrect statements were made unintentionally and in good faith.  During the mid-trial colloquy, I not only did not recall in the moment or afterwards the relevant communications with Mr. Majidi's counsel back in October 2018, but I was also focused on the fact that defense counsel were accusing me and my colleagues of unethical and, indeed, criminal activity.

32.     Mr. Shor's counsel began the June 10, 2019 colloquy by stating he was concerned about "more than just the addition of the identity of [Mr. Shor]" in the allocution.  (Tr. 756).  He also accused the Government of (a) listening to Mr. Shor's proffer regarding the timing of the events at issue, and (b) then improperly influencing Mr. Majidi's allocution so it "drag[ged] the relevant conduct back to 2014 in a way that is consistent with the government's case and inconsistent with ours."  (*Id.* at 757-58).  As for the *mens rea*, defense counsel clearly accused the Government of intentional and criminal conduct:  "It is tailoring, transforming evidence in a way that if defense counsel had done that with his witness or others, I suggest, Your Honor, there would be accusations of witness tampering, obstruction."  (Tr.  758).

33.     The colloquy that has given rise to the Court's concerns about my factually incorrect answers occurred after these pointed statements and accusations by Shor's counsel.  As the interchange reveals on multiple occasions, I and my colleagues were focused on an unambiguous allegation that we had engaged in conduct that was both improper and criminal in nature.  Those were striking claims.  That context, I respectfully suggest, is important to the Court's

understanding how and why incorrect information was communicated to the Court unintentionally and in good faith.

34.     I want to emphasize that none of the above is intended to deflect the Court's attention away from me and toward defense counsel.  Defense counsel have a job to do, and none of the foregoing is intended to impugn them or the way they acted in this case.  Rather, in scrutinizing my conduct and my colleagues, I respectfully suggest that the context described above is critical.

35.     I turn now to the specific questioning of me and my colleagues during the June 10, 2019 proceedings, and the bases of my responses to the Court.

**AUSA Nicholas**

36.     During his colloquy with the Court, AUSA Nicholas explained that it was a "routine" and "frequent" practice for the Government to speak with defense counsel about a proposed allocution; that "[t]here is absolutely nothing improper at all about attorneys discussing what would be an appropriate allocution," including to make sure "an allocution hits the elements" and is "factually accurate."  (Tr. 762).  AUSA Nicholas also said he was "quite confident that the allocution that [Mr. Majidi] gave is consistent with proffer notes that far precede the allocution." (*Id.* at 763).  AUSA Nicholas went on to state that defense counsel's accusations — that the Government had committed obstruction of justice and witness tampering — were "inappropriate," and that he took "extreme umbrage at [their] throwing those terms at us."  (*Id.*).  I believed that AUSA Nicholas's representations were accurate, and I continue to believe they were accurate.

37.     The Court also asked AUSA Nicholas how the Final Allocution "got to be different" from the Draft Allocution.  (Tr. 763).  He responded, "I don't specifically know how it got to be different.  No."  (*Id.*).  I believed that AUSAs Nicholas' representation to the Court was

accurate.  Mr. Majidi had pled guilty more than seven months earlier, and I did not recall the communications with my colleagues noted above in paragraphs 17 to 20.  Moreover, as the Government advised the Court in its June 19, 2020 letter, "At the time of trial, none of the members of the Government team had a memory of the Redline."  (June 19, 2020 Gov't Ltr. 1-2 (Dkt. 368)).

### AUSA Naftalis

38.    As noted above, at the time I answered the Court's questions on June 10, 2019, I had found only two emails relating to Mr. Majidi's allocution:  the October 29 Email and attached Draft Allocution, and the 4:03 p.m. Email.  I had not found and did not recall the internal emails with AUSAs Nicholas and Griswold noted above in paragraphs 17 through 20.  Moreover, I did not recall the specifics of my communications with Mr. Majidi's counsel about the allocution. Those communications were not only entirely appropriate and unremarkable, but they had occurred seven months earlier, at a time when I had a five-week-old child and was recovering from wrist surgery.

39.    As I advised the Court, my recollection on June 10, 2019 was as follows:  I recalled that Mr. Majidi's counsel had sent me the Draft Allocution, which I had reviewed, and that I then spoke by phone with Mr. Rosenberg about it, on what I thought was "the day before the plea."  (Tr. 765-67).  The Court then asked whether I recalled the substance of my communications with Mr. Majidi's counsel.  (*Id.* at 767).  At the outset I made clear, "I don't recall the substance — I don't recall the specifics."  (*Id.*; *see also id.* at 768-71 (repeating throughout the colloquy that I did not have a "specific recollection" of my communications with Mr. Rosenberg)).  I went on to say that my "recollection" of "the substance" of the conversation was that I had said that the allocution should "just hit the elements" — *i.e.*, that it should be shorter — which I noted was consistent with my "general practice" and "general advice to all lawyers."  (*Id.* at 767-69).

40.     In answering the Court's questions, I had firmly in mind defense counsel's accusations of witness tampering and obstruction of justice.  I believed then, and continue to believe, those accusations were baseless and unfair, and said so at the time.  (*See* Tr. 771 ("The accusations that are getting lobbed in, I take personally and seriously, and the suggestion is offensive that we are suborning perjury in some way.  The man proffered, Mr. Majidi, with me for months.  We spent months talking about [how] Jeremy Shor was literally the guy who got the corrupt marks every single time.  And the suggestion that we were suborning perjury because Mr. Majidi allocuted to it[] . . . . I certainly did nothing to improperly shape testimony — to shape his allocution.")).  My reaction was visceral, which caused me to misapprehend certain of Your Honor's questions and to respond to defense counsel's allegations rather to than the precise questions that Your Honor put to me.  As a result, I unintentionally gave incorrect answers, for which I apologize to the Court.

41.     For example, the Court asked whether I was representing as an officer of the Court that I in no way sought to "shape or modify" Mr. Majidi's allocution.  (Tr. 769).  I responded, "Correct.  I don't remember exactly what I said, but I would never suggest to a defense lawyer, this is what he should say or not say."  (*Id.*).  After a pause during which I conferred with AUSAs Nicholas and Griswold, I clarified that "by 'shape,' I mean to do something improper.  The direction would be consistent with what the person said in the proffers."  (*Id.*).  As reflected by my clarification, I understood the Court's use of the words "shape or modify" to refer to the misconduct the defendants were alleging:  witness tampering and obstruction of justice.  (*Id.*; *see also id.* ("I don't like the word 'shape'")).  I was also responding to these allegations when I said, "I certainly do not tell people what to say" (*id.* at 768) and "I would never suggest to a defense lawyer, this is what he should say or not say" (*id.* at 769).  In those comments, I was denying what

I understood was the essential (and only relevant) accusation:  that I had told Mr. Majidi to say Mr. Shor was involved in the crimes, and to "drag" the period of criminal activity backwards in time, when neither was true.  (*Id.* at 757-58).  I would never do that and did not do so here.  I was attempting to convey to the Court my view that giving suggestions or "direction . . . consistent with what the person said in the proffers" (*id.* at 769) was perfectly appropriate, but I now recognize that my answers were too categorical.  At times, as discussed above, I have made suggestions to defense counsel about what a cooperating witness might say in his or her allocution that are consistent with his or her prior proffer statements, and indeed I now know I did so in this case.  But those circumstances are different in kind from the accusations I was responding to in the moment.

42.     The Court asked whether I or anyone from the Government had asked Mr. Majidi's counsel to "change the names of anyone in the allocution," and I said, "No."  (Tr. 770).  Later, the Court pointed out that co-defendant Jeremy Shor was not specifically named in the Draft Allocution, but was in the Final Allocution. (*Id.*).  I responded:  "Just to be clear, [Shor's] name was in the Information, so this isn't like — this isn't new to anybody.  I don't recall saying, make sure you allocute to — you didn't include Shor in the first draft, put him in when you do it in Court.  I don't recall that."  (*Id.* at 771).  My answer "no" was incorrect to the extent that I did in fact suggest to counsel that Mr. Majidi include Shor's name in the allocution.[7]  Though at the time

---

[7]     As the Court alluded to, Mr. Shor was already referenced, but not named, in the Draft Allocution.  (Tr. 770; *see also* July 16, 2020 Gov't Ltr. 7 (Dkt. 390) (the Draft Allocution said Mr. Majidi participated in the scheme with Mr. Ahuja and "others," and pressured "traders" to meet performance targets that Mr. Ahuja had set)).  The Proposed Comments and Final Allocution were also consistent with what Mr. Majidi had told the Government at his first proffer and consistently thereafter:  that Mr. Shor was his co-conspirator.  (*See id.*; *supra* ¶ 5 ("SHOR [was] also involved in the mismarking of securities"); *accord* 3520-11, at 2, 5; 3520-13, at 4; *see also* Tr. 771 ("The

I did not have a specific recollection of my conversation with Mr. Majidi's lawyer, after reviewing the internal emails noted above in paragraphs 17 through 20, I now recognize that I did make that suggestion.

43.     The Court asked whether I had suggested that Mr. Majidi's counsel "change the date" of the length of the scheme in the allocution.  I responded, "There is no change in the date.  There is no change in the date of Mr. Majidi."  (Tr. 770).  My answer was and is accurate. Defense counsel's core allegation that the Government sought to "drag[] the relevant conduct back to 2014" was factually incorrect.  (*Id.* at 757-58).  The Draft Allocution that Mr. Majidi's lawyers sent to the Government specifically said that the mismarking scheme went from 2014 to 2016. (*See* Ex. C, at CR0061 ("Between 2014 and 2016, I participated in a scheme to defraud investors in the mortgage credit fund of PPI by inflating the month end net asset value of the fund."); *id.* at CR0059 ("[b]etween 2014 and 2016")).  The Draft Allocution, as well as the Proposed Comments and the Final Allocution, were thus consistent with what Mr. Majidi had told the Government during his very first proffer.  (*See supra* ¶ 5 ("The mismarking of securities at PPI occurred from 2014 to 2016."); *see also* July 16, 2020 Gov't Ltr. 6 (Dkt. 390)).

44.     The Court also asked me whether I had a conversation with Mr. Rosenberg regarding the allocution on the day of the plea allocution, and I said, "No."  (Tr. 772).  Having refreshed my recollection with documents, I now believe that we did speak shortly before the plea about having Mr. Majidi sign the cooperation agreement and the allocution.

---

man proffered, Mr. Majidi, with me for months.  We spent months talking about [how] Jeremy Shor was literally the guy who got the corrupt marks every single time.")).

**Additional Colloquy**

45.    After the Court asked AUSA Griswold questions about her communications regarding Mr. Dinucci's allocution, AUSA Nicholas more clearly captured some of the points I was trying to make:

> I just want to add, . . . the word the Court used was "alter." I do not think there would be anything improper about the government getting a draft allocution and saying to a lawyer, didn't he proffer to a longer time period, or . . . hasn't he said a hundred times that he committed the crime with person X? . . . [I]t would be improper, of course, for the government to ask for an alteration to an allocution that is not founded in the evidence. That would be totally improper. There's no way that's what happened here.

(Tr. 783-84).

46.    After the Court's colloquies with me and my trial partners, Mr. Shor's counsel recognized the seriousness of his prior accusations, which were different in kind than a claim that a prosecutor merely requested that an allocution include information provided throughout the proffers. Indeed, Mr. Shor's counsel then tried to walk back the accusation of criminal activity:

> I'm not suggesting that these lawyers are trying to manipulate the evidence with false information. I'm sure that they believe the changes that were made in the allocutions are accurate. . . . I'm not suggesting that these folks were lying, or suborning perjury. Those words never came out of my mouth. What I did say is, if a defense lawyer had done some of these things and didn't turn over that evidence when it was called for, there would be a real questioning of the conduct. Here, it may be perfectly acceptable. . . . I'm not accusing anyone of suborning perjury.

(Tr. 788-89). However, during the critical colloquy that has given rise to the Court's concerns, the accusation that I and my colleagues had tried in multiple ways to "manipulate the evidence with false information" was explicit and unmistakable. My focus on that accusation was central to the

reason why I communicated, mistakenly and in good faith, incorrect information to the Court that day about my communications with Mr. Majidi's counsel regarding his allocution.

B.     **June 19, 2019 Colloquy**

47.     Consistent with the Court's June 10, 2019 ruling (Dkt. 213), the Court asked Mr. Rosenberg, Mr. Majidi's counsel, about his recollections of communications with me regarding Mr. Majidi's allocution on June 19, 2019.  (Tr. 2044-63 (Ex. O hereto)).  The Court included in that colloquy a question that captured the essence of what I understood the June 10 colloquy was about:  "If you were asked by the government to modify the allocution in a way that you thought was contrary to what your client had said, would you have done it?"  (*Id.* at 2048).  In addition to answering "[a]bsolutely not" to that question, Mr. Rosenberg said he had a "very vague recollection" that he spoke with me the day before Mr. Majidi's guilty plea about the Draft Allocution.  (*Id.*).  Mr. Rosenberg said:  "There was nothing ominous about it.  Certainly no one ever suggested that Mr. Majidi allocute to something that had not already been disclosed as the general theme and facts of his involvement in this matter."  (*Id.* at 2049).  Mr. Rosenberg said the changes between the Draft Allocution and the Final Allocution would have to have been "the product of [his] discussions with the government," although he did not "have a recollection of that conversation."  (*Id.* at 2052-53).  Mr. Rosenberg said the Final Allocution was consistent with what Mr. Majidi had told the Government during proffer sessions; that the Final Allocution was accurate; and that the Government did not force or pressure defense counsel to change the allocution.  (*Id.* at 2053-54).  Finally, Mr. Rosenberg said that he had "a very, very, very vague recollection" that the Government had suggested that "the initial part of our draft or what was submitted to them [was] overly complicated or overly specific . . . [,] too detailed," but not "incorrect."  (*Id.* at 2055).

48.     After the colloquy with Mr. Rosenberg, Mr. Shor's counsel told the Court he was not seeking "to get into the back-and-forth" between Mr. Majidi's counsel and the Government regarding Mr. Majidi's allocution.  (Tr. 20640.  The Court then invited the parties to review its June 10, 2019 ruling and raise any issues the next day.  (*Id.* at 2065).  The Court also said:  "I have a better understanding of what happened.  I want the parties to think about whether they want to make additional arguments to me about what happened or whether they want to stand on what has been said previously, and I'll decide."  (*Id.* at 2066-67).  Neither Shor's counsel nor Ahuja's counsel made additional arguments.  I understood that these allocution-related issues had been resolved, and I did not otherwise search my files or seek to refresh my recollection further.

**V.     June 19, 2020 Letter to the Court**

49.     On January 27, 2020, the Office's Freedom of Information Act ("FOIA") specialist Darian Hodge emailed AUSAs Griswold, Nicholas, and me a FOIA request from Ahuja's counsel (the "FOIA Request").  I promptly forwarded the FOIA Request to my supervisors, AUSAs Damian Williams and Jason Cowley, copying AUSAs Griswold and Nicholas.  As I wrote in that email, I believed that the Government had already produced the relevant documents to the defense — "I think we've already produced whatever there was, but I will double check" — and I said that I would consult with Associate United States Attorney John McEnany "about how we should handle this."  (Ex. P (SDNY_PPI_00167-68)).

50.     The next morning, I forwarded the FOIA Request to Mr. McEnany and wrote:  "Can we talk about the below today?  This relates to the PPI securities fraud case that I tried before Judge Failla this summer and which is on appeal now.  The request was made by Paul Weiss, who is counsel to one of the defendants."  (Ex. Q (SDNY_PPI_00169-78)).  Later that

morning, I spoke with Mr. McEnany and discussed the FOIA Request and the Court's June 10, 2019 Decision, which I emailed to him that same day for his review.  (*Id.*).

51.     On March 9, 2020, I emailed Mr. McEnany the 21 potentially responsive documents that I had located during my search (the "Documents"), which included the internal emails noted above in paragraphs 17 to 20 (documents that I had not found or recalled during trial). (SDNY_PPI_00181-231)).  Later that day or the following day, March 10, 2020, I spoke briefly with Mr. McEnany.  My understanding was that he would get back to me to speak further after he had reviewed the Documents.  Shortly thereafter, on March 12, 2020, the COVID-19 pandemic produced its dramatic effect on the Office, and I have been working remotely since then.  Mr. McEnany and I did not speak further regarding the FOIA Request.

52.     I had no role thereafter in the Government's response to the FOIA Request. (*See* Nov. 25, 2020 Gov't Ltr. 4 (Dkt. 419)).  I did not learn that Executive Office for United States Attorneys had made a FOIA production to Mr. Ahuja's counsel (or what documents were contained in it) until June 10, 2020, when AUSA Griswold advised me that Mr. Ahuja's counsel had contacted her.

53.     On June 11 or 12, 2020, I had discussions with my colleagues and then reviewed the transcript of my June 10, 2019 colloquy with the Court, which I had not previously reviewed in connection with the FOIA Request.  I recognized that certain of my statements to the Court were unintentionally incorrect or incomplete, and that it would be appropriate for the Government to send a letter apprising the Court and the defendants of that fact, which the Government did.  (*See* June 19, 2020 Gov't Ltr. (Dkt. 368)).

*        *        *        *

- 21 -

54.     As noted above, I made mistakes, but they were unintentional, and I never failed to act in good faith.  During trial, I should have located the internal emails noted above in paragraphs 17 though 20.  Had we found those documents then, I would have refreshed my recollection and would not have incorrectly responded to the Court's questions about my communications with Mr. Majidi's counsel.   While those communications were proper, appropriate, and routine, and Mr. Majidi's Final Allocution accurately reflected what he had previously proffered to the Government, my errors should not have happened.  Again, I apologize to the Court, and assure Your Honor that the right lessons have been learned.  I thank the Court for its time and attention to this matter.

Pursuant to 18 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:        New York, New York
              February 12, 2021


                                    Joshua A. Naftalis
                                    Assistant United States Attorney