J6AYAHU6   Dole - Cross   Page 750

1  We got some documents. We didn't get some documents.
2  I don't know. There are some documents that the government
3  believes it's seeing for the first time, period.
4       THE COURT: Is there a category of materials that
5  you're seeing for the first time? For example, the Bloomberg
6  chats or something else? Are there individual documents that
7  just look new to you?
8       MS. GRISWOLD: I don't know that it's one specific
9  category. One example is Defense Exhibit 5083. Most of them I
10 didn't get in hard copy. I got on the screen. So I was just
11 taking notes of them. I think it's not the texts but some of
12 the Bloomberg are emails.
13      Some of the stuff that went to investors, Ms. Pyun and
14 I were just trying to figure out over lunch. We could go over
15 one by one what was provided today. If it's helpful to
16 your Honor, we could tell your Honor which ones are new to us
17 or not.
18      I don't think I could do much better than giving you
19 DX5083 as an example and say that they fall into a couple of
20 different categories, but we're not concerned about Mr. Dole's
21 texts.
22      THE COURT: But what you are concerned with are some
23 of the investor communications.
24      Yes?
25      MS. GRISWOLD: Some of the investor communications and

J6AYAHU6   Dole - Cross   Page 751

1  some of the Bloomberg communications. To be clear, I'm not
2  trying to suggest that any of these are not authentic. I just
3  don't know where they came from. So I'm just trying to figure
4  out if there is some practical way, give where we are, to get
5  some representation so we can move forward. Again, I'm not
6  objecting to these documents.
7       THE COURT: Mr. Finzi? Sir, the investor
8  communications, where are they coming from?
9       MR. FINZI: They are coming from, I believe -- and a
10 little bit of knowledge is dangerous here. So I should
11 probably pass this off to somebody who knows better.
12      But I believe they're coming from one of two places,
13 either PPI's records or investors that we've subpoenaed or that
14 the government subpoenaed.
15      THE COURT: All right.
16      MR. FINZI: Then presumably they might have seen them
17 before.
18      THE COURT: That was my point.
19      But you're leaving open the possibility that these may
20 be things that the government has seen and they're just
21 mistaken?
22      MR. FINZI: No. I think it's also stuff that they
23 haven't seen, but it wouldn't be the first trial that they see
24 things on cross that they haven't seen before.
25      THE COURT: No, but they just want to know for

J6AYAHU6   Dole - Cross   Page 752

1  authenticity that you have not created them for purposes of
2  this trial. That's appreciated.
3       The Bloomberg chats are coming from where? PPI's
4  records?
5       MR. FINZI: Yes, your Honor.
6       THE COURT: And these are the same records for which
7  there was some pushback from PPI or its counsel about
8  producing? Not to you perhaps. Maybe just to the government.
9       MS. GRISWOLD: Yes, your Honor. I think Mr. Naftalis
10 had addressed that there had been a point at which we were -- a
11 resolution was made that we will take in a certain first batch
12 of documents.
13      Then when we went back, there was a discussion about
14 resources and some resistance to producing the rest. I don't
15 know how much we want to retread that.
16      THE COURT: I don't want to retread that.
17      There has now been a representation from Mr. Finzi on
18 behalf of Mr. Ahuja that these documents are authentic, and
19 he's given you certain sources where they come from.
20      Do you need something else right now?
21      MS. GRISWOLD: Not right now, your Honor. I would
22 like to reflect on it this evening. It is new to have a
23 situation -- to have this situation. I'm not asking for any
24 other relief right now. I want to consider whether I want to
25 come before the Court with another request.

J6AYAHU6   Dole - Cross   Page 753

1       THE COURT: At the moment, I have nothing else on my
2  plate right now with respect to that.
3       Mr. Ruzumna, I believe it's time to talk about your
4  motion, and I want to give you some preliminary observations,
5  and then you and everyone here who wishes to can speak to these
6  issues.
7       Sir, I am making a distinction between requiring the
8  government to check its records and to see whether there are
9  communications with counsel that might merit production under
10 Triumph Capital or general principles of impeachment or Giglio
11 or 3500 material and whether those documents can actually be
12 introduced at trial.
13      Do you understand the difference?
14      MR. RUZUMNA: I believe so, your Honor.
15      THE COURT: Is it your view, sir, that any
16 communications that counsel for the government might have with
17 counsel for a particular cooperating witness about their
18 allocution would be improper?
19      MR. RUZUMNA: Would be improper? No. Of course not.
20      THE COURT: Let me follow on that. This is something
21 where you and I might part company, but that's fine.
22      It seems to me that the government can speak with
23 defense counsel, with cooperators' counsel, about a possible
24 allocution. Requesting an allocution I don't believe is,
25 per se, improper. I don't think you do as well. Requesting

| J6AYAHU6 | Dole - Cross | Page 754 |
|---|---|---|

 1  discussions about an allocution I don't think is, per se,
 2  improper. Although it might be under certain circumstances.
 3      And for me, the issue is perhaps not so much whether
 4  there is a distinction between the proposed allocution and what
 5  actually gets said in front of a judge but whether or not what
 6  actually gets said in front of a judge can be tethered at all
 7  or traced at all to the statements that were made in prior
 8  proffer sessions with the government.
 9      So your point is well taken, which is that it is
10  troubling to you that a proposed allocution went to the
11  government that contained no references to your client. And
12  then when it came time for the allocution, something else was
13  said. I appreciate the concern.
14      I'm not sure whether the fact of a change is itself
15  either indicative of government misconduct or indicative of
16  Giglio material for the declarant, for the cooperating witness.
17  Let me, please, continue.
18      I have a competing issue which is that of the
19  attorney-client privilege that I presume would adhere in any
20  communications between the cooperating witness and his or her
21  counsel.
22      So where I was coming to in terms of a position from
23  which we could have discussions is that if it turns out that
24  the witness was aware of this proposed allocution and
25  understood that it was there, said something to the government

| J6AYAHU6 | Dole - Cross | Page 755 |
|---|---|---|

 1  and then said something else, there might be some concern.
 2  There might be some fodder for cross-examination.
 3      If the witness, the cooperating witness, is unaware
 4  entirely of the allocution, the proposed allocution -- excuse
 5  me -- and has had no discussions with counsel about it, my
 6  concern is that we're going to start getting into privileged
 7  communications.
 8      So from my perspective, what I'd like to know --
 9  perhaps the government can proffer on this issue -- is how it
10  is we got from the proposed allocution to the final allocution.
11      MR. RUZUMNA: I think I can address that in part,
12  your Honor, based on some materials that were produced to us as
13  3500 materials I believe last night.
14      THE COURT: And these are not the materials that were
15  attached as exhibits to your letter, sir?
16      MR. RUZUMNA: No.
17      THE COURT: Okay.
18      MR. RUZUMNA: The government produced handwritten
19  notes from the conversation that was had over the weekend with
20  Mr. Majidi's counsel and Mr. Dinucci's counsel. Of course,
21  those are the two cooperating witnesses for whom we are
22  discussing their plea allocutions.
23      Neither attorney has a specific recollection of
24  discussing the proposed allocution with their client. However,
25  Mr. Dinucci's counsel said that it is his practice to review a

| J6AYAHU6 | Dole - Cross | Page 756 |
|---|---|---|

 1  proposed allocution with his client before sending it to the
 2  government for review because, of course, one would want to
 3  know that one's client was on board with the statement that
 4  you, as their agent, are suggesting that they make.
 5      THE COURT: Yes.
 6      MR. RUZUMNA: Mr. Rosenberg, who is Mr. Majidi's
 7  counsel, said he did not have a specific recollection, but he
 8  has not done anything to refresh himself on it and would like
 9  that opportunity. I assume that he would have a similar
10  practice because I think that is common practice among defense
11  lawyers.
12      THE COURT: You would use it yourself, sir. Yes?
13      MR. RUZUMNA: I would absolutely do it. I don't
14  think, frankly, it would be consistent with my ethical
15  obligations to commit to something of the import of a plea
16  allocution without clearing it by my client.
17      THE COURT: All right.
18      MR. RUZUMNA: If I can, your Honor.
19      THE COURT: You may, sir.
20      MR. RUZUMNA: I think there are two issues. I would
21  suggest, your Honor, that the changes from the initial proposed
22  allocution to the final allocution as delivered is more than
23  just the addition of the identity of my client.
24      What we see in both of these allocutions is changes in
25  terms of the actual conduct by the individual who is

| J6AYAHU6 | Dole - Cross | Page 757 |
|---|---|---|

 1  allocuting, both with Mr. Majidi in terms of what he did, how
 2  he acted, and how he acted specifically to my client. And with
 3  Mr. Dinucci and Mr. Majidi, there are changes in the time
 4  frame.
 5      As your Honor knows, our view of this case is very
 6  different from the government's. The government has charged a
 7  conspiracy from in or about January 2014, before my client even
 8  arrived at Premium Point, all the way through some point in
 9  2016.
10      We have said that this mismarking scheme, if you'll
11  call it that, really is not present in 2014 or even the
12  majority or much of 2015. And when there were issues in 2015,
13  the second half or late 2015, Mr. Shor did not join in those.
14  He pushed back and took the actions that he had discussed.
15      So the timing is critical. The government knew that
16  timing because we had made presentations. Mr. Shor had
17  proffered. We made very clear the type of defense that we
18  would be offering.
19      And that's why, when we discussed before trial whether
20  there was a likelihood of Mr. Shor's proffer statements coming
21  out, I said probably not, because we are going to be
22  100 percent consistent.
23      So the changes in the allocutions remove references to
24  this alleged misconduct by the two allocutors being in late
25  2015 or 2015 and '16. And it drags the relevant conduct back

J6AYAHU6   Dole - Cross   Page 758

1 to 2014 in a way that is consistent with the government's case
2 and inconsistent with ours.
3     What strikes me, your Honor, is that there is not just
4 the addition of a name or the removal of a name that happens to
5 be my client's. It is tailoring, transforming, evidence in a
6 way that if defense counsel had done that with his witness or
7 others, I suggest, your Honor, there would be accusations of
8 witness tampering, obstruction.
9     So this is the kind of thing that causes me great
10 concern because we have been subject to changes in allocutions
11 that, as proposed, would be very helpful to us, would have
12 likely been delivered, if Mr. Dinucci's counsel is right that
13 he had gone over it and if Mr. Rosenberg says about Mr. Majidi,
14 as I suspect he will, I would have cleared this with him, and
15 it changed something else.
16     We'd like to ask the witnesses about this. I don't
17 know if they'll remember, and that's why we'd like to ask their
18 lawyers if they don't. Or maybe we could come up with a
19 creative way of doing something to show the differences.
20     The second point, your Honor, is not only that first
21 big bucket that I mentioned, but the second point goes back to
22 an issue that we seem to keep having, and that is these drafts
23 would not have been turned over but for subpoenas issued by the
24 defense and your Honor saying, I know you've gone back and
25 reviewed your files, but do it again and again and again.

J6AYAHU6   Dole - Cross   Page 759

1     And one would think when you dig at the bottom of the
2 barrel, at some point, you're going to hit the bottom. But we
3 keep getting more, and it's not just a couple of random things.
4 It happens to be substantive, in this case, Giglio/Brady stuff.
5     So those are my two concerns, the first one
6 substantively. The second one is why didn't we get this.
7     THE COURT: Why don't I hear from someone,
8 Mr. Nicholas.
9     MR. NICHOLAS: Thank you, your Honor. I can speak.
10     THE COURT: There is a lot to speak to, sir. So be
11 very careful in responding, please. Thank you.
12     MR. NICHOLAS: Yes. Of course, your Honor. Yes.
13 I didn't know if by that comment your Honor meant that
14 the Court was going to prompt me.
15     THE COURT: No. But now I will.
16     MR. NICHOLAS: Sure.
17     THE COURT: I've begun to lay out the way I've been
18 thinking about these issues. Mr. Ruzumna has asked me to focus
19 slightly differently than I have been focusing and has proposed
20 the two points of concern that he has. I want to hear from you
21 on those.
22     I suppose I want to hear from you as well regarding
23 the notes that were produced last night because this is the
24 first time I'm hearing of those.
25     MR. NICHOLAS: Your Honor, I can speak to those first.

J6AYAHU6   Dole - Cross   Page 760

1 I can start with that.
2     The call with Mr. Rosenberg was with me, and I'll just
3 give the full color of the call. I was sitting in my office.
4 I got a call from Mr. Rosenberg. He appeared to be in a car.
5     He said, hey, max. I got a call, a request from
6 Mr. Shor's lawyer, Dan Ruzumna. I think he said something like
7 he asked if I would accept service of a subpoena. He wants to
8 ask me about any discussion I had about an allocution. I don't
9 remember, but having tried to refresh myself.
10     And then he said, I'm away for the weekend.
11     I said, have a great weekend. I did not speak on the
12 call except to say, have a great weekend.
13     I don't recall him saying anything along the lines of
14 what Mr. Ruzumna said in terms of his looking for an
15 opportunity to refresh myself. He did say, I haven't refreshed
16 myself. I'm in the country for the weekend. That was the
17 call.
18     THE COURT: Did you understand or did you suggest to
19 him that when his weekend fun was over that he might consider
20 looking back on his notes to try and refresh himself?
21     In other words, were you contemplating a second call
22 from him when he got back from the country?
23     MR. NICHOLAS: Your Honor, since I was hearing about
24 it for the first time, I did not want to engage substantively
25 with him on it at all. I don't know if he's a contemplated

J6AYAHU6   Dole - Cross   Page 761

1 witness now in some way. I don't think that would be
2 appropriate.
3     I was simply in listening mode. I certainly think it
4 would be natural for him to try to refresh himself. I'm not
5 suggesting otherwise, but the call was I was asked by
6 Mr. Ruzumna if I would accept service of the subpoena. I said
7 yes.
8     He once asked me about any conversations I had about
9 the allocution. I don't have a memory about having tried to
10 refresh myself. I'm in the country. So that was that call.
11     THE COURT: All right.
12     MR. NICHOLAS: I was also on the call with AUSA
13 Griswold and counsel for Mr. Dinucci.
14     THE COURT: Remind me again who counsel for
15 Mr. Dinucci is.
16     MR. NICHOLAS: Dan Zinman from Richards Kibbe & Orbe.
17     THE COURT: Thank you.
18     MR. NICHOLAS: Your Honor, on that call, Mr. Zinman
19 said that he did not have a specific recollection with respect
20 to conversations he had about Mr. Dinucci's allocution but --
21 I'm not quoting from my notes. I don't have the notes in front
22 of me, but I believe he said, as a general practice matter, he
23 reviews a direct allocution with his client.
24     I'm looking at Ms. Griswold in case she remembers it
25 differently, but I think that's what he said.

| J6AYAHU6 | Dole - Cross | Page 762 |

1  So those were the two calls that we had between
2  Thursday and today with those lawyers.
3       THE COURT: Okay. Then let's start with more basic
4  principles.
5       What is the position of your office regarding the
6  propriety of the office speaking with defense counsel about
7  proposed allocutions?
8       MR. NICHOLAS: Your Honor, I think that's routine.
9  Speaking with the defense -- to be clear, I don't know that
10 it's routine to request a draft allocution.
11      That's not something -- I don't think I have ever
12 requested a draft allocution. I'm not saying there would be
13 anything improper about that at all. To be clear, I do not
14 think there would be anything improper about that.
15      But in terms of speaking about an allocution, as
16 your Honor knows from presiding over many plea allocutions, it
17 often happens that in court, the parties confer right before
18 someone allocutes. That is routine. There is absolutely
19 nothing improper at all about attorneys discussing what would
20 be an appropriate allocution.
21      There are many legitimate considerations that would go
22 into that -- making sure that an allocution hits the elements,
23 making sure that an allocution is factually accurate. There is
24 nothing improper about that in the office's view, and I think
25 it's frequent.

| J6AYAHU6 | Dole - Cross | Page 763 |

1       THE COURT: You would agree, would you not -- let's
2  focus first on Mr. Majidi's allocution.
3       You would agree it is quite different from the
4  proposed allocution.
5       Yes, sir?
6       MR. NICHOLAS: Yes. I agree that it's different.
7  Yes. Yes. Agreed.
8       THE COURT: Do you know how it got to be different,
9  sir?
10      MR. NICHOLAS: I don't specifically know how it got to
11 be different. No. I would not be privy to -- I certainly
12 wouldn't be privy to a conversation between Mr. Majidi's
13 counsel and Mr. Majidi about the final allocution.
14      I'm quite confident that the allocution that he gave
15 in court is consistent with proffer notes that far precede the
16 allocution. So I think that this notion that's been kind of
17 floated -- I think the word used in Mr. Ruzumna's motion was
18 "impeded the truth-seeking function," and I thought I heard in
19 his remarks today "obstruction of justice."
20      THE COURT: And witness tampering.
21      MR. NICHOLAS: And I know the Court does not like
22 adverbs. I take extreme umbrage at throwing those terms at us.
23 I think it was inappropriate.
24      THE COURT: Sir, can you please help me understand how
25 a proposed allocution became a final allocution. I can see

| J6AYAHU6 | Dole - Cross | Page 764 |

1  situations in which counsel just sat around with a client and
2  talked about it some more and decided that something less wordy
3  was better.
4       I guess I'd really like to know if there's someone at
5  your table who had a conversation with Mr. Majidi's counsel
6  about Mr. Majidi's allocution that in any way impacted the
7  substance of that allocution.
8       (Continued on next page)

| J6a1ahu7 | | Page 765 |

1       MR. NICHOLAS: Let me just take one moment, your
2  Honor.
3       MS. GRISWOLD: Yes, your Honor. I think -- I handled
4  Mr. Dinucci's plea and Mr. Naftalis handled Mr. Majidi's plea,
5  so just so we're precise, I think we should address this
6  question with your Honor, respectively. If you want to start
7  with Mr. Majidi, I think it's Mr. Naftalis.
8       THE COURT: Please do, because that's what I have my
9  notes on first. Thank you.
10      Mr. Naftalis? Do you have a memory, sir?
11      MR. NAFTALIS: Your Honor, I don't have a specific
12 memory. I remember receiving the -- just to go back, the
13 practice among the defense bar is they often say, we're going
14 to send these to you. We don't ask for them. Just to be
15 clear.
16      THE COURT: You did not ask for it in this case.
17      MR. NAFTALIS: No. I decidedly did not ask for it. I
18 think oftentimes in cooperator pleas, and in regular pleas,
19 defense lawyers ask if we will review it, and we say, you're
20 welcome to send it to us, but we're not asking you to.
21      THE COURT: That's fine. There was a request. Was
22 that perhaps from Mr. Dinucci's allocution?
23      MS. GRISWOLD: Yes, your Honor. I did request a
24 draft.
25      THE COURT: Then let's focus on Mr. Majidi.

J6a1ahu7
Page 766

1    So Mr. Naftalis, do you have a recollection one way or
2    the other as to whether Mr. Majidi's counsel offered to send
3    you the proposed allocution?
4         MR. NAFTALIS: My rec -- I don't have a specific
5    recollection, but it's not my practice to request them from
6    defense lawyers.
7         THE COURT: Okay. But assuming it were to arrive or
8    assuming defense counsel were to say, would you like to see it,
9    your practice would be to say, you can send it to me, I'm not
10   requesting it?
11        MR. NAFTALIS: Correct.
12        THE COURT: Okay. Somehow it ended up with you, yes?
13        MR. NAFTALIS: Yes.
14        THE COURT: When it ended up with you, did you review
15   it?
16        MR. NAFTALIS: Yes.
17        THE COURT: Did you speak again with counsel about it
18   before the actual plea proceeding?
19        MR. NAFTALIS: I know I spoke to them. I can't tell
20   you when. I certainly never spoke to Mr. Majidi.
21        THE COURT: Okay. That's fine. But let me make sure
22   I understand what you recall. You recall receiving the
23   allocution.
24        MR. NAFTALIS: Yeah. I recall receiving it and before
25   the plea, yes.

J6a1ahu7
Page 767

1         THE COURT: And I want to be clear. I'm
2    distinguishing you affirmatively recalling from you not
3    disputing that you got it. You actually affirmatively recall
4    receiving it.
5         MR. NAFTALIS: Yes.
6         THE COURT: Thank you.
7         All right. You recall having one or more
8    communications with Mr. Rosenberg prior to the actual plea
9    proceeding?
10        MR. NAFTALIS: My recollection is we spoke on the
11   phone. I can't tell you -- I don't have it in front of me, but
12   say it came the day before the plea. I think we spoke the day
13   before, but I can't tell you when in the passage of time.
14        THE COURT: All right. And do you recall at all the
15   substance of your communication?
16        MR. NAFTALIS: I don't recall the substance -- I don't
17   recall the specifics. The substance was, which is what I say
18   to all defense lawyers, which is, you've given us an
19   allocution; we're only asking you allocute to the elements and
20   what's in the information, and that -- to be clear, I don't
21   think there's any great change in these allocutions, which is
22   they allocute to the crime, and what they allocute to is
23   consistent with what they told us, and what they propose in
24   their proposed allocutions is also consistent to what they told
25   us, meaning it's in our notes. Both of them are in our notes.

J6a1ahu7
Page 768

1    We just typically say, you're a cooperator, you're going to be
2    under oath, allocute to the elements, you're not testifying to
3    the judge, this isn't your opportunity to blame others or, you
4    know, this isn't your sentencing proceeding, for example. It's
5    just allocute. Again, I don't think there's anything improper
6    about that, and it's typical, as your Honor knows, in plea
7    allocutions with cooperators, that they're very basic, same for
8    regular defendants, which is, just hit the elements. And
9    that's my recollection. That's my general advice to lawyers.
10   I certainly do not tell people what to say.
11        THE COURT: That's what I want to hear.
12        So right now as you're talking to me, it's fair to say
13   you don't have a specific recollection of the communication
14   with Mr. Rosenberg, is that correct?
15        MR. NAFTALIS: Correct. But my general practice,
16   whenever I get one of these, is, listen, you've written this,
17   just hit the elements. My job is not to tell your client what
18   to say. We've debriefed him. Your job is to allocute to what
19   happened, meaning to the elements.
20        THE COURT: No. Thank you. I know. If Mr. Majidi
21   had read into the record what was sent as a proposed
22   allocution, would you have cared?
23        MR. NAFTALIS: No. I think it will be consistent with
24   his testimony. I mean --
25        THE COURT: I want to make sure you heard what I said.

J6a1ahu7
Page 769

1         MR. NAFTALIS: Would I care? No.
2         THE COURT: Okay. You're telling me, you're
3    representing to me as an officer of the court that in no way
4    did you seek to shape or modify the allocution.
5         MR. NAFTALIS: Correct. I don't remember exactly what
6    I said, but I would never suggest to a defense lawyer, this is
7    what he should say or not say.
8         THE COURT: Both of your co-counsel want to speak with
9    you.
10        MR. NAFTALIS: My colleagues are pointing out, by
11   "shape," I mean to do something improper. The direction would
12   be consistent with what the person said in the proffers.
13   That's -- I don't --
14        THE COURT: I don't actually understand what you just
15   said, so let's back up, please.
16        You've said to me that it is your practice to have the
17   cooperator hit the elements, is that correct?
18        MR. NAFTALIS: Correct.
19        THE COURT: Are you saying that you would never give
20   more specific direction than that?
21        MR. NAFTALIS: I mean, if something is factually
22   wrong, I don't want someone allocuting that's wrong. But I
23   don't have a specific recollection of shaping this one. I
24   don't like the word "shape," but --
25        THE COURT: Okay. Then let's not use the term

Page 770

1  "shape."  Did you, or did anyone from the government, ask
2  Mr. Majidi's counsel to change the names of anyone in the
3  allocution?
4         MR. NAFTALIS:  No.
5         THE COURT:  Did you ask him to change the date?
6         MR. NAFTALIS:  Not that I can -- I don't even recall.
7  I'd have to look at the redline.  My recollection --
8         THE COURT:  Please do.
9         MR. NAFTALIS:  My recollection -- I can tell you my
10 one recollection is the proposed allocution -- I'm confusing
11 them.  I'm looking at the Dinucci one.
12        THE COURT:  Then please don't do that.  Please think
13 of -- go ahead.  Look at the redline.
14        MR. NAFTALIS:  There is no change in date.  There is
15 no change in the date of Mr. Majidi.  The only change is that
16 it's shorter, and as opposed to summarizing what -- I'm looking
17 at this.
18        THE COURT:  Yes, of course.
19        MR. NAFTALIS:  I don't see any additions or
20 subtractions.
21        THE COURT:  I do.  The addition I'm seeing is Mr. Shor
22 is not named in the first iteration and he is named in this
23 one.  Now perhaps your argument is that he's lumped in with
24 certain traders or someone else that are mentioned in the
25 proposed allocution.  That is the change that I identified.

Page 771

1         MR. NAFTALIS:  Just to be clear, his name was in the
2  information, so this isn't like -- this isn't new to anybody.
3  I don't recall saying, make sure you allocute to -- you didn't
4  include Shor in the first draft, put him in when you do it in
5  court.  I don't recall that.
6         THE COURT:  All right.  Is there anything else you can
7  tell me about your conversation with Mr. Rosenberg a day or so
8  prior to the actual guilty plea proceeding?
9         MR. NAFTALIS:  No, other than I think that it was
10 appropriate, and again, I --
11        THE COURT:  I have you more as a fact witness, sir.
12        MR. NAFTALIS:  Yes.
13        THE COURT:  I think I have --
14        MR. NAFTALIS:  The accusations that are getting lobbed
15 in, I take personally and seriously, and the suggestion is
16 offensive that we are suborning perjury in some way.  The man
17 proffered, Mr. Majidi, with me for months.  We spent months
18 talking about Jeremy Shor was literally the guy who got the
19 corrupt marks every single time.  And the suggestion that we
20 were suborning perjury because Mr. Majidi allocuted to its
21 information is like -- I can't even like believe that it's
22 being lobbed in, but it is what it is.  I certainly did nothing
23 to improperly shape testimony -- to shape his allocution.  So
24 again, I would urge defense counsel to choose their words,
25 because some of this stuff is getting a little insane.

Page 772

1         THE COURT:  All right.  I don't agree with last
2  adjective.
3         Sir, on the day of the plea proceeding, did you have a
4  conversation with Mr. Rosenberg regarding the allocution?
5         MR. NAFTALIS:  No.
6         THE COURT:  Did you receive a revised allocution?
7         MR. NAFTALIS:  No.  And I think you can tell -- by the
8  way, as your Honor will recall, when we took the plea, there
9  was a pause.
10        THE COURT:  Yes, because --
11        MR. NAFTALIS:  And I was -- so --
12        THE COURT:  Yes, and in fact, it wasn't one of my
13 finer moments as a person taking pleas.  I had to ask questions
14 about the wire, and thank you for proffering about that.  I do
15 remember that part of it.
16        All right.  And then thereafter, there were no
17 communications about the allocution, am I correct, that you can
18 recall?
19        MR. NAFTALIS:  You mean after he actually pled guilty?
20        THE COURT:  Yes.
21        MR. NAFTALIS:  No.
22        THE COURT:  Okay.  All right.  Thank you.
23        Ms. Griswold.
24        MS. GRISWOLD:  Yes, your Honor.
25        So I handled the plea for Mr. Dinucci.  I hadn't

Page 773

1  recalled, prior to last week, one way or the other about the
2  issue of whether we requested or discussed an allocution.
3  After the issue with Mr. Majidi was raised, I went back through
4  my emails and found an email from Mr. Zinman saying -- actually
5  an email from me before that asking if he had a draft
6  allocution, and then the email where he provided one.  It has
7  been my practice, not necessarily in every case, but to ask for
8  draft allocutions so that the pleas can go smoothly, and when I
9  say that, I mean so that the allocutions can be accurate and
10 consistent with what I understand the facts of the case to be
11 from the proffers.
12        In this case the next recollection I have is that -- I
13 don't know if it was a phone call or in Judge Hellerstein's
14 courtroom.  I can pull up an exchange with Mr. Zinman, which I
15 will recount, but I believe it was in the courtroom.
16        THE COURT:  Just one moment, please.
17        After you made a request, you received something in
18 response to the request.
19        MS. GRISWOLD:  Yes.
20        THE COURT:  You reviewed the something that you
21 received at or about the time of its receipt.
22        MS. GRISWOLD:  I don't have an independent
23 recollection of doing so, but yes, I reviewed it in advance of
24 the plea.
25        THE COURT:  You did not have communications with

J6a1ahu7                                                        Page 774

1   Mr. Zinman prior to the plea proceeding?
2           MS. GRISWOLD: That is my best recollection. I
3   remember discussing -- and I believe it was in Judge
4   Hellerstein's courtroom when we actually discussed some of the
5   allocution. What I'm saying is that, is it possible that that
6   conversation was on a phone call? It's possible. I think it
7   was in the courtroom.
8           THE COURT: All right. But the next recollection that
9   you have regarding these plea proceedings is in fact in the
10  courtroom, in Judge Hellerstein's courtroom.
11          MS. GRISWOLD: Yes, your Honor.
12          THE COURT: This is prior to the plea?
13          MS. GRISWOLD: Yes, your Honor.
14          THE COURT: All right. And tell me what happened,
15  please.
16          MS. GRISWOLD: So I do recall -- and I have the
17  redline of the allocution as delivered versus the allocution in
18  draft form. I do recall having a conversation with Mr. Zinman
19  about the reference to the time period with respect to when he
20  was asked, he being Mr. Dinucci, to provide improper marks. I
21  remember specifically noting that the proposed allocution had
22  2015 and that it was my recollection that the statements by
23  Mr. Dinucci during our proffer sessions had put that time
24  period into 2014.
25          I'm also looking -- and I went back to look at this,

J6a1ahu7                                                        Page 775

1   that that is consistent with our proffer notes. On July 20th
2   of 2017, on page 4 of 9 of a 302, we have a note: "During late
3   2014 and early 2015, an understanding existed between PPI and
4   Dinucci. PPI understood Dinucci was willing to mark bonds
5   where PPI wanted bonds marked."
6           So I do recall asking Mr. Zinman about the time frame
7   and to confer about whether or not 2014 was a more accurate
8   date for when his understanding of the request for the improper
9   marks was made. And I did not have any direct communications
10  with Mr. Dinucci. This was more than two years ago, so I don't
11  remember -- I don't think it was -- I don't know whether he
12  went out in the hallway or it happened in the courtroom. But
13  that is what I remember. I do remember pointing out the time
14  period and saying, I think the accurate starting point is 2014
15  and I ask you to consider that.
16          THE COURT: And did he come back and say we've
17  considered it, or did you have a conversation with Mr. Zinman
18  prior to the actual plea proceeding taking place?
19          MS. GRISWOLD: I don't believe so. I believe it was
20  in Judge Hellerstein's courtroom. I pause because I don't
21  remember. It's possible that I had a phone call with him
22  before. I'm remembering one interaction with him.
23          THE COURT: I'm asking an imprecise question. I will
24  ask a more precise question.
25          You've just recounted a conversation that you had with

J6a1ahu7                                                        Page 776

1   Mr. Zinman regarding the opening date, the beginning date of
2   the charged conspiracy, and you communicated to him your belief
3   that Mr. Dinucci's proffers would place that at 2014. After
4   you said that to him, is it your recollection that he had a
5   meeting with his client or that he immediately said to you,
6   you're right, or do you not recall?
7           MS. GRISWOLD: I don't recall. I do believe -- recall
8   him conferring with his client at some point in the proceeding.
9   I don't recall whether it was at that moment. I believe that
10  he conferred with his client after I had that conversation with
11  him. I had no direct communication with his client. And then
12  his client's allocution was 2014, so I believe that it has to
13  be that he had a communication with his client.
14          THE COURT: And I understand that. My question is:
15  Did he speak to you before Judge Hellerstein took the bench and
16  took the guilty plea?
17          MS. GRISWOLD: Yes. I believe this was -- this
18  happened before the plea was taken. Am I not understanding
19  your question?
20          THE COURT: I'm not asking the best questions I could.
21          The conversation you just recounted about you telling
22  him about 2014, clearly that was before the plea proceeding.
23  He then conferred with his client. Did he tell you, prior to
24  the plea proceeding beginning, that his client agreed with you
25  or that he agreed with you that 2014 was the proper date, the

J6a1ahu7                                                        Page 777

1   correct date?
2           MS. GRISWOLD: I don't have a recollection one way or
3   the other. Based on all the facts I recounted, I would infer
4   yes, that I got an answer that he either agreed or disagreed
5   with me, but I don't remember at the plea, and as an officer of
6   the court, I'm trying to be absolutely as precise as I can.
7           THE COURT: Of course.
8           MS. GRISWOLD: I can't pull that up in my mind.
9           THE COURT: All right. Anything else that you can
10  recall about the proceeding?
11          MS. GRISWOLD: No, your Honor.
12          THE COURT: If he had said to you that he disagreed
13  and that the proper date was 2015, what would you have done?
14          MS. GRISWOLD: Obviously I would absolutely want
15  Mr. Dinucci to make statements to the Court that he believed
16  were accurate, so if his counsel said to me that he could not,
17  you know -- he disagreed with me on that fact, I would not have
18  resisted.
19          THE COURT: Other than your reference to Mr. Zinman
20  about the date of the conspiracy, do you recall any other
21  communications with Mr. Zinman about the substance of the
22  allocution?
23          MS. GRISWOLD: No. That's what I recall.
24          THE COURT: In any way, to the best of your
25  recollection, did you otherwise edit this allocution?

J6a1ahu7                                                          Page 778

 1          MS. GRISWOLD: Not that I recall.
 2          THE COURT: All right. Mr. Nicholas, do you want to
 3   return to telling me why I should not be concerned and why I
 4   should not do what counsel is asking me to do.
 5          MR. NICHOLAS: Yes, your Honor.
 6          So I think counsel asked -- just going off
 7   Mr. Ruzumna's letter, counsel asked for a couple different
 8   things. I think one was an adverse inference instruction. So
 9   I don't think that such an instruction will be appropriate.
10   It's an extreme remedy. I think Judge Scheindlin referred
11   to -- this is a Latin phrase, which I may get wrong, but -- its
12   in terrorem effect. I think that's from Zubulake. I'm sorry
13   about my Latin. And I think Judge Scheindlin went on to say
14   it's obviously extremely powerful, and I think she was
15   discussing it in the context -- and a lot of the cases that I
16   looked at over the weekend, or last night, I guess, discuss it
17   in the context of actual spoliation.
18          Here, the defense, defense counsel actually has the
19   drafts, so the evidence has not been destroyed. I disagree
20   that it has evidentiary value in terms of the proceeding, but
21   even tabling that, it's not like we -- it's not like they will
22   never have the opportunity to see the draft allocutions for
23   Mr. Dinucci and Mr. Majidi. They have them. They have them in
24   advance of either witness testifying. In Mr. Dinucci's case,
25   there's no chance he even gets on this week. And even in

J6a1ahu7                                                          Page 779

 1   Mr. Majidi's case, he may not get on.
 2          So we're not in a spoliation world, but I don't
 3   think -- I think an adverse inference would be gratuitous and
 4   extremely prejudicial to the government in this context.
 5          THE COURT: Okay.
 6          MR. NICHOLAS: With respect to -- sorry, your Honor.
 7   I'm just looking at my notes.
 8          THE COURT: Please do.
 9          MR. NICHOLAS: Your Honor, with respect to the use, I
10   think the other bucket was kind of the use of the draft
11   allocutions at trial. So, Judge, here's what I would offer
12   about that. If, in reading the draft allocution -- the
13   extremely able counsel is going to cross-examine these
14   witnesses. They have another data point for preparing their
15   cross in terms of the draft allocutions. If, in reading Amin
16   Majidi's draft allocution, Mr. Ruzumna thinks, I now have a
17   good faith basis to ask a question that I wouldn't have
18   otherwise thought to ask or a point that I'm going to press
19   that I wouldn't have thought of without seeing this, obviously
20   he has the benefit of the draft allocution. And there's
21   nothing, you know -- if he has a good faith basis to ask the
22   questions, then he can ask the questions, of course, on cross.
23   But I don't think that the draft itself has any evidentiary
24   place in the trial.
25          THE COURT: Sir, let me stop you, please, so I can be

J6a1ahu7                                                          Page 780

 1   sure I understand what you're saying. Are you suggesting that
 2   defense counsel for either defendant should be permitted to
 3   inquire of the particular witness, be it Mr. Majidi or
 4   Mr. Dinucci, what it is they intended to say in the proposed
 5   allocution?
 6          MR. NICHOLAS: No, your Honor.
 7          THE COURT: Okay. I want you to be very clear.
 8          MR. NICHOLAS: No. I appreciate the opportunity to
 9   clarify. What I mean is that if in reading -- so let's take
10   Mr. Dinucci as an example. The date range is wider in the plea
11   before Judge Hellerstein than it was in the draft allocution.
12   So it may be the case that Mr. Ruzumna sees the draft and
13   thinks, you know what, like, I'm going to press this guy on
14   when the conspiracy that he's talking about actually started.
15   But I do not think it would be appropriate for him to invoke
16   the allocution and say, isn't it a fact that your lawyer sent
17   to Ms. Griswold a draft in which the date was later? Among
18   other things, that communication came from the lawyer, but
19   also, that would implicate like a flood of proffer notes that
20   precede the actual allocution.
21          So to kind of put a point on this, I don't think that
22   defense counsel wants, and we're not seeking to introduce, a
23   bevy of proffer notes into the record with a bunch of -- there
24   may be occasions in this trial where it's appropriate to
25   introduce prior consistent statements, but I don't think that

J6a1ahu7                                                          Page 781

 1   that should be coming up here. But if a draft allocution sent
 2   by a lawyer is left hanging out there, I think that would
 3   implicate a truckload of prior consistent statements that are
 4   consistent with the actual plea and that are more accurate than
 5   the draft. So I think this goes down a long rabbit hole, or
 6   maybe I mix metaphors. But I think the Court knows what I
 7   mean. There would be an issue if the plea that was given
 8   before the Court, or before Judge Hellerstein, or this Court,
 9   were inconsistent with statements made by the witness to the
10   government in proffer sessions. That would obviously be
11   fertile ground for cross-examination. But the fact that a
12   draft allocution sent by a lawyer was not as fulsome as prior
13   proffers, to me, that is so far afield from having evidentiary
14   value. It's so often the case -- put aside just cooperating
15   witnesses. It's so often the case that a defendant of any kind
16   does not, in his or her plea allocution, specify everything
17   that happened in the crime or gives a more specific date range
18   or only mentions one person instead of two people. I mean,
19   most pleas are not as complete as a PSR. And to start going
20   down this -- I mean, to start going down this road of every
21   time there is any sort of communication between the government
22   and the defense lawyer or the fact that a draft allocution sent
23   by a lawyer is not the same as the actual sworn plea,
24   independent of whether the sworn plea is consistent with
25   proffer statements, I think is kind of a bottomless well.

J6a1ahu7                                                                Page 782

1   THE COURT: I'm trying to see how many metaphors
2   you're going to get into this discussion, sir.
3   MR. NICHOLAS: I'm sorry, Judge.
4   THE COURT: That's fine, sir.
5   Mr. Nicholas, when Mr. Majidi testifies, can I imagine
6   that Mr. Rosenberg will be here?
7   MR. NICHOLAS: Judge, I don't know the answer to that.
8   I think that I -- it's my understanding that one of his counsel
9   is planning to be here for the majority of the testimony. I
10  don't know that it would be Mr. Rosenberg. He has two lawyers,
11  two partners.
12  THE COURT: Yes. But if I asked.
13  MR. NICHOLAS: I have every reason to believe he would
14  comply, and we can certainly ask him to.
15  THE COURT: And would there be any government
16  objection to my inquiring of Mr. Rosenberg about efforts, or
17  not, of the government to shape, to use the discussion
18  Mr. Naftalis and I were having, the plea allocation?
19  MR. NICHOLAS: Your Honor, obviously I wouldn't and
20  couldn't get in the way of the Court doing that.
21  THE COURT: I'm just asking if you object, sir, and
22  tell me why.
23  MR. NICHOLAS: Well, your Honor, to the extent that it
24  may implicate conversations that Mr. Rosenberg had with
25  Mr. Majidi in terms of what to say, I think there would be a

J6a1ahu7                                                                Page 783

1   privilege issue.
2   THE COURT: I appreciate exactly what you're saying,
3   and that's why what I was asking you was: If I had discussions
4   with Mr. Rosenberg about whether he felt that he was being
5   asked by the government to alter a proposed allocation for
6   reasons other than the evidence, do you have any objection to
7   that?
8   MR. NICHOLAS: I just want to make sure I understand
9   the question, because it's important.
10  THE COURT: Okay. Well, here, let me try it again,
11  sir, okay? Your colleagues, Mr. Naftalis and Ms. Griswold,
12  have gotten up and told me their recollection of their
13  communications with Mr. Zinman and with Mr. Rosenberg. You
14  remember that, sir, yes?
15  MR. NICHOLAS: Yes, I do.
16  THE COURT: Is there any reason why I couldn't inquire
17  of the other party to that conversation whether they have the
18  same recollection?
19  MR. NICHOLAS: The short answer is no. But I just
20  want to add, the way the Court -- the word the Court used was
21  "alter." I do not think there would be anything improper about
22  the government getting a draft allocation and saying to a
23  lawyer, didn't he proffer to a longer time period, or didn't
24  he -- hasn't he said a hundred times that he committed the
25  crime with person X? Now I think the Court, in the Court's

J6a1ahu7                                                                Page 784

1   statement a moment ago, included the clause "other than the
2   evidence," so, I mean, if the question is, did the
3   government -- it would be improper, of course, for the
4   government to ask for an alteration to an allocution that is
5   not founded in the evidence. That would be totally improper.
6   There's no way that's what happened here. I don't think it
7   would be improper, though, and therefore I don't know if there
8   needs to be inquiry about whether there was a conversation
9   about the proffer, about the allocution encompassing the
10  evidence.
11  THE COURT: Okay. All right. Let me try it a
12  different way, please, sir.
13  Your colleagues have strong but not entirely complete
14  recollections of those communications. Would you agree with
15  that?
16  MR. NICHOLAS: Yes.
17  THE COURT: They don't remember every moment.
18  MR. NICHOLAS: Yes.
19  THE COURT: Right. Is there any reason to inquire, or
20  not to inquire, of the other side of those conversations?
21  MR. NICHOLAS: Your Honor, my hesitation is just --
22  I'm not trying to be difficult.
23  THE COURT: No.
24  MR. NICHOLAS: I just -- it's not something that I've
25  had the experience with before and so I'm, you know, I guess

J6a1ahu7                                                                Page 785

1   loath to start -- to agree in any categorical way, because I
2   don't, that every conversation that the government has with a
3   defense lawyer, or a lawyer of a cooperating witness,
4   implicates Giglio. I take it the Court's inquiry is narrower,
5   and I appreciate that. I just want to make sure that I'm clear
6   about that.
7   THE COURT: Of course. And you should not read into
8   my questions a decision. I'm exploring the issue. And I
9   wanted to understand your thoughts.
10  MR. NICHOLAS: Yes, your Honor.
11  THE COURT: Okay. Check with your colleagues. Is
12  there anything else you want to say?
13  MR. NICHOLAS: Just one moment, your Honor.
14  THE COURT: Thank you.
15  MR. NICHOLAS: Your Honor, I have nothing to add. And
16  again, to be clear, whatever the Court wants us to do, we will
17  do. I just wanted to get my position out there.
18  THE COURT: Of course. You believe it sets an
19  unfortunate precedent.
20  MR. NICHOLAS: I think it could.
21  THE COURT: Okay.
22  MR. NICHOLAS: It could.
23  THE COURT: I understand.
24  Mr. Ruzumna, I'll hear from you in reply.
25  MR. RUZUMNA: Your Honor, just a few points, and I'll

J6a1ahu7                                                                                                              Page 786

 make this brief.
         I believe a plea allocution is different in kind than a normal conversation that a defense lawyer may have with the government. This is the culmination of a cooperating witness's investigation and cooperation, or at least initial stage of the cooperation, so I think that this is of much greater magnitude than a normal conversation.
         I respect what Mr. Nicholas says that not every communication is going to have to be scoured up and down for any, you know, potential thought, but when you're talking about a plea allocution, and it really goes to all conversations, if there's Brady or Giglio information that's provided, it has to be turned over, particularly in this context.
         THE COURT: Counsel, do you have reason to doubt the representations made to me by the prosecutors who were involved in the two conversations?
         MR. RUZUMNA: No.
         THE COURT: All right.
         MR. RUZUMNA: And I want to get to that in a moment.
         The statements by a lawyer for a witness, or for his or her client, are not always -- can be admissions for that particular client. The lawyer is the agent. Particularly in this case where we know Mr. Zinman's practice is to review a statement with a witness before sending it to the government for a plea allocution, I think that draft is the witness,

J6a1ahu7                                                                                                              Page 787

Mr. Dinucci's, statement. I think he adopted it, and the fact Mr. Nicholas said that there may be proffer statements that are inconsistent with it -- maybe he used a different time frame on another date -- it doesn't mean that that is not a statement of the witness. It doesn't become a statement because it's consistent; it doesn't become a statement because it's inconsistent. If the witness, Mr. Dinucci, in that one particular instance, adopts a statement and it gets sent to the government, that's his statement. Even if it is later changed. I don't suggest that Ms. Griswold was trying to manipulate it in a way that she thought was untrue, but it doesn't matter, because that draft allocution, that proposed allocution, if Mr. Zinman's practice held up, is Mr. Dinucci's statement. We should be allowed to use it in the cross-examination. Not just, oh, that's interesting, there is a date 2015, maybe that will lead me to inquire about it. I can ask him about his statement if he offers a prior -- I'm sorry -- if he offers any testimony that's inconsistent with that statement. So just like any other statement by Mr. Dinucci, I can use his draft allocution as a prior inconsistent statement. I can use it to refresh recollection. That is, in my mind, very, very clear.
         And going to that same point, this idea that if the defense wants to use these proposed allocutions, it would somehow open up the door to all the proffer notes of these witnesses, that's not true. Using a statement does not allow

J6a1ahu7                                                                                                              Page 788

the introduction of a prior consistent statement, unless that prior consistent statement was made before there was a motive to lie. These proffer statements by these witnesses cannot come in as prior consistent statements because at that point the witness did have a reason to provide the government with evidence that that witness would think would help with his cooperation.
         Lastly, your Honor, I want to make clear, as your Honor asked me very directly, I'm not suggesting that these lawyers are trying to manipulate the evidence with false information. I'm sure that they believe the changes that were made in these allocutions are accurate. They go beyond just cleaning it up to do the elements. They include my client's name. Sometimes they take out relevant statements about Mr. Majidi. It goes beyond just cleaning them up or minimizing them. It does more than that. I'm not suggesting that these folks were lying, or suborning perjury. Those words never came out of my mouth. What I did say is, if a defense lawyer had done some of these things and didn't turn over that evidence when it was called for, there would be a real questioning of the conduct. Here, it may be perfectly acceptable. Maybe it is purely that when a defense lawyer suggests that a proposed allocution, these lawyers said, hey, I think your dates are wrong, go back and check, whatever else. If it was adopted by the witness, it's still a statement by that witness. We still

J6a1ahu7                                                                                                              Page 789

can use it for the appropriate purposes a witness statement can be used for. But those things have to be turned over. This is Brady. This is Giglio. It has to be turned over. It can't be, well, there was a mistake in it so we don't need to turn it over because the final is good enough. That's not how Brady and Giglio work. That's where I'm getting at, your Honor.
         And what I do resent is, every time we call out something that, as your Honor noted, these things should have been turned over, and I do think it's consequential and I do think if the shoe had been on the other foot, there would have been a lot of grief that we would have suffered, and they're suffering grief now, so I'm not suggesting otherwise. But I don't like to be the bad guy. I don't like to be the one, I can't believe someone's accusing me of suborning perjury. I'm not accusing anyone of suborning perjury. I'm saying this is a big deal and I have a client to represent, and these things have to be looked into. We're entitled to certain relief, and I've laid out what I think that is. And I don't want to be called to the carpet for being the bad guy and doing all these things every time we say we should have gotten something.
         So thank you, your Honor.
         THE COURT: All right. I don't recall calling you to the carpet, sir.
         MR. RUZUMNA: You didn't.
         THE COURT: All right. Thank you.

J6a1ahu7                                                          Page 790

1    Mr. Finzi, do you want to be heard, or does someone
2    from your table want to be heard on this, or you're just saying
3    you agree with all of Mr. Ruzumna's arguments?
4         MR. FINZI: I agree with --
5         THE COURT: I'm sorry.  I can't hear you, sir.
6         MR. FINZI: I agree with all of Mr. Ruzumna's
7    arguments.  And I'll be very, very brief, and I actually mean
8    it this time, because I'm tired.
9         The point here, Judge, at least from where we sit, is
10   that if there had not been communications between the
11   government and defense counsel, the allocutions delivered would
12   have been different, and they would have been different in a
13   way that benefited us.  It would have been sworn statements,
14   admissible before this jury as prior statements made under
15   oath, to a certain extent, at least -- and I don't expect us to
16   agree on this with the government, but to a certain extent, at
17   least, inconsistent in material ways with the allocution that
18   was actually delivered.  So however it happened here, we have
19   been deprived of -- or events have transpired such that our
20   cross-examination of these government witnesses are not as -- I
21   hate to say effective because that makes it seem like it's
22   tactical, but are not based on the words they originally
23   intended to utter.
24        THE COURT: All right.  Thank you.
25        I was looking at the rules of evidence this morning.

J6a1ahu7                                                          Page 791

1    I want to look again at the prior consistent and prior
2    inconsistent statements.  You will either get a written order
3    from me tonight or something first thing tomorrow.  It's not
4    going to come up tomorrow morning.  We apparently have a lot of
5    other things to do.  But can I see the parties at 8:45
6    tomorrow.
7         That's a yes.  Terrific.
8         MR. FINZI: Yes.
9         THE COURT: Anything else to address?
10        That's a no.  Great.
11        MS. GRISWOLD: No.
12        THE COURT: Go forth.  I'll see you tomorrow.  Thank
13   you very much.
14        THE DEPUTY CLERK: All rise.
15        (Adjourned to June 11, 2019, at 8:45 a.m.)

Page 792

INDEX OF EXAMINATION

Examination of:                                        Page
ASHISH DOLE
Cross By Mr. Finzi . . . . . . . . . . . . . . . 540

DEFENDANT EXHIBITS

Exhibit No.                                        Received
5086, 5086A  . . . . . . . . . . . . . . . . . . 607
1 and 2      . . . . . . . . . . . . . . . . . . 653
003          . . . . . . . . . . . . . . . . . . 680
1064         . . . . . . . . . . . . . . . . . . 664
1064A        . . . . . . . . . . . . . . . . . . 587
1065         . . . . . . . . . . . . . . . . . . 590
1065A        . . . . . . . . . . . . . . . . . . 591
1066         . . . . . . . . . . . . . . . . . . 669
1155         . . . . . . . . . . . . . . . . . . 675
1157         . . . . . . . . . . . . . . . . . . 609
1162         . . . . . . . . . . . . . . . . . . 612
1165         . . . . . . . . . . . . . . . . . . 667
3001         . . . . . . . . . . . . . . . . . . 553
4211         . . . . . . . . . . . . . . . . . . 703
5052         . . . . . . . . . . . . . . . . . . 641
5055         . . . . . . . . . . . . . . . . . . 712
5065         . . . . . . . . . . . . . . . . . . 547
5066         . . . . . . . . . . . . . . . . . . 682
5078         . . . . . . . . . . . . . . . . . . 601

Page 793

DEFENDANT EXHIBITS CONTINUED
Exhibit                                              Page
5081         . . . . . . . . . . . . . . . . . . 603
5081A        . . . . . . . . . . . . . . . . . . 603
5083         . . . . . . . . . . . . . . . . . . 742
5085         . . . . . . . . . . . . . . . . . . 606
5100         . . . . . . . . . . . . . . . . . . 741
5101         . . . . . . . . . . . . . . . . . . 742
5103         . . . . . . . . . . . . . . . . . . 629
5127         . . . . . . . . . . . . . . . . . . 683
5207         . . . . . . . . . . . . . . . . . . 671
5209         . . . . . . . . . . . . . . . . . . 696
5212         . . . . . . . . . . . . . . . . . . 542
5213         . . . . . . . . . . . . . . . . . . 600
5214         . . . . . . . . . . . . . . . . . . 707
5215         . . . . . . . . . . . . . . . . . . 736
5216         . . . . . . . . . . . . . . . . . . 738
5217         . . . . . . . . . . . . . . . . . . 744
5218         . . . . . . . . . . . . . . . . . . 605
5221         . . . . . . . . . . . . . . . . . . 705
5223         . . . . . . . . . . . . . . . . . . 655
5224         . . . . . . . . . . . . . . . . . . 610
5224         . . . . . . . . . . . . . . . . . . 660
5225         . . . . . . . . . . . . . . . . . . 657
5231         . . . . . . . . . . . . . . . . . . 714