UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>ANILESH AHUJA and JEREMY SHOR,<br><br>            Defendants. | 15 Cr. 328 (KPF) |

I, Andrea M. Griswold, pursuant to Title 28, United States Code, Section 1746, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I am currently an Assistant United States Attorney in the United States Attorney's Office for the Southern District of New York (USAO-SDNY).

2. I have been a member of the prosecution team assigned to the above-captioned matter since at or near the inception of the criminal investigation, in or about 2016, along with AUSA Joshua Naftalis. On or about May 9, 2018, a Grand Jury sitting in the Southern District of New York returned an indictment charging defendants Anilesh Ahuja, Amin Majidi and Jeremy Shor with securities fraud and other offenses for their alleged role in an alleged criminal mismarking scheme. Former AUSA Max Nicholas joined the prosecution team in 2018, after the case was indicted, and was part of the 3-AUSA trial team consisting of AUSAs Naftalis, Griswold and Nicholas that tried the case in June and July 2019.

3. I make this declaration in response to the Order issued by the Court on January 13, 2021 (Dkt. 424) denying certain defense applications but ordering the three members of the prosecution team to provide sworn statements responding to six questions posed by the Court as

1

well as one additional question posed by defense counsel and ordered by the Court as reflected in an amended order dated January 20, 2021 (Dkt. 426).

4. I have not discussed the substance of my responses with anyone. A paralegal assisted me with certain administrative tasks including compiling the documents referenced herein.

### Question 1

5. The first question asks the declarant to identify "the nature and scope of [my] involvement in any plea discussions with Mr. Majidi or his counsel."

6. The principal nature of my involvement in any plea discussions with Mr. Majidi and/or his counsel is that I helped organize and then participated in a series of proffers with Mr. Majidi and his counsel, beginning with an attorney proffer. Given that a goal of the proffer process for Mr. Majidi was to obtain a cooperation agreement, I consider my involvement in the proffer process responsive to this question.

7. After Majidi's arrest and indictment in May 2019, I recall that AUSA Naftalis and I spoke by phone with counsel for Mr. Majidi concerning the prospect of Mr. Majidi providing information to the Government with the goal of obtaining a cooperation agreement. In substance, I recall that the Government conveyed information about the nature of the evidence against Mr. Majidi and indicated that the Government would be interested in meeting with Mr. Majidi pursuant to a proffer agreement. On June 14, 2018, counsel for Mr. Majidi provided an attorney proffer to me and AUSA Naftalis. This attorney proffer was contemporaneously memorialized in notes authored by AUSA Naftalis and ultimately produced as part of Mr. Majidi's Section 3500 material (3520-4). This and the other documents referenced in my declaration are contained in an Appendix in the order they are cited herein.

8.      On or about June 18, 2018, four days after the attorney proffer, Mr. Majidi appeared with his counsel at the USAO-SDNY to meet with the Government as well as representatives of the Federal Bureau of Investigation ("FBI") and Securities and Exchange Commission ("SEC") for a proffer. The FBI memorialized this proffer in an FBI 302.

9.      Based on my review of the Rule 3500 material memorializing proffers with Mr. Majidi, Mr. Majidi again proffered with the Government on July 10, 2018, July 13, 2018, and July 18, 2018. Based on my review of the FBI 302s, I participated in each of these meetings with the exception of the July 13, 2018 meeting.

10.     Following these proffers, the Government extended a written cooperation agreement to Mr. Majidi, through counsel, pursuant to which he would agree to plead guilty to each of the Counts contained in the Indictment. I recall that AUSA Naftalis took principal responsibility for drafting the cooperation agreement, which was approved by supervisors internally in the USAO-SDNY in the normal course. While I do recall being copied on ministerial emails between counsel for Mr. Majidi and the Government concerning the likely timing of Mr. Majidi's plea to a cooperation agreement, I do not recall participating in negotiations, if any, with Mr. Majidi's counsel concerning the cooperation agreement or guilty plea.

## Question 2

11.     The second question asks the declarant to identify "[my] involvement in any communications with their colleagues, Mr. Majidi, and/or his counsel regarding the substance of Mr. Majidi's allocution."

12.     I do not recall participating in any discussions with Mr. Majidi and/or his counsel regarding the substance of Mr. Majidi's allocution. Based on my recollection, and on a review

of the documents produced by the Government related to the topic of Mr. Majidi's plea and allocution, I do not believe I participated in discussions with Mr. Majidi and/or his counsel regarding the substance of Mr. Majidi's allocution.

13. As to communications with my colleagues regarding the substance of Mr. Majidi's allocution, I was a recipient and/or participant on the following internal emails sent on Monday, October 29, 2018 and Tuesday, October 30, 2018:

   a. I was a recipient of an email sent by AUSA Naftalis on October 29, 2018 at approximately 4:17 pm to me and AUSA Nicholas containing the subject "Majidi allocution." The 4:17 email forwarded an email from counsel for Mr. Majidi to AUSA Naftalis minutes earlier attaching a "proposed allocution" for Mr. Majidi as a word document entitled "Allocution-Approved 1029.doc." The 4:17 email was previously produced to the parties and the Court (USAO_SDNY_026401).

   b. I was a recipient of an email sent by AUSA Naftalis, also on October 29, 2018, at approximately 5:32 pm, to me and AUSA Nicholas, in which AUSA Naftalis replied to his earlier email and requested to meet "about this and some other stuff tomorrow." Both AUSA Nicholas and I responded in separate emails that we could meet the next day, October 30, 2018, and the time of 3:00 pm was agreed. These emails were previously produced to the parties and the Court (USAO_SDNY_026405-09).

   c. I was a recipient of an email sent by AUSA Naftalis at approximately 9:54 pm on October 29, 2018 to me and AUSA Nicholas stating his view that the draft allocution received from counsel for Majidi was "way too detailed" and asking to discuss in "our team meeting." I was a recipient of the response by AUSA Nicholas at 9:56 pm on October 29, 2018 in which AUSA Nicholas stated: "I completely agree. Should be bare bones just hit the elements. Agree let's discuss at mtg." These emails were previously produced to the parties and the Court (USAO_SDNY_026410 and USAO_SDNY_026414).

   d. I was also a recipient of the email sent by AUSA Naftalis at approximately 11:59 am on the next day, October 30, 2018 with subject line "Allocution – draft edits" and attaching a word document entitled "Allocution-Approved 1029.doc." (USAO_SDNY_026464). The attachment has been referred to in recent filings with the Court as the "Redline."

14. While I cannot be certain, I do not believe I opened the attachment to either the 4:17 pm email sent by AUSA Naftalis on October 29, 2018, nor the 11:59 am email sent on

4

October 30, 2018 at or near the time they were sent. This belief is based on the fact that I did not send an email commenting on either attachment but also on the fact that I was on trial before the Honorable Paul G. Gardephe from October 22, 2018 through October 29, 2018 in *United States v. Irfan Amanat*, 15 Cr. 536 (PGG). I recall that after the jury returned a verdict of guilty in that case on the morning of October 29, 2018, the case proceeded to a hearing on remand which I handled for the Government. I recall leaving the Office shortly after the hearing concluded and returning to the Office in the afternoon of October 30, 2018.

15. I do not recall that a team meeting between the AUSAs in this matter occurred on the afternoon of October 30, 2018, at 3:00 pm or otherwise. Apart from my participation in the emails as described above, I do not recall participating in any discussions with my colleagues on October 29, 2018 or October 30, 2018 concerning the substance of the allocution proposed by Mr. Majidi's counsel, nor edits thereto.

16. I did not attend Mr. Majidi's plea proceeding on October 31, 2018. I do not recall having any communications with any of my colleagues that day concerning Mr. Majidi's allocution.

## Question 3

17. The third question asks the declarant to identify "the date, time, parties to, and mode of communicating for each of the communications" identified in response to Question 2. My response to Question 2 includes this information.

## Question 4

18. The fourth question asks the declarant to identify "the totality of the prosecutor-declarant's knowledge, as of June 10, 2019, concerning any communications by and among the

5

representatives of the United States Attorney's Office, Mr. Majidi, and/or Mr. Majidi's counsel regarding the substance of Mr. Majidi's plea allocution."

19. As of June 10, 2019, I was aware that Mr. Majidi's counsel had sent a proposed allocution to the Government in advance of Mr. Majidi's October 2018 plea. This was disclosed on the record on June 5, 2019 at Tr. 118-119 by AUSA Nicholas. I recall that this production was triggered by AUSA Nicholas suggesting, on or about June 4, 2019, that the AUSAs should look to see if Mr. Majidi's counsel had sent the Government a draft allocution prior to his plea. AUSA Naftalis located the draft allocution on the morning of June 5, 2019 and it was produced to the parties and disclosed to the Court the same morning.

20. As of June 10, 2019, I did not recall the Redline. At that time, it was my belief that I was not involved in and had no knowledge of communications between the Government and counsel for Mr. Majidi concerning the substance of the draft allocution or changes thereto.

## Question 5

21. The fifth question asks the declarant: "to the extent the prosecutor-declarant answered questions from the Court regarding Mr. Majidi's plea allocution on June 10, 2019, the bases for the answers they provided, any areas as to which they had any uncertainty in their answers to the Court, and any steps taken at any time after June 10, 2019, in order to confirm the accuracy of their representations to the Court."

22. I did not answer questions from the Court regarding Mr. Majidi's plea allocution on June 10, 2019.

## Question 6

23. The sixth question asks the declarant "to the extent the prosecutor-declarant witnessed other members of the prosecution team answer questions from the Court regarding Mr.

Majidi's plea allocution on June 10, 2019, their contemporaneous belief as to the accuracy of their colleague's representations to the Court, the bases for that belief, and any steps taken by the prosecutor-declarant at any time after June 10, 2019, in order to confirm the accuracy of their colleague's representations to the Court."

24.    AUSA Naftalis was questioned by the Court on June 10, 2019 concerning his knowledge of the origins of the differences between the draft allocution Mr. Majidi's counsel provided to the Government and the allocution Mr. Majidi ultimately provided in court. Prior to this colloquy, I do not recall a discussion with AUSA Naftalis concerning the differences between the draft and final Majidi allocutions.

25.    I have reviewed the transcript of the June 10, 2019 colloquy between AUSA Naftalis and the Court on this topic. At page 769 of the trial transcript, beginning at line 2, the Court asked AUSA Naftalis: "Okay. You're telling me, you're representing to me as an officer of the court that in no way did you seek to shape or modify the allocution." AUSA Naftalis responded, beginning at line 5: "Correct. I don't remember exactly what I said, but I would never suggest to a defense lawyer, this is what he should say or not say." The Court then indicated to AUSA Naftalis beginning at line 8: "Both of your co-counsel want to speak with you." I have a distinct recollection of wanting to consult with AUSA Naftalis at this moment and of making a physical gesture to AUSA Naftalis indicating that I would like to speak with him. I recall that AUSA Nicholas was also seeking an opportunity to consult.

26.    I wanted to interrupt the proceeding because I did not think that the answer provided by AUSA Naftalis that he would never suggest information to counsel in the context of a draft cooperator allocution was wholly accurate. To be clear, I did not believe that AUSA Naftalis was intending to provide incorrect information to the Court. I believe that AUSA

7

Naftalis thought he was being asked the question of whether he did anything wrong. I understood the Court to be asking a different question, namely if AUSA Naftalis had a role in the changes between the Majidi draft allocation and the allocation Mr. Majidi ultimately gave in court. Given the differences between the draft and final Majidi allocation, it was my assumption that AUSA Naftalis had provided some input to Mr. Majidi's counsel but that he may not recall the details of his input.

27. After AUSA Nicholas and I signaled a desire to consult with AUSA Naftalis, the Court allowed us to do so. While I do not recall the precise details of this consultation or the words used, I do recall two concepts being discussed. First, I recall that I asked AUSA Naftalis, in substance, whether he actually recalled the specifics of his conversations with counsel for Mr. Majidi, and noting that the plea had occurred more than six months ago. Second, I recall that either I or AUSA Nicholas noted the difference between asking counsel to add something new to a draft allocation and noting for counsel that a draft allocation was inconsistent with statements made by a witness during proffer sessions. I do not recall whether AUSA Naftalis responded and, if so, what he said. It is possible that there was additional discussion during the AUSA consultation.

28. When AUSA Naftalis resumed his colloquy with the Court on page 769 line 10, he stated: "My colleagues are pointing out, by "shape," I mean to do something improper. The direction would be consistent with what the person said in the proffers." This statement is consistent with what I recall being discussed during the AUSA consultation.

29. The colloquy between the Court and AUSA Naftalis then continued. Among other answers, AUSA Naftalis answered "No" to the Court's question (at page 770, lines 1-3) of

8

whether AUSA Naftalis or anyone else in the Government changed the names of anyone in the allocution.

30. I do not remember having the reaction in the moment that this answer by AUSA Naftalis was wrong and needed to be corrected. In hindsight, I believe this is likely because my focus was on AUSA Naftalis clarifying that he may have provided input on the draft allocution rather than particular changes to the allocution. In addition, I knew that the inclusion of Mr. Shor's name was consistent with Mr. Majidi's proffers as Mr. Majidi had inculpated Mr. Shor in both his first proffer with the Government on June 18, 2018, as did his counsel in the attorney proffer four days earlier.

31. I did not take steps after June 10, 2019 to confirm the accuracy of AUSA Naftalis' representations to the Court. As noted above, though I believed that AUSA Naftalis had played a role in suggesting changes to Mr. Majidi's allocution and thus I wanted him to acknowledge this in responding to the Court, I was confident that any changes that originated with AUSA Naftalis were consistent with Mr. Majidi's proffer statements. It also did not occur to me that internal emails might exist that would illuminate the nature of the input AUSA Naftalis provided on the draft allocution.

32. In June 2020, when I first opened the Redline authored by AUSA Naftalis, it was clear to me that certain answers given by AUSA Naftalis on June 10, 2019 were inaccurate and needed to be corrected.

### Additional Question

33. The final question asks the declarant for "an explanation of the steps they took before representing in their June 8, 2019 letter to the Court that they had reviewed all communications with witnesses' attorneys, including steps taken to locate evidence of oral

9

communications; whether they identified any of the undisclosed communications at the time; and, if so, why those communications were not disclosed."

34.     The June 8, 2019 letter (the "June 8 Letter") indicated that the purpose of the search conducted by the Government was to communications with witness' attorneys that might contain materials that should be disclosed pursuant to *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149 (2d Cir. 2008). The Court had made clear that draft allocutions received from counsel for cooperating witnesses should be included. The Government undertook its searches after Court on June 6 and June 7 and on Saturday, June 8. I took the following steps to search my files:

a.     <u>Search of my own emails</u>: My most common mode of communication with counsel for witnesses is via email. In preparation for filing the June 8 Letter, I searched my emails using the web-based email archive system. This system backs up all emails, including deleted ones, for at least three years. I recall that I approached the process witness-by-witness in that I would search for relevant communications with counsel for witness x and finish that process before turning to witness y. I do not recall if I used search terms or sorted the emails by recipient/sender in order to focus on emails sent to/from counsel for witnesses. I believe I used some combination of these approaches. I believe I started with the cooperating witnesses, beginning with Mr. Dinucci and Mr. Dole because the Government was seeking to determine whether counsel for either witness had provided a draft allocution to the Government. Through this process, I identified a number of communications I believed responsive to the Court's inquiry. For example, on June 7, 2019, I identified and subsequently produced a draft allocution

that counsel for Mr. Dinucci sent to the Government.[1] My email searches focused on communications with counsel and not on internal emails.

  b. <u>Efforts to Contact Counsel for Certain Witnesses</u>: In addition to searching my own archive emails for responsive materials, I also reached out to counsel for Mr. Dole. I did this because I was unable to locate a draft allocution for Dole in my emails and decided to ask his attorney if he recalled sending one. On June 8, 2019, counsel for Mr. Dole sent me an email indicating that his team had searched their files and did not find a draft allocution. (SDNY_PPI_00075-78).

  c. <u>Search of Email Archives of Supervisor</u>: I also consulted with my then-supervisor who had handled Mr. Dole's 2017 plea proceeding. The supervisor did not recall receiving a draft allocution from counsel for Mr. Dole. The supervisor recalled providing a hard copy file containing the signed cooperation agreement and Information to AUSA Naftalis. AUSA Naftalis checked this hard copy file and it did not contain a draft allocution. On the afternoon of June 8, 2019, I got on the phone with the supervisor (who was not in the Office) and, with his authorization, searched his email archives which were accessible from his Office Computer. (SDNY_PPI_00075-78). I did not find a draft allocution for Mr. Dole. The supervisor indicated that he also maintained PST files containing emails for each case. I checked the supervisors PST files for this matter as well.

  d. <u>Previously Received Productions</u>: With respect to my search for a draft allocution for Mr. Dole, I also asked a paralegal to double check all of the materials produced to the

---

[1] As the Court is aware, in July 2020, I identified a second draft allocation I received from counsel for Mr. Dinucci labeled "draft allocuation." While I do not specifically recall, it is my belief that when I identified the first draft Dinucci allocution, I stopped searching for a draft allocution as it did not occur to me that counsel may have sent a second one.

11

Government by counsel for Mr. Dole to confirm the productions did not contain a draft allocution. (SDNY_PPI_00060).

  e.  <u>Hard Copy Materials</u>:  It is not my practice to maintain hard copies of communications received or sent to counsel for a witness, with the exception of original plea agreements.  When I receive written correspondence from counsel, I typically scan the correspondence and load it to the shared drive.

  f.  <u>Oral Communications</u>:  I have not as a practice memorialized routine communications with counsel that are ministerial in nature, such as a phone call to arrange a time for a proffer session.  In contrast, where counsel for a witness seeks to provide a proffer concerning what his or her client witness would or might say factually on a topic, I recognize this is discoverable under *Triumph Capital* and it is my practice to memorialize this communication, either in an email note to file or as a handwritten note.  In either case, I then save the note to that witnesses' 3500 folder on the shared drive.

  g.  <u>Shared Drive</u>:  I recall that at least one AUSA member of the trial team searched the shared drive for responsive materials.  I believe it may have been AUSA Nicholas but I am not certain.

  35.  In addition to my recollection, the emails produced by the Government on September 24, 2020 illustrate aspects of the substantial mid-trial search process undertaken by the Government between June 6 and June 8.  For example, on the evening of Friday, June 7, 2019, I sent an email to my colleagues stating: "I'm only 50 percent done with my review (I've done cooperators and immunized witnesses)."  AUSA Naftalis responded: "I looked through Skybridge, Dinucci, Nimberg, Majidi so far."  (SDNY_PPI_00058).  The same email chain reflects that the Government team met at the Office the next morning, Saturday, June 8, 2019,

12

and continued to conduct its review for much of the day before filing its letter. There are other examples in the September 24, 2020 production demonstrating the work the Government undertook to search its files for responsive materials.

36. While I believe I undertook substantial efforts to identify all communications with counsel that might be discoverable under *Triumph Capital*, I recognize that my email searches could and should have been more thorough, and that it would have been best to memorialize the steps I took to conduct them.

February 12, 2021
New York, New York

_____/s/_____
Andrea M. Griswold
Assistant United States Attorney