UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

UNITED STATES OF AMERICA  :

v.  :   Case No.: S1 18 Cr. 328 (KPF)

ANILESH AHUJA, et al.,  :

                Defendants.  :

------------------------------------x

I, Max Nicholas, declare and state as follows:

        1.      I was one of the three Assistant United States Attorneys who handled the trial in *United States v. Anilesh Ahuja, et al.*, S1 18 Cr. 328 (KPF). I respectfully submit this declaration in response to the Court's Order in this case dated January 13, 2021. I address below questions (i) through (vi) on pages 3-4 of the Court's Order and the additional questions on page 3 of the Court's January 20, 2021 memo-endorsement of Mr. Ahuja's letter dated January 19, 2021.

        2.      **Question (i): "Identify the nature and scope of [the prosecutor-declarant's] involvement in any plea discussions with Mr. Majidi or his counsel."**

              a.      I did not participate in any plea discussions with Mr. Majidi or his counsel. To the best of my understanding, at the time I joined the prosecution team Mr. Majidi had already completed the series of proffers with the Government that preceded his entering into a cooperation agreement. I attended Mr. Majidi's plea hearing on October 31, 2018 and met him and his counsel for the first time there. AUSA Naftalis handled the plea hearing for the Government, and it was my understanding that he had led the preceding proffers with Mr. Majidi. I did not participate in any substantive conversations with Mr. Majidi or his counsel at the plea hearing.

        3.      **Questions (ii) and (iii): "Identify [the prosecutor-declarant's] involvement in any communications with their colleagues, Mr. Majidi and/or his counsel regarding the substance of Mr. Majidi's allocution; [and] the date, time, parties to, and mode of communicating for each of these communications."**

              a.      I did not communicate with Mr. Majidi or his counsel regarding the substance of Mr. Majidi's plea allocution. I do not have an independent recollection of discussing the substance of Mr. Majidi's plea allocution with my colleagues. I have since reviewed emails that show we exchanged emails about the allocution.

    b. Specifically, on October 29, 2018 at 4:18 p.m., AUSA Naftalis forwarded to me and AUSA Griswold an email that he had received from Mr. Majidi's counsel which enclosed as an attachment a proposed plea allocution (the "Draft Allocution"). (Dkt. #385-2). On October 29 at 5:32 p.m., I sent a reply-all email to AUSA Naftalis and AUSA Griswold asking if they were free to meet about "this and some other stuff" the next day. (Dkt. #385-3). Several scheduling emails followed. (Dkt. #385-3). Also on October 29 at 9:54 p.m., AUSA Naftalis emailed me and AUSA Griswold expressing his view that the Draft Allocution was "way too detailed" and asked if the three of us should discuss it at our contemplated meeting the next day. (Dkt. #385-4). On October 29 at 9:56 p.m., I sent a reply-all email to AUSA Naftalis and AUSA Griswold in which I stated that I agreed with AUSA Naftalis's view that the Draft Allocution was too detailed, and that I thought the plea allocution should "just hit the elements." (Dkt. #385-4). On October 29 at 9:58 p.m., AUSA Naftalis sent a Microsoft Outlook calendar invite to me and AUSA Griswold for a "PPI Team Meeting" on October 30 at 3:00 p.m. (Dkt. #385-5). I accepted the calendar invite. (Dkt. #385-6).

    c. On October 30, 2018 at 11:59 a.m., AUSA Naftalis sent to me and AUSA Griswold an internal email titled "Allocution - draft edits," with no text in the body of the email. The email attached a Word document with track changes to the Draft Allocution (the "Redline"). (Dkt. #385-8). I have no independent recollection of receiving that email or of reading the Redline or discussing it with my colleagues at that time. To my understanding, the email searches conducted at the U.S. Attorney's Office in June 2020 and July 2020 did not produce any response by either me or AUSA Griswold to AUSA Naftalis's October 30, 2018 email attaching the Redline or any other follow-up emails regarding the Redline.

    d. Although AUSA Naftalis, AUSA Griswold and I had agreed over email to meet on October 30, 2018 at 3:00 p.m., I do not recall that we met that day and I do not recall discussing with AUSA Naftalis or AUSA Griswold the substance of Mr. Majidi's plea allocution or the Redline until at least June 10, 2020.

    e. On June 10, 2020, counsel for Mr. Ahuja contacted the Government to ask a question about the response he had received to a Freedom of Information Act ("FOIA") request that he had made for AUSA Naftalis's emails concerning, and drafts of, plea allocutions for Mr. Majidi. On either June 10, 2020 or June 11, 2020, as part of an internal discussion at the U.S. Attorney's Office prompted by counsel's request, the Redline was re-sent to me for the first time since October 30, 2018. When it was re-sent to me I had no memory of having seen it before. I reviewed the Redline on June 10 or 11, 2020 and participated in internal discussions about it at the U.S. Attorney's Office. On June 19, 2020, the Government filed a letter regarding the Redline.

2

4. **Question (iv): "Identify the totality of the prosecutor-declarant's knowledge, as of June 10, 2019, concerning any communications by and among representatives of the United States Attorney's Office, Mr. Majidi, and/or Mr. Majidi's counsel regarding the substance of Mr. Majidi's plea allocution."**

a. On June 10, 2019, I was aware that Mr. Majidi's counsel had sent AUSA Naftalis the Draft Allocution prior to Mr. Majidi's plea hearing and that the Draft Allocution differed from the allocution that Mr. Majidi ultimately gave, but I did not know the substance of any other plea discussions between Mr. Majidi or his counsel and any members of the U.S. Attorney's Office. The fact that the Draft Allocution differed from the allocution that Mr. Majidi gave in court did not cause me concern, as the allocution Mr. Majidi gave in court was consistent with his proffer statements and covered the elements of the crimes with which he was charged.

5. **Question (v): "To the extent the prosecutor-declarant answered questions from the Court regarding Mr. Majidi's plea allocution on June 10, 2019, [identify] the bases for the answers they provided, any areas as to which they had any uncertainty in their answers to the Court, and any steps taken at any time after June 10, 2019, in order to confirm the accuracy of their representations to the Court."**

a. On June 10, 2019, the Court asked me if I knew how Mr. Majidi's plea allocution came to differ from the Draft Allocution. (Trial Transcript ("Tr.") 763). I did not know, and said so. (Tr. 763). I did not have reason to know how Mr. Majidi's plea allocution came to differ from the Draft Allocution because I had not been involved in any discussions with Mr. Majidi or his counsel regarding his allocution and because, as of June 10, 2019, I had no memory of the October 30, 2018 internal email from AUSA Naftalis attaching the Redline.

6. **Question (vi): "To the extent the prosecutor-declarant witnessed other members of the prosecution team answer questions from the Court regarding Mr. Majidi's plea allocution on June 10, 2019, [identify] their contemporaneous belief as to the accuracy of their colleague's representations to the Court, the bases for that belief, and any steps taken by the prosecutor-declarant at any time after June 10, 2019, in order to confirm the accuracy of their colleague's representations to the Court."**

a. I witnessed AUSA Naftalis answer questions from the Court on June 10, 2019 regarding Mr. Majidi's plea allocution. I have done my best to recall and describe below my contemporaneous thoughts during his colloquy with the Court.

b. At the beginning of the colloquy, AUSA Naftalis represented that he did not have a specific memory of his conversation with Mr. Majidi's counsel about Mr. Majidi's allocution. (Tr. 765). When asked if he recalled the substance of his communication with Mr. Majidi's counsel about Mr. Majidi's allocution, he first answered, "I don't recall the substance – I don't recall the specifics." (Tr. 767).

3

    c. I do not have an independent recollection of those statements, but it would not have surprised me that AUSA Naftalis could not recall a conversation with a cooperating witness's attorney that he had had more than seven months earlier.

    d. AUSA Naftalis then stated: "The substance was, which is what I say to all defense lawyers, which is, you've given us an allocution; we're only asking you to allocute to the elements and what's in the information, and that – to be clear, I don't think there's any great change in these allocutions, which is they allocate to the crime, and what they allocate to is consistent with what they told us, and what they propose in their proposed allocutions is also consistent to what they told us, meaning it's in our notes. Both of them are in our notes. We just typically say, you're a cooperator, you're going to be under oath, allocute to the elements, you're not testifying to the judge, this isn't your opportunity to blame others or, you know, this isn't your sentencing proceeding, for example. It's just allocute. Again, I don't think there's anything improper about that, and it's typical, as your Honor knows, in plea allocutions with cooperators, that they're very basic, same for regular defendants, which is, just hit the elements. And that's my recollection. That's my general advice to lawyers. I certainly do not tell people what to say." (Tr. 768).

    e. While I do not have an independent recollection of those statements, I can say that I was not familiar with AUSA Naftalis's general practice and would have had no reason to doubt that he was describing it accurately. I do remember becoming concerned during AUSA Naftalis's colloquy with the Court that he was conflating a description of his general practice with an account of his specific conversation with Mr. Majidi's counsel in this case, which I understood would have taken place more than seven months earlier. As discussed below, I sought to address my concern during a brief conference among the members of the trial team, and I believed that by the end of the colloquy my concern had been alleviated.

    f. The Court also asked AUSA Naftalis if he would have cared if Mr. Majidi had read the Draft Allocution into the record, and AUSA Naftalis said that he would not have. (Tr. 768-69). I understood AUSA Naftalis to mean that he would not have been bothered if Mr. Majidi had recited the Draft Allocution in court rather than giving the allocution that he actually gave in court. I had no reason to doubt the accuracy of that statement, as I understood that the Draft Allocution, although verbose, covered the elements of the charged crimes and was consistent with Mr. Majidi's proffer statements.

    g. The Court then asked: "You're telling me, you're representing to me as an officer of the court that in no way did you seek to shape or modify the allocution," and AUSA Naftalis answered, "Correct. I don't remember exactly what I said, but I would never suggest to a defense lawyer, this is what he should say or not say." (Tr. 769).

    h. I thought that answer was potentially mistaken. My belief was based on common sense rather than on any knowledge of any conversation between

4

AUSA Naftalis and Mr. Majidi or his counsel. AUSA Naftalis had already acknowledged during the colloquy that he had had a conversation with Mr. Majidi's counsel prior to Mr. Majidi's plea proceeding (Tr. 766-67), and I inferred that a purpose of that conversation might have been to discuss what the allocution should say. Moreover, the allocution Mr. Majidi gave in court differed from the Draft Allocution, and it made sense that at least some of the changes would have been discussed when AUSA Naftalis spoke with Mr. Majidi's counsel before the plea hearing.

      i.     In order to address my concerns, I gestured to AUSA Naftalis that I wanted to confer with him. I saw that AUSA Griswold was doing the same thing. The Court saw that we were doing this and granted the three of us time to confer, which we did briefly at counsel table. (Tr. 769 ("Both of your co-counsel want to speak with you.")). In substance, I recall making the following points to AUSA Naftalis during this conference: (a) if you do not remember your whole conversation with Mr. Majidi's counsel because it was a long time ago, then in describing that conversation you should not commit to anything you are not absolutely sure of; and (b) you likely cannot be absolutely sure that you made no suggestion at all to Mr. Majidi's counsel about his allocution, and if what you meant to say was that you made no suggestion that was *improper*, that is a different point and you should make that clarification. I recall that AUSA Griswold either indicated her agreement with those points or made similar ones.

      j.     Immediately after this conference, AUSA Naftalis clarified his prior answer as follows: "My colleagues are pointing out, by 'shape,' I mean to do something improper. The direction would be consistent with what the person said in the proffers." (Tr. 769). That statement alleviated any concerns that I had about what AUSA Naftalis had said thus far. I understood AUSA Naftalis to be clarifying that although he did not have a recollection of doing so, it was possible that he had given Mr. Majidi's counsel "direction" on the plea allocution beyond "hit the elements," but that to the extent he had done so, the direction would have been consistent with what Mr. Majidi said in his proffers. I had no reason to doubt that this statement was accurate, and indeed based on my own familiarity with Mr. Majidi's proffer statements I knew that they were consistent with his plea allocution. Moreover, I did not believe it would have been improper for AUSA Naftalis to give direction to a cooperator's attorney regarding a proposed allocution provided that it was consistent with the cooperator's own proffered statements.

      k.     Accordingly, at that point I did not have outstanding concerns about the accuracy of AUSA Naftalis's representations to the Court. In light of AUSA Naftalis's clarification that "[t]he direction would be consistent with what the person said in the proffers," I no longer had a concern that AUSA Naftalis was leaving an impression that he specifically recalled advising Mr. Majidi's counsel to just hit the elements.

      l.     After the clarification described above, the Court asked AUSA Naftalis: "Did you, or did anyone from the government, ask Mr. Majidi's counsel to change the names of anyone in the allocution?" AUSA Naftalis answered, "No." The Court asked, "[d]id you ask him to change the date?" AUSA Naftalis answered, "Not

5

that I can – I don't even recall." He later amplified this response as follows: "Just to be clear, [Shor's] name was in the information, so this isn't like – this isn't new to anybody. I don't recall saying, make sure you allocute to – you didn't include Shor in the first draft, put him in when you do it in court. I don't recall that." (Tr. 770-71).

    m. I had no reason to doubt AUSA Naftalis's representations. We had just concluded a conference during which I had stressed to AUSA Naftalis that it was critical to commit to only those facts that he was absolutely sure of, and he had responded to this advice immediately by clarifying an earlier answer. This showed to me that he had registered and agreed with the advice, and I had no reason to believe that he would then make a representation of which he was uncertain. Moreover, it was not surprising to me that Mr. Majidi would name Mr. Shor in his plea allocution, and I did not believe that Mr. Majidi's or his counsel's decision to include Mr. Shor's name in the plea allocution meant that AUSA Naftalis must have prompted the inclusion. Mr. Majidi and Mr. Shor worked extremely closely together in carrying out the charged mismarking scheme and their offense conduct was largely integrated. I knew based on my review of Mr. Majidi's proffer notes that he frequently mentioned Mr. Shor in describing his own (Mr. Majidi's) offense conduct.

    n. I did not take steps to confirm the accuracy of my colleague's responses after leaving the courtroom on June 10, 2019, as I did not have any outstanding concerns about the accuracy of AUSA Naftalis's representations to the Court. I had also already searched my own emails for conversations with counsel for cooperating witnesses in the course of preparing the Government's June 8, 2019 letter to the Court (discussed below) and understood that AUSA Naftalis had done the same with respect to his emails with counsel. I was not aware of anything from those searches that contradicted the statements made in court.

   7. **Additional Questions: "Include ... an explanation of the steps [the prosecutor-declarant] took before representing in their June 8, 2019 letter to the Court that they had reviewed all communications with witnesses' attorneys, including steps taken to locate evidence of oral communications; whether they identified any of the undisclosed communications at the time; and, if so, why those communications were not disclosed."**

    a. Prior to the Government's filing of its June 8, 2019 letter (Dkt. #209), I searched my email inbox and outbox, including archived emails, for emails that I sent to or received from attorneys representing witnesses in the Premium Point investigation. I also checked my office for any handwritten notes of conversations with attorneys representing witnesses in the investigation. I do not recall identifying any of the communications referred to in Mr. Ahuja's January 19, 2021 letter as the undisclosed communications.

6

\*   \*   \*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on February 12, 2021 in New York, New York.

By: _____
Max Nicholas