UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ANILESH AHUJA, a/k/a "Neil," and
JEREMY SHOR,

Defendants.

No. S1 18 Cr. 328 (KPF)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION FOR DISMISSAL OF THE INDICTMENT OR FOR A NEW TRIAL

WEDDLE LAW PLLC
Justin S. Weddle
Julia I. Catania
250 West 55th Street, Floor 30
New York, New York 11226
T: 212-997-5518

*Attorneys for Jeremy Shor*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Roberto Finzi
Richard C. Tarlowe
1285 Avenue of the Americas
New York, New York 10019-6064
T: 212-373-3000

KIRKLAND & ELLIS LLP
John P. Del Monaco
601 Lexington Avenue
New York, New York 10022
T: 212-446-4800

*Attorneys for Anilesh Ahuja*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................2

I.    STATEMENT OF FACTS ................................................................5

    A.    Defense Efforts to Secure Pretrial Disclosure of Government
Communications with Counsel for Cooperating Witnesses ........................5

    B.    Defense Trial Subpoenas Reveal Additional Undisclosed Communications
with Counsel for Cooperating Witnesses ..................................................14

    C.    The Defendants' Mid-Trial Motion to Dismiss the Indictment .....................19

    D.    The Government's Additional Search for Communications with Witnesses'
Counsel ....................................................................................................20

    E.    The Defendants' Motions Regarding the Draft Allocutions ...........................21

    F.    The Inability to Introduce Evidence About the Changes to the Cooperators'
Allocutions Was Particularly Significant in this Case................................28

    G.    Mr. Ahuja's Post-Trial FOIA Request Reveals More Undisclosed
Communications ......................................................................................31

    H.    The Current Record Regarding the Cooperators' Allocutions......................33

II.    APPLICABLE LEGAL STANDARDS ..................................................43

    A.    Federal Rule of Criminal Procedure 33..........................................................43

    B.    The Government's *Brady* Obligations ...........................................................44

    C.    Dismissal of the Indictment...........................................................................46

III.  ARGUMENT ....................................................................................49

    A.    At Minimum, the Court Should Vacate the Convictions and Order a New
Trial Based on the Suppressed Evidence Concerning the Allocutions....................49

    B.    The Government's Repeated Disclosure Failures and Misrepresentations to
the Court Warrant Dismissal of the Indictment or, at Least, a New Trial.................70

CONCLUSION..................................................................................................89

**PRELIMINARY STATEMENT**

The circumstances that have led to the filing of this motion are extraordinary.  It has taken Rule 17(c) subpoenas and a post-trial FOIA request to unearth documents that were in the prosecutors' possession and indisputably should have been disclosed to the defense before trial.  Those documents, which never would have seen the light of day if the defendants had not resorted to these extraordinary forms of "self-help," demonstrate beyond any reasonable dispute that the government:  failed to disclose *Brady* and *Giglio* material before, during, and after trial; provided assurances to the Court that it had conducted specific searches of its communications when in fact the government either did not conduct those searches or was careless in doing so; and made representations, in response to questions from the Court (and on which the Court expressly relied) that were both incomplete and incorrect.  If the prosecutors had conducted even the slightest inquiry to confirm the accuracy of those representations, it would have been apparent to them that those representations were not accurate.  Even if unintentional and lacking in bad faith, the government's reckless indifference to the defendants' rights prejudiced the defendants and warrants dismissal of the Indictment or, at a minimum, a new trial.

The circumstances surrounding the allocution of Amin Majidi provide a stark example.  As a result of the government's failure to memorialize and disclose information they now acknowledge should have been produced, the jury did not see and hear evidence that a cooperating witness, when asked by the Court at his plea what he had done that made him guilty of the offenses he was pleading guilty to, read nearly word-for-word from a statement that was prepared by a prosecutor and handed to him only minutes earlier.  The jury did not see evidence that the version of the allocution the cooperator testified to on that day was significantly different from the allocution "approved" by the

cooperator and sent to the government by his counsel two days earlier, and that those differences served to conform the allocution to key aspects of the government's narrative.

Beyond showing that the witnesses were malleable, the withheld evidence about the government's role in shaping the allocutions would have allowed the defense to argue to the jury that the government had curated the cooperators' version of the facts to match the government's theory of the case. This concrete example of the government's shaping of a witness's statement under oath—in conjunction with its efforts to similarly tailor other allocutions—would have provided powerful documentary evidence on which to base an argument that, on critical subjects, the cooperators' testimony had shifted over time to more closely fit the government's narrative—even where that narrative was contradicted by other evidence.

When the issue arose during trial, the government was adamant that it had not—and never would—do more than suggest that the cooperator "hit the elements" or correct factual errors in a proposed allocution. But once it became clear, one year after trial, that the government had in fact rewritten the allocution from scratch, the government tried to defend its actions by arguing that there was nothing improper about the role it played in shaping (and, at least one case, writing) the allocutions of its cooperating witnesses. But the government's focus on whether the conduct was proper misses the point. It was the government's failure to *disclose* its conduct—and the evidence demonstrating it—that prejudiced the defendants by denying them the opportunity to present evidence and make important arguments to the jury that would have cast doubt on important aspects of the government's case, which relied heavily on its cooperating and

3

immunized witnesses.  As a result, and whether under Rule 33 or *Brady* (or both), the government's failure to disclose the allocution-related evidence warrants a new trial.

The government's failure to memorialize and disclose the circumstances surrounding Majidi's plea allocution and cooperator allocutions more generally was emblematic of a far broader issue that affected this case.  Since discovery began, the defense expressed concern that the government repeatedly either misunderstood or did not pay sufficient attention to its disclosure obligations, and did not implement measures to adequately memorialize, maintain, and turn over information that the defendants are entitled to under the Constitution.  Time and again the government assured the Court and the defense that it understood and complied with its discovery obligations, and time and again those assurances were proven wrong.  It is now clear that the government disregarded its own policies and failed to implement any process to reasonably ensure that it satisfied its disclosure obligations.  And although the government at times claimed otherwise, the reality is that these issues came to the fore only because of the defendants' Rule 17 subpoenas and post-trial FOIA requests.  Constitutionally mandated disclosures should not have to be pried out of the government by the defense, but over and over that is exactly what happened here.

The central issue presented in this motion is not the appropriateness of the government's conduct at trial and whether the government acted in good faith when it made untrue representations to the Court.  The central issue, rather, is that the government's deficiencies in identifying, locating, memorializing, and producing *Brady* and *Giglio* material, and in ensuring that information it provided to the Court was accurate, interfered

with the defendants' right to a fair trial and warrant dismissal of the Indictment or, at least, a new trial.

## I.     STATEMENT OF FACTS

### A.     Defense Efforts to Secure Pretrial Disclosure of Government Communications with Counsel for Cooperating Witnesses

From nearly the start of this case, the defense raised concerns about the government's understanding of and compliance with its disclosure obligations as they related to communications with counsel for cooperating witnesses, and made repeated requests that the government memorialize and disclose communications (written or oral) with counsel for government witnesses. Those requests (and the corresponding reviews conducted by the government) should have captured the communications that we now know were not disclosed until—and in some cases after—trial. The specific emphasis on communications with counsel for government witnesses at around the same time that the Majidi plea took place—including both shortly before and shortly after—provide important context for the government's failure to record or disclose those communications.

#### 1.     *The Defense Identifies Specific Categories of* Brady

Beginning shortly after indictment, the defendants sent detailed discovery requests which specifically referenced *Brady* obligations and emphasized that "[f]or purposes of the *Brady* doctrine, the format of the information does not determine whether it is discoverable," and that the government should "memorialize[]" "all such information." May 29, 2018 Shor Ltr. at 10, ECF 52-6 (internal quotation marks omitted).

When making its initial Rule 16 production on June 12, 2018, the government reported that it was "unaware of any *Brady* material." June 12, 2018 Gov't Ltr. at 1, ECF 56-9. The defendants questioned that representation, knowing that the

government had spoken to dozens of witnesses during its multi-year investigation and had received (and at that point not disclosed) pre-indictment presentations from counsel.

Mr. Shor advised the government, for example, that there was "undeniably substantial evidence" in the government's possession that supported Mr. Shor's defenses and requested that the government conduct a "reasonable investigation of materials within its actual or constructive possession" to discover and disclose exculpatory materials consistent with *Brady* and *Giglio*. June 26, 2018 Shor Ltr. at 1–2, ECF 52-8. The letter from Mr. Shor's counsel specifically referred to "witness statements—either by witnesses or counsel speaking as agents for witnesses." *Id.* at 2.

Shortly thereafter, at the pretrial conference on July 25, 2018, counsel for Mr. Ahuja echoed these concerns and expressed skepticism about the government's claim that it was aware of no *Brady* material. July 25, 2018 Conference Tr. 8:17-21, ECF 39. In response, the government replied that it was "actually surprised to hear that" the defense "believe[s] there is *Brady*," as the government did "not believe there is any." *Id.* at 15:16-20. The government suggested that the defense was simply attempting to "creat[e] a false record." *Id.* at 16:9-10.

A few weeks later, on August 15, 2018, Mr. Ahuja sent a letter to the government identifying specific categories of information that would fall within the government's *Brady* obligations. *See* Aug. 15, 2018 Ahuja Ltr., ECF 56-11. Mr. Ahuja's letter also sought to confirm "two aspects of the government's disclosure obligations": First, that "exculpatory or impeachment material must be disclosed to the defense even if it was never memorialized." Second, that "the government's disclosure obligations extend

to exculpatory or impeachment information communicated to the government by *counsel for a potential witness.*"  *Id.* at 1–2 (emphasis in original).

When the government did not respond, the defense followed up, on August 30, 2018, and September 27, 2018.  *See* Aug.–Sept. 2018 Emails at 2, 6, ECF 56-13.  The government indicated that it would respond "in due course" or by mid-October.  *Id.* at 1, 4.  In addition, each defense counsel participated in a conference call with the prosecution to discuss the materials that would fall within the prosecution's *Brady* obligations.  The call with Mr. Shor's counsel occurred on July 11, 2018, and the call with Mr. Ahuja's counsel occurred on October 1, 2018.  *Id.*; Nov. 5, 2018 Gov't Ltr. at 2, ECF 52-14.  In the July 11 call, Mr. Shor's counsel specifically reminded the prosecutors that statements by witnesses' lawyers can be *Brady* material, and that exculpatory information must be disclosed even if it is not written down or if the prosecution team does not believe it.  As part of their October 1 call, Mr. Ahuja's counsel referred to their August 15, 2018 letter, which set out the categories of information Mr. Ahuja believed constituted *Brady*.

Less than a month later, on October 31, 2018, Majidi pled guilty.  Despite the near-contemporaneous and very specific discussions of the government's obligation to memorialize, preserve, and disclose substantive communications it had with counsel for witnesses, the government did not memorialize and disclose its communications with Majidi's lawyer in the days leading up to and on the day of that plea, including its rewritten allocution, and those communications came to light only after defense subpoenas and, ultimately, a FOIA request, at a time when the participants in those conversations could not recall the substance of what was discussed.

The government first responded to the defense's pretrial *Brady* requests on November 5, 2018.   The disclosure included excerpts of statements made to the government by 14 potential witnesses, nearly all of which predated the May 2018 indictment and some of which dated as far back as October 2016, and therefore had been in the government's hands at the time of their earlier statements about the non-existence of *Brady* material.   Nov. 5, 2018 Gov't Ltr., ECF 52-14.   Apparently recognizing the importance of what would become a disputed issue at trial concerning the timing of the purported mismarking, the disclosure included a reference to notes of a July 10, 2018 meeting indicating that Majidi told the prosecution that he did not believe the "push" for higher marks in the hedge fund was "material in Q1 and Q2 2015" and that "[t]he push became a problem in Q2 2015."   *Id.* at 7.   The November 5 disclosures included no reference to any of the communications with Majidi's counsel about the plea allocution (or edits to the allocution itself) that had taken place within the prior week.   Nor did they disclose anything about the government's role in revising Majidi's allocution.

2.     *Defense Motions to Compel Pretrial Disclosures*

On November 9, 2018, as part of their pretrial motions, each defendant moved to compel *Brady* disclosures, specifically noting that the government's recent disclosures were late, incomplete, and made after the government's representations that there was no *Brady* material to disclose.   *See* Shor Pretrial Mot. at 2, 18–21, ECF 53; Ahuja Pretrial Mot. at 2, 21–28, ECF 55.

Because the government's disclosure did not include any statements made by *counsel* for any witness, both defendants reiterated that "*Brady* obligations are broad enough to include exculpatory and impeachment information that might be found in communications from a witness's counsel to the USAO."   ECF 55 at 22 (internal quotation

8

marks omitted).   Counsel again emphasized that the government's *Brady* obligations extended to information that was "not memorialized" in "tangible form."   *Id.* (internal quotation marks omitted).   Counsel also specifically noted that Majidi, who had pled guilty just before the motions were filed, was now a cooperating witness, and that his counsel had made presentations to the government asking that he not be charged; thus, it was difficult to understand how the government could conclude that nothing in those presentations was inconsistent with Majidi's guilty plea and anticipated trial testimony.   Ahuja Reply Mem. at 13, ECF 69.

In response to the defendants' motions, the government argued that no relief was necessary because "the Government has represented that it understands and is in compliance with its disclosure obligations."   Gov't Mem. of Law in Opp. to Pretrial Mots. at 10, ECF 65.   The government explained that its November 5, 2018 disclosures—which included statements going back to 2016 but no communications related to Majidi's allocution less than a week earlier—were "a product of the Government's thorough review of its file," and "plainly reflect[ed] the Government's appreciation of its disclosure obligations."   *Id.*   Explaining its delay in producing the November 5 disclosures, the government emphasized that it "simply took the Government time to review its file with care in an effort to produce a thorough disclosure."   *Id.* at 11.   The government also confirmed that it understood that "un-memorialized statements and statements by counsel for a witness" can qualify as *Brady* material, and stated that "to the extent it becomes aware of *Brady* material taking one of these forms in this case, it will produce that material."   *Id.* at 13 n.5.

9

On January 17, 2019, the Court held a conference addressing the defendants' pretrial motions. Two days before the hearing, the government made additional disclosures, including pre-indictment witness statements from as far back as 2017. January 17, 2019 Conference Tr. 47:2-10, ECF 79. At the January 17 hearing, the defense detailed their numerous requests for *Brady* materials over the prior seven months and argued that the government's recent disclosures had occurred only because "we press and press and we specifically identify a piece of information," and then "it is sometimes disclosed, but we don't know what else is out there." *Id.* at 44:3-5. The government assured the Court and defense that it had "reviewed the entire file in the case" a "number of times thoughtfully," and was not aware of any material that should be disclosed. *Id.* at 61:6–62:23. The government also confirmed that it "completely underst[ood], obviously, that oral *Brady* is the same as written *Brady*," and information was "still *Brady*" even "if something comes from counsel as opposed to the individual's mouth." *Id.* at 64:10-18.

The Court expressed concern about the government's late disclosures, even accepting that the reason for the delay was based on the government's "very thorough review of the file." *Id.* at 60:10-12. The Court also asked the government if it had produced all statements by attorneys for witnesses that "might be [broadly] considered exculpatory," to which the government said "yes," with the potential exception of notes from other attendees of an April 2018 pre-indictment presentation by Majidi. (The prosecution team said that it had checked its own notes of that meeting and had not identified anything warranting disclosure.) *Id.* at 76:7–77:6. The Court directed the government to review the other attendees' notes, as well as the categories of *Brady* material listed by counsel, and suggested that the government "speak with defense counsel and say something more

specific than: We know our *Brady* obligations." *Id.* at 66:14–67:13, 84:17–85:2.  Beyond these instructions, and based on the government's representations and assurances, the Court otherwise denied the defense motions.

    3.    *The Defense Request that the Government Submit Notes of Its Communications with Counsel for* In Camera *Review*

In late January and early February 2019, the government made additional disclosures arising out of the Court's instructions at the hearing.  These disclosures included statements made in the course of its investigation dating back to 2016 and statements by counsel for Majidi at an April 2018 pre-indictment presentation to the U.S. Attorney's Office.  These statements by Majidi's counsel, apparently contained in the notes of an attendee of the meeting who was not a member of the prosecution team, included the statements that Majidi had no knowledge of a corrupt relationship with the broker Frank Dinucci; that it would have been "reasonable to believe that Shor's marking was [at] fair value"; and that PPI's Valuation Committee provided "transparency" to pricing and the pricing was examined by outside auditors.  Jan. 30, 2019 Gov't Ltr. at 5–6, ECF 92-1.  These statements, which squarely contradicted core allegations in the Indictment, apparently did not appear in the notes of prosecution team members who had attended the same meeting.

    In response, on March 5, 2019, Mr. Ahuja filed a letter requesting, among other things, that the Court order an *in camera* review of the government's notes of communications with counsel for government witnesses.  Mar. 5, 2019 Ahuja Ltr. at 2–5, ECF 92.  Counsel expressed concern in particular that the statements from Majidi's April 2018 presentation had not been produced until January 30, 2019, notwithstanding repeated requests:

It appears that the delay resulted from the fact that the prosecutor's notes did not
include these statements (or any *Brady* from that meeting) and that no other
government notes were even checked until after the January 17[, 2019] conference.
***The disclosure therefore raises troubling questions about the extent to which the
government has been memorializing and disclosing Brady (including
impeachment information) provided verbally.***

*Id.* at 4 (emphasis added).  The government opposed the defense request, stating that it had

"re-review[ed] its case file" and "its notes of conversations with counsel for all potential

Government witnesses, and is in compliance with its disclosure obligations as to those

conversations."  Mar. 8, 2019 Gov't Ltr. at 4, ECF 94.  The government went on to say that

"Mr. Ahuja has no basis to accuse the Government of hiding the ball with respect to *Brady*

material in conversations with counsel," claiming that Mr. Ahuja's request was an effort to

"penaliz[e]" the government for "meeting its obligations."  *Id.* at 5.

During a telephone conference on March 11, 2019, the Court stated that it

would be "surprised and dismayed" were it to see another "expansive" *Brady* disclosure,

noting that it was the Court's "expectation and understanding that all that was supposed to

be done has now been done, and that to the extent there is additional *Brady* information

that is being disclosed, it is being disclosed because it has only just arisen as a result of

witness prep."  Mar. 11, 2019 Tr. at 6:16-22, ECF 99.  Again relying on the government's

representations, the Court denied Mr. Ahuja's request for *in camera* review.  *Id.* at 7:5-6.

4.    *Defense Efforts to Obtain Government Communications with
      Counsel for Cooperators Missing from the Government's
      3500/*Giglio *Productions*

After reviewing the government's initial 3500/*Giglio* productions in April

2019, the defense remained concerned that the government's disclosures were incomplete,

and followed up with the government to inquire about the existence of certain specific

material.  Noting evidence of oral discussions between the government and counsel for

witnesses, the substance of which had not been produced, Mr. Ahuja again requested that the government confirm it had "provided copies of all notes or other summaries of conversations with counsel for any government witness and that, to the extent no notes or summaries exist, that you have disclosed any *Brady* or *Giglio* from such conversations." Apr. 29, 2019 Ahuja Ltr. at 2–3, Ex. A.

Mr. Ahuja further observed that, other than a small number of letters or emails, the 3500 material did not appear to "include email communications or other written correspondence between the government and witnesses or their counsel," and asked the government to either confirm that no such communications occurred or locate and produce them. *Id.* at 3. The government responded one week later, simply stating "[w]e understand our disclosure obligations with respect to conversations with counsel for Government witnesses and are complying with them." May 6, 2019 Gov't Ltr. at 2, Ex. B.

That same day, the defense wrote to the Court explaining that it had identified "specific categories of information that appeared to be missing from the [government's 3500] production," including "specific meetings and conversations with counsel for certain witnesses for which no notes or other 3500 was produced." May 6, 2019 Ahuja Ltr. at 1–2, ECF 319-2. The government replied that it "has complied with its obligations under *Brady* and *Giglio*, including with respect to conversations with counsel." May 13, 2019 Gov't Ltr. at 2, ECF 158.

On May 15, 2019, again relying on the government's representations, the Court issued an order stating that it would not order the government to provide supplemental disclosures "at this time." May 15, 2019 Order at 1, ECF 163.

**B.      Defense    Trial    Subpoenas    Reveal    Additional    Undisclosed Communications with Counsel for Cooperating Witnesses**

In the weeks leading up to trial, and as a result of its growing concern over the government's belated and incomplete disclosures, the defense served a series of Rule 17(c) subpoenas on the government's cooperating witnesses and their counsel requesting written communications between the cooperating witnesses and their counsel on the one hand and the government on the other hand.  Notwithstanding all of the prior defense requests, and repeated assurances from the government, regarding communications with counsel for witnesses, these Rule 17(c) subpoenas resulted in the discovery of previously undisclosed, substantive communications between the government and counsel for cooperating witnesses.

On May 30, 2019—with trial scheduled to begin four days later—the government produced a letter dated April 18, 2018, that contained written responses from Majidi's counsel to questions raised by the government at their pre-indictment presentation ("April 2018 Majidi Letter").  Ex. C.  The letter stated, among other things, that Majidi believed some investors knew about the use of "sector spreads" and an "imputed mid" in pricing PPI's securities.  *Id.* at 2.  That assertion alone was significant because it contradicted the government's theory that these methods of valuing securities were hidden from investors, and was directly relevant to the defendants' alleged intent to defraud investors.

The defense wrote to the Court that same day, noting that "[f]or nearly a year, we have asked the government for information relating to the pre-indictment presentation made by Mr. Majidi's counsel on his behalf; and for nearly a year, we were told that the government understood its *Brady/Giglio* obligations and was complying with

them."  May 30, 2019 Ahuja Ltr. at 2, ECF 319-4.  The defense further noted that "it appear[ed] clear that this material was produced to us by the government not because they (belatedly) discovered it on their own, but because they were told about it by Mr. Majidi's lawyers" in response to the Rule 17(c) subpoena the defense had issued to Majidi's counsel. *Id.*

When trial began on June 3, the government acknowledged that it had recalled the existence of the letter only because Majidi's counsel had recently raised it with them in anticipation of responding to the defense's Rule 17 subpoenas.  Trial Tr. 13:21–14:4.  The government attributed its failure to locate the document on its own to a filing error.  The Court was "not exactly satisfied with the explanation that this was a filing error." *Id.* at 10:22-23.  The government repeated that it took its obligations seriously (*id.* at 11:8), and denied knowledge of any other *Brady/Giglio* information.  *See id.* at 11:15-23.

The government also assured the Court that, over the weekend prior to trial, it "went through and looked at all the files" again to determine whether there were "other possible files here that, when we went back and did our *Brady* and *Giglio* review . . .[,] that they may have somehow substantive material in them, and we had satisfied ourselves that there aren't any other files."  *Id.* at 13:4-10.  Significantly, in light of events to follow, the government confirmed in particular that it had again reviewed its correspondence and notes of conversations with counsel for the cooperating witnesses and alleged co-conspirators. *Id.* at 24:11–25:3.

The weekend before trial, in response to a separate Rule 17(c) subpoena, Gregory Kehoe, counsel for Ashish Dole, indicated to the defense that he had email discussions with the government relating to Dole's plea that the government had not

15

produced. *Id.* at 25:10-19. The defense raised the issue with the Court, and the government explained that Mr. Kehoe had reached out about producing the email chain in question in response to the subpoena, that it did not object to its production, and that, at the Court's direction, it would provide it to the defense. *Id.* at 26:19–27:17. The chain included an email from Mr. Kehoe to the government in 2017 providing redlined edits to the government's proposed cooperation agreement and Information. Dole000249–74, Ex. D. On the first two days of trial, also in response to the Rule 17(c) subpoena, Mr. Kehoe produced additional new communications, including emails with the government concerning a request for immunity on behalf of Dole. *See* Dole000140–42, Ex. D.

In the redlined edits proposed on behalf of Dole, Mr. Kehoe (who had been present for Dole's proffers with the government) inserted a comment asking, "How did you come up with this number," in reference to the allegation in the draft Information that PPI's net asset value (NAV) was inflated by more than $100 million. Dole000264. In response, the government deleted the $100 million figure from Dole's Information, and the version to which he pled guilty contained no such reference. Information, *United States* v. *Dole*, 17 Cr. 698 (Nov. 13, 2017), ECF 6. The Indictment later filed against Mr. Ahuja and Mr. Shor, however, included that figure, and the government elicited it from Dole during his trial testimony and specifically relied upon it in its arguments to the jury.[1]

---

[1]     Dole testified that he allegedly told Mr. Ahuja that Mr. Shor's bonds were "mismarked by over $100 million"—the same figure he had apparently previously questioned through counsel. Trial Tr. 442:22–24. The government relied on this $100 million figure in both its opening and closing statements. *See id.* at 143:16-18; *see also id.* at 4701:14-17, 4703:11-14, 4705:15-17. As the defense showed at trial, Mr. Kehoe questioned the figure for good reason: Dole's analysis purportedly supporting this figure itself listed a number of third-party quotes from independent brokers that were significantly higher than Dole's subjective valuations, sometimes by over 500 percent. *See* GX 1579-A. The Court struck the $100 million figure from the defendants' PSRs, in part because it was "not so sure" about the figure (and because the figure conflated restatement amounts with loss amounts). Shor Sentencing Tr. 112:17-20.

Upon learning of Dole's proposed edits through the Rule 17(c) subpoena, the defense expressed "serious concern about the government's interpretation of its discovery obligations and disclosure obligations," given that "the government looked at that communication and felt it was not subject to a disclosure obligation." Trial Tr. 90:23–91:12.  In response, the government claimed that the correspondence reflecting the edits "wasn't [Dole']s statement," and thus did not need to be turned over. *Id.* at 108:1-10.  The government also stated that the proposed changes to the Information were "fully rejected," when in fact the government had removed the $100 million figure. *Id.*  And the prosecutors reiterated their concern that "the [defense's] accusations [were] making a false record as to everything we do." *Id.* at 108:17-18.

Mr. Kehoe's production also contained an email with the government in which the government, responding to Mr. Kehoe's request that he be allowed to submit a memorandum supporting Dole's request for immunity, asked Mr. Kehoe "[c]an we talk briefly about this tomorrow or Friday before you send us anything—we want to be mindful of *Triumph Capital* issues.  Let us know some times when you are available for a brief call." Dole000140.  Defending the email in court, the government stated that it was "being very careful," and "making sure" that Mr. Kehoe understood that "if he put something in writing about Mr. Dole, that we would consider our disclosure obligations to attach to it."[2] Trial Tr. 122:13–123:2.

On June 5, 2019, two days after jury selection began, the government gave the defense an email received from Majidi's counsel, Seth Rosenberg, on October 29, 2018,

---

[2]     The government's cautioning of Mr. Kehoe of the government's obligation under *Triumph Capital* to disclose statements by a witness's attorney contradicts the government's contention *after* receiving the redlined edits and comments from Mr. Kehoe on the draft Information and cooperation agreement that it had no obligation to disclose those because they were not Dole's statements.

two days prior to Majidi's guilty plea, and attaching a document entitled "Allocution –
Approved 1029."  ECF 385-2.  The document was a proposed allocution that differed in
certain important respects from the allocution that Majidi delivered in Court.  Among other
things, the allocution highlighted the "second half of 2015" as the period in which PPI
marks were supposedly inflated; referenced mismarking in a single specific "fund"; stated
that Majidi applied "pressure" on his traders to meet targets; and did not mention Mr. Shor
at all.  *Id.*  In contrast, the allocution that Majidi delivered in Court did not reference 2015
(much less the second half of that year); referred to fraudulently inflated NAVs at the
"funds" (plural) managed by PPI; contained no reference to Majidi applying "pressure" on
traders; and specifically referenced Mr. Shor's alleged involvement in the charged offense.
Tr. 31:15–32:10, ECF 61.  All of these changes were consistent with the government's
theory of the case, whereas the proposed allocution sent by Majidi's counsel aligned with
the defense theories in important respects.

   The email attaching the proposed allocution was produced by the
government only after the defense had subpoenaed Majidi's counsel for communications
with the government, and when the government knew that counsel's production in response
to that subpoena was imminent. The prosecution denied, however, that the Rule 17
subpoena prompted the government to disclose the document:  "[T]hat's not how that got
disclosed.  In fact, after court the other day, I went back and I – I went back and
remembered that it would be – it was possible that his lawyers would have sent a proposed
allocution. . . .  I'm not saying I shouldn't have given it over; I'm just saying that did not
prompt that disclosure."  Trial Tr. 469:24–470:11.  But, as discussed *infra*,
contemporaneous internal government communications produced after trial show that the

government produced the proposed allocution because the government feared that the defendants "[o]therwise" would "get it from" Majidi's counsel.   SDNY_PPI_00003 (produced Sept. 24, 2020), ECF 428-12.

###    C.    The Defendants' Mid-Trial Motion to Dismiss the Indictment

Prior to even receiving the proposed Majidi allocution, and based on information available at the time, the defense moved to dismiss the Indictment.  Voir Dire Tr. 430:8–431:20; Trial Tr. 87:24–88:2.  The defense argued that it was irrelevant whether the government "deliberately violated their disclosure obligations," arguing that:

> [A]t some point it seems like the system, whatever the system is – and I don't know if it's a question of knowledge, learning, or training, or a process through which people go through their files.  The system in this case, we believe, hasn't worked.

Trial Tr. 125:25–126:11.

In response to the motion, the Court conducted an inquiry of the government concerning the apparent disclosure failures, including specifically with respect to the (by-then) proposed Majidi allocution.  *Id.* at 466–482.  While noting that the allocution originally prepared by Majidi's counsel and sent to the government for review "should have been produced," the Court denied the motion.  *Id.* at 478:19–479:19.  The Court ordered the government, yet again, "to review all of [its] attorney communications in this case" to confirm that it had no additional *Brady/Giglio* materials to disclose.  *Id.* at 479:13-16.  The Court requested "something in writing" from the government stating that it understood its obligations under "*Triumph Capital* and cases of that type," that the "review has been done," and that "you believe that disclosure has been made."  *Id.* at 480:4-11.  The Court noted that:  "No. 1, these are constitutional rights, and they matter; No. 2, there need to be consequences."  *Id.* at 482:18-25.

**D.**     **The Government's Additional Search for Communications with Witnesses' Counsel**

On June 8, 2019, one week into trial, the government notified the Court that it had reviewed its files, "including archived emails, for all communications with attorneys for witnesses in this case." June 8, 2019 Gov't Ltr. at 1, ECF 209. Its search resulted in the production of, among other documents, cooperators' bank records, cooperators' citizenship and real estate documents, communications with cooperating witnesses' counsel related to travel and bail modifications (e.g., seeking the government's position on a request to permit Dole to "travel outside the area for two conference[s]"), and communications with witnesses' counsel related to document productions. *Id.*

The search also revealed another previously undisclosed draft plea allocution sent to the government, this one from Frank Dinucci. *Id.* The draft allocution was sent to the government by Dinucci's counsel on April 5, 2017, the day before Dinucci entered his guilty plea. The proposed allocution was sent under cover of an email in which Dinucci's counsel asked the government to "let me know if you'd like to discuss" the proposed allocution. Apr. 5, 2017 D. Zinman Email to Gov't, ECF 210, Ex. I.

Similar to the proposed Majidi allocution, Dinucci's draft allocution emphasized the 2015-16 period, and did not mention any misconduct at PPI occurring in 2014. Specifically, the draft stated that Dinucci had provided favorable marks to PPI "[d]uring th[e] time period [of] 2015 and 2016," and that "at some point during this time period," someone at PPI began to provide Dinucci with requested marks. *Id.* at 3. When Dinucci delivered his allocution in court the next day, he told Judge Hellerstein that the criminal conduct occurred "in or around mid-2014" and that he provided inflated marks to PPI beginning "at some point after mid-2014." Tr. 17:2-23, ECF 210, Ex. F.

Separately, on June 6, 2019, Majidi's counsel produced documents in response to the defense's Rule 17(c) subpoena. The production contained the October 29, 2018 email from Majidi's counsel to the government attaching the proposed Majidi allocution. It also contained an October 30, 2018 email from the government to Majidi's counsel that had not been previously disclosed by the government. In that email, responding to the proposed allocution from Majidi's lawyer, AUSA Naftalis asked Majidi's counsel: "Can you talk around 430?" ECF 385-9. That email—indicating for the first time that a phone call between the government and Majidi's counsel occurred the day before Majidi delivered a materially different plea in court on October 31, 2018— suggested (but did not prove) that Majidi's delivered plea allocution may have been influenced in some way by the government's reaction to Majidi's proposed allocution. There was, however, no disclosure or memorialization of the specific feedback, if any, that the government provided in response to the proposed allocution during that phone call or otherwise. Nor was there any disclosure of the revised allocution written by the government.

### E.    The Defendants' Motions Regarding the Draft Allocutions

Before the next trial day, Mr. Shor filed a letter motion concerning the revised allocutions. June 9, 2019 Shor Ltr. at 1–2, ECF 210. The letter noted that "the proposed plea allocution that Mr. Majidi's counsel forwarded to the Government for review should have been disclosed previously" and was "materially different from that which Mr. Majidi ultimately offered in court, and the language added after Government review seems designed to implicate Mr. Shor in alleged criminal acts." *Id.* at 1. Again expressing concern that "these materials would not have been produced if defense counsel had not subpoenaed Mr. Majidi's lawyers," *id.* at 3, the letter stated further that, "[a]s with Mr.

21

Majidi, after the Government's apparent tinkering, Mr. Dinucci allocuted in a manner that went well beyond the elements of the charged offenses and inculpated Mr. Shor with factual claims that did not appear in Mr. Dinucci's proposed allocution," *id.* at 1.

Noting that the revisions to the allocutions and the surrounding circumstances were relevant not only to Majidi's and Dinucci's "partiality" towards the government, but also to the degree to which the government "interfered with the truth-seeking function of the trial," Mr. Shor argued that the defense should be permitted to question Majidi and Dinucci about these events, call their respective attorneys to testify as to the changes in the allocutions, and offer into evidence the draft and final allocutions and the related emails between the cooperators' counsel and the government. *Id.* at 4. Mr. Shor also requested an adverse inference instruction "[i]n light of the belated nature of these disclosures, and in consideration of the numerous other belated *Brady* and *Giglio-*related disclosures in this case." *Id.* at 5.

Later that same day, Mr. Ahuja submitted a separate letter joining in Mr. Shor's motion. June 9, 2019 Ahuja Ltr. at 1, ECF 319-6. Given that the emails between the cooperators' counsel and the government reflected oral communications related to the proposed allocutions, Mr. Ahuja also requested that the Court "order the government to provide a description of any oral communications it had with counsel concerning the content of cooperator plea allocutions and any suggested modifications to those allocutions." *Id.*

The Court addressed the defendants' motions the next day (June 10, 2019). The Court began by again conducting a factual inquiry of the government, asking prosecutors about their recollections of the circumstances surrounding the changes to the

allocutions, starting with the proposed Majidi allocution and the government's discussions with Majidi's counsel. In response to the Court's questioning, AUSA Nicholas, stating that he did not know whether it was routine to "request a draft allocution" and that he did not think he had ever done so himself, noted that there was "nothing improper at all about attorneys discussing what would be an appropriate allocution." Trial Tr. 762:8-20. Referring to the fact that the proposed Majidi allocution and Majidi's actual allocution were "quite different," the Court asked whether AUSA Nicholas knew how the allocution delivered in court got to be different. AUSA Nicholas responded: "I don't specifically know how it got to be different. No." *Id.* at 763:1-11.

The Court then asked AUSA Naftalis, who, along with AUSA Nicholas, was present for Majidi's plea, if he had a memory of a "conversation with Mr. Majidi's counsel about Mr. Majidi's allocution that in any way impacted the substance of that allocution." *Id.* at 764:4-7. AUSA Naftalis said that he "decidedly did not ask for" a proposed allocution from Majidi's counsel, but he "affirmatively" recalled receiving Majidi's proposed allocution prior to the plea. *Id.* at 765:17, 767:3-5. Stating that he did not "recall the specifics" of his discussions with counsel for Majidi (*id.* at 767:16-17), AUSA Naftalis said that he did not and "would never" tell a defense lawyer what a cooperator should or should not say. *Id.* at 769:5-7. He confirmed that he would not have cared if "Mr. Majidi had read into the record what was sent as a proposed allocution," *id.* at 768:20–769:1, and that to the extent he spoke to Majidi's lawyer about the allocution, his comments would have been limited to reminding the cooperator's lawyer to "hit the elements." *Id.* at 768:15-19. The Court asked AUSA Naftalis whether, "as an officer of the court," he was representing that in no way did he "seek to shape or modify the

allocation." AUSA Naftalis responded, "Correct." *Id.* at 769:2-5. At that point, the other prosecutors asked to confer privately with AUSA Naftalis and apparently "stressed to [him] that it was critical to commit to only those facts that he was absolutely sure of."[3] AUSA Naftalis then clarified that he might provide more specific direction than "hit the elements" if "something is factually wrong." *Id.* at 769:16-22.

The Court next asked AUSA Naftalis about certain specific differences between the proposed and final allocation. *Id.* at 770:5, 21-25. When the Court asked if AUSA Naftalis had asked Majidi's counsel to change the names of anyone in the allocation (as the draft allocation did not reference Mr. Shor), AUSA Naftalis answered "No." *Id.* at 770:1-20, 771:1-5. The Court also asked AUSA Naftalis if he had a conversation with Majidi's lawyer regarding the allocation on the day of the plea proceeding, and AUSA Naftalis answered "No." *Id.* at 772:1-5.

With respect to Dinucci's proposed allocation, AUSA Griswold recalled having a discussion with Dinucci's counsel—which she believed occurred in Judge Hellerstein's courtroom—and remembered noting that the proposed allocation referenced 2015 and pointing out that she thought the "accurate starting point is 2014." *Id.* at 775:6-15. AUSA Griswold did not recall otherwise suggesting changes to Dinucci's proposed allocation. *Id.* at 777:2–778:1.

With respect to communications with Dole's counsel before Dole's plea proceeding, AUSA Griswold said that the prosecution team had searched its files for draft allocations and asked the supervisors who handled Dole's plea to do the same, reporting that the search had not identified any communications. *Id.* at 532:2–533:16. When the

---

[3]    Nicholas Decl. ¶¶ 6.g.–6.m, ECF 430-1; *see* Griswold Decl. ¶¶ 25–30, ECF 429-1; *see also* Trial Tr. 769:8-13.

Court noted that the government's search "seem[ed] to presuppose that the communications would be provided in writing," and asked whether anyone recalled "oral discussions" with Dole's attorneys about the allocution, AUSA Griswold said "No."  *Id*. at 533:1-7.

When the discussion turned to the merits of the defense motions, the government argued that the defendants were not entitled to the requested relief.  The government started by saying that they did not believe the allocutions had any "evidentiary value" because plea allocutions were not intended to be comprehensive and did not purport to fully reflect what was said in proffers.[4]  *Id.* at 779:9–781:25.  The government went on to argue that to the extent that the proposed allocutions provided the defense with a basis to press the cooperators on certain facts, such as when the alleged conspiracy began, the defense had the allocutions in advance of either witness testifying.  *Id.* at 778:18–779:24.

That evening, the Court issued an order denying the defendants' motions. The Court concluded that "[o]n the record before the Court—which includes extensive questioning of those prosecutors with firsthand knowledge of the events—the Court finds no improper conduct."  June 10, 2019 Order at 1–2, ECF 213.  In denying the request for an adverse inference, the Court explained that "[t]hough there have been problems with the Government's discharge of its disclosure obligations, the Court believes that those matters have been resolved by the Government's compliance with the Court's recent directives." *Id.* at 5.

---

[4]     Communications uncovered in post-trial proceedings reveal that while the government was telling the Court that the allocution had no evidentiary value, prosecutors noted privately that "the allocution gives [the defense] some more questions on cross."   June 8, 2019 Gov't Emails, SDNY_PPI_00061 (produced Sept. 24, 2020), Ex. E.

In precluding evidence of and cross-examination on the different versions of the allocutions, the Court—then unaware of the existence of a written document establishing that the government had rewritten the revised allocution and handed it to Majidi to read in Court—found that "[w]hile there is some probative value to identifying the alterations" between the proposed draft and final allocutions, it was "far outweighed by the potential for confusing the jury." *Id.* at 3.

On June 19, 2019—as it previously indicated it would do—the Court questioned Majidi's counsel. Trial Tr. 2044–63. Mr. Rosenberg confirmed that he had sent the proposed Majidi allocution to the government on October 29, 2018, and that Majidi was "familiar with the draft." *Id*. at 2046:16–2047:1. Mr. Rosenberg said he had no recollection of having prepared the allocution that Majidi delivered in Court, *id.* at 2050:25–2051:21, and that the changes between the two versions would have been the result of discussions with the government, not with Majidi himself, *id.* at 2052:15–2053:7. Mr. Rosenberg said he had a "vague" recollection of speaking with AUSA Naftalis about the allocution after receiving an email from him asking to speak on October 30, 2018, but did not recall the substance of that conversation. *Id.* at 2047:21–2048:13.

Having confirmed with Mr. Rosenberg that Majidi read from "written notes" at his plea, the Court noted a gap in the factual record: "Somehow someone had to do the editing, and I don't know whether it was you or a colleague or Mr. Majidi or something else. I don't know how it came to be that the edits were entered." *Id.* at 2058:18–2059:3. The Court asked Mr. Rosenberg whether the government "might have sent you . . . [a]n edited allocution," and Mr. Rosenberg replied that, if the government had, he would have produced it, and that his firm "d[id] [not] have the document that Mr. Majidi

read in our system" or in his firm's physical files.  *Id.* at 2059:15–2061:7, 2063:15-18.  The Court also asked whether Mr. Rosenberg recalled receiving something from the government by means "other than email" after he spoke with AUSA Naftalis, either the night before Majidi's plea or the day of the plea.  Mr. Rosenberg did not recall.  *Id.* at 2063:2-14.  Mr. Rosenberg stated that "the [only] people who could have touched the document" were himself, his partner (and Majidi's other attorney) Brian Linder, or the government, that he did not "recall making any changes," and that he "believe[d] Mr. Linder would tell [the Court] the same thing."  *Id.* at 2058:25–2060:19.

Counsel for Mr. Shor promptly renewed his request to offer evidence that the proposed Majidi allocution was intended to be delivered in Court and to question Majidi on its contents.  *Id.* at 2064:2-22.  When the Court noted that Mr. Rosenberg's answers opened up the possibility that it was the government that had "handled the edits" to the proposed Majidi allocution, AUSA Naftalis confirmed that he did not "send anything to Mr. Rosenberg."  *Id.* at 2065:23–2066:18.  The Court relied on AUSA Naftalis's response, noting:  "Mr. Rosenberg suggested that maybe there was a possibility that the government handled the edits.  So I'm allowed to ask whether they handled the edits, and I'm being told they didn't."  *Id.* at 2066:15-18.

On June 21, the Court denied Mr. Shor's renewed request, stating that its conversations "with Mr. Rosenberg give me some comfort that this is not a situation in which the government was directing language or directing language contrary to the information which Mr. Majidi had proffered."  *Id.* at 2345:11-18.

Although not knowable to the Court or the defense at the time, it is now clear that in ruling on the defendants' motions, the Court relied on a version of the facts

that was incomplete and inaccurate.

**F.      The Inability to Introduce Evidence About the Changes to the Cooperators' Allocutions Was Particularly Significant in this Case**

The government's case, which involved allegedly fraudulent valuations of esoteric and illiquid securities during a market contraction, did not include either experts or independent valuation analysis of market data.  The government, rather, relied heavily on its cooperating witnesses, and the immunized testimony of James Nimberg, to establish both the alleged inflation of the marks and the defendants' fraudulent intent and participation in the charged conspiracy.

The importance of cooperator testimony to the government's case is reflected in its summations, during which the government frequently invoked their testimony in an effort to demonstrate Mr. Ahuja's knowledge of and participation in criminal wrongdoing at PPI.  The government argued, for example, that "Mr. Nimberg and Mr. Majidi, the two portfolio managers, they came in here and they told you that it was going on and that Mr. Ahuja knew about it.  Not only knew about it, but he instructed on it, demanded it."  Trial Tr. 4643:2-11.  Repeatedly, the government quoted or paraphrased cooperator testimony to emphasize that Mr. Ahuja was, contrary to defense arguments, a knowing participant in the alleged conspiracy.  *Id.* at 4643:20-24, 4644:9-22, 4653:22-24, 4664:19-24, 4665:11-14, 4673:5-25, 4675:16–4676:8, 4677:21–4678:2, 4682:1-13, 4702:1-9; *see* Gov't Summation Presentation, at 61, 71–73, 76, 80–81, 84, 87, 89.

The government returned to the theme in its rebuttal summation, arguing that "in this case, it's not one witness who's talking about doing it with Ahuja.  It's not two witnesses who talk about doing it with Ahuja.  It's Majidi, it's Dole, and it's Nimberg. They were all at PPI, and they all talk about doing it with Ahuja."  *Id.* at 4906:24–4907:3;

*see also id.* at 4895:8-16.  To the extent the government relied on text messages or emails in its case against Mr. Ahuja, Mr. Ahuja himself was notably absent from most of those communications.  And where Mr. Ahuja was present or referenced in the communication, it was frequently only cooperating witness testimony that permitted the government to argue that the text or email in question was suggestive of criminal intent.  *Id.* at 4663:13-16, 4664:1-9; *see also* Gov't Summation Presentation at 67–70, 78–79, 82.

        With respect to Mr. Shor, the government similarly relied on its cooperators to depict Mr. Shor's conduct as improper and to counter Mr. Shor's argument that he had raised concerns about marks beginning in mid-2015 by suggesting that those efforts were not about raising concerns but about blackmailing others at PPI.  *See id.* at 4886:21-25. ("Witness after witness told you they were doing it in 2014 too and that Shor had the connect.  The connect, Dinucci, testified and said that he was involved in it going all the way back."); *id.* at 4691:4-19 ("This internal writedown—that wasn't about actually telling the truth to investors.  Mr. Dole told you what Mr. Shor told him it what was about.  Mr. Shor said [to Dole] he was planning to mark his book down by about $20 million just to give the management . . . a taste of what would happen if he was unhappy and he left."); 4692:1-3 ("Mr. Majidi told you the same thing.  He thought Mr. Shor was just showing him his muscle to strengthen his position to negotiate for compensation.").

        Counsel for Mr. Ahuja sought to respond to the government's arguments by highlighting the absence of tangible evidence tying Mr. Ahuja to the mismarking scheme, and noted that the only evidence linking him to that scheme came from biased and pliant cooperating (and immunized) witnesses:  "[T]he prosecution is asking you to rely on the testimony of the cooperating witnesses—Nimberg, Dole, Majidi.  And they can flash up a

lot of text messages and say, oh, that's corroboration, corroboration.  But I'm going to go through some examples, and I ask you to look at those carefully, to really scrutinize those. Are they actually corroboration, or is the witness just telling you what it means?"  *Id.* at 4712:12-20.  In fact, a major pillar of Mr. Ahuja's defense was that the (often complicated and jargon-heavy) documents that the government relied on to "establish" Mr. Ahuja's knowledge of the conspiracy often did not tell the story the government's witnesses testified they did.  *See, e.g.*, *id.* at 4729:25–4730:13, 4731:25–4732:11, 4737:3-19.

Likewise, Mr. Shor's counsel highlighted the absence of actual data to back up the cooperators' unsubstantiated claims of inflated valuations over an overbroad two-year period of time.  For example, Mr. Shor's counsel demonstrated, through data, that Auriga's prices (where Dinucci, a purportedly corrupt broker, worked at the time) were lower than or equal to all other reputable brokers 60 percent of the time in 2014 and the vast majority of the time in February 2015.  Trial Tr. 4817–4820.  Likewise, in February 2015, Performance Trust (another broker that the government claimed, based on cooperator testimony, was corrupt) was lower than other brokers 7 out of 10 times.  *Id.* at 4820.  By contrast, Shor's counsel pointed out, Majidi purported to interpret a text message on February 4, 2015, referring to "saying hello to Frank" as a reference to Mr. Shor getting fraudulent prices, even though the text message gave no support to that interpretation, and the data showed that Auriga's prices were lower than those of other brokers.  *Id*. at 4821.

Because the Court denied defense efforts to cross-examine witnesses and offer affirmative evidence of the government's role in drafting cooperator plea allocutions, the evidence admitted at trial did not allow for defense arguments regarding either (1) the government's role in shaping cooperator testimony or (2) the fact that the cooperating

witnesses were willing to be influenced by the government in framing their descriptions of their conduct.

### G. Mr. Ahuja's Post-Trial FOIA Request Reveals More Undisclosed Communications

The jury returned its verdicts on July 11, 2019, and thereafter, on November 26, 2019, counsel for Mr. Ahuja submitted a FOIA request to the Executive Office of United States Attorneys ("EOUSA"), seeking emails and other documents related to the proposed Majidi allocution. According to the government, members of the prosecution team received that request on January 27, 2020. June 19, 2020 Gov't Ltr. at 3, ECF 368. Within a day, AUSA Naftalis discussed the request with Associate United States Attorney John McEnany, and, apparently recognizing the obvious connection, sent him a copy of the Court's June 10, 2019 Order. Naftalis Decl. ¶ 50, ECF 428.

Significantly, and only days earlier, Mr. Shor had filed his reply brief in connection with his application for bail pending appeal. One of the issues raised in the application was whether it was error to preclude cross-examination of the cooperators on the evolution of their allocutions. In response to Mr. Shor's argument, the government argued that "a second premise of Shor's argument—that the final allocutions were somehow 'tailored' by the Government 'to hurt Shor'—is also deeply misleading." The government argued that, among other things, "[the Court] found as a factual matter that there was no improper shaping of Dinucci's or Majidi's allocutions." Opp. Mot. at ¶ 47, *United States* v. *Shor*, 19-3936 (2d Cir. Jan. 16, 2020), ECF 58-1. Oral argument on the defendants' motion for bail pending appeal was scheduled for February 4, 2020 (eight days after the prosecution team received the FOIA request).

According to the government's recent submissions, on or before March 9, 2020, AUSA Naftalis "identified" the documents reflecting his rewriting of the proposed Majidi allocution—thus highlighting the ease with which the documents could, and should, have been located earlier—and sent them to AUSA McEnany with approximately 20 other documents.  ECF 368 at 3.  Notwithstanding the motion practice, the back and forth with the Court and the defense, and the "gap" in the Court's knowledge of why and how the allocution had changed—and notwithstanding a pending appeal that relied on a ruling made on the basis of a record that the government knew was, at best, incomplete—the government made no effort to bring these documents to the attention of this Court, the Court of Appeals, or the defense.

Instead, months later, on May 27, 2020, the EOUSA provided the defense its response to Mr. Ahuja's FOIA request.  The production included an email among the three members of the prosecution team, dated October 30, 2018, the day before Majidi's plea.  The subject was "Allocution – Draft edits," and the email appeared to reflect the existence of an attachment, but the production did not include an attachment.  ECF 366-4.

On June 10, 2020, counsel for Mr. Ahuja followed up with the government to request the document that appeared to be attached to the original email.  The attachment was not produced until nine days later, after the defense sought relief in this Court.  The attachment was the government's rewritten allocution, with changes tracked against the proposed and "approved" allocution the government had received from Majidi's counsel.  *See* App.

### H.   The Current Record Regarding the Cooperators' Allocutions

Since June 2020—when the government first produced the revised allocution—the government has made several additional disclosures and submitted declarations from members of the trial team.

On June 26, 2020, the government produced a series of documents relevant to the Majidi, Dole, and Dinucci pleas. This production was incomplete, and resulted in a further disclosure on July 11, 2020, containing a previously undisclosed second draft Dinucci allocution. The Court then ordered a conference for July 24, 2020. Shortly before that conference, the government produced yet another previously undisclosed document related to the Dinucci plea allocution: an email exchange from April 5, 2017, the day before Dinucci's plea, in which one of the prosecutors asked to speak to Dinucci's counsel and said "I think we would like a hard copy of the allocution to review but we can discuss briefly first," and to which Dinucci's counsel responded "sure." ECF 392-1.

At the July 24, 2020 conference, the government agreed to conduct certain specified searches of its communications, which were then modified pursuant to defense requests and an order of the Court. ECF 396, ECF 399. Based upon the government's proposed voluntary searches, the Court denied defense requests for Court-ordered disclosures. July 24, 2020 Conference Tr. 43:24–44:24, ECF 397. On September 24, 2020, the government produced another tranche of responsive documents, including additional communications relevant to the Majidi, Dole, and Dinucci pleas.

In reviewing this production, the defense realized that the government had not performed the searches it had agreed to perform, and that its production did not include documents that earlier productions had demonstrated should exist. Oct. 14, 2020 Shor Ltr. at 2, ECF 411. When the government refused to answer the defense's follow-up questions,

the Court ordered the government to respond to certain questions and to make certain additional productions. ECF 412 at 5.[5] These disclosures were themselves incomplete and raised new issues. So, for example, the government, with one exception,[6] was unable to recover text messages dating back to the cooperator pleas, even though text messages among the prosecutors from trial reflected their discussing disclosures to defendants by text message, including the disclosure of the proposed Majidi allocution. Oct. 30, 2020 Gov't Ltr. at 3, ECF 414.

All told, and although the record remains incomplete in certain respects, the following facts are essentially uncontroverted.

### 1.   *Majidi Plea*

Phone records reflect three calls between the government and Majidi's counsel on Friday, October 26 (the substance of which were not memorialized), followed by Majidi's counsel sending to the government on Monday, October 29, a proposed allocution.[7] That proposed allocution gave rise to a series of email exchanges among the prosecutors in which they commented about the allocution proposed by Majidi's counsel

---

[5]   On October 30, 2020, the government disclosed a May 27, 2020 exchange between the U.S. Attorney's Office FOIA Specialist and a FOIA attorney at EOUSA concerning the revised Majidi allocution and the decision to withhold it, which included government personnel's frank discussion about "hoping" they could make "this one" "go away." ECF 415-1.

[6]   The government was able to recover text messages from a personal cell phone from one of the three prosecutors for the three months surrounding Majidi's plea. Oct. 30, 2020 Gov't Ltr. at 3, ECF 414; Sept. 24, 2020 Gov't Ltr. at 5 & n.7, ECF 406.

[7]   AUSA Naftalis categorically denied making a request to review Majidi's allocution (Trial Tr. 765:17), and stated in his declaration that he believes he spoke with Majidi's counsel during two of the three Friday calls about "accepting the cooperation agreement and the scheduling of his guilty plea." Naftalis Decl. ¶ 12, ECF 428. But, the evidence strongly suggests that such a request was made. The email Mr. Rosenberg sent AUSA Naftalis the following Monday enclosing the proposed Majidi allocution said only "Proposed allocution attached," ECF 385-1, suggesting there had been some prior discussion of Mr. Rosenberg sending a proposed allocution, and AUSA Griswold told the Court that it has "been [her] practice" to "ask for draft allocutions so that the pleas can go smoothly" (Trial Tr. 773:6-11), and she asked Dinucci's counsel to send her a draft allocution prior to Dinucci's plea, ECF 210, Ex. H.

and scheduled an internal meeting the next day to discuss it.  The next day, prior to that internal meeting, AUSA Naftalis circulated a rewritten allocution to the other members of the prosecution team in tracked changes.  Immediately after the time slot reserved for the internal meeting, AUSA Naftalis emailed Majidi's counsel (replying to the email with the proposed allocution) to set up a call, and the two spoke for approximately 11 minutes.  No email transmitting the rewritten allocution to Majidi's counsel exists.  The next day, October 31 (the day of the plea), AUSA Naftalis suggested to Majidi's counsel that they meet 10 minutes before the plea outside Your Honor's courtroom.   The record establishes—and the government has not contested—that at that meeting, a prosecutor handed a hardcopy of the government's version of the allocution to either Majidi or one of his lawyers.  When Majidi pled guilty moments later, he read from the government's version virtually word-for-word.

The documents and call logs show the following sequence of events:

- <u>Friday, Oct. 26, 2018.</u> Phone logs show three calls, lasting 137 seconds, 143 seconds, and 11 seconds, respectively, between AUSA Naftalis and counsel for Majidi.  SDNY_PPI_00294 (produced Sept. 24, 2020), Ex. F.

- <u>Monday, Oct. 29, 2018 at 4:15 p.m.</u> Majidi's counsel emails AUSA Naftalis a proposed allocution labeled "approved."  ECF 385-1.

- <u>Monday, Oct. 29, 2018 at 4:17 p.m.</u> AUSA Naftalis forwards the proposed allocution to AUSAs Griswold and Nicholas.   ECF 385-2.

- <u>Monday, Oct. 29, 2018 at 5:32 p.m.</u> AUSA Nicholas responds to AUSA Naftalis's email forwarding the proposed allocution by asking if the prosecutors could meet about the allocution and other items the next day.  ECF 385-3.

- <u>Monday, Oct. 29, 2018 at 6:08 p.m. to 9:54 p.m.</u> The prosecutors exchange emails about scheduling and ultimately propose 3:00 p.m. the next day for their internal meeting.  *Id.*

- <u>Monday, Oct. 29, 2018 at 9:54 p.m.</u> Immediately thereafter, AUSA Naftalis again forwards the proposed Majidi allocution from Majidi's counsel to AUSAs Griswold and Nicholas, noting that the attached draft "is way too detailed in my view.  Should we discuss at our team meeting?"  ECF 385-4.

- <u>Monday, Oct. 29, 2018 at 9:56 p.m.</u> AUSA Nicholas responds to AUSA Naftalis, stating: "I completely agree.  Should be bare bones just hit the elements.  Agree let's discuss at [meeting]." *Id.*

- <u>Monday, Oct. 29, 2018 at 9:58 p.m.</u> AUSA Naftalis sends AUSAs Griswold and Nicholas a calendar invite for a "PPI Team Meeting" scheduled from 3:00 p.m. to 4:00 p.m. on October 30, 2018.  Both AUSAs Griswold and Nicholas accept the meeting invitation.  ECF 385-5–7.

- <u>Tuesday, Oct. 30, 2018 at 11:59 a.m.</u> AUSA Naftalis sends an email to AUSAs Griswold and Nicholas.  The email contains no text, but the subject line reads "Allocution – Draft edits." Attached to the email is a rewritten, redlined version of a Majidi allocution.  *See* App.

- <u>Tuesday, Oct. 30, 2018 at 4:03 p.m.</u> Three minutes after the internal meeting scheduled the previous day was scheduled to end, AUSA Naftalis replies to the October 29 email from Majidi's counsel, asking if Majidi's counsel could "talk [at] around 430 [p.m.]."  ECF 385-9.

- <u>Tuesday, Oct. 30, 2018 at 4:52 p.m.</u> AUSA Naftalis calls Mr. Rosenberg.  The call lasts approximately ten minutes and thirty seconds.  Ex. F.

- <u>Wednesday, Oct. 31, 2018 at 2:22 p.m.</u> AUSA Naftalis emails Majidi's counsel, suggesting that they meet in the hallway outside the courtroom ten minutes before the plea scheduled for that afternoon at 4:00 p.m.  At 2:46 p.m., Majidi's counsel replies, "sure."  ECF 385-10.

- <u>Oct. 31, 2018 at 4:00 p.m.</u> Majidi pleads guilty, and in doing so delivers an allocution that is essentially identical to the rewritten allocution circulated by AUSA Naftalis to the prosecution team the day before.  At the plea, Majidi confirms that he was reading from "written notes," and when Majidi is asked if "[t]he thoughts expressed in those notes are yours," Majidi replies "They are mine."  Tr. 31:2-11, ECF 61.

No member of the prosecution team memorialized the government's role in changing the allocution.  The revised version was not preserved or placed in the file, and no one memorialized the facts that the government edited the allocution or delivered it to Majidi's team by hand—even though the defense repeatedly and just weeks earlier had requested that communications between the government and counsel for cooperating witnesses be recorded and preserved.  Those facts were not disclosed until a year after trial, and only after being prompted by a defense FOIA request.

36

Moreover, although one of the prosecutors wrote the revised allocution and the other two received it, none mentioned it when the issue was raised in court in June 2019. Instead, the Court was told that the government did *not* handle the edits to the proposed allocution. Trial Tr. 2066:15-18. And, although the emails produced after trial show that AUSA Naftalis arranged to meet with Majidi's lawyer shortly before his plea— and the prosecution has now acknowledged that the allocution was discussed at that meeting—AUSA Naftalis told the Court on June 10, 2019 (just after being told by his fellow prosecutors to "commit to only those facts that he was absolutely sure of," Nicholas Decl. ¶¶ 6.g.–6.m, ECF 430-1), that he did not speak to Majidi's lawyer about the allocution on the day of the plea. Trial Tr. 772:1-5; Naftalis Decl. ¶ 22. The government has not explained why that email exchange was not produced or mentioned at that time, especially in light of the fact that just two days prior to the June 10 colloquy with the Court, the government represented that it had "reviewed . . . all communications with attorneys for witnesses in this case." June 8, 2019 Gov't Ltr. at 1, ECF 209; *see* June 19, 2020 Gov't Ltr. at 1, ECF 368 (same).

There likewise has been no explanation for why the government's changes to Majidi's allocution were delivered to Majidi or his counsel orally or by hand, or both, and not by email. Although the government created an electronic version reflecting its changes, and circulated that version by email among the prosecution team, it was never emailed to Majidi's counsel. The evidence does not support the theory repeatedly suggested by the government post-trial—that AUSA Naftalis "communicated the same changes that he proposed in the Redline . . . to Majidi's counsel, and that those changes were then incorporated into Majidi's allocution." June 24 Gov't Ltr. at 2, ECF 371; *see*

Naftalis Decl. ¶ 21 ("I believe that I . . . suggested the Proposed Comments to Mr. Rosenberg for him and Mr. Linder to consider and discuss with Mr. Majidi.").[8]  In any event, any uncertainty regarding the substance of the government's communications with Majidi's counsel during the telephone call on October 30 or the pre-plea meeting on October 31 is the result of the prosecution's failure to memorialize them at the time.

Although the fact and extent of the government's role in revising the allocution—regardless of the specific changes made—should have been disclosed, the changes themselves are notable.  As an initial matter, the proposed allocution stated that the "scheme accelerated in the second half of 2015, as the hedge fund's performance was deteriorating."  App. at 3–4.  That sentence—and any reference to 2015—was removed from the revised allocution and replaced with a statement that Majidi participated in a scheme with Mr. Ahuja and Mr. Shor "[b]etween 2014 and 2016."  *Id.*

Although a reference to 2014 appeared on the third page of the proposed Majidi allocution, the revision removed an affirmative statement by Majidi that would have helped the defense.  Both defendants argued throughout trial that any mismarking at PPI began in mid-2015.  *E.g.*, Trial Tr. 162, 188.  The time frame included in the draft sent to the government also matched the Securities & Exchange Commission's allegations in its parallel civil lawsuit, which (despite a lower burden of proof) charged a scheme from "at least September 2015 through March 2016."  Amended Complaint ¶ 2, *SEC* v. *Premium Point Investments LP*, No. 18-cv-04145-AJN (S.D.N.Y. Nov. 19, 2018), ECF 24.

---

[8]     The prosecution's theory is inconsistent with Mr. Rosenberg's mid-trial representations to the Court to the effect that he spoke to AUSA Naftalis by phone, but did not take notes, and that neither he nor Mr. Linder edited the allocution.  Trial Tr. 2058:25–2059:19, 2060:13-19, 2061:16-18.

The government changed the allocution in other meaningful ways.  So, for example, the government deleted any reference to Majidi pressuring traders and added specific references to Mr. Shor.  It also changed "fund" to "funds," foreshadowing the significant issue that would play out at trial over alleged mismarking in the New Issue Fund, where Mr. Ahuja played a larger role.

2.    *Dinucci Plea*

Records show four calls between the government and Dinucci's counsel at Richards Kibbe & Orbe on April 3, 2017, three days before Dinucci's plea.  The last of these calls lasted approximately 13 minutes.  Ex. F.

The next day, April 4, AUSA Griswold emailed counsel for Dinucci to ask that he send her a copy of the plea allocution "as soon as possible."  ECF 210, Ex. H.  Mr. Zinman replied that evening, stating that he had left AUSA Griswold a voicemail and agreeing to speak with her the next day.  *See* ECF 392-1 (produced July 16, 2020).  That voicemail has not been produced,[9] and call logs produced by the government do not reflect an April 4, 2017 call.

On April 5, 2017 at 10:18 a.m., AUSA Griswold emailed AUSA Naftalis that she "want[ed] to draft the sealing paperwork and speak to Zinman on the [Dinucci] allocution," which was scheduled for the next day.  SDNY_PPI_00001 (produced Sept. 24, 2020).  According to an email not produced until July 16, 2020, AUSA Griswold emailed Mr. Zinman at 10:24 a.m. on April 5, 2017, and arranged to speak with him at 11:00 a.m.

---

[9]    The government stated that it had searched for, but has not been able to locate, this voicemail.  ECF 414 at 1.  We understand that typically voicemails at the USAO are attached to emails with caller ID information.  It is possible that the email fell outside the three-year period used for document preservation at the USAO, ECF 406 at 3 n.2, but it is worth noting that an April 4, 2017 email was still within the three-year period when the government performed its searches for communications with counsel in June 2019.

ECF 392-1.  In that email, AUSA Griswold wrote that "I think we would like a hard copy of the allocution to review but we can discuss briefly first."  *Id.*  AUSA Griswold's call logs show that she in fact spoke with Mr. Zinman at 10:58 a.m., and that the call lasted 92 seconds.  Ex. F.  The government did not produce any notes of this call.  It is not clear why the government's search of its communications with counsel for cooperating witnesses, which the government represented it had completed on June 8, 2019, did not reveal the April 5 email with Mr. Zinman.

Later on April 5, about an hour after the call referred to above, Mr. Zinman sent the government a proposed allocution asking if the government would "like to discuss."  ECF 210, Ex. I at 2.[10]  Consistent with the allocution proposed by Majidi's counsel, the allocution prepared by Dinucci's counsel referred to mismarking that occurred in 2015 and 2016.  *Id.* at 3.  Mr. Zinman told the Court that his "practice would be . . . [to] have provided a draft to [Mr. Dinucci] before" he "sent it to the government."  Trial Tr. 3137:8-17.  Less than forty minutes after sending the first proposed allocution to AUSA Griswold, at 12:44 p.m., Mr. Zinman sent to AUSA Griswold a revised allocution.  *See* ECF 389-1–2.[11]  This draft referred to mismarking "[b]eginning in 2015."  *Id.*  Because the

---

[10]     This allocution was not produced until the middle of trial, on June 7, 2019.  Following the Court's questioning regarding the late disclosure of the proposed Majidi allocution, the government "found the proposed allocution that [Dinucci's] lawyer sent us in the archives," and produced it to the defense.  *See* SDNY_PPI_00008 (produced Sept. 24, 2020).

[11]     This email was first produced on July 11, 2020.  The government initially justified its failure to produce this second proposed allocution by noting that "[t]he title of the transmission email accidentally spelled 'allocution' as 'allocuation.'"  July 16, 2020 Gov't Ltr. at 3, ECF 390.  However, the government was specifically ordered "to review *all of [its] attorney communications* in this case," Trial Tr. 479:13-16 (emphasis added), and had it done so, the government would have identified this communication, among other undisclosed communications with counsel, regardless of how the word allocution was spelled (or whether any particular term even appeared in the email).  The government has more recently suggested that it failed to produce this communication because AUSA Griswold did not conduct the search ordered by the Court (and certified by the government), but she instead stopped her "review of all of [her] attorney communications," *id.*, after finding a single proposed allocution sent to her by Dinucci's counsel, Griswold Decl. ¶ 34.a & n.1.

government did not memorialize its oral communications with Mr. Zinman, we do not know what was said. At his allocution the next day, Dinucci told the Court that the mismarking began "at some point after mid-2014." Tr. 17:11-23, ECF 210, Ex. F.

     3.   *Dole Plea*

The record is less clear with respect to Dole. As with Majidi and Dinucci, documents make clear that there were oral communications with Dole's counsel that the government chose not to memorialize. But, unlike with Majdi and Dinucci, there are no written communications between prosecutors and counsel for Dole transmitting a proposed allocution. Other documents produced during trial or post-FOIA, however, combined with the prosecution's pattern of vetting and causing the alteration of other cooperator allocutions, strongly suggest that the same may have occurred with Dole.

On November 12, 2017, the day before Dole's plea, a member of the trial team received a call from Greenberg Traurig, the law firm representing Dole. That call lasted more than five minutes. Ex. F. There is no record of the content of that call. AUSA Naftalis sent an email to Dole's counsel on November 13, 2017 (the day of the plea), providing a phone number to reach him. Dole000351, Ex. D. That email produced by Dole's counsel during trial, but not by the government, suggests the existence of a further call that day. Phone records—which do not cover AUSAs' personal devices—do not show that call.

The government's post-FOIA production on June 26, 2020 included another new email among the prosecutors from the day of Dole's plea, which was covered by the trial team's then unit chiefs. At trial, in connection with its Court-ordered search of communications with cooperators' counsel, the government represented it had also consulted with both unit chiefs, and that the one chief who remained with the Office had

41

(with the assistance of AUSA Griswold) checked his own files and emails. Trial Tr. 532:5–533:15; *see also* Griswold Decl. ¶ 34.c. The government did not produce an email from the day of Dole's plea in which one of the unit chiefs emailed the FBI case agent asking, "Is [Dole's] lawyer there?" ECF 385-15 (produced June 26, 2020). After the FBI agent confirmed that Dole's lawyer, Mr. Kehoe, was indeed present, the unit chief wrote, "Could you please ask him to give us a call or swing by after you guys are done over there?" *Id.* At 12:54 p.m., the FBI agent wrote back to let the unit chief know that "[Dole's lawyer] now said he will call at 1:15pm. Apologies for the change, just fyi." *Id.* The trial team and the other unit chief were all copied on this email exchange.

The next day, one of the unit chiefs wrote to Mr. Kehoe (copying the other unit chief), stating: "It was good to see you yesterday. Thanks for making yourself available for a few minutes before the proceeding." ECF 385-16 at 2 (produced June 26, 2020). At trial, and after completing its review of communications with cooperators' counsel, the government stated that no one had recalled "oral discussions" with Dole's attorneys about his allocution. Trial Tr. 533:7. We now know discussions took place on the day of Dole's plea, but because they were not substantively memorialized, we do not know what transpired during them.

\* \* \* \*

The additional disclosures made since the FOIA request not only supplement the factual record regarding the allocutions, but also add to a record reflecting multiple instances where the government avoided substantive written communications with counsel for cooperating witnesses and, instead, communicated orally (sometimes in person) without memorializing (or disclosing) those communications.

## II. APPLICABLE LEGAL STANDARDS

### A. Federal Rule of Criminal Procedure 33

Federal Rule of Criminal Procedure 33(a) authorizes courts to "vacate any judgment and grant a new trial if the interest of justice so requires." And the Rule vests district courts with "broad discretion" to set aside a jury verdict and order a new trial in order to "avert a perceived miscarriage of justice." *United States* v. *Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992); *see United States* v. *Canova*, 412 F.3d 331, 348 (2d Cir. 2005). "Unlike Rule 29 . . . under which the Court view[s] the evidence in the light most favorable to the prosecution, Rule 33 permits the Court to weigh the evidence objectively." *United States* v. *Pauling*, 256 F. Supp. 3d 329, 339 (S.D.N.Y. 2017); *see United States* v. *Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) ("The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation.").

Where the motion for a new trial is based on "newly discovered evidence," a defendant seeking a new trial must show: "'(1) that, with due diligence, they could not have discovered the evidence during trial; (2) that the evidence is material; and (3) that the evidence is non-cumulative.'" *Harris* v. *United States*, 9 F. Supp. 2d 246, 254 (S.D.N.Y. 1998) (quoting *United States* v. *Torres*, 128 F.3d 38, 48–49 (2d Cir. 1997)), *aff'd*, 216 F.3d 1072 (2d Cir. 2000)).

The Court may order a new trial under Rule 33 where the government has failed to disclose "evidence in the prosecutor's control that is of an exculpatory or impeaching nature." *United States* v. *Stofsky*, 527 F.2d 237, 243 (2d Cir. 1975). The Court's analysis under Rule 33 with respect to evidence in the government's possession largely mirrors its analysis under *Brady*. *See id.* If the government "deliberately suppressed the evidence, a new trial is warranted if the evidence is merely material or

favorable to the defense." *United States* v. *Kahn*, 472 F.2d 272, 287 (2d Cir. 1973). Inadvertent or negligent government conduct requires a defendant to show that there would have been a "significant chance" that the newly discovered evidence "could have induced a reasonable doubt . . . to avoid a conviction." *United States* v. *Seijo*, 514 F.2d 1357, 1364 (2d Cir. 1975).

### B.   The Government's *Brady* Obligations

When a defendant is prejudiced by the government's failure to disclose to the defense favorable evidence, a new trial is warranted, regardless of the reason why the material was not produced. *Brady* v. *Maryland* holds that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963); *see also Giglio* v. *United States*, 405 U.S. 150, 153 (1972); *Kyles* v. *Whitley*, 514 U.S. 419, 432, 445 (1999).

There are three components to a *Brady* violation: "(1) the evidence at issue is favorable to [the defendant] because it is either exculpatory or impeaching, (2) the government suppressed that evidence, and (3) [the defendant] was thereby prejudiced." *United States* v. *Fernandez*, 648 F. App'x 56, 61 (2d Cir. 2016) (citing *Strickler* v. *Greene*, 527 U.S. 263, 281–82 (1999)).

As to the first component, favorable evidence "includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness." *United States* v. *Coppa*, 267 F.3d 132, 139 (2d Cir. 2001). *Brady* encompasses evidence that impeaches or calls into question the government's conduct of its investigation. *See Kyles*, 514 U.S. at 445 (noting that the suppressed evidence was crucial because, among other things, it "would have raised

opportunities to attack . . . the thoroughness and even the good faith of the investigation, as well"). The Second Circuit has cautioned that the government's "'consequent responsibility'" to make appropriate disclosure is such that "a prosecutor 'anxious about tacking too close to the wind will disclose a favorable piece of evidence.'" *Coppa*, 267 F.3d at 143 (quoting *Kyles*, 514 U.S. at 437, 439).

As to the second component, "[m]aterial is 'suppressed' within the meaning of *Brady* if it is not 'disclosed in time for its effective use at trial.'" *United States* v. *Jain*, 2020 WL 6047812, at *9 (S.D.N.Y. Oct. 13, 2020) (quoting *United States* v. *Douglas*, 525 F.3d 225, 245 (2d Cir. 2008)). In determining whether material was suppressed, a prosecutor is "presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case.'" *United States* v. *Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (quoting *Kyles*, 514 U.S. at 437). A determination that material was "suppressed" requires no finding relating to the prosecution's good or bad faith, and indeed does not even require a finding as to why the materials were not produced.

As to the third component, prejudice is established when there is "'a reasonable probability that the Government's suppression affected the outcome of the case'" or if the suppressed evidence could "'reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *United States* v. *Thomas*, 981 F. Supp. 2d 229, 241 (S.D.N.Y. 2013) (quoting *Coppa*, 267 F.3d at 135). When determining the materiality of suppressed evidence, it must be "considered collectively, not item by item." *Kyles*, 514 U.S. at 436; *see also Wearry* v. *Cain*, 136 S. Ct. 1002, 1007–

08 (2016) (emphasizing same and reversing and remanding where defendant's due process rights were violated by State's failure to disclose evidence casting doubt on credibility of witness).

Where the government's case is "far from overwhelming," *United States* v. *Triumph Capital Grp.*, *Inc.*, 544 F.3d 149, 163 (2d Cir. 2008), or where the suppressed evidence accords with the defense's theory and evidence, *United States* v. *Rivas,* 377 F.3d 195, 199–200 (2d Cir. 2004), the suppressed evidence is more likely to be material. *See also United States* v. *Gil,* 297 F.3d 93, 103 (2d Cir. 2002) (evidence material where "arguments and inferences [it] could support or reinforce . . . bear importantly on the central issue at trial"). "To prevail on his *Brady* claim, [a defendant] need not show that he more likely than not would have been acquitted had the new evidence been admitted. . . . He must show only that the new evidence is sufficient to undermine confidence in the verdict." *Wearry*, 136 S. Ct. at 1006 (internal quotation marks omitted). "Given this legal standard, [a defendant] can prevail even if . . . the undisclosed information may not have affected the jury's verdict." *Id.* at n.6.

The usual remedy for a *Brady* violation is a new trial. *Poventud* v. *City of New York*, 750 F.3d 121, 132 (2d Cir. 2014). But where a new trial does not sufficiently remedy the government's errors, or where there is significant prosecutorial misconduct (even if not intentional), dismissal with prejudice may be an appropriate remedy. *See United States* v. *Garrison*, 888 F.3d 1057, 1065 (9th Cir. 2018).

## C.    Dismissal of the Indictment

For purposes applicable here, a district court may dismiss an indictment either because (1) it finds a serious due process violation, *or* (2) it concludes that dismissal

is warranted under its supervisory powers. *United States* v. *Bundy*, 968 F. 3d 1019, 1030 (9th Cir. 2020).

As to the former, "'if the government violates a protected right of the defendant, due process principles may bar the government from invoking the judicial process to obtain a conviction if the government's conduct reached a demonstrable level of outrageousness.'" *United States* v. *Jain*, No. 19-CR-59 (PKC), 2020 WL 6047812, at *9 (S.D.N.Y. Oct. 13, 2020) (quoting *United States* v. *Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991) (alteration omitted). Determining whether misconduct rises to the level of a due process violation "turns on whether the governmental conduct, standing alone, is so offensive that it shocks the conscience." *United States* v. *Walters*, 910 F. 3d 11, 27 (2d Cir. 2018) (alteration and internal quotation marks omitted). A defendant's due process rights are violated when the government fails to disclose evidence materially favorable to the accused in violation of *Brady*. *Thomas*, 981 F. Supp. 2d at 238; *cf. Walker* v. *City of New York*, 974 F.2d 293, 300 (2d Cir. 1992) ("[W]ithholding *Brady* material will virtually always lead to a substantial violation of constitutional rights.").

Although the government's failure to comply with *Brady* typically results in a new trial, the remedy of dismissal of an indictment is available in order "'to eliminate prejudice to a defendant in a criminal prosecution, where it [is] impossible to do so by imposition of lesser sanctions, or to deter a pattern of demonstrated and longstanding widespread or continuous official misconduct.'" *Jain*, 2020 WL 6047812, at *9 (quoting *United States* v. *Broward*, 594 F.2d 345, 351 (2d Cir. 1979)); *see also United States* v. *Stein*, 541 F.3d 130, 144, 158 (2d Cir. 2008) (affirming dismissal of indictment where district court concluded "no other remedy would restore [defendants] to the position they

would have enjoyed but for the government's unconstitutional conduct"); *Broward*, 594 F.2d at 351 (noting that foregoing "may not be the only conceivable circumstances in which we would uphold a dismissal").

A district court also may "dismiss an indictment under its inherent supervisory powers (1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct." *Bundy*, 968 F.3d at 1030 (internal quotation marks omitted); *see also United States* v. *Hasting*, 461 U.S. 499, 505 (1983); *Mesarosh* v. *United States*, 352 U.S. 1, 14 (1956). The government's "reckless disregard" for constitutional obligations, even if unintentional, can constitute flagrant or outrageous misconduct warranting dismissal. *Bundy*, 968 F.3d at 1042; *United States* v. *Chapman*, 524 F.3d 1073, 1085–86 (9th Cir. 2008).

Although the exercise of a court's supervisory authority to dismiss an indictment is a "drastic remedy," the Second Circuit has approved this result "when the pattern of misconduct is widespread or continuous." *United States* v. *Brown*, 602 F.2d 1073, 1075–77 (2d Cir. 1979). As a result, a district court may dismiss an indictment with prejudice where a prosecutor's actions constitute "reckless disregard" for discovery obligations, substantially prejudice the defense, and no lesser remedial action is available. *Chapman*, 524 F.3d at 1084–86 (affirming dismissal based on finding that government "recklessly violated its discovery obligations" where prosecutor failed to log disclosed and nondisclosed materials, and misrepresented to court that he had fully complied with *Brady* and *Giglio*, "even if the documents themselves were not intentionally withheld from the defense"); *see also United States* v. *Aguilar*, 831 F. Supp. 2d 1180, 1206, 1210 (C.D. Cal.

2011) (dismissing indictment due to the government's "many wrongful acts," including *Brady* violations, and noting that the government "should not be permitted to escape the consequences of that conduct" and "benefit from a 'do over'").

## III.   ARGUMENT

### A.   At Minimum, the Court Should Vacate the Convictions and Order a New Trial Based on the Suppressed Evidence Concerning the Allocutions

The government's suppression of—or failure to disclose in time for effective use at trial—the allocution-related evidence warrants a new trial under either Rule 33 or *Brady*.  The evidence suppressed by the government is material and non-cumulative, and its most significant features (including the extent of the government's role in drafting the revised allocution) were not revealed until after trial.

Whether the government's conduct was "improper" or undertaken in good faith is irrelevant for these purposes.  What matters is that the government's disclosure failures—even if unintentional—deprived the defendants of their right to present relevant evidence and make important arguments to the jury.  If the government had made its required disclosures before trial, the defense would have been able to put before the jury compelling evidence to support an argument that the cooperators were effectively a blank slate upon which the government impressed its theory of the case.  Indeed, one would be hard pressed to find a more concrete example of this fact than where a prosecutor scripted meaningful changes to an allocution that the witness adopted wholesale under oath and without question.

Particularly when combined with evidence of similar efforts to make changes to other cooperators' allocutions, as well as evidence from proffer notes of the witnesses' testimony on key issues shifting to more closely align with the government's

theory of the case, the allocution-related evidence would have powerfully supported an argument regarding the malleability of the government's cooperators. And it would have allowed for a meaningful and evidence-based argument that the cooperators' versions of events had been curated and reworded to match the government's version of the facts. The suppression of this evidence and information requires a new trial.

      1.    *The Evidence Was "Suppressed" For Purposes of* Brady

Critical information regarding the changes to Majidi's proposed allocution and the government's role in making those changes was not disclosed until after trial. Because there is no dispute that the material was in the government's possession and not "disclosed in time for its effective use at trial," *Jain*, 2020 WL 6047812, at *9, the information was necessarily suppressed under *Brady*, regardless of the reasons for the government's failure to disclose it. As relevant under Rule 33, the defense could not have discovered this evidence with due diligence before trial. Indeed, despite the defense's repeated efforts—going as far back as August 2018 and reiterated in November 2018, January 2019, and March 2019—to specifically obtain "exculpatory or impeachment information communicated to the government by *counsel* for a potential witness," Aug. 15, 2018 Ahuja Ltr. at 1–2, ECF 56-11 (emphasis in original), the government still did not disclose its revised Majidi allocution until a year *after* trial.

The government now concedes, as it must, that its efforts to identify and produce material were insufficient, but maintains that these failures were unintentional. *See, e.g.*, Griswold Decl. ¶ 36. As discussed *infra* § III.A, this record—which clearly shows that every member of the prosecution team either wrote or received a copy of the revised allocution and took no steps to preserve or produce it, or to disclose the government's role in shaping the allocution—justifies a finding that the decision not to

produce or disclose the suppressed communications was deliberate or at least reckless.  But in determining the defendants' right to a new trial, the government's intent is ultimately irrelevant.  The Court "need not decide whether the non-disclosure was a deliberate tactical concealment, or resulted from the mismanagement of information, or from sloppy thinking about the evidentiary significance of the material."  *Leka* v. *Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001).  That is because "[i]t is clear enough, without deciding these questions, that the prosecution failed to make sufficient disclosure in sufficient time to afford the defense an opportunity for use."  *Id.*

### 2.    *The Suppressed Evidence Was Material and Non-Cumulative*

#### (a)    The Suppressed Allocution-Related Evidence Was Material

The suppressed allocution evidence was material to the defense in multiple respects.  In particular, the revised Majidi allocution, and the circumstances surrounding its creation and delivery to Majidi, provided straightforward evidence that would have allowed the defense to question significant aspects of the government's presentation of its case at trial.

The government will surely take the position that the changes in the plea were immaterial.  So, for example, AUSA Naftalis stated that he would not have cared if "Mr. Majidi had read into the record what was sent as a proposed allocution," Trial Tr. 768:20–769:1.  But that claim is belied by the evidence that has now been produced.  The evidence shows that upon receiving the proposed allocution, AUSA Naftalis circulated it to the trial team and both he and AUSA Nicholas remarked on it and the need to meet to discuss it; all three prosecutors scheduled a meeting to discuss the allocution (among other matters); AUSA Naftalis rewrote the proposed allocution and circulated it to the trial team;

51

and then he discussed it first in a ten-minute phone call and then during an in-person meeting with Majidi's counsel immediately prior to his plea. *See supra* § I.H.

The substance of the government's changes to the allocution was material. The Court has noted that Majidi's actual allocution was "quite different from the proposed allocution," Trial Tr. 763:1-5, and the edits did not merely go to the elements of the charged offenses. For example, the government deleted Majidi's statement that the "scheme accelerated in the second half of 2015, as the hedge fund's performance was deteriorating."

Both defendants argued throughout trial that any alleged mismarking at PPI began in mid-2015. Mr. Shor had argued that this was when he began raising the issue of aggressive marks with Majidi, and Mr. Ahuja had emphasized that the illiquidity in the market that became more pronounced in mid-2015 was such that the mismarking would not have been obvious to Mr. Ahuja as PPI's CEO. In response to the defense arguments, the government sought to push the start of the mismarking back to 2014. Indeed, notwithstanding objective evidence that the marks reflected fair value in 2014—including E&Y's extensive testing of 2014 marks as part of its audit and E&Y's subsequent determination that no restatement was necessary for periods before the second half of 2015—the government used cooperator testimony to argue that mismarking had occurred in 2014. *See* Trial Tr. 4886:13-23 ("Why would someone like Majidi or Dole or Dinucci say that they had committed a crime in 2014 when they hadn't?. . . . People are not going to exaggerate their own involvement in crimes. Witness after witness told you they were doing it in 2014 too . . . ."). The government plainly believed that it would be more credible that Mr. Ahuja, as CEO of PPI, knew about and participated in the alleged mismarking scheme, and that Mr. Shor began pushing back against Majidi in mid-2015 because of his

compensation and not the pressure Majidi was placing on him to push marks, if the alleged mismarking scheme began earlier.[12]   In deleting the statement adopted by Majidi that referred to 2015, the government undercut a defense argument, and did so without any disclosure to the defense.

The government has also argued that the changes to the allocution like this one are consistent with prior proffer statements and therefore irrelevant.  Neither is true.

As to the former, the government has stressed that Majidi mentioned in his initial proffer that mismarking began in 2014, *see* July 16, 2020 Gov't Ltr. at 6, ECF 390 (citing 3520-05 at 7 (June 18, 2018 Majidi proffer)), and continues to repeat the inaccurate claim that the revised Majidi allocution was "consistent with the defendant's proffer statements," Naftalis Decl. ¶ 15; *see also* June 19, 2020 Gov't Ltr. at 4, ECF 368 ("[E]ach of the changes reflected in the Redline is completely consistent with Majidi's statements during proffer sessions.").[13]   But while the government's changes may be consistent with some selected excerpts of prior 302s, they are plainly inconsistent with others.  So, for example, in one pre-plea proffer, Majidi said: "There was always a push on the hedge fund business to have aggressive marks.  MAJIDI did not initially believe the push in the hedge fund was material in Q1 and Q2 2015, but he could not recall.  The push became a problem

---

[12]     It was also important for the government to try to place the mismarking before the second half of 2015 because Nimberg resigned on July 1, 2015 and, thus, testimony from Majidi or others that PPI's marks reflected fair value before the second half of 2015 would have contradicted Nimberg's testimony.  Trial Tr. 1679:1-9; 1676:4–1677:8.

[13]     The SEC, which had multiple representatives at the same meetings, *see, e.g.*, 3520-05 at 1, ECF 428-1 (listing two SEC representatives at June 18, 2018 Majidi proffer), did not allege mismarking that went back to 2014.  Rather, the SEC charged a scheme that ran from "at least September 2015 through March 2016."  Amended Complaint ¶ 2, *SEC* v. *Premium Point Investments LP*, 18-cv-04145-AJN (S.D.N.Y. Nov. 19, 2018), ECF 24.  And, of course, Majidi's counsel were at the same proffers, and had an interest in proposing an allocution that was consistent with those proffers, and yet the proposed Majidi allocution differed significantly from the version the government edited.

in Q2 2015, including in April 2015 when there was a drop in rates." 3520-08 (302 of July 10, 2018 proffer) at 6, ECF 385-12.

The same 302 suggests that Majidi was challenged on the point, and stated that "*It was possible mismarking began in 2014.  It was possible there were months in 2014 when marks were being moved.*" *Id.* at 7 (emphasis added).[14]  Thus, the statements in the initial proffer, as memorialized in the prosecution team's raw notes and a memorandum, are consistent with the suppressed evidence, and could fairly be used to show that cooperators' information was malleable and variable.

In subsequent proffers, Majidi stressed 2015 as the beginning of the mismarking period. *See, e.g.*, 3520-11 at 2–3, 6–8 (July 13, 2018 Majidi proffer), ECF 385-14; 3520-13 (July 18, 2018 Majidi proffer) (only discussing conduct from 2015 onwards); *see also* ECF 385 at 11 n.4 (citing proffer notes).  And even at trial, after testifying on direct that the mismarking began in 2014, Majidi also admitted on cross-examination that marks were within "an acceptable range" in 2014 and it was in the second half of 2015 that marks became "out of whack" with the securities' fair value.  Trial Tr. 2693:4-8, 2716:24–2718:12.  Regardless, even if the changes were consistent with his proffers, so was the proposed allocation. *See Rivas*, 377 F.3d at 199–200 (*Brady* material can have "both an inculpatory and an exculpatory effect" and granting new trial based on disclosure that was both consistent with government witness's trial testimony and that

---

[14]     Majidi's first proffer reflects other discussion of the time period of the alleged conspiracy.  The 302 states, at page 7, that Majidi claimed that "[t]he mismarking of securities at PPI occurred from 2014 through 2016. . . .  The mismarking began with the NEW ISSUE portfolio, as early as the end of 2013.  The phenomenon spread to the hedge fund in early 2015, as returns started to struggle in the hedge fund." 3520-05 at 7, ECF 385-13.  But the raw notes of the same proffer, indicate that these were some of the first statements taken from Majidi, and that they came in the context of a review of the Indictment—i.e., the government's established narrative. 3520-06 at 1, Ex. G.

supported defense theory).  Importantly, the government never has claimed that anything it deleted or changed was factually inaccurate.

The defense case would have been bolstered if Majidi had delivered the allocution that was originally proposed.  The defense case would have been helped even more if the defense had had access to the suppressed evidence and could have shown that, at least on one occasion, the government had scripted Majidi's sworn statement to match the government's preferred time frame.  Changes to align with one interpretation of a witness's prior statements rather than another interpretation constitute a material revision, and it is ultimately up to the jury, not the government, to determine which interpretation reflects the truth.  *See Kyles*, 514 U.S. at 440 (lauding goal of "preserv[ing] the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations").  Majidi's concession on cross-examination that the marks in 2014 reflected fair value would have made it all the more compelling to be able to show the jury that the government excised his reference to the second half of 2015 in the proposed allocution, and he read the revised version even though he believed the proposed allocution to be entirely accurate.

The change in the date was not the only revision of consequence.  Although Majidi's proposed allocution referenced only the "Mortgage Credit Fund"—a fund in which Mr. Ahuja had limited substantive involvement—the government changed the allocution to refer to "funds" and "portfolios" (plural).  App.  Again, the government was not neutral on the distinction, and the issue was hotly contested at trial.

The revised allocution deleted any references to Majidi "pressuring traders," even though a central pillar of both Mr. Ahuja and Mr. Shor's defense was that it

was Majidi who had pushed traders for inflated marks.  And while the proposed allocution did not mention Mr. Shor at all, the government's revisions added two specific references to Mr. Shor to identify him as a participant in the marking scheme.  All of these changes were consistent with the government's theory of the case and inconsistent with the defense theory.  Put another way—and separate and apart from the very fact that changes were made at all—if Majidi had delivered his allocution as originally proposed, it would have figured prominently at trial.  More fundamentally, and most importantly, regardless of the materiality of the *substance* of the revisions, the *fact* of the revisions was itself relevant and material.  The suppression of evidence of Majidi's willingness to let the government shape his words to the Court denied the defense the opportunity to put material evidence before the jury.

The government has focused in its post-trial letters and sworn declarations on arguing that the revisions to the proposed Majidi allocution were not "improper."  June 24, 2020 Gov't Ltr. at 2, ECF 371 (arguing that the changes were not "improper"); July 16, 2020 Gov't Ltr. at 11, ECF 390 ("[T]here was nothing improper about the edits that the Government proposed to Majidi's counsel."); Naftalis Decl. ¶ 25.[15]  Whether or not the revisions were "improper," however, is ultimately beside the point.  Again, the probative value of the evidence—and thus both its admissibility and materiality—did not arise out of the propriety of the government's conduct, but rather from the fact that it happened.  We now know that Majidi's counsel had provided an "approved" version of Majidi's allocution

---

[15]     Although the government now insists that editing cooperator plea allocutions is routine and proper—a proposition that need not be decided to rule on these motions—AUSA Naftalis was firm in that he did not, and never would, tell a cooperator what to allocute to, and only would suggest hitting the elements or correcting a factual inaccuracy.  Trial Tr. 769:10-22.  At the time, and before the evidence revealed that it was in fact the prosecution that rewrote Majidi's plea, none of the prosecutors suggested that rewriting a cooperator's allocution is a customary practice.

to the government, the government rewrote it, the government conveyed its rewrite to Majidi's counsel shortly before Majidi's plea, and Majidi then read that rewrite to the Court under oath and told the Court it reflected his own "thoughts."  Tr. 31:8-11, ECF 210, Ex. C.  The government deprived the defense of the opportunity to properly challenge the government reliance on cooperators' testimony with this concrete and undisclosed evidence of both the witnesses' malleability and the government's willingness to take advantage of it.

That lost opportunity was particularly significant in a case that relied heavily on cooperator testimony.  As the government itself framed the case in summations, a not guilty verdict would require that jurors believe "that Mr. Nimberg lied to you, Mr. Majidi lied to you, Mr. Dole lied to you."  Trial Tr. 4639:25–4640:2.

The government's case against Mr. Ahuja focused on his setting inflated "targets" and his knowledge that PPI's marks were being provided by corrupt brokers.  But evidence that Mr. Ahuja's performance targets were improper rested almost entirely (and with very few exceptions) on cooperator testimony as opposed to documentary or other evidence.  *See id.* at 4643:20-24 ("You also learned about Ahuja's setting the targets.  He's the one each month, rather than just look at what the numbers actually were, Mr. Ahuja set these targets.  You heard it from Mr. Dole:  Every month we had a target that we had to get to.  Mr. Nimberg:  They were set by Neil."); *id.* at 4644:3-22 (citing Majidi and Nimberg testimony to argue that Mr. Ahuja's "targets" were not "aspirational encouragement" but rather "instruction").  And the only supposed proof tying Mr. Ahuja to the corrupt brokers was testimony from cooperating witnesses.  *Id.* at 1230:5-21 (Dole testifying that Mr.

Ahuja referred to "Shor's boys"); *id.* at 4667:7-8 (government arguing to jury that "you know he knew about Dinucci because Dole told you that too").

Where the government did rely on communications referencing or involving Mr. Ahuja, it often cited the cooperators' interpretation of the (frequently complex financial) contents of those communications to argue that they evidenced Mr. Ahuja's guilt. *See, e.g.*, *id.* at 4707:1-7 (citing Dole's testimony to argue Mr. Ahuja's explanations of "creation value" to auditors did not make sense); *id.* at 4677:21-24 (relying on Dole testimony to argue that email to Mr. Ahuja referencing a few bonds reflected "analysis" of how "overmarked" the bonds in New Issue generally were).

The government's case against Mr. Shor likewise depended on cooperator testimony, often to interpret salacious but not self-evidently criminal text messages, *id.* at 2186–90 (Majidi interpreting text message with crude sexual references as relating to obtaining fraudulent pricing from Dinucci); *id.* at 248, 251, 276–78 (Dole interpreting text messages with crude sexual references as relating to *quid pro quo* relationship of trades for fraudulent marks); *id.* at 4653 (government summation); *id.* at 4877 (government rebuttal summation: "there are a bunch of other text messages where Mr. Shor does use dirty words. I don't want to rehash them again because I don't feel like being uncomfortable again in talking about them in front of you all again, but lots of dirty words were used by Mr. Shor in those texts."), to establish inflated valuations questioned by Dole's counsel in his revisions to the Information and unsupported by the E&Y valuation experts who reviewed the valuations, and to undermine, with uncorroborated claims regarding ulterior motives, Shor's conduct that was inconsistent with criminal intent, such as marking down his book by millions of dollars in defiance of Majidi's instructions, *id.* at 346–351 (Dole recounting

a purported conversation with Mr. Shor in a bar—nowhere reflected in any of Dole's 3500—in which Dole claims Mr. Shor described a plan to mark down his book to obtain leverage in compensation negotiations regarding his bonus).

The suppressed rewrite of the allocution would not have been presented in isolation. The jury could also have learned that the changes to Majdi's proposed allocution were consistent with changes made to the proposed allocution of another cooperator, Dinucci, and accepted by Dinucci when he entered his plea. And the jury would have heard that the government had spoken with counsel for yet another cooperator, Dole, on the day of his plea, with the substance of those communications remaining unknown because the government did not memorialize them.

But the jury did not hear any of this evidence, which would have placed the evidence they heard and saw at trial (or the lack thereof) in context.[16] While the jury knew that the government's key witnesses were testifying pursuant to cooperation agreements, the jury was unaware of the government's role vetting and editing their sworn allocutions. The defense should have been permitted to use this evidence to call into question—through affirmative evidence, cross-examination, and argument—whether (and, if so, to what extent) the cooperators were speaking in their own voice as opposed to reading a script authored by the government. The suppressed evidence could have been used to argue that

---

[16]    While the defense was unaware of the government's role in drafting the revised Majidi allocution at the time, the defense was able to elicit another notable aspect of Majidi's plea: that Majidi had initially said, in response to a Court question, that he did not understand his conduct to have been illegal, but that he had then changed his answer after the government asked for a moment to confer. Trial Tr. 2360:5–2362:22; *see also id.* at 2349:9-12 (defense noting that such testimony went to Majidi's "motive to testify in a way that is consistent with what the government expects to hear. That's a jury argument, and I'm entitled to make it."). At the time, however, the defense was entirely unaware of one possible explanation for Majidi's hesitation: that the phrase that had triggered the Court's question—"I knew what I was doing was wrong"—was ***added by the government*** and most likely seen by Majidi for the first time either just before or as he read his allocution. *See* July 6, 2020 Ahuja Ltr. at 19, ECF 385.

the witnesses were pliable and had been steered to provide testimony helpful to the government.

A prosecutor's interaction with a witness can, intentionally or unintentionally, influence the witness's testimony.[17]  As a result, courts have stressed the importance of permitting defense counsel to cross-examine witnesses on the circumstances surrounding conduct suggestive of witness coaching or pliability.  For example, in *Kyles*, the Supreme Court concluded that a jury would have been troubled—and the verdict potentially affected—by suppressed evidence reflecting an evolution in an eyewitness's testimony, as "[t]hese developments would have fueled a withering cross-examination, destroying confidence in [the witness's] story and raising a substantial implication that the prosecutor had coached him to give it."  514 U.S. at 443; *see also Geders* v. *United States*, 425 U.S. 80, 89–90 (1976) (noting one way to deal with problem of potential "influence on testimony or 'coaching' of a witness" was "[s]killful cross-examination" by opposing counsel).  And in *United States* v. *Milles*, the Ninth Circuit concluded that thorough cross-examination about the government handing a witness a question-and-answer sheet prior to his testimony protected the defendant's right to a fair trial.  363 F. App'x 506, 509 (9th Cir. 2010); *see also United States* v. *Sayakhom*, 186 F.3d 928, 945 (9th Cir. 1999) (where government witness's testimony suggested potential coaching, denying relief because "[c]ross-examination and argument are the primary tools for addressing improper witness

---

[17]     *See* Brittany R. Cohen, "*Whose Line Is It Anyway?": Reducing Witness Coaching by Prosecutors*, 18 N.Y.U.J. Legis. & Pub. Pol'y 985, 1031 (2015) ("Prosecutors have the ability, whether knowingly or unknowingly, to alter witnesses' descriptions of events through improper witness coaching before cases proceed to trial.").

coaching," and defense was "free to address the witness' credibility on cross-examination or in closing argument"), *amended*, 197 F.3d 959 (9th Cir. 1999).[18]

Evidence of specific manifestations of cooperators' receptiveness to the government's suggested testimony is particularly compelling because all such witnesses have at least a theoretical incentive to please prosecutors by stretching the truth and inculpating the defendant. *See Bruton* v. *United States*, 391 U.S. 123, 136 (1968) (noting that the "credibility [of an accomplice] is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others," and commenting that the "unreliability of such evidence is intolerably compounded" when it "cannot be tested by cross-examination"); *On Lee* v. *United States*, 343 U.S. 747, 757 (1952) ("The use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility. To the extent that they do, a

---

[18]     Separate and apart from the essential airing of these circumstances before the jury as part of a fair trial, courts have also expressed concern about prosecutors putting words in witnesses' mouths. *See Maldonado* v. *Scully*, 89-cv-5483 (RWS), 1990 WL 102209, at *2 (S.D.N.Y. July 12, 1990) (noting impropriety when "prosecutor took the position that the State would entertain a plea from the co-defendants only if they allocuted to the facts as the prosecutor purported to know them to be"), *aff'd*, 932 F.2d 956 (2d Cir. 1991). Indeed, courts have pointed to the full exploration of the prosecutor's conduct in front of the jury as remedying the impropriety of witness coaching. *United States* v. *Cincotta*, 689 F.2d 238, 244–45 (1st Cir. 1982) (finding that a government document coaching witnesses on how to present testimony was "prosecutorial misconduct," but denying relief because the trial court permitted defendant to cross-examine witnesses on the document); *see generally United States* v. *Bautista*, 23 F.3d 726, 731–32 (2d Cir. 1994) (noting that government contact with witness during break in cross-examination was improper, but finding no constitutional violation where that contact was elicited by prosecutor on re-direct, and the witness was then "subjected to further cross-examination by defense counsel"); *United States* v. *Malik*, 800 F.2d 143, 149 (7th Cir. 1986) (recess conversation between prosecutor and government witness did not warrant reversal where that conversation was known to defense counsel and defense counsel had an opportunity to cross-examine the witness); *People* v. *Giap*, 273 A.D.2d 54, 55 (1st Dep't 2000) ("The conference [between the prosecutor and a witness during a recess] did not impair the truth-seeking function of the trial or cause any prejudice to defendant, who was able to exploit this incident fully on resumed cross-examination.").

defendant is entitled to broad latitude to probe credibility by cross-examination and to have the issues submitted to the jury with careful instructions.").

Here, of course, neither the defense nor the Court was aware of the full scope of the evidence showing that the government had provided Majidi with proposed statements and Majidi had adopted them as his own, or the extent of the government's intervention in the other cooperator allocutions. It is not unreasonable to conclude that the jury would have viewed the evidence against the defendants in a materially different light if the defense had been aware of, and had the opportunity to introduce, the suppressed evidence at trial.

Ironically, the prosecution's vehemence in denying any role in making meaningful edits to Majidi's proposed allocution is itself powerful evidence of their materiality. *See* Trial Tr. 769:6-7 (AUSA Naftalis stating that he "would never suggest to a defense lawyer, this is what he should say or not say."); *id*. at 770:6-20, 771:1-5 (stating unequivocally that the government had not added Mr. Shor's name to the allocution); *id.* at 2066:15-18 (Court relying on government's assurances that they did not handle the edits to the Majidi allocution). The evidence we know now exists—that AUSA Naftalis received Majidi's allocution, that he and his trial partners then called for a meeting to discuss it, that he rewrote it, and then, rather than simply emailing changes or otherwise memorializing his conduct and communications, spoke by phone with counsel and called for an in-person and undisclosed meeting with counsel prior to the plea—also demonstrates an awareness on the government's part that evidence of this conduct would be material to the defense and the jury in evaluating the credibility of Majidi and the reliability of the investigation and prosecution.

Indeed, the government's summation to the jury about the defendants' state of mind aptly applies to the prosecution's failures to memorialize and produce its communications with defense counsel and its revisions to allocutions: "And they're doing this, they're meeting secretly, and doing it over cellphone and WhatsApp.  And Mr. Nimberg told you, there was no need for that.  They could have picked up the [potentially recorded] phone on the desk or sent an email if they thought this was legitimate."  Trial Tr. 4658:10-14.  The prosecution's conduct and statements contradict their claims that (a) they would not have cared if Majidi had read the proposed allocution and (b) they believed the allocution-related evidence to be unworthy of disclosure to the Court or the defense, and immaterial to the jury.

(b)  The Suppressed Allocution-Related Evidence Was Not Cumulative

Nor was the suppressed allocution-related evidence cumulative.  Although Majidi's cross-examination included extensive questioning about his credibility, the defense and the Court were unaware of the simple and compelling evidence of his willingness to be coached, and the government's willingness to coach him.  This stark evidence—in easy-to-follow written documents—is not the same as impeaching a cooperators' motivations generally, and is qualitatively different from the issues—many of them ancillary—on which the cooperating witnesses were already impeached.

Moreover, this evidence would have served as a basis for the defense to develop an argument that key portions of the witnesses' trial testimony were the product of government influence.  Linking the government's efforts to shape the plea allocutions to the key cooperator testimony, the defense could have further undermined the reliability of the government witnesses and caused the jury to more skeptically view the government's

theory of the defendants' criminal intent.  *See Kyles*, 514 U.S. at 445 ("Damage to the prosecution's case would not have been confined to evidence of the eyewitnesses, for [the government witness's] various statements would have raised opportunities to attack . . . the thoroughness and even the good faith of the investigation, as well."); *Bowen* v. *Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation.").  This evidence would have been particularly powerful here given that there was objective, documentary evidence that aligned with the defense theory and contradicted the cooperators' testimony.[19]  That concrete evidence would have likewise cast a new light on the variation of witness statements over the course of dozens of proffer and prep sessions, as well as testimony elicited at trial that had not previously or had only recently appeared in 3500 material—powerfully crystallizing the malleability of the cooperating witnesses for the jury.[20]

---

[19]     For example, although the government witnesses testified that Mr. Ahuja "set targets" to convey to Skybridge and PPI's other investors, Trial Tr. 2103:20-23, the evidence showed that Majidi regularly supplied Mr. Ahuja with PPI's performance numbers, and that Mr. Ahuja accurately conveyed those numbers to Mr. Gayeski at Skybridge.  *See id.* at 4732:4–4733:11; Ahuja Summation Presentation at 17–18 (documenting Mr. Gayeski asking for a "breakdown of performance, Mr. Ahuja forwarding the request to Majidi, who provided PPI's marks to Mr. Ahuja, and Mr. Ahuja providing those exact numbers to Mr. Gayeski).  Similarly, the government relied heavily on cooperator testimony in arguing that mismarking at PPI began in 2014, Trial Tr. 1591:22-25, even though the expert valuations performed by PPI's independent outside auditor, E&Y, determined that a restatement of PPI's NAV calculations was warranted only as of September 2015, and not any earlier.  *See id.* at 2978:7–2979:11 (E&Y Partner John Ansbacher).  After testing PPI's valuations for the second quarter of 2015, E&Y concluded that no restatement prior to September 2015 was necessary.  *Id.* at 2978:21–2979:11; *see also id.* 2952:21-24 (PPI received a clean audit from E&Y in 2014).  And while Nimberg repeatedly stated that his book was mismarked, *see id.* at 1758:11-12, after a review of the trading activity in Nimberg's book from 2014 through June 2015, Mr. Ahuja's expert witness concluded that Nimberg's bonds were, on average, sold at higher prices than his marks, indicating that his book was not overmarked, *id.* at 4344:9–4347:4.

[20]     *See* Trial Tr. 561:3-17 (Dole); *id.* at 1705:8–1706:1 (Nimberg); *id.* at 2249:10-22 (Majidi); *id.* at 3282:13-16 (Dinucci).

In fact, critical evidence (specifically requested by the jury during deliberations) came in the form of uncorroborated cooperator testimony that bore indicia of government "shaping." For example, Mr. Ahuja argued that there was no evidence of his ever referring to "Shor's boys" or "Shor's guys," as Dole testified, and that Dole had simply made that up. *See* Trial Tr. 4765:4-6, 4766:14-16. When the government originally asked Dole on redirect if Mr. Ahuja had used the term "Shor's guys"—the term referenced in the Superseding Indictment (S1 ¶ 30)—Dole readily agreed he had, before changing his story to say the term was "Shor's boys." *Id.* at 1230:5-21. Nothing in the voluminous record of contemporaneous communications reflected Mr. Ahuja using either term. Evidence of the government "shaping" the draft allocution for Majidi and Dinucci could have been used to argue that Dole's testimony was the product of government influence or even Dole's desire to please the government. The government would have been hard pressed to argue that there was no evidence of this kind of shaping of cooperator testimony.

Mr. Shor also could have used this evidence to challenge the government's theory that there were multiple corrupt brokers, as indicated by the phrase "Shor's boys." The defense had shown that despite Dinucci's testimony, the marks he provided were frequently lower than marks provided by sources that were not alleged to be "corrupt" brokers. In fact, more than half of the time, Dinucci's marks were *lower* than Bank of America, Cantor Fitzgerald, Goldman Sachs, and Morgan Stanley, brokers as to whom there was not even a suggestion of fraud. *See id.* at 4817:23–4818:21.

Dinucci's testimony that Mr. Shor referred to receiving pressure from his "bosses" (plural) provides another example of key cooperator testimony—which was uncorroborated and, indeed, contradicted by documentary evidence—that would have been

undermined and cast in a different light by the allocution evidence.  On cross-examination of Dinucci, Mr. Ahuja's counsel emphasized that (i) through dozens of meetings with the government, Dinucci had never mentioned Mr. Ahuja when discussing the people who Mr. Shor identified as the source of pressure at PPI, (ii) the documentary evidence reflected that Mr. Shor always referred to his "boss" (singular) as the source of pressure, (iii) Dinucci always understood Mr. Shor's use of the word "boss" to be a reference to Majidi, and (iv) Dinucci had mentioned Mr. Ahuja in this context to the government for the first time only weeks before trial.  Trial Tr. 3689–3695:1.  In response to leading questions on redirect, however, Dinucci claimed that Mr. Shor sometimes used the term "bosses" (plural).  *Id.* at 3695:22–3696:6.  Mr. Ahuja's attempt to cast this testimony as the product of government influence would have been substantially bolstered by the evidence of the government's shaping of the allocutions.[21]

And it was only at trial that Nimberg testified to a new uncharged theory of fraud in which he allegedly participated—the practice of strategically limiting challenges to marks as too low, and never challenging them as too high.  *Id.* at 1559:23–1562:2.

If the jury had seen concrete evidence that the government had scripted Majidi's plea and Majidi had willingly accepted the rewrite, that the government had taken pains to vet Dinucci's allocution, and had ensured itself an opportunity to speak to Dole's counsel on the day of Dole's plea, the defense would have been able to make straightforward arguments that this additional testimony, uncorroborated (and often contradicted) by the documentary record, was the product of cooperators and immunized

---

[21]  The significance of this issue is highlighted by the jury's specific request for communications referring to "bosses" (plural).  *See* Court Ex. 1 at 1, ECF 227.  (There were none.  Trial Tr. 5066:6-13.)

witnesses adjusting their testimony to match what they thought the government wanted to hear.  In practice, and based on the evidence it was aware of and able to offer at trial, the impact of these examples was undermined by the absence of the suppressed evidence.

3.  *The Court's June 10, 2019 Ruling Was Based on the Government's Incomplete and Inaccurate Account*

The Court's June 10, 2019 Order (ECF 213) precluding cross-examination of Majidi and Dinucci about their allocutions—and preventing the defense from calling their respective counsel as witnesses—relied on a number of inaccurate factual predicates that either originated with the government or that the government failed to correct when given the opportunity to do so.

At the time of its June 10, 2019 ruling, the Court recognized the potential significance of evidence of the government's involvement in the changes to the proposed Majidi allocution, and signaled its interest in the issue by inquiring of the government and counsel for the cooperating witnesses, and ordering the government to re-check its files and certify its compliance with the Court's orders.  The government thereafter represented that its search was complete, and, by implication, that all of the relevant documents had been produced.

The Court, through no fault of its own, ruled on an incomplete and incorrect record.  Although the Court was aware that Majidi's proposed plea allocution was "quite different" from the allocution he delivered in court, Trial Tr. 763:1-5, the Court did not know—because the government was adamant in denying it—that the government authored the revised version and was responsible for every one of the changes.  The Court also did not know that the government actually handled the editing of the document.  The Court was told the opposite, noting that "Mr. Rosenberg suggested that maybe there was a

possibility that the government handled the edits[,] [s]o I'm allowed to ask whether [the prosecutors] handled the edits, and I'm being told they didn't." *Id.* at 2066:15-18.  The Court also was told unequivocally that AUSA Naftalis did not speak with Majidi's counsel on the day of Majidi's plea hearing, s*ee id.* at 772:1-5, even though he asked to and did speak to Majidi's lawyer in person before the plea, discussed the allocution, and almost certainly handed him or Majidi the rewritten allocution.  The government also told the Court that it did not send anything to Mr. Rosenberg by means other than email.  *See id.* at 2063:11-14 ("THE COURT: On the day of the plea . . . did you receive anything from the government by any means other than email?   MR. ROSENBERG: I don't have a recollection of that."); 2065:23–2066:2 ("THE COURT: While I have you standing, sir, did the government send anything to Mr. Rosenberg?  MR. NICHOLAS: Your Honor, I have no recollection of that.  MR. NAFTALIS: No.").

       In denying relief to the defendants, the Court further relied on the belief that the government had performed the searches it was directed to perform.  As the Court explained, "[t]hough there have been problems with the Government's discharge of its disclosure obligations, the Court believes that those matters have been resolved by the Government's compliance with the Court's recent directives."  ECF 213 at 5.  The Court's faith in the government's compliance with its directives was misplaced.  If the government had complied with the Court's unambiguous directive to review ***all*** emails with counsel for cooperating witnesses, the government could not have made the representations it made.

       The Court's diligent efforts to determine the facts suggests that those facts mattered to the ultimate ruling on the issue before the Court.  Now that we know that the true facts are different (and in some cases the polar opposite) of the facts presented to the

Court, it stands to reason that the Court's ruling would have been (or at least could have been) different had it known the truth. Rule 403 favors admissibility, and evidence is excluded only when its probative value is substantially outweighed by its prejudicial effect, such as jury confusion. *See United States* v. *White*, 692 F.3d 235, 247 (2d Cir. 2012). The probative value of this newly discovered evidence, coupled with the newly discovered emails among the prosecutors concerning Majidi's plea, is high, and certainly not substantially outweighed by any unfair prejudice to the government or risk of jury confusion.

The Court's finding of prejudice, as articulated in its ruling, rested on two assumptions—the need to explain Rule 11 proceedings to the jury, and the risk that jurors might believe the prosecutors had done something improper in vetting the allocutions. ECF 213 at 4. But if the Court had been provided accurate and complete information about the prosecution's interactions with cooperators' counsel, its analysis of the existence and weight of these two prejudices would at a minimum have been different. And while the Court also noted concerns about implicating privileged communications, the evidence uncovered after trial confirms that the government handled the changes to the allocutions and that the communications and conduct underlying those changes would not be privileged.

\* \* \* \*

In sum, and whether viewed as *Brady* or as newly discovered evidence under Rule 33 (or both), the evidence related to the allocutions was suppressed as that term is defined in the case law, was material to the defense, and was non-cumulative. On this record, we respectfully submit that it is hard to argue (and harder to find) that there was

not 'a reasonable probability that the Government's suppression affected the outcome of the case" and that these suppressed *Brady* materials would not have "'put the whole case in such a different light as to undermine confidence in the verdict.'" *Thomas*, 981 F. Supp. 2d at 241 (quoting *Coppa*, 267 F.3d at 135).   Likewise, under Rule 33, there is at a minimum a "significant chance" that evidence of witness malleability and government influence could have "induced a reasonable doubt in the minds of enough jurors to avoid a conviction."  *Seijo*, 514 F.2d at 1364.

The Court should therefore, at minimum, order a new trial in which the defense can offer and argue from the newly discovered evidence.  *See United States* v. *Badalamente*, 507 F.2d 12, 17–18 (2d Cir. 1974) (reversing conviction, finding *Brady* violation, and ordering new trial where cooperator testimony was "crucial to the determination of [the defendant's] guilt or innocence," and the government suppressed evidence that "had a direct bearing on the persuasiveness of [that] testimony"); *United States* v. *Russell*, 1:16-CR-00396-GHW, 2018 WL 2088282, at *2–3 (S.D.N.Y. May 4, 2018) (granting new trial based on prosecutors' "inadvertent" failure to disclose proffer notes because, "if available to the defense, [the notes] would have provided substantial grist for cross-examination").

**B.**     **The Government's Repeated Disclosure Failures and Misrepresentations to the Court Warrant Dismissal of the Indictment or, at Least, a New Trial**

The government's suppression of evidence regarding its role in crafting the cooperating witnesses' plea allocutions itself warrants a new trial.  Those particular disclosure failures, however, were only part of larger systemic disclosure issues that arose again and again over the course of discovery, pretrial motions, trial, and post-trial proceedings.  The government had no meaningful process to reasonably ensure that

information was properly memorialized, preserved and produced, leading to multiple failures to disclose *Brady* and *Giglio* material on a timely basis, and in some cases a failure to make any disclosure at all.  Yet, each time the defense expressed concern or the Court inquired, the government provided assurances it had performed the requisite searches of its files when we now know they either did not perform those searches or performed them in a woefully deficient manner.  And, the government made representations to the Court about its role with respect to the cooperator allocutions that we now know were not true and whose falsity would have been obvious to the government if it had properly memorialized its interactions, or if it had conducted even the most modest inquiry at the time.  Incredibly, none of these facts even would have come to light if not for defense Rule 17(c) subpoenas and a FOIA request.

While dismissal of an indictment is an extraordinary remedy, this is an extraordinary case.  The record established here, which either does not exist or is not available in other cases, shows at least a "reckless disregard" for constitutional obligations, which—even if unintentional—can constitute flagrant misconduct warranting dismissal under the Court's inherent supervisory powers.  *Bundy*, 968 F.3d at 1019, 1042.  Dismissal also is appropriate here because no lesser remedy can undo the prejudice caused by the government's conduct.  Just as the government itself conceded in the recent *Nejad* case, "it would not be in the interests of justice to further prosecute [this] case."  *United States* v. *Nejad*, 487 F. Supp. 3d 206, 209 (S.D.N.Y. 2020) (citations and internal quotation marks omitted).  Alternatively, and at a minimum, the government's conduct in this case warrants a new trial in the "interest of justice."  Fed. R. Crim. P. 33(a).

While the government's declarations state that any mistakes were made in "good faith," Naftalis Decl. ¶ 54, that claim has never been tested by cross-examination or in any kind of evidentiary hearing.  In *United States* v. *Spinelli*, 551 F.3d 159, 166 (2d Cir. 2008), the Second Circuit declined to affirm a district court based on its conclusion that prosecutors were unaware of a witness's perjury because it rested on "sworn affidavits, which were never tested by cross-examination because the district court denied Spinelli's motion without any evidentiary hearing."  Rather, the Court assumed the prosecutors acted knowingly.  *Id.*  Here, too, the defendants "had no opportunity to challenge the prosecutors' statements," *id.*, and therefore this Court should assume that the government acted—at least—recklessly.  Indeed, the record of disclosure failures and misstatements to the Court in this case strongly supports the conclusion that defendants' constitutional rights were recklessly disregarded.

1.      *The Disclosure Failures Were at Least Reckless*

When the defense initially moved to dismiss the Indictment at trial—even *before* the proposed Majidi allocution had been produced—we expressed the view that the government's system for ensuring appropriate disclosure in this case simply had not worked.  Trial Tr. 126:1-11.  That proved to be an understatement.  The prosecutors had no functioning process for recording, preserving, and disclosing substantive communications with counsel for cooperating witnesses.  This lack of process was particularly troubling in light of the repeated reminders from the defense and the Court, and specific orders from the Court, regarding that very category of information.

This lack of any procedure reasonably designed to satisfy the government's obligations in this case manifested itself in several ways, including, among many others, the following:

_The Proposed Majidi Allocution and the Revised Majidi Allocution_:  None
of the prosecutors identified the proposed allocution or revised allocution as a document
that needed to be disclosed or took any steps to preserve it for disclosure (such as
segregating in a _Giglio_/3500 file).   Nor did anyone memorialize or disclose the
communications with Majidi's lawyer about the allocution that took place on October 30
by telephone and on October 31 in person.

   As a result, no record was created, and no disclosure made, of either the fact
that the government communicated revisions to the allocution to Majidi's counsel or the
substance of the conversation about the allocution that the government now concedes
occurred on the day of the Majidi plea.   Whether or not done in bad faith, that was a
deliberate decision.   On other occasions, the government recorded and disclosed mundane
and far less significant interactions with cooperating witnesses—such as a note produced
with the 3500 materials for Dole disclosing "pizza" (3506-41)—presumably a reference to
having provided Dole with pizza during his prep.   Surely the government did not believe
there was anything improper about that, but recorded and disclosed it.

   Moreover, the communications with Majidi's lawyer that were neither
memorialized nor disclosed occurred after months of the defense specifically emphasizing
the government's obligation to memorialize and disclose communications with counsel for
cooperating witnesses.   And then, just ten days after Majidi's plea, both defendants filed
pretrial motions arguing that the government had not complied with its _Brady_ obligations
and again emphasizing communications with counsel for witnesses.   ECF 53 at 2, 18–21;
ECF 55 at 2, 21–22.   In briefing those motions, the defense specifically noted that Majidi

had just recently become a cooperating witness and that the government presumably had been communicating with his counsel.  ECF 69 at 13.

The proposed Majidi allocution was first produced during the week of trial when—as reflected in contemporaneous emails—the government determined that some of these communications would otherwise be produced by Majidi's counsel in response to the defense's subpoena.  *See* ECF 428-12.  The government's internal communications show that the government's focus, when considering whether to disclose the document, was not on the defendants' constitutional rights, but on how the government's failure to disclose would reflect on the government.  *See id.*

Once the proposed Majidi allocution was produced to the defense during trial, the parties spent considerable time discussing the revisions and their origin, and the Court took the time to question the government and Majidi's counsel about "how it came to be that the edits were entered."  Trial Tr. 2058:25–2059:3.  The government again failed to disclose the revised Majidi allocution—and provided the Court with misinformation that was contradicted by it.  Even assuming the prosecutors had forgotten about their revisions, accidental omission or memory lapse is not a satisfactory excuse for a Constitutional failure to disclose.  *See, e.g.*, *Jain*, 2020 WL 6047812, at *3 ("Allowing for the passage of time which could produce a memory failure, prudence would have suggested that the AUSA ask whether there were materials that she had overlooked or should be considered for possible production.").  Moreover, any failed recollection could and should have been easily refreshed, either through the searches the Court had ordered the government to conduct just days before the colloquy, or by looking at their emails after the colloquy to ensure the information provided to the Court was accurate.  Even the most minimal inquiry (such as

74

that called for by the narrow FOIA request) would have led the government to identify the revised Majidi allocution.

This is not a situation in which the suppressed material was difficult to find: It did not require complicated searches, and it was not in the possession of some other government agency or even another prosecutor within the Southern District. It was the product of a prosecutor's personal efforts to redraft a cooperator's allocution, and the evidence of it was in the emails of all three prosecutors.

The April 2018 Majidi Letter: On the eve of trial, the government produced a letter from Majidi's counsel containing substantive information relevant to the defense and undermining key government allegations. *See* Ex. C; ECF 319-4. The government explained that this material was inadvertently withheld due to a filing error and conceded that it had recalled that the letter existed only because Majidi's counsel had raised it in connection with the defense's Rule 17(c) subpoena.

The June 8, 2019 Letter Certifying the Completion of the Court-Ordered Searches: After the discovery of the proposed Majidi allocution and the April 2018 Majidi Letter referred to above, the Court ordered the government "to review *all* of [its] attorney communications in this case." Trial Tr. 472:2–479:19 (emphasis added). On June 8, 2019, the government represented to the Court that it had reviewed its files, "including archived emails, for *all* communications with attorneys for witnesses in this case," and produced documents it thought warranted disclosure to the defense. ECF 209 at 1 (emphasis added).

Neither the Court's order, nor the government's response, included any limitation on the scope of the required (and supposedly performed) search; both referred specifically to "all" communications with attorneys for witnesses. If that search had been

conducted with any reasonable degree of care, it necessarily would have uncovered documents that were not produced until more than a year later, in June, July, and September 2020, after the FOIA request, such as a revised draft of Dinucci's proposed allocution, an exchange with Dinucci's counsel about the allocution, an exchange with Majidi's counsel about meeting outside of the courtroom just before Majidi's plea, and various records of calls with cooperators' counsel, including calls with Dole's and Dinucci's counsel on the day before or day of their client's pleas.

And, the ease with which critical documents—such as the revised Majidi allocution and the email from the government asking Majidi's lawyer to meet in the courtroom before Majidi's plea—were discovered through a simple FOIA request from the defense highlights the government's lack of reasonable diligence in searching for this material before then. The FOIA request was neither broad nor complicated; it called for emails sent to or from AUSA Naftalis regarding the allocution over a three-day period leading up to and including the date of the Majidi plea. It was that request that apparently generated approximately twenty documents, including the revised Majidi allocution and the email requesting a pre-plea meeting. The government's failure to identify and disclose those documents at any time prior to or during trial is at least reckless.

Regardless of whether any specific decision to not record or produce a particular communication was made in good faith, the absence of a systematic and reliable process designed to record, preserve, and produce that information was the result of intentional action or inaction. The government chose not to implement a process designed to ensure the complete and timely disclosure of communications with cooperators' counsel. *See Bundy*, 968 F.3d at 1041 ("Someone in the government made a conscious choice to

withhold these documents. It may not have been a malicious choice, but it also was not a matter of simple oversight. At best, the government failed to appreciate the relevance of the evidence. At worst, it sought to handicap the defendants by withholding evidence . . . . In either circumstance, the government fell well short of its obligations to work toward fairly and faithfully dispensing justice rather than simply notching another win." (internal citations omitted)). Where, as here, the "government acted with at least reckless disregard for the *Brady* value of some evidence that prejudiced the defense's ability to marshal their case," the Court can and should dismiss the Indictment under its supervisory powers. *Id.* at 1042.

The government's own policies set forth a simple process that, if followed here, would have avoided the disclosure failures that occurred. The Justice Manual reminds prosecutors that "'[s]ubstantive' case-related communications" that "contain discoverable information should be maintained in the case file or otherwise preserved in a manner that associates them with the case or investigation." Justice Manual § 9-5.002(B)(5). More specifically, DOJ mandates that:

> To ensure that e-communications are properly preserved, ***prosecution team members should move and/or copy potentially discoverable e-communications, together with any potentially discoverable attachments*** and threads of related e-communications, from the user's e-communication account ***to a secure permanent or semi-permanent storage location*** associated with the investigation and prosecution, ***or print and place them with the criminal case file as soon as possible but not later than 10 days after the e-communication is sent or received.***

U.S. Dep't of Justice - Office of the Deputy Attorney General, GUIDANCE ON THE USE, PRESERVATION, AND DISCLOSURE OF ELECTRONIC COMMUNICATIONS IN FEDERAL CRIMINAL CASES (Mar. 30, 2011) (emphases added).[22] Communications with counsel for

---

[22]   *See* https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/

witnesses, including emails transmitting draft allocutions and relating to witnesses' pleas, were seemingly never segregated and placed in a discoverable, segregated "file" at all (much less within ten days of being sent or received).  Thus, the inadequate, ad hoc searches the government conducted should not even have been necessary in the first place.

The government's failure to adhere to its own internal policies is particularly ironic given the extent to which the prosecutors relied at trial on PPI's purported failure to ensure that employees carefully reviewed and adhered to PPI's compliance policy.[23]  The government's disregard for its own policies suggests that it was at the least "recklessly indifferent" to the rights of the defendants.[24]

> 2. *The Government's Representations to the Court Were Made Recklessly*

The government made representations (repeatedly) about searches it purportedly had performed that we now know it either performed carelessly or did not perform at all.  And, the government made factual representations to the Court regarding its role in shaping the cooperator allocutions that we now know—and that the government certainly should have known—were not true.  Regardless of the government's good or bad faith, it has a responsibility to exercise far greater diligence to ensure that its representations—particularly where they go directly to the defendants' constitutional rights

---

electronic-communications.pdf.

[23]    *See* Trial Tr. 1221:2-23 (Dole testifying that no one made sure he reviewed compliance policy); *id.* at 1223:5-7 ("Q. Would you say, Mr. Dole, that PPI had a culture of compliance? A. I would not.").

[24]    The government also argued that the jury could infer guilt from Mr. Ahuja's preference for sending text messages because PPI's compliance system did not monitor or preserve text messages between employees.  *See* Trial Tr. 4681:12-20; *see also id.* at 4658:10-14 (arguing one could infer guilt from Mr. Shor's use of WhatsApp and cell phone).  And yet despite DOJ policies directing that "[p]rosecution team members should not use personally owned electronic communication devices . . . to transmit case-related information to . . . other team members," Justice Manual § 9-5.004, at least one member of the prosecution team used a "personal cellphone" for "work purposes" and to communicate with other team members, Oct. 30, 2020 Gov't Ltr. at 3, ECF 414.

and are relied upon by the Court to deny relief—are accurate.  Like its failure to disclose documents, the government's conduct in making these representations cannot be characterized as anything less than reckless.

(a)    <u>The Government's Representations Regarding Its Searches and Compliance with Disclosure Obligations</u>

As set forth in detail above (see *supra* § I), the government repeatedly told the Court and the defense that it had reviewed and re-reviewed its case file in search of information that should be disclosed.  These representations repeatedly proved to be wrong.

So, for example, in January 2019, while the Court credited that the reason for the government's second round of belated disclosures was a "very thorough review of [its] file," and accepted the government's representation that it had produced all statements by witness attorneys that "might be [broadly] considered exculpatory," the Court directed the government to conduct yet another review of its file.  Jan. 17, 2019 Conference Tr. 60:11-12, 76:7-11.  When that review resulted in still more disclosure of information predating the Indictment, including information from a Majidi pre-indictment proffer that the defense had been seeking for months, the defense reiterated its concerns about the government's compliance with its *Brady* obligations.  The Court—again relying on the government's representations that it had now "reviewed its notes of conversations with counsel for all potential Government witnesses, and is in compliance with its disclosure obligations as to those conversations," Mar. 8, 2019 Gov't Ltr. at 4, ECF 94, denied relief, stressing that it was the Court's "expectation and understanding that all that was supposed to be done has now been done."  Mar. 11, 2019 Conference Tr. 6:16-22.

After the government belatedly produced additional *Brady* at the outset of trial, including the April 2018 Majidi Letter, the government reassured the Court, as it had

79

done before, that it "went through and looked at all the files" again, including its correspondence and notes of conversations with counsel for witnesses.  Trial Tr. 13:4-10, 24:20–25:3.  Two days later, and prompted by a Rule 17(c) subpoena, the government produced for the first time the proposed Majidi allocution, which all three prosecutors had received by email in October 2018.[25]

    After the to-date unexplained late disclosure of the proposed allocution, the Court ordered the government to again review all of its communications with counsel for witnesses.  In their June 8, 2019 letter to the Court, the government certified that it had completed that review.  As we now know, this review was itself incomplete in that it did not include communications with counsel related to plea allocutions and another draft of the Dinucci allocution.[26]  The government to this day has failed to explain why many of these documents were not located or produced before or during trial.  And, when the government has proffered explanations for specific failures, those explanations reflect artificial and arbitrary limitations the government created for its searches, in some cases contrary to the scope of the searches it was ordered to conduct and represented that it did

---

[25]    The prosecutors' internal texts reflect that they were reviewing other emails related to the proposed Majidi allocution during that first week of trial, and there has been no explanation as to why the revised Majidi allocution was not similarly identified and produced on June 5, 2019, along with the proposed allocution.  *See* SDNY_PPI_00293 (one trial team prosecutor texting another on June 5, 2019, to say that the prosecutor saw "follow up emails" to Majidi's proposed allocution).

[26]    The government's reaction to these issues when raised by the defense only amplified the problem.  When the defense pointed out gaps in the disclosure, the government consistently said that it had reviewed its file and was complying with its obligations, and that the defense was "making a false record."  Trial Tr. 107:23–108:18; *see also id.* at 109:10-20 ("[T]he disclosures are not the result of them stamping their feet; the disclosures are the result of the government doing their job."), 771:23–25 ("So again, I would urge defense counsel to choose their words, because some of this stuff is getting a little insane.").  And again, the record shows that government decisions on whether or not to produce documents were sometimes motivated by a determination of whether or not the defense was destined to get the information from another source and how that would make the government look.  *See* ECF 428-12 (government stating they were inclined to disclose the proposed Majidi allocution because "[o]therwise they'll get it from [counsel for Majidi,] (seems like even if they fight she'd make them produce, like with Kehoe) and claim we hid it").

conduct. So, for example, the government initially suggested that when searching its communications with witnesses' counsel during trial, it missed the second proposed Dinucci allocution because that particular email misspelled "allocution." July 16, 2020 Gov't Ltr. at 3, ECF 390. But, a search for emails mentioning "allocution" would have captured the revised Majidi allocution, which was attached to an email with the subject "Allocution – Draft edits." ECF 385-8. Notably, the government was directed by the Court to search "all" emails with lawyers for witnesses, and stated that it had; there was no indication that those searches were limited by self-selected search terms.

And while the government explains its failure to unearth the suppressed evidence among *internal* correspondence because it searched only *external* correspondence, they also inexplicably failed to disclose key *external* correspondence. Long after the verdict and, again, only in response to the defense's post-trial FOIA request, the government produced documents containing an email exchange between AUSA Naftalis and Majidi's counsel scheduling a meeting just before Majidi's plea hearing. ECF 385-10. Thus, while AUSA Naftalis stated in his sworn declaration that, in connection with the Court-ordered search during the first week of trial, and *prior to the June 10 colloquy,* he reviewed "archived emails sent to and received from counsel for each of the cooperating witnesses," Naftalis Decl. ¶ 26, there is no explanation for why this exchange was not produced. Other communications that should have come up in any search for communications with counsel for witnesses, including another draft allocution from Dinucci's counsel and emails with counsel or FBI agents reflecting the government's oral discussions with counsel for Dinucci and Dole just before their pleas, were likewise not produced by the government until over a year after trial began.

We also now know that the government's search did not even *attempt* to include all external correspondence with witnesses' attorneys, as required:  One of the prosecutors believes she did not identify the additional draft Dinucci allocution because, having identified the first draft, she "stopped searching for a draft allocution as it did not occur to [her] that counsel may have sent a second one[,]" Griswold Decl. ¶ 34.a & n. 1.  These self-imposed limitations were inconsistent with Court directives and the government's repeated assurances and representations that it had searched its entire file and all its communications with witnesses' counsel—representations the government made in December 2018, January, March, and May 2019, and multiple times during trial itself.[27]

> (b)   The Government Representations About the Cooperator Allocutions

The government was also at least reckless when making inaccurate representations to the Court about the cooperator allocutions.  The government categorically stated that it "in no way" sought to shape or modify the allocution, and then clarified that any changes would have been limited to reminding the witness to "hit the elements" or correct factual inaccuracies.  Trial Tr. 769:2-5.  Even after being advised by

---

[27]   *See* Dec. 7, 2018 Mem. of Law in Opp. to Pretrial Mots. at 10–11, ECF 65 (government's November 2018 disclosures "a product of the Government's thorough review of its file" which took time to review "with care"); January 17, 2019 Conference Tr. 61:6–62:23 (government representing that it had "reviewed the entire file in the case" a "number of times thoughtfully" and was not aware of any material that should be disclosed); March 8, 2019 Gov't Ltr. at 4, ECF 94 ("The Government has reviewed its notes of conversations with counsel for all potential Government witnesses, and is in compliance with its disclosure obligations as to those conversations."); May 13, 2019 Gov't Ltr. at 2, ECF 158 ("The Government has complied with its obligations under *Brady* and *Giglio*, including with respect to conversations with counsel."); Trial Tr. 13:4-10 (government representing that it had "went through and looked at all the files" again immediately prior to trial, including communications with counsel for witnesses); *id.* at 24:12–25:3 (government confirming it had gone through correspondence and notes of communications with counsel for defendants, cooperating witnesses, and alleged co-conspirators); June 8, 2019 Gov't Ltr. at 1–2, ECF 209 ("[W]e have reviewed our file, including archived emails, for all communications with attorneys for witnesses in this case."); *see also* June 19, 2020 Gov't Ltr. at 1–2, ECF 368 (noting that during trial, the "Government trial counsel reviewed their archived emails for all communications with attorneys for witnesses in the case, including attorneys for cooperating witnesses").

his colleagues not to make any representations that he was not "absolutely sure of," Nicholas Decl. at ¶ 6.m; Griswold Decl. at ¶¶ 25–30, AUSA Naftalis, in response to the Court's question, stated that he had not asked Majidi's counsel to change the names of anyone in the allocution.  The revised Majidi allocution reveals that the government twice inserted Mr. Shor's name into the allocution.  *See* Trial Tr. 770:6-20.  And, when the Court asked AUSA Naftalis if he had spoken to Majidi's lawyer on the date of Majidi's plea, he also answered "No," even though he in fact asked to and did meet with Majidi's lawyer on the day of the plea, at least in part to discuss the allocution.  *Id.* at 772:3-5.

Notably, the email exchange between AUSA Naftalis and Majidi's lawyer arranging that meeting would have been part of the government's Court-ordered review of all of its communications with witnesses' counsel, which the government supposedly completed only two days prior to the colloquy with the Court.  And, as noted, had the government conducted even a cursory review of its emails after the colloquy to ensure the information it provided to the Court was accurate—or even the same search it conducted in response to the FOIA request for particular emails in a three-day window—it would have seen that the information it provided to the court was not accurate.

These often categorical but often incomplete or inaccurate statements further complicated defense efforts to obtain critical material, and were prejudicial to the defendants.  *See United States* v. *Sipe,* 388 F.3d 471, 490 (5th Cir. 2004) ("[T]he government's affirmative misrepresentation . . . effectively pushed [defendant] off track, taking from him powerful evidence exposing the witness's bias."); *Aguilar*, 831 F. Supp. 2d at 1207 ("The prejudice here is palpable once the prosecution and trial are assessed as a whole.  Beginning even before the jury was selected and continuing throughout trial, the

Defendants were thrown off balance by being forced to devote enormous effort to responding to and redressing serious and prejudicial wrongs, while at the same time having to defend themselves against the charges.").

The government apparently took no steps following the colloquy with the Court to ascertain whether the information it had provided was complete or accurate. AUSA Naftalis says now that he "understood that these allocution-related issues had been resolved," and thus he "did not otherwise search [his] files or seek to refresh [his] recollection further."  Naftalis Decl. ¶ 48.  But, at the very least, AUSA Naftalis had made several affirmative statements to the Court regarding the circumstances surrounding the allocution that a simple search of his own emails (e.g., by searching the word "allocution" in the two days between receiving the proposed Majidi allocution and Majidi's plea hearing) would have revealed to be incorrect.  The government has an obligation to do more than answer the Court's questions confidently and incorrectly, and then make no effort to see if its statements were in fact true.  *See United States* v. *Nejad*, 2021 WL 681427, at *8 (S.D.N.Y. Feb. 22, 2021) ("[P]ublic confidence in the administration of justice depends on prosecutors owning and rectifying their mistakes. . . .  It is imperative that prosecutors fulfill their constitutional and ethical obligations with the same zeal with which they pursue convictions.").  And, even upon locating the revised allocution at some point no later than March 9, 2020, the government still did not come forward independently to correct its misrepresentations, despite an obligation to do so.

3.   *The Government's Efforts to Avoid Creating a Written Record Cannot Be Cured by a New Trial*

The government's conduct in this case also included efforts to avoid putting certain communications in writing, or to communicate by means that are less likely to leave

a written record.  As a direct result, we are left without a written record of the substance of many oral communications that should have been—and never will be—disclosed to the defendants.  That prejudice cannot be cured through a new trial.

The government's obligations, of course, depend on the content—not the form—of the communications.  *United States* v. *Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) (*Brady* disclosure required regardless of whether statements were memorialized).  Thus, while there is nothing inherently wrong with preferring oral communications to written ones, that practice does not, as it was permitted to do here, shield information from disclosure.

In response to a Rule 17 subpoena, counsel for Dole produced an email in which, before he sent a memorandum seeking immunity, the government asked him to "talk briefly . . . before you send us anything – we want to be mindful of *Triumph Capital* issues."  *See* Dole000140, Ex. D.  The government's explanation for this email was that it wanted to make sure that Dole's counsel understood that "if he put something in writing about Mr. Dole, that we would consider our disclosure obligations to attach to it."  Trial Tr. 122:14–123:2.  Tellingly, when a cooperator's attorney was about to put in writing something that would undermine the government's case, the government "cautioned" the lawyer that anything he sent would have to be disclosed.  Yet, time and time again, when the government received communications from cooperators' lawyers, the government did not view those as subject to disclosure and did not take steps to ensure they were segregated and disclosed.  In addition, "warning" counsel for a cooperator that disclosure obligations attach to things that they send in writing only dissuades counsel from communicating in writing, and therefore makes it imperative that the government diligently memorialize oral

discussions with counsel and capture that memorialization in a system designed to result in disclosure.  Here, no notes (contemporaneous or otherwise) or other memorialization of any related discussion with Dole's counsel were produced.

The government's tendency to avoid putting substantive communications with counsel for cooperators in writing was evidenced by other instances in which the defense inquired of the government about communications that were not disclosed but seemed likely to have occurred.  For example, the defense repeatedly sought the *Brady* information it assumed existed in the government's notes of Majidi's pre-indictment "pitch" to the Office requesting that he not be charged criminally.  But that information was not produced until the government, following the Court's suggestion at the January 2019 oral argument on the defense *Brady* motions, checked the notes of meeting attendees *other* than those on the prosecution team.  *See* Mar. 5, 2019 Ahuja Ltr. at 2–4, ECF 92. Similarly, in early May 2019, the defense noticed the government's proposed jury charge included a proposed instruction regarding immunized government witnesses, but none of the 3500 materials contained information regarding a grant of immunity.  After defense counsel expressed concern that there must have been discussions concerning potential immunity with a government witness that had not been disclosed as 3500, the next day the government produced a "disclosure" for Nimberg that purported to capture a year's worth of substantive discussions, simply stating "Spring 2018 – Spring 2019 – USAO conversation w/ Nimberg counsel . . . Gov't – discussion about potential of applying to Court for immunity (2018–19)."  3525-10 (produced May 3, 2019).  The government, in other words, provided "disclosure" of those discussions only when asked by the defense whether they occurred, and apparently never took any steps to memorialize those

discussions when they occurred.  The result was a failure to provide disclosures that are "sufficiently specific and complete to be useful."  *Rodriguez*, 496 F.3d at 226.

In what may be the most significant example of an effort to avoid "creating a record," the government edited the proposed Majidi allocution in Microsoft Word and circulated it electronically among members of the trial team in redline form.  But, the government did not simply send its revised allocution to Majidi's counsel by email. Instead, minutes after the scheduled end of the prosecutors' internal meeting on October 30, 2018, the prosecutor replied to the email from Majidi's counsel that had sent the proposed allocution and asked to speak by telephone that afternoon.  They then spoke for nearly 11 minutes.  Still, the revised allocution was not sent by email.  Then, the next day, October 31, AUSA Naftalis suggested to Majidi's counsel that they meet in person before the plea, and at that meeting, handed to either Majidi or his counsel a hard copy of the revised allocution, without saving a copy for the government's 3500/*Giglio* files.  To this day there has been no explanation—and we cannot conceive of a legitimate one—for why the revised Majidi allocution (which clearly existed in electronic form and had been circulated within the Office by email the day before the plea) was delivered to Majidi or his lawyer only orally or by hand, or both.

These examples—which are necessarily only examples of where the preference for not putting (or transmitting) communications in writing are apparent from the documents—at minimum reflect a deliberate disregard for the government's disclosure obligations.[28]

---

[28]    We expect the government will argue that the preference for oral communications with counsel— like their own use of text messages rather than email—is not noteworthy or probative of their intentions.  Whether or not that is true, it is not the position the government took at trial with respect to Mr. Ahuja's preference for text over emails.  *See* Trial Tr. 4680:5-8 (government arguing on

* * * *

At the very least, the systemic issues detailed here warrant a new trial. But considering the full context of this case, we respectfully submit that the Court could and should conclude the "imposition of lesser sanctions" than dismissal would not "eliminate prejudice to [the] defendant." *Jain*, 2020 WL 6047812, at *9 (quoting *Broward*, 594 F.2d at 351). Although the district court must "approach [its remedy] with some caution and with a view toward balancing the interests involved," *Hasting*, 461 U.S. at 499, dismissal is appropriate "because the government withheld key evidence favorable to the defense until after trial was underway—in clear violation of its duties under *Brady*—and dismissing without prejudice would allow the government to cure its mistakes, to the detriment of the defendants." *Bundy*, 968 F.3d at 1031..

Granting a new trial, rather than dismissing the Indictment, would advantage the government by giving it the opportunity to refine its case. The defendants were entitled to have all discoverable information before the witnesses testified for the first time so that they could put on their best defense. A retrial does not give the defendants the same opportunity, because the cooperating and immunized witnesses are now aware of what documentary evidence exists (or does not exist), and, having testified, are even more wedded to the government's version of events and far more likely to deny their own malleability. *See Bundy*, 968 F.3d at 1043–44 (finding that retrial "would only advantage the government by allowing them to strengthen their witnesses' testimony based on the

---

summation that one of the four reasons the jury should find that Mr. Ahuja knew about the fraud is that the jury could infer his guilt from "the lengths that [Mr. Ahuja] went through in order to prevent the existence of emails showing he knew about the fraud from coming to light"); *id.* at 2984:2-4 (government asking E&Y witness whether E&Y CEO had a "policy that says, don't send any emails to me[,] I don't want to be on any emails"); *see also id.* at 4658:10-14 (government arguing on summation that Shor's guilt could be inferred because he communicated with Dinucci by WhatsApp and cell phone).

knowledge gained from the information provided by the defense and revealed thus far," and that the government could "perfect its opening statements based on the revealed defense strategy"); *United States* v. *Fitzgerald*, 615 F. Supp. 2d 1156 (S.D. Cal. 2009) (dismissing indictment under supervisory powers for *Brady* violation where retrial would substantially prejudice defendant by allowing the government to revise its case strategy).

Most importantly, a new trial could not actually cure the prejudice from the government's systemic failure to memorialize and disclose key information related to its witnesses. As demonstrated above, that information was often not contemporaneously memorialized, and we respectfully submit that on this record we cannot be confident that the defendants have received (or can ever receive) the disclosures they are entitled to under the Constitution and laws of the United States.

## CONCLUSION

For the foregoing reasons, the defense respectfully requests that the Court dismiss the Indictment, or, in the alternative, order a new trial.

Dated: April 2, 2021

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

/s/ Roberto Finzi
Roberto Finzi
Richard C. Tarlowe
1285 Avenue of the Americas
New York, New York 10019-6064
T: 212-373-3000
rfinzi@paulweiss.com
KIRKLAND & ELLIS LLP
John P. Del Monaco
601 Lexington Avenue
New York, New York 10022
T: 212-446-4800

*Attorneys for Anilesh Ahuja*

WEDDLE LAW PLLC
Justin S. Weddle
Julia I. Catania
250 West 55th Street, Floor 30
New York, New York 11226
T:  212-997-5518

*Attorneys for Jeremy Shor*

# Appendix

**From:**          Naftalis, Joshua (USANYS)
**To:**            Griswold, Andrea (USANYS); Nicholas, Max (USANYS)
**Subject:**       Allocution - Draft edits
**Date:**          Tuesday, October 30, 2018 11:59:00 AM
**Attachments:**   Allocution - Approved 1029.doc

USAO_SDNY_026366

~~COUNT ONE AND COUNT THREE—CONSPIRACY AND SECURITIES FRAUD~~ALL COUNTS

Between 2014 and 2016, I was employed at Premium Point Investments, or PPI, ~~as the portfolio manager for the mortgage credit hedge fund. Premium Point Investments or PPI was~~ an investment adviser located in Manhattan. During that time, I was the portfolio manager for the mortgage credit fund, a hedge fund that invested in, among other things, residential mortgage backed securities. ~~Among my roles as the portfolio manager was overseeing the work of a number of traders. Each month the traders participated in the process of obtaining marks from third party brokers for the purpose of determining the value of the securities in the hedge fund. Each trader under my supervision selected brokers to provide prices or marks for the securities they were responsible for trading. PPI's administrative division communicated requests for marks to the selected brokers. When the marks came in they were then used to calculate the hedge fund's net asset value each month.~~ The month-end net asset value of the funds that PPI managed was an important measure of the ~~hedge~~ fund~~'~~s~~'~~ performance and was disseminated to investors and potential investors through the mail and interstate wire communications. The funds' net asset value and their performance also determined PPI's management and performance fees.

Between 2014 and 2016, ~~At the direction of Neil Ahuja, CEO of PPI,~~ I participated in a scheme with, among others, Neil Ahuja, CEO of PPI, and Jeremy Shor, a trader at PPI, to fraudulently inflate the month-end net asset value of the funds that ~~hedge~~ PPI managed. ~~fund to encourage new investment and discourage investors from redeeming their investments in PPI. This scheme~~

USAO_SDNY_026367

~~accelerated in the second half of 2015, as the hedge fund's performance was deteriorating.~~
~~Specifically, I communicated to the traders under my supervision monthly performance targets~~
~~set by Mr. Ahuja and I then pressured them to meet those targets.~~ Instead of marking the
~~independent third-party valuation of the~~ securities in ~~the~~ PPI's portfolios at their fair market
value, I worked with Ahuja, Shor, and others to mismark their value. ~~determining the net asset~~
~~value, I agreed with Mr. Ahuja and others to let the performance target he set affect the value of~~
~~the securities reported by PPI.~~ I knew that the resulting monthly net asset value was inflated for
the purpose of deceiving investors as to the ~~hedge~~ fund~~'s~~' performance.  As part of this scheme,
I used interstate emails and text messages.  I knew what I was doing was wrong.

**Naftalis, Joshua (USANYS)**
**Formatted:** Tab stops: Not at  3.25"

COUNT TWO AND FOUR  CONSPIRACY AND WIRE FRAUD

Naftalis, Joshua (USANYS)
Formatted: Tab stops: 3.25", Centered

Between 2014 and 2016, I participated in a scheme to defraud investors in the mortgage credit fund of PPI by inflating the month-end net asset value of the fund through the means I previously described.  In pressuring traders under my supervision to meet the performance targets set by Mr. Ahuja, I often communicated with them by text message and email.  I knew that the inflated net asset value was communicated to investors in an effort to encourage them to invest in the hedge fund or to discourage them from redeeming their investments.

# Clean Copy of Revised Majidi Allocution

ALL COUNTS

Between 2014 and 2016, I was employed at Premium Point Investments, or PPI, an investment adviser located in Manhattan.  During that time, I was the portfolio manager for the mortgage credit fund, a hedge fund that invested in, among other things, residential mortgage backed securities. The month-end net asset value of the funds that PPI managed was an important measure of the funds' performance and was disseminated to investors and potential investors through the mail and interstate wire communications.  The funds' net asset value and their performance also determined PPI's management and performance fees.

Between 2014 and 2016, I participated in a scheme with, among others, Neil Ahuja, CEO of PPI, and Jeremy Shor, a trader at PPI, to fraudulently inflate the month-end net asset value of the funds that PPI managed.  Instead of marking securities in PPI's portfolios at their fair market value, I worked with Ahuja, Shor, and others to mismark their value.  I knew that the resulting monthly net asset value was inflated for the purpose of deceiving investors as to the funds' performance.  As part of this scheme, I used interstate emails and text messages.  I knew what I was doing was wrong.