UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

   UNITES STATES OF AMERICA,

       v.                                                     S1 18 Cr. 328 (KPF)

   ANILESH AHUJA, a/k/a "Neil," and
   JEREMY SHOR,

         *Defendants*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

# GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTIONS FOR
## A NEW TRIAL AND DISMISSAL OF THE INDICTMENT

AUDREY STRAUSS
United States Attorney
Southern District of New York

Andrea M. Griswold
Joshua A. Naftalis
Assistant United States Attorneys
   - Of Counsel –

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ...................................................................................................... 3

    A.    The Evidence at Trial.................................................................................. 3

          1.    Evidence Showing How the Mismarking Scheme
               Worked and Shor's Central Role in the Scheme ...................................... 3

          2.    Evidence of the Use of Sector Spreads to Mismark Securities.................. 7

          3.    Evidence Showing that Ahuja Knew About and
               Directed the Mismarking Scheme.......................................................... 9

          4.    Defense Case........................................................................................ 12

    B.    The Government's Disclosures................................................................. 14

          1.    Pre-Trial Disclosures ........................................................................... 14

          2.    Draft Cooperator Allocutions and June 10, 2019 Order .......................... 17

          3.    Post-Trial Disclosures .......................................................................... 20

          4.    The Post-Trial Review .......................................................................... 21

ARGUMENT ......................................................................................................... 22

    POINT I:  THE COURT SHOULD DENY THE DEFENDANTS'
    MOTION FOR A NEW TRIAL .......................................................................... 22

    A.    Applicable Law........................................................................................ 23

          1.    Rule 33 ................................................................................................ 23

          2.    New Trials for Purported *Brady* and *Giglio* Violations............................ 24

    B.    Discussion............................................................................................... 27

          1.    The Redline and Second Draft Dinucci Allocution Are Not *Brady* or
               *Giglio* Material.................................................................................... 27

          2.    The Redline, Second Draft Dinucci Allocution, and Related Cross-
               Examination Would Have Been Inadmissible .......................................... 33

i

      3.      The Redline and Second Draft Dinucci Allocution Are Not Material...... 35

POINT II:  THE COURT SHOULD DENY THE DEFENDANTS'
MOTION TO DISMISS THE INDICTMENT .................................................................. 42

  A.     Applicable Law ................................................................................................ 42

  B.     Discussion ........................................................................................................ 43

CONCLUSION ............................................................................................................... 47

# TABLE OF AUTHORITIES

<u>Cases</u>

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................................. 24

*Giglio v. United States*, 405 U.S. 150 (1972) ...................................................... 24, 27

*In re United States (Coppa)*, 267 F.3d 132 (2d Cir. 2001) .................................... 25, 28

*Kyles v. Whitley*, 514 U.S. 419 (1995)................................................................. 22, 25

*Maldonado v. Scully*, 1990 WL 102209 (S.D.N.Y. July 12, 1990) .............................. 41

*Paul v. Giap*, 273 A.D.2d 54 (1st Dep't 2000) ........................................................ 42

*Romero* v. *United States*, 28 F.3d 267 (2d Cir. 1994) .................................................. 23

*Strickler v. Greene*, 527 U.S. 263 (1999) ............................................................ 25, 28

*United States v. Agurs*, 427 U.S. 97 (1976) ........................................................... 26

*United States v. Amato*, 03 Cr. 1382 (NGG), 2006 WL 1495497 (E.D.N.Y. May 26, 2006) ...... 34

*United States v. Avellino*, 136 F.3d 249 (2d Cir. 1998) ............................................. 26

*United States v. Bagley*, 473 U.S. 667 (1985) ..................................................... 25, 35

*United States v. Bautista*, 23 F.3d 726 (2d Cir. 1994) ............................................... 41

*United States v. Bell*, 584 F.3d 478 (2d Cir. 2009) (per curiam)................................... 23

*United States v. Block*, 16 Cr. 595 (JPO), 2019 WL 1254762 (S.D.N.Y. Mar. 19, 2019) .......... 24

*United States v. Broward*, 594 F.2d 345 (2d Cir. 1979) ............................................. 43

*United States v. Brown*, 602 F.2d 1073 (2d Cir. 1979)............................................... 43

*United States v. Camacho*, 302 F.3d 35 (2d Cir. 2002) ............................................... 24

*United States v. Chin*, 934 F.2d 393 (2d Cir. 1991) ................................................... 43

*United States v. Cincotta*, 689 F.2d 238 (1st Cir. 1982)............................................. 41

*United States v. Connolly*, 16 Cr. 370 (CM), 2019 WL 2120022 (S.D.N.Y. May 2, 2019)......... 43

*United States v. Cronic*, 466 U.S. 648 (1984) .......................................................... 24

*United States v. Cuervelo*, 949 F.2d 559 (2d Cir. 1991) ............................................................. 43

*United States v. Davidson*, 308 F. Supp. 2d 461 (S.D.N.Y. 2004) ................................................ 25

*United States v. DeLucia*, 125 F.3d 845 (2d Cir. 1997) ................................................................ 33

*United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001) ........................................................ 23, 27

*United States v. Gambino*, 59 F.3d 353 (2d Cir. 1995) ............................................................... 23

*United States v. Ghailani*, 761 F. Supp. 2d 114 (S.D.N.Y. 2011) ............................................... 34

*United States v. Gil*, 297 F.3d 93 (2d Cir. 2002) ............................................................ 26, 28, 38

*United States v. Gonzalez*, 529 F.3d 94 (2d Cir. 2008) ............................................................... 43

*United States v. Jackson*, 345 F.3d 59 (2d Cir. 2003) ................................................................. 26

*United States v. Jones*, 15 Cr. 153 (VSB), 2018 WL 3599730 (S.D.N.Y. July 27, 2018) .......... 26

*United States v. Madori*, 419 F.3d 159 (2d Cir. 1995) ........................................................... 24, 28

*United States v. Magassouba*, 544 F.3d 387 (2d Cir. 2008) ........................................................ 43

*United States v. Malik*, 800 F.2d 143 (7th Cir. 1986) .................................................................. 41

*United States v. McCourty*, 562 F.3d 458 (2d Cir. 2009) ............................................................ 23

*United States v. Milles*, 363 F. App'x 506 (9th Cir. Jan. 26, 2010) .............................................. 41

*United States v. Payne*, 63 F.3d 1200 (2d Cir. 1995) .............................................. 25, 35, 36, 38

*United States v. Pierre*, 781 F.2d 329 (2d Cir. 1986) .................................................................. 42

*United States v. Purcell*, 967 F.3d 159 (2d Cir. 2000) ................................................................. 42

*United States v. Reyes*, 49 F.3d 63 (2d Cir. 1995) ...................................................................... 26

*United States v. Rivas*, 377 F.3d 195 (2d Cir. 2004) ................................................................... 33

*United States v. Rodgers*, 101 F.3d 237 (2d Cir. 1996) ............................................................... 24

*United States v. Romero*, 54 F.3d 56 (2d Cir. 1995) .................................................................... 26

*United States v. Sanchez*, 969 F.2d 1409 (2d Cir. 1992) ........................................................ 23, 42

*United States v. Spinelli*, 551 F.3d 159 (2d Cir. 2008) .................................................... 25, 27, 36

*United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) ................................................... 43

*United States v. Stofsky*, 527 F.3d 237 (2d Cir. 1975) ................................................ 23

*United States v. Taylor*, 802 F. App'x 604 (2d Cir. 2020) ......................................... 32

*United States v. Walters*, 910 F.3d 11 (2d Cir. 2018) ................................................ 42, 43, 44, 46

*United States v. White*, 972 F.2d 16 (2d Cir. 1992) ................................................... 27

*United States v. Wong*, 78 F.3d 73 (2d Cir. 1996) ..................................................... 25, 26, 27, 35

## PRELIMINARY STATEMENT

Without addressing the majority of the overwhelming evidence of guilt introduced during their trial, defendants Anilesh Ahuja and Jeremy Shor move for a new trial, pursuant to Federal Rule of Criminal Procedure 33, or dismissal of the Indictment, pointing primarily to a few documents that reflect input that the Government had on a draft allocution for cooperating witness Amin Majidi and a second draft of the allocution of cooperating witness Frank Dinucci.  These motions should be denied.

These materials do not constitute *Brady* or *Giglio* and would not have been admissible at trial, and the defendants cannot show they were prejudiced from not having the entirety of these materials during trial.  In a ruling dated June 10, 2019, based on the record before the Court at that time, the Court denied the defendants' motions to introduce evidence of the Government's input, or to cross-examine the cooperating witnesses, on the changes to Dinucci's and Majidi's allocutions, finding no improper conduct by the Government and precluding cross examination pursuant to Federal Rule of Evidence 403 because of the "minefield of privilege and procedural issues" and the "abundant evidence on which to cross examine the cooperating witnesses." (Dkt. 213).  While there are now additional communications that the Government did not find during trial, these disclosures do not undermine the correctness of the Court's mid-trial decision.  Even if these materials had been admissible at trial, which they were not, they would not have been material to the jury's considered and swift verdict.  Indeed, the defendants do not to engage meaningfully with the trial record and fail to address a single Government exhibit admitted at trial.  When the materials disclosed after trial are placed in proper context alongside all of the materials available to the defense and the overwhelming evidence supporting the convictions, the hollowness of the defendants' claim of materiality is readily apparent.

1

The defendants also assert that the Government engaged in a widespread pattern of recklessly failing to identify and disclose *Brady* and *Giglio* material.  That is wrong.  Much of the defendants' brief discusses disclosures that they in fact had — and were able to use — at trial. The Government made the majority of these disclosures three to seven months before trial, and they thus plainly cannot constitute *Brady* or *Giglio* violations.  In asserting a pattern of Government misconduct, the defendants also repeatedly ignore or mischaracterize evidence of the Government's fulfillment of its disclosure obligations.  For example, while the defendants wrongly assert that all communications with counsel for witnesses must be disclosed and speculate that the Government must have engaged in a pattern of not memorializing disclosable information, the defendants ignore the numerous pretrial disclosures that arose from oral communications with counsel for various witnesses, including counsel for Majidi and Dinucci.

The Government has acknowledged that it made certain mistakes, but those good faith mistakes absolutely do not establish a pattern of reckless Government misconduct. This was confirmed by the results of the extensive post-trial review of the Government's files, including internal communications and work product, carried out under the direction of a Deputy Chief of Appeals over several months.  As the Court recognized in its January 13, 2021 Order, the review — which the defendants ignore entirely — did "not reveal more systemic disclosure problems or other issues warranting additional discovery or investigation."  The defendants' motions should be denied.[1]

---

[1]    Shor also moves for sanctions, a motion that Ahuja does not join. (Dkt. 448).  That motion is frivolous.   As Shor concedes, "the request must be denied on this record" under governing Second Circuit law.  (*Id.* at 1).  Shor is also not entitled to such relief for substantially the same reasons that the defendants' joint motion should be denied.

**BACKGROUND**

A.    **The Evidence at Trial**

The evidence at trial conclusively demonstrated that between 2014 and 2016, Ahuja oversaw and Shor implemented a fraudulent scheme to inflate the net asset value ("NAV") of hedge funds that PPI managed to retain investors funds and conceal the funds' poor performance.

The Government called four witnesses who were participants in the criminal mismarking scheme:  Ashish Dole (an assistant trader and trader at PPI), Amin Majidi (a partner and portfolio manager at PPI), Frank Dinucci (a corrupt broker who provided inflated marks to PPI), and James Nimberg (a partner and portfolio manager at PPI).  Dole, Majidi, and Dinucci pleaded guilty before trial and testified pursuant to cooperation agreements.  Nimberg, an immunized witness, did not have an agreement with the Government.  Other witnesses called by the Government included two senior executives at SkyBridge, the largest investor in PPI.  The Government also introduced 327 exhibits into evidence, including numerous text messages and emails involving Ahuja, Shor, or both.

1.    **Evidence Showing How the Mismarking Scheme Worked and Shor's Central Role in the Scheme**

The   Government   introduced   numerous   contemporaneous   electronic communications between and among Shor, Dinucci, Dole, and Majidi that demonstrated the fraudulent process that Shor and Dole used to obtain inflated price quotes from Dinucci, beginning in 2014.  For example, in April 2014, Shor advised Dole to "[g]ive [Dinucci] orders for [the] day *at your marks*."  (GX 858-B (emphasis added)).  In July 2014, Dole told Shor that he could "put in *prices we want* from [Dinucci] to get to 1mm up on [the Mortgage Credit Fund ("MCF")]."  (GX 858-E (emphasis added)).  In September 2015, Dinucci texted Shor to "[t]ell [Dole] to chuck me a dam[ ] trade *if I keep marking up* all his bonds."  (GX 880-Z (emphasis added)).  In March

2015, Dole told Majidi that "Frank [Dinucci] can of course mark bonds anywhere." (GX 850-G). In October 2015, Shor sent a text message to Dinucci providing the marks that Dinucci was to assign for certain of PPI's bonds; Dinucci promptly assigned to the bonds substantially the same marks that Shor had self-prescribed. (GX 880-O; GX 662; GX 1256; Tr. 3346-47). Documentary evidence also showed Dinucci's firm valuing a bond held by PPI at twice the amount assigned by other brokers. (GX 964-B). Shor often acknowledged in frank terms the inappropriateness of his *quid pro quo* relationship with Dinucci. For example, he texted Majidi that he felt like "shower[ing]" after meeting with Dinucci (GX 840-C) and routinely compared his method of obtaining inflated prices from Dinucci to performing sexual favors for him (GX 855-E; GX 858-T; GX 852-H; GX 853-B).

Consistent with these contemporaneous communications, Dole, Majidi, and Dinucci each testified at length about PPI's method of obtaining inflated marks to falsify the NAV of its funds, beginning in 2014. Dinucci testified that "every month" Shor would "come to [Dinucci] with the marks that [Shor] needed to increase the performance of the [MCF]" (Tr. 3335) and that Dinucci would provide those marks (Tr. 3344). Dinucci testified that the corrupt process began in "late 2014" or "the fourth quarter 2014." (Tr. 3317-18). Dinucci explained how the mismarking increased over time: "while month-end prices were inflated, it was nothing to how they evolved between late 2014 into 2015 and '16." (Tr. 3320-21).

Dole, who worked as Shor's trading assistant before being promoted to a trader, testified that Shor told him "very soon after" Shor started at PPI in April 2014 that Shor liked to use "friendly brokers" who would provide higher marks in exchange for trading with them. (Tr. 246-47). Dole testified that he and Shor would use Dinucci's inflated marks to close the gap between where the portfolio was valued and where they wanted it to be valued based on the month-

end "targets" set by Ahuja and Majidi. (Tr. 247 ("[Shor] said that depending on the values that we need for the securities, if you want higher values, we could go to [particular] brokers and get the values in exchange for giving them some trades."); Tr. 271 (Shor and Dole "could calculate how much further [they] were from the target and exactly what prices Mr. Dinucci needed to provide [them] to reach the target"); Tr. 253 (Shor and Dole would "tell [Dinucci] to give [them] the prices that [they] want[ed] and get to that target")). Dinucci testified that "[f]rom late 2014 through the duration of this pricing scheme," he had conversations with Shor about why Shor's bosses — Ahuja and Majidi — wanted inflated valuations. (Tr. 3327).

Majidi testified that he "primarily worked with Mr. Shor and Mr. Dole," whom he supervised, to get higher marks. (Tr. 2179). Majidi testified that he obtained inflated marks from Dinucci in contravention of the requirement that PPI obtain objective third-party price quotes. (Tr. 2180-84). As to the time period, Majidi testified that the mismarking in the Mortgage Credit Fund occurred "throughout 2014 and 2015" and into the first months of 2016. (Tr. 2107). More specifically, Majidi testified that the "magnitude was much larger in 2015, especially in the latter part of the year" where "the magnitude became completely out of whack" because "[b]oth prices of the mortgage assets went down and also liquidity dried up." (Tr. 2108).

The Government also called James Nimberg, a partner and portfolio manager at PPI between 2013 and 2015, as a witness. Nimberg did not enter into an agreement with the Government and testified pursuant to a grant of immunity. (Tr. 1527). Nimberg testified that he "participated in a scheme to inflate marks, inflate bond prices which inflated the NAV which inflated the returns that were reported to investors." (Tr. 1529). Nimberg identified several individuals at PPI with whom he participated in the criminal mismarking scheme, including Shor, Majidi, and Ahuja, and further testified that Ahuja directed the mismarking. (Tr. 1531). As to

time period, Nimberg testified that he engaged in the mismarking scheme on a monthly basis "[b]etween 2014 and 2015." (Tr. 1529). When asked when Ahuja first "gave instructions to push up the value of bonds," Nimberg identified the timeframe as "sometime in 2014." (Tr. 1562).

As with the testimony of Dole, Dinucci, and Majidi, Nimberg's testimony was substantially corroborated by contemporaneous text messages that Nimberg exchanged with participants in the mismarking scheme, including Ahuja and Majidi, beginning in 2014. For example, in a May 31, 2014 text message, Majidi wrote to Nimberg: "We need another 400k in the hedge fund. Let's chat Monday." (GX 870-H). Nimberg testified that this text message was a reference to how much PPI needed to increase its NAV to achieve the fraudulent estimates set by Ahuja. (Tr. 1567). In a more explicit text exchange dated July 2, 2014, Nimberg told Majidi the agency RMBS book "is already over marked by 1mm." (GX 087-L). In yet another text exchange dated December 11, 2014, Nimberg stated, in substance, that he did not want to get involved in the New Issue Fund ("NIF") because it was not a good business plan, and Majidi responded: "True. They don't lose money. It's just that they mark shit up and show false returns." (GX 870-P). Nimberg further testified that at this time — December 2014 — the New Issue Fund was being fraudulently marked up at the direction of Ahuja. (Tr. 1597).

Additional text messages introduced from the first half of 2015 showed that Nimberg continued to raise concerns about mismarking until June 2015 when Nimberg left PPI — after being "demoted" by Ahuja "because [Nimberg] was complaining about the marks, about the inflation, and also refusing to participate." (Tr. 1532). For example, in a February 2015 text message, Nimberg wrote to Majidi that Nimberg had "told [Ahuja] not to tell Troy [at SkyBridge] we're killing it for this reason. The month end marks we're using are 12 mm greater than where they should have been." (GX 870-CC). In another text from March 2015, Nimberg complained

to Majidi that "we need to have a reality check on the new issue marks. This is a problem." (GX-870-FF). Majidi responded, "[t]hat portfolio is about 4% overmarked," and asked Nimberg to delete the text thread, to which Nimberg responded, "If I delete this I think it still happened." (*Id.*). The Government offered several additional text messages explicitly referencing mismarking in early 2015, including a text message from April 2015 in which Nimberg referred to bonds in the MCF portfolio as "[t]he grossly over marked shit." (GX 870-GG).

## 2. Evidence of the Use of Sector Spreads to Mismark Securities

In addition to obtaining fraudulent marks from Dinucci for individual securities, PPI also inflated the NAVs of its funds by exploiting a device called the "sector spread." PPI purported to mark each of its securities at the "mid," that is, the midpoint between the bid price and the ask price for that individual security. The "sector spread" referred to the average difference between the bid and ask prices for *all* of the securities in a particular sector (for example, non-agency RMBS bonds). (Tr. 315-16, 2180). PPI would obtain a sector spread from an outside broker and add half of that spread to the bid prices for individual securities held in its funds, thereby creating a so-called "imputed" mid price for those securities that would be used for valuation purposes. (Tr. 1552). PPI concealed from the largest investor in the MCF, SkyBridge, that it was using this "imputed" mid process — after SkyBridge had specifically told Ahuja that it would not invest if this unusual "imputed" mid process was used and PPI then confirmed that it would not be. (GX 1004 (SkyBridge telling Ahuja over email not to use the sector spread for valuation purposes); Tr. 1370-71 (SkyBridge understood from PPI that PPI would not use the sector spread for valuation purposes)). More broadly, PPI took advantage of this practice by widening the sector spreads that it applied to the securities in its funds, thus inflating the NAVs. As Majidi described

it, PPI used "wider sector spreads" to "jack up the prices" of securities in the MCF and the NIF, resulting in a "higher NAV." (Tr. 2120).

In this second method of inflating the NAV, Shor again played a pivotal role. Shor and Dole pressed brokers to widen the sector spreads they were providing to PPI, without disclosing to those brokers that PPI was using the sector spreads for valuation purposes. (Tr. 318-19, 325, 3428-30). Even Dinucci, who often parroted back to Shor whatever sector spread Shor asked for, was deceived about the purpose of the spread. (Tr. 3428-30 (Dinucci testifying that Shor told him sector spreads were "strictly being used for internal reports. Nothing else.")).

Again, contemporaneous communications introduced at trial substantially corroborated the testimony provided by the cooperating and immunized witnesses, and illustrated PPI's fraudulent use of sector spreads. For example, in December 2014, Shor texted Dole, "[a]m I asking frank [Dinucci] for bid ask," a reference to the sector spread. (GX 858-K). The use of the sector spread to engage in mismarking continued into 2016. For example, in March 2015, Dole texted Majidi that "[w]e widen bid-ask every month to get money in [a sector of bonds held by the NIF]." (GX 850-H). In April 2015, Nimberg complained to Majidi "we[']re already using fukked bid ask." (GX 870-HH). A November 2015 email that Shor sent to Dinucci's firm showed PPI applying to one of its bonds a sector spread that was almost as much as the price of the bond itself. (GX 129; *see also* Tr. 325 (Dole testifying that applying this spread "ma[de] no sense")). And the jury was shown an example from January 2016 in which the application of a sector spread increased the purported value of one of PPI's bonds by over 165 percent. (Tr. 3997).

Dole, Majidi, and Nimberg testified at length about PPI's exploitation of the sector spread to increase the NAVs of its funds. Dole testified that PPI "solicit[ed] higher and higher [sector] spreads to mark the bonds higher" in the "hedge fund [*i.e.*, the MCF] as well as the New

Issue Fund." (Tr. 326). Dole recounted that in November 2015, Shor successfully convinced one broker, Performance Trust, to re-label the "mid" price quotes that it provided to PPI as "bid" price quotes, which allowed PPI to fraudulently add the sector spread to securities that were already priced at the "mid" (and did not need any adjustment) — an even greater distortion of the NAV. (GX 1315; Tr. 359-61). Majidi testified that PPI "pushed" sector spreads "wider" to force the NAV to come in "where we wanted," as opposed to "searching for the truth" about where the marks should be. (Tr. 2119). Nimberg testified that PPI used inflated sector spreads to "act[ ] like a lever" on entire sectors of bonds in its funds. (Tr. 1561). And just as the "challenge" process was corrupted to obtain inflated broker quotes, it was also corrupted to widen the sector spreads provided by brokers. (GX 1593 (contemporaneous Bloomberg message where Dole "challenges" a sector spread from Dinucci's firm to make it wider); Tr. 431 (describing same); Tr. 1561 (Nimberg testifying that PPI manipulated the challenge process to obtain sector spreads that it understood were too high to inflate the NAV); Tr. 2198 (Majidi describing the application of "challenges" to sector spreads)).

### 3. Evidence Showing that Ahuja Knew About and Directed the Mismarking Scheme

The evidence at trial also demonstrated that Ahuja directed the mismarking scheme at PPI, beginning in 2014. As a threshold matter, Ahuja set the inflated targets for monthly returns in the MCF and the NIF that the fraudulent mismarking scheme was designed to meet. (GX 858-Q (December 2014 text message from Dole to Shor telling him that "big boss," meaning Ahuja, was saying to "push for 2.5 [million]" for the November 2014 return in the MCF); Tr. 1565 (Nimberg testifying that the target returns were "set by Neil [Ahuja]"); Tr. 2103-04 (Majidi testifying that he and Ahuja "set the targets" for monthly returns that were "systematically higher than the actual" performance of the securities)).

But Ahuja did far more than set inflated targets for PPI's monthly returns. He pressured the other members of the fraudulent scheme to mark up the securities in PPI's funds to hit or at least come near the inflated targets. Contemporaneous text messages between and among PPI employees reflect this pressure from Ahuja to commit fraud. For example, in February 2015, the portfolio manager of the NIF, Mark Ginsberg, texted Dole that Ginsberg had "*just told [Ahuja] we are mismarked* by 500 [basis points] and [Ahuja's] asking for 60 [additional basis points]. This has to end." (GX 859-G (emphasis added)). But it did not end. In March 2015, Nimberg texted Majidi that "Neil [Ahuja] has to stop ratcheting up the monthly stress." (GX 870-DD). And in January 2016, Majidi texted PPI's head of investor relations that "the reason the [MCF] is overmarked is because [Ahuja] would lie to [SkyBridge] about returns and [Majidi] would have to push [Shor] to mark things up." (GX 840-Y).

Ahuja's own text messages also show that he was constantly kept apprised of, and repeatedly directed the continuance of, the mismarking of securities held in PPI's funds. For example, in May 2015, Ahuja texted Dole to "just force" the April month-end marks for the NIF. (GX 851-C). In June 2015, Dole texted Ahuja that "we took 3.5 mm *to mark up* New Issue io [referring to a sector of bonds held in the NIF] last month." (GX 851-D (emphasis added)). In October 2015, when Dole informed Ahuja that marking down certain bonds held in the NIF would impede PPI's ability to "show returns," *i.e.,* report positive investment performance, that month, Ahuja directed Dole to "bring [the marks] up." (GX 851-H). And in the same text message conversation, Ahuja expressed the hope that "printing returns" may convince investors to stay in the NIF for an extra year. (*Id.*).

In addition to Ahuja's own text messages and those of his co-conspirators describing Ahuja's involvement in the mismarking scheme, three witnesses testified that Ahuja

10

directed the fraud.  Nimberg testified that beginning in 2014, Ahuja instructed him to inflate the value of the bonds in the MCF portfolio "on a monthly basis."  (Tr. 1562).  When Nimberg complained to Ahuja about the pressure he felt to inflate the marks, Ahuja told him to "put on your big boy pants."  (Tr. 1616).  Majidi testified that he and Ahuja, together, set targets for month-end returns in the MCF that they knew were unrealistic and that they understood could be achieved only through the fraudulent mismarking scheme.  (Tr. 2103).  Majidi had regular conversations with Ahuja about the fact that the MCF and the NIF were mismarked.  (Tr. 2104, 2156).  Majidi discussed with Ahuja point-blank that Dinucci was providing "inflated marks for both the Mortgage Credit Fund and the New Issue Fund," and that PPI "need[ed]" Dinucci's fake marks to hit the targets that Ahuja and Majidi were setting.  (Tr. 2193-94).  Majidi also recounted that Mark Ginsberg, the portfolio manager for the NIF, had complained to Ahuja that "the securities [in the NIF] were so overpriced that . . . he could not sell anything," and Ahuja's only reaction was to bristle at Ginsberg's "tone."  (Tr. 2231-32).  Dole testified that in October 2015 — at least six months before the fraudulent scheme collapsed — he told Ahuja that some of the securities in the NIF were overmarked by 20 to 30 percent.  (Tr. 415).  On another occasion, when Dole shared with Ahuja his view that the strategy for the New Issue Fund could not make money, Ahuja simply told him that the fund "need[ed] to make money."  (Tr. 373).  And in mid-2015, when Dole relayed to Ahuja a shortfall in reaching a target month-end return for the NIF, Ahuja instructed Dole to "widen the [sector] spread to get there."  (Tr. 318-20).

Notwithstanding Ahuja's acute knowledge of the fact that the NAVs for the Mortgage Credit Fund and the New Issue Fund were inflated — and his responsibility for directing the fraud — he gave investors false assurances to the contrary.  In January 2016, for example, Ahuja promised SkyBridge that the month-end valuations PPI was reporting for the MCF were

"marked to the screws" (GX 360), an "industry phrase" meaning that the valuations were "extremely tight" and indicating a high level of comfort with their "accuracy" (Tr. 3060). Ahuja made this false representation to try to induce SkyBridge to make an additional investment of more than $50 million into the MCF. In fact, the truth at that time was that the valuations in the MCF were significantly overmarked, as the evidence established Ahuja well knew. And PPI ultimately issued a restatement admitting that for the period September 2015 through March 2016, it had overstated the NAV in certain of its funds by between 13 and 15 percent. (GX 446; GX 447). All told, the mismarking scheme amounted to a fraud of over $100 million. (Tr. 443-45).

### 4. Defense Case

In his arguments to the jury and through his cross-examination of Government witnesses, Shor put forward a defense that he never joined any mismarking conspiracy, he acted in good faith, and he quit PPI when concerns he had raised in 2015 about its valuation practices were not addressed. Ahuja's defense theory was, in essence, that certain of his employees, including Majidi, fraudulently manipulated PPI's valuations without his knowledge and falsely blamed him for the fraud. Cross-examination of the Government's cooperating witnesses accounted for much of the trial in this case. For example, Ashish Dole and Amin Majidi were each cross-examined for approximately two-and-a-half days after one day or less of direct examination.

Counsel for Shor cross-examined Majidi on his direct testimony that the mismarking scheme had started in 2014. Specifically, counsel for Shor confronted Majidi with a text message between Majidi and Daniel Osman, a partner at PPI, dated January 26, 2016, in which Majidi said in 2014 that "the book was properly marked." (Tr. 2692-93). Majidi responded that while he thought the marks were "aggressive" in 2014, he also "thought it was within an acceptable range of illiquid assets." (Tr. 2693). Majidi also acknowledged that "throughout 2014" he was

"very pleased with Jeremy Shor's performance as a trader" and "complimented him frequently about his trading acumen." (Tr. 2693-94). Shor's counsel then argued in summation that Majidi had "admitted the pricing from 2014 until summer 2015 was justifiable." (Tr. 4869). Counsel also argued that other objective evidence, including the sampling audit conducted by Ernst & Young for 2014, demonstrated that the "numbers bear out all of 2014 and the first half of 2015 too." (Tr. 4807).

The defense also cross-examined Majidi on his motivations to please the Government. During cross-examination by counsel for Ahuja, Majidi admitted that he was terrified about the prospect of going to jail and that "a way to reduce charges" was to cooperate with the Government. (Tr. 2355). Majidi agreed that when he met with the Government, he had reviewed the Indictment which gave him a general idea of "what type of information would be of use to the government." (Tr. 2357). Majidi further acknowledged that he had met with the Government approximately 25 times, for sometimes hours, and agreed that he "basically ha[d] a dry run of [his] testimony" when he met with the Government. (Tr. 2249). Counsel also cross-examined Majidi about how he modified an answer he provided to the Court during his plea allocution — that he allocuted that he understood his misconduct was "illegal" only after an interruption during which "the government lawyer came over to the table" where Majidi was sitting in Court. (Tr. 2362). During cross-examination by Shor's counsel, Majidi acknowledged he was incentivized to please the Government, agreeing that it was up to the Government to determine whether he had provided substantial assistance that could be credited by the Court at sentencing. (Tr. 2575).

Counsel for Shor argued in summation that the testimony of Majidi and the other cooperating witnesses should not be credited, including because "Amin Majidi had every incentive

to tell the government what it wanted, yet still he made so many admissions that just corroborates the defense case." (Tr. 4869). Counsel for Ahuja also argued pointedly in summation that the testimony of the Government's cooperating witnesses had been "scripted" following 25 to 30 meetings with the prosecution. (Tr. 4736). Counsel told the jury that the close relationship between the cooperating witnesses and the Government, combined with the Government's leverage, meant that the witnesses were lying on the stand:

> The Government has extraordinary leverage over those cooperators. Don't overlook that. They've met with them 25, 30 times . . . . Your common sense tells you that that's not necessary. If you tell the truth, it's not that hard to do. You don't need to rehearse that many times. I think you might be able to put on a Broadway show with fewer rehearsals than that. And remember how this process works. They're trying to get that 5K letter that goes to the judge so they can get a lower sentence. They write it. They decide whether they get it and they write it. And so they've met 30 times. They know what they are going to say. *It's all scripted.* But they haven't written the letter yet. They want that leverage over those cooperators. They want to make sure that those cooperators are going to say what they want to hear. And they are not getting that 5K until after this trial. And you know that those witnesses want that letter to be as strong as possible. The stronger the letter, the less likely they go to jail. They write it. They want to say what these guys want to hear. And they lied on the stand.

(Tr. 4780 (emphasis added)).

## B.    The Government's Disclosures

### 1.    Pre-Trial Disclosures

The majority of the discovery in this case was produced on June 12, 2018, within a month of Indictment, and consisted of more than six million pages of electronically searchable Rule 16 materials containing documents, audio recordings, statements by Shor to law enforcement and the SEC, along with an index.

14

At the time of its initial production, the Government had not yet completed its review of its files for information potentially disclosable under *Brady* or under the policies set forth in Section 9-5.001 of the Justice Manual concerning disclosure of exculpatory information beyond what is legally required. As it was undertaking that review, the Government received letters from counsel for Shor and Ahuja, respectively, on June 26, 2018 and August 15, 2018, requesting disclosure of certain categories of information. Following invitations from the Government to confer on these requests, the Government spoke with Shor's counsel on July 11, 2018, and with Ahuja's counsel on October 1, 2018. The Government also invited the defense to provide any additional information regarding any topic areas or defense theories the defense would like the Government to be aware of as it continued to review its files. On July 25, 2018, the Court also set a June 2019 trial date.

Between November 5, 2018 and February 7, 2019, the Government made four substantive disclosures resulting from its review of its file:

- On November 5, 2018, the Government sent the defense a ten-page, single-spaced disclosure containing detailed disclosures for 14 witnesses.

- On January 15, 2019, the Government sent the defense an additional three-page letter with information relating to two witness interviews, as well as information from a phone call with counsel for a potential witness.

- On January 30, 2019, the Government sent the defense a nine-page letter that included information from a presentation by Majidi's counsel, statements made by witnesses during interviews with the SEC at which the Government was not present, and additional statements made by certain potential witnesses. Several of the disclosures in the January 30, 2019 letter related to disclosures from Government notes memorializing phone calls or in-person meetings with counsel for witnesses, including disclosures from oral communications with counsel for Majidi, Dinucci, Ginsberg, and U.S. Bank, PPI's administrator.

- On February 7, 2019, the Government produced notes from a presentation counsel for PPI made to the SEC in the presence of counsel for Ahuja.

(Exs. A to D).

Beginning on April 26, 2019, the Government began producing *Jencks* Act material ultimately consisting of more than three thousand pages covering 54 potential Government witnesses.  This included material both for witnesses on the Government's witness list as well as for all witnesses that had been interviewed during the Government's investigation but would not be witnesses at trial.

Though cooperating and immunized witnesses are not part of the prosecution team as a matter of law, the Government undertook to proactively seek and obtain relevant materials from its cooperating and immunized witnesses.  Specifically, the Government made reasonable inquiries of all cooperating and immunized witnesses and their counsel about the existence of relevant evidence, as well as *Brady* or *Giglio* material, as memorialized in its April 26, 2019 letter to the Court.  (Dkt. 132).  As part of this process, the Government also asked each of these witnesses whether they possessed any materials that might be inconsistent with their anticipated testimony.  Through counsel, each cooperating witness represented that they did not have additional materials falling into these categories.

During trial, counsel for both Dole and Majidi made productions in response to Rule 17(c) subpoenas issued by Ahuja.  Counsel for Dole produced approximately 500 pages of documents that had not previously been provided to the Government, including text messages, which included both relevant and impeachment material.  On inquiry from the Court, counsel for Dole acknowledged that the Government had specifically inquired "to make sure" that the Government had "everything that's relevant and everything that might undercut Mr. Dole's testimony."  (Tr. 520).

This Dole production also included communications between Dole's counsel and the Government concerning counsel's request that the Government immunize Dole.  Specifically,

on July 5, 2017, counsel emailed the Government to indicate that it intended to "submit a memorandum in support of Mr. Dole's request for immunity." The Government responded the same day asking "[c]an we talk briefly about this tomorrow or Friday before you send us anything — we want to be mindful of Triumph Capital issues." Following this exchange, on July 27, 2017 and August 7, 2017, counsel for Dole sent detailed letters totaling 15 single-spaced pages of factual representations and argument on behalf of Dole, and requesting a non-prosecution agreement. The Government disclosed all of these letters well in advance of trial.

A production by counsel for Majidi at the start of trial also prompted the Government to identify a letter sent by Majidi's counsel to the Government that included factual information, such as that Majidi believed at least some investors knew about PPI's use of an imputed-mid price to arrive at valuations. (Tr. 6.) The letter had inadvertently not been disclosed earlier because it was received from Majidi's counsel along with a discovery cover letter and was filed in a folder containing discovery cover letters.

### 2. Draft Cooperator Allocations and June 10, 2019 Order

The Government did not initially produce draft allocutions of cooperating witnesses. The Government does not consider communications with defense counsel about a proposed allocution to constitute either *Jencks* Act material or *Giglio* for the cooperating witnesses. (*See also* June 10, 2019 Order (Dkt. 213) ("the Court does not believe that it is *per se* improper for a prosecutor to review, or even to comment on, a proposed plea allocution")). After trial commenced, however, the Court made it clear that draft allocutions received from counsel for cooperating witnesses should have been produced to the defense earlier as potential statements of the cooperators, under *Triumph Capital*. The Government promptly conducted a search to

17

determine whether a draft allocution existed for Majidi and, when it found that one did, produced it to defense counsel (the "Draft Allocution").

The same day the Government produced the Draft Allocution, the Court also directed the Government to review its attorney communications for any additional materials that should be produced to the defense pursuant to *Triumph Capital*. (Tr. 479). That evening and the following day, the Government undertook that review, the details of which are addressed in the Government's June 8, 2019 letter (Dkt. 209) and the sworn declarations of the members of the trial team (Dkt. 428-430). The Government made additional disclosures from this review, including a draft of the Dinucci allocution that Dinucci's counsel had emailed to the Government prior to his plea. As set forth in the declarations, the Government also searched for, but did not identify, a draft cooperator allocution for Dole. As Nimberg was an immunized witness, he did not have an allocution.

The draft Dinucci allocution contemplated that Dinucci would state that his corrupt dealings with PPI took place "during . . . 2015 and 2016." (Dkt. 210, Ex. I). *Jencks* Act materials showed that Dinucci had told the Government during proffer sessions that his corrupt dealings with PPI began in 2014. (3520-57, at 1-2; 3520-31, at 1-2; Tr. 774-778). Dinucci pleaded guilty to securities fraud offenses on April 6, 2017, pursuant to a cooperation agreement, before the Honorable Alvin K. Hellerstein. At his Rule 11 proceeding, Dinucci allocuted, in relevant part, that "at some point after mid-2014 [Shor] began to engage in a practice of providing me with his proposed marks [for PPI securities]." (3505-47 at 17).

Majidi pleaded guilty to the original indictment on October 31, 2018. At his Rule 11 proceeding, Majidi allocuted, in relevant part, that between 2014 and 2016 he participated in a scheme with Ahuja, Shor, and others to mismark securities at PPI (the "Final Allocution"). The

Draft Allocution that Majidi's counsel sent to the Government prior to Majidi's Rule 11 proceeding also reflected his participation in a scheme to defraud investors through the mismarking of securities "[b]etween 2014 and 2016" (Dkt. 428, Ex. C, at CR0059 & 61), but did not reference Shor by name, although it did reference Ahuja "and others" (*id.* at CR0061). *Jencks* Act materials produced before trial reflected that Majidi had repeatedly proffered to the Government that Shor was one of his co-conspirators, beginning with his lawyers' proffer to the Government and his first proffer with the Government, and that the mismarking scheme took place between 2014 and 2016. (3520-04; 3520-05 at 7; 3520-08, at 1, 6, 7; 3520-11 at 2, 5; 3520-13, at 4; 3520-21, at 1; Tr. 2053).

During trial, the Court inquired of the Government as to how the changes between the draft and final versions of Dinucci's and Majidi's plea allocutions occurred. The Government stated that it had suggested to counsel for Dinucci to consider whether 2014 to 2016 was a more accurate time period for the scheme in light of Dinucci's proffer sessions with the Government. As the Government has acknowledged, it made certain unintentional mistakes in responding to the Court's questions about its communications with defense counsel about Majidi's allocution. These are discussed in prior letters to the Court and in the sworn declarations of the members of the trial team.  (Dkt. 368; 371; 384; 390; 393; 406; 410; 414; 419; 428-30).

The Court also inquired of counsel for Dinucci and Majidi concerning the changes to the allocutions.  Both counsel affirmed that, consistent with the requirement of Rule 11 that a plea allocution need only provide "a factual basis for the plea" (Fed. R. Cr. P. 11(b)(3)), they had not intended the draft allocutions to capture the entirety of the facts proffered by their clients (Tr. 3138, 2049), they were not pressured by the Government to change the allocutions (Tr. 3141, 2054), and the final allocutions given by their clients were factually accurate (Tr. 3140, 2053).

Majidi and Dinucci were represented by counsel at all relevant times, including during all proffer sessions and their plea proceedings.

Shor sought to cross-examine Dinucci and Majidi on the differences between their draft and final allocutions.  In a June 10, 2019 Order, the Court denied Shor's request under Federal Rule of Evidence 403.  (Dkt. 213).  The Court began by noting that it did "not believe that it is *per se* improper for a prosecutor to review, or even comment on, a proposed plea allocution."   The Court found that the proposed cross-examination had the potential to "confus[e] the jury" in three ways.  (*Id.*).  First, the Court found that Shor's proposed line of cross risked leaving a misimpression with the jury that something "improper" should be inferred from the changes from draft to final allocutions.  (*Id.*).  Second, the Court found that allowing the proposed cross would require an explanation of plea allocutions and the parameters of Rule 11, which would exacerbate the risk of juror confusion.  (*Id.*).  Third, the Court found that there would be no way to cross Dinucci and Majidi on the changes to their allocutions without asking them about privileged conversations with their attorneys, with whom they had formulated their allocutions.  (*Id.*).  The Court concluded that the "marginal" probative value of the proposed cross was "far outweighed" — indeed, "dwarfed" —by "the likelihood of juror confusion."  (*Id.*).

### 3. Post-Trial Disclosures

In June and July 2020, following a FOIA request made by counsel for Ahuja, the Government disclosed a redline that reflected the Government's proposed comments to the Draft Allocution ("the Redline"), and several other documents related to Dinucci's guilty plea allocution, including another draft of Dinucci's allocution ("the Second Draft Dinucci Allocution").  (Dkt. 368, 371).  The circumstances of these disclosures are discussed in prior letters to the Court and in

the sworn declarations of the members of the trial team.  (Dkt. 368, 371, 390, 393, 397, 406, 410, 414, 419, 428-30).

### 4.    The Post-Trial Review

The Government undertook a review of materials in this case pursuant to the Government's letters dated June 24, 2020 and July 16, 2020 (Dkt. 371, 390); the Court's directive at the conference held on July 24, 2020 (Dkt. 397); the Government's letter dated July 31, 2020 (Dkt. 393); and the Court's Order dated August 4, 2020 (Dkt. 396) (the "Review").

The Review was conducted by a Deputy Chief of the Appeals Unit, Karl Metzner. AUSA Metzner reviewed nearly 10,000 communications.  The Review process and its results are detailed in the Government's letter dated September 24, 2020.  (Dkt. 406).  As discussed in that letter, the Review did not identify any draft cooperator plea allocutions that had not previously been produced.  The Review also did not identify any communications between the Government and counsel for cooperating witnesses that had not previously been produced, with the exception of communications that took place during the 2019 trial.  These mid-trial emails related to the Government's efforts to confirm that counsel for Ashish Dole had not provided the Government with a draft plea allocution, as well as conversations with counsel for Majidi and Dinucci that were described to the Court and defense counsel during trial.   (Tr. 760-64).   The Review also identified no additional materials for production within the Government's internal electronic share drive, voicemails, or chats.  The Government made clear that while it was producing 42 documents, the production of those documents did not reflect a determination that that material constituted *Brady*, *Giglio* or *Triumph Capital*.  Instead, the Government produced those documents because they might illuminate issues of inquiry to the Court.  The Government also produced certain materials for the Court's review *in camera*.

21

On January 13, 2021, the Court issued an Order denying defense requests for additional discovery and a hearing, and directing the submission of sworn declarations from members of the trial team.  In the same Order, the Court noted that the Review had yielded no evidence of "systemic disclosure problems or other issues warranting additional discovery or investigation."  (Dkt. 424).

## ARGUMENT

### POINT I

### THE COURT SHOULD DENY THE DEFENDANTS' MOTION FOR A NEW TRIAL

The defendants argue that the Court should order a new trial, pursuant to Rule 33, because the Government purportedly failed to disclose *Brady* and *Giglio* material related to the allocutions of cooperating witnesses, focusing in particular on the Redline.  (Mot. 49-70).  This argument is without merit.  The defendants largely gloss over the stringent standard for such relief, because they cannot meet it.  Government input on draft cooperator allocutions that is consistent with statements the witnesses made in proffer sessions, as is the case here, does not constitute *Brady* or *Giglio*.  But the Court need not even reach this issue because neither the Redline nor the Second Draft Dinucci Allocution would have been admissible evidence, and, moreover, they are not "material" because the defendants cannot show that they "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).  The Redline is immaterial in light of the other impeachment material available to the defendants and the overwhelming evidence of the defendants' guilt on all counts.  Similarly, the Second Draft Dinucci Allocution, which the defendants do not even allege is material, is cumulative of the Government's mid-trial disclosures.

### A.    Applicable Law

#### 1.    Rule 33

Under Federal Rule of Criminal Procedure 33, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  A new trial should be ordered "[s]paringly and in the most extraordinary circumstances."  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).  Because "motions for a new trial are disfavored in this Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and "should be granted only with great caution," *United States v. Stofsky*, 527 F.3d 237, 243 (2d Cir. 1975), district courts, after examining the totality of the evidence and considering objectively all of the facts and circumstances, should grant the motion only if the court finds "a real concern that an innocent person may have been convicted," *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992); *see also Ferguson*, 246 F.3d at 134 ("The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice.").

A new trial should not be granted when the court is "satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict."  *Ferguson*, 246 F.3d at 134.  A court must "strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury," *id*. at 133 (internal quotation marks omitted), and generally "must defer to the jury's resolution" of those issues, *United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009) (per curiam).  Indeed, only in "exceptional circumstances" may a trial judge "intrude upon the jury function of credibility assessment."  *Sanchez*, 969 F.2d at 1414.  "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33."  *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).

The pendency of an appeal ordinarily divests a district court of jurisdiction over a matter. *See United States v. Rodgers*, 101 F.3d 237, 251 (2d Cir. 1996) ("As a general matter, [t]he filing of a notice of appeal is an event of jurisdictional significance — it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.  A district court does not regain jurisdiction until the issuance of the mandate by the clerk of the court of appeals." (internal quotation marks omitted)).  Indeed, Rule 33 itself makes clear that a district court may not grant a new trial motion until a case is remanded by the court of appeals.  *See* Fed. R. Crim. P. 33(b)(1) ("If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.").  Nonetheless, a district court may deny a Rule 33 motion while an appeal is pending.  *See United States v. Camacho*, 302 F.3d 35, 36-37 (2d Cir. 2002) (citing *United States v. Cronic*, 466 U.S. 648, 667 n. 42 (1984)); *see also United States v. Block*, 16 Cr. 595 (JPO), 2019 WL 1254762, at *11 (S.D.N.Y. Mar. 19, 2019) (denying Rule 33 motion in securities fraud trial involving newly disclosed cooperator *Giglio*).  A district court may also "signal its intention" to grant a Rule 33 motion, at which point the court of appeals can consider a motion to remand the case.  *Camacho*, 302 F.3d at 36-37.

## 2.  New Trials for Purported *Brady* and *Giglio* Violations

The Government has a duty to disclose evidence favorable to the accused that is material to guilt.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963). This duty covers not only exculpatory evidence but also impeachment information for Government witnesses.  *Giglio v. United States*, 405 U.S. 150, 154 (1972).  "Impeachment evidence is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *United States v. Madori*, 419 F.3d 159, 170 (2d Cir. 1995) (internal quotation marks omitted).

A new trial is warranted under *Brady* where (1) "the government failed to disclose favorable evidence," and (2) "the evidence it 'suppressed' was material." *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996) (quoting *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995)); *see also United States v. Spinelli*, 551 F.3d 159, 164 (2d Cir. 2008) (a *Brady* violation will result in a new trial only "if the undisclosed information is 'material,' within the exacting standard of materiality established by the governing case law").

As to the first factor, "'evidence whose disclosure is required under *Brady* may consist not only of exculpatory evidence but also of impeachment evidence.'" *Wong*, 78 F.3d at 79 (quoting *Payne*, 63 F.3d at 1210)); *see also United States v. Davidson*, 308 F. Supp. 2d 461, 465 (S.D.N.Y. 2004) ("Evidence is 'favorable' if it is exculpatory or if it could have been used to impeach other evidence relied on by the Government.").

As to the second factor, evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A 'reasonable probability' of a different result is . . . shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678); *accord In re United States (Coppa)*, 267 F.3d 132, 135 (2d Cir. 2001). There "is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). Because "materiality is assessed in light of the totality of the trial evidence[,] . . . [t]he court must consider the net effect of the suppressed evidence, not simply its item-by-item effect. *Davidson*, 308 F. Supp. 2d at 464. "Cumulative materiality is the touchstone of the *Brady* analysis." *Id.* (citing *Kyles*, 514 U.S. at 419). "Where the evidence against the defendant is ample

or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin." *United States v. Gil*, 297 F.3d 93, 103 (2d Cir. 2002).

"New evidence that is merely impeaching will not ordinarily justify a new trial." *United States v. Reyes*, 49 F.3d 63, 68 (2d Cir. 1995). The "evidence in question [must] 'create[] a reasonable doubt that did not otherwise exist.'" *United States v. Romero*, 54 F.3d 56, 60-61 (2d Cir. 1995) (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)). "Evidence of impeachment is material if the witness whose testimony is attacked, supplied the *only* evidence linking the defendant(s) to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case," *Wong*, 78 F.3d at 79 (emphasis added; internal quotation marks omitted); *accord United States v. Avellino*, 136 F.3d 249, 256-57 (2d Cir. 1998). In contrast, "[n]ew impeachment evidence is *not* material, and thus a new trial is *not* required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *Wong*, 78 F.3d at 79 (emphasis in original; internal quotation marks omitted); *accord United States v. Jackson*, 345 F.3d 59, 74 (2d Cir. 2003). "For this reason, courts in this Circuit have routinely and properly denied motions for a new trial based on the discovery of [impeachment evidence relating to] cooperating witnesses who were already impeached on other grounds." *United States v. Jones*, 15 Cr. 153 (VSB), 2018 WL 3599730, at *5 (S.D.N.Y. July 27, 2018 (collecting cases)); *see also Block*, 2019 WL 1254762, at *11 (denying Rule 33 motion in securities fraud trial involving newly disclosed cooperator *Giglio*). Thus, a new trial is warranted only if "the evidence is material, noncumulative, and would probably lead to an acquittal." *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993); *see also United States v. Jones*, 965 F.3d 149, 165 (2d Cir. 2020) (denying Rule 33 motion where "new impeachment evidence" was "cumulative"); *Avellino*, 136 F.3d at 257

("Undisclosed impeachment evidence is not material in the *Brady* sense when, although 'possibly useful to the defense,' it is 'not likely to have changed the verdict.'" (quoting *Giglio*, 405 U.S. at 154)); *Spinelli*, 551 F.3d at 165 ("[I]f the information withheld is merely cumulative of equally impeaching evidence introduced at trial, so that it would not have materially increased the jury's likelihood of discrediting the witness, it is not material."); *United States v. White*, 972 F.2d 16, 22 (2d Cir. 1992) (cumulative evidence is "routinely held insufficient to warrant a new trial").

### B.    Discussion

For the reasons that follow, the defendants' motion for a new trial should be denied because, in addition to the inadmissibility of the new evidence, the defendants have not met their burden of showing that (1) "the government failed to disclose favorable [*Brady* or *Giglio*] evidence," and (2) the evidence was "material."  *Wong*, 78 F.3d at 79.  The defendants cannot show that "the most extraordinary circumstances" justify the relief they seek.  *Ferguson*, 246 F.3d at 134.

### 1.    The Redline and Second Draft Dinucci Allocution Are Not *Brady* or *Giglio* Material

The defendants cannot show that the Redline or the Second Draft Dinucci Allocution are *Brady* or *Giglio* material.  *See Wong*, 78 F.3d at 79.  Government communications with defense counsel about a cooperating witness's allocution that are tethered to proffer statements are appropriate under the law, and the defendants cite no authority for their claim that such communications are *Brady* or *Giglio*.  Nor is the Government aware of any.[2]

---

[2]    The Government, of course, recognizes that in this case the Court directed the Government to disclose its communications with defense counsel regarding plea allocutions, and that the Government did not locate or produce the Redline and Second Draft Dinucci Allocution until after trial despite its efforts to identify and produce disclosable materials.

27

The Redline and Second Draft Dinucci Allocution are not *Brady* material because they are not exculpatory and do not "tend to show" that the defendants are not guilty.  *Gil*, 297 F.3d at 101; *accord Strickler*, 527 U.S. at 281-82; *Coppa*, 267 F.3d at 139.  Nor are they *Giglio* because they could not "alter the jury's assessment of" either Majidi's or Dinucci's "credibility." *Madori*, 419 F.3d at 170.

The defendants' core claim about the Redline is that it was *Giglio* material because they could have used it to show that Majidi was "malleable," and that the Government "shap[ed]" Majidi's allocution to "match the government's theory of the case." (Mot. 3).  The Redline shows no such thing.  First of all, the premise that the Government was seeking to advance its theory of the case in a plea allocution makes no sense because the plea allocution itself was inadmissible hearsay.  More importantly, far from showing that Majidi was a "blank slate" who was parroting the Government's "theory of the case" (*id.* at 49), the Redline reflects proper comments that were consistent with what Majidi had previously told the Government during his proffers, including his very first proffer with the Government, as well as the attorney proffer that preceded it (3520-04; 3520-05, at 7).

Before turning to the specific differences between the Redline and the Draft Allocution on which the defendants focus, it first bears noting that the defendants largely acknowledge that the Redline was "consistent" with "prior 302s" that were available to them during trial, and thus not a basis for impeachment.  (Mot. 53).  Nor do the defendants acknowledge that both Majidi's and Dinucci's counsel told the Court that they would never have permitted their respective clients to allocute in a way that was contrary to their prior proffer statements or that was untruthful.  (*See* Tr. 2048 (Majidi's counsel); *id.* at 3140 (Dinucci's counsel)).  That is why the defendants' argument reduces to a claim that they wanted to show the jury "the fact of the

revision," as opposed to "the substance."  (Mot. 56).  But the fact of Government communications with defense counsel about an allocution consistent with proffer statements of the witness is not *Giglio*.

The defendants make exaggerated and misleading claims that the suggested comments in the Redline were not tethered to Majidi's proffer statements to try to transform the Redline into *Giglio*.[3]  The defendants first contend that the Government sought to "push the start of the mismarking back to 2014."  (Mot. 52-53).  This is simply untrue.  The Draft Allocution stated in the very first sentence that the scheme extended "[b]etween 2014 and 2016" (Dkt. 428, Ex. C, at CR0059), and repeats that same time frame:  "Between 2014 and 2016, I participated in a scheme to defraud investors in the mortgage credit fund of PPI by inflating the month end net asset value of the fund."  (*Id.* at CR0061).  The defendants' assertion that the Government introduced the concept that the scheme began in 2014 into the allocution is therefore factually incorrect.  In any event, Majidi stated at his very first proffer with the Government that the mismarking began in 2014.  (*See* 3520-05 at 7 ("The mismarking of securities at PPI occurred from 2014 to 2016.").  And he repeated that time frame in subsequent proffers.  (*See* 3520-08, at 1 ("The pressure for marks at PPI started in May 2013."); *id.* at 6 ("The arbitrage issues with NEW ISSUE percolated from late 2013 through 2015 . . . .  The mismarking of securities at PPI started in NEW ISSUE to mask negative arbitrage. . . .  The push [in the hedge fund] became a problem in Q2 2015. . . .  In 2014, there was pressure from MAJIDI and NIMBERG to be on their toes and to mark aggressively."); 3520-08, at 7 ("While there was pressure in 2014, the issues at PPI were not

---

[3]     The defendants skip over the Government's suggested deletion of the phrase that Majidi acted "[a]t the direction of Neil Ahuja" (Dkt. 428, Ex. C, at CR0059), a deletion that belies the notion that the changes were somehow designed to cast Ahuja in a worse light.

as major as they were later.  It was possible mismarking began in 2014.  It was possible there were months in 2014 when marks were being moved.  The pressure for marks was from AHUJA.")).

Majidi testified to that time frame during trial as well.  (*See* Tr. 2106 (Majidi testifying that between 2014 and 2016, he "had a significant part in inflating the prices of the assets and the net asset value of the portfolios" at PPI); *id.* at 2104 (Majidi testifying that between 2014 and 2016 he "frequently" discussed with Ahuja his fraudulent "targets" compared to PPI's "actual" returns); *id.* at 2015-06 (Majidi testifying that between 2014 and 2016 he discussed with Ahuja providing investors with inflated month-end estimates); *id.* at 2017 (Majidi testifying that the Mortgage Credit Fund was mismarked "throughout '14 and '15" and the "first two months of '16"); *id.* at 2159 (Majidi testifying based on GX 840-Y that Ahuja "lied to investors" in "2014 and '15," mismarking the New Issue Fund to "hide losses")).

Relatedly, the defendants attempt to make hay out of the fact that the Draft Allocation said that the mismarking scheme "accelerated" in the second half of 2015, but that the Redline did not include this detail.  (Mot. 53-55).  As the word "accelerated" implies, the scheme was previously in motion, which is consistent with Majidi's proffers that the scheme started in 2014, as noted.  Moreover, Majidi highlighted this acceleration during his proffers.  (*See* 3520-05, at 7 ("The [mismarking] phenomenon spread [from the New Issue Fund] to the hedge fund in early 2015, as returns started to struggle in the hedge fund."); 3502-08, at 6 ("The push [in the hedge fund] became a problem in Q2 2015").  Majidi similarly testified at trial that the scheme accelerated in 2015.  (*See, e.g.*, Tr. 2108 ("Magnitude [of the mismarking] was much larger in 2015, especially in the latter part of the year.")).

The defendants also point to the fact the Government proposed removing reference to Majidi's "pressuring traders."  (Mot. 55-56).  This too was nothing new.  Majidi's counsel

proffered to the Government in June 2018, before Majidi even began to proffer, that there was "pressure from Amin to increase NAV & show performance," and that Majidi "understood that [they] were trying to get prices Neil [Ahuja] set that were not fair value — to show performance — knew wrong." (3520-04). Majidi made similar statements to the Government during his proffers. (*See*, *e.g.*, 3520-08, at 7 ("MAJIDI conveyed the pressure from AHUJA to his (MAJIDI's) subordinates."). And Majidi testified similarly at trial. (*See* Tr. 2106 ("I would push the traders"); *see also* Tr. 2179, 2384, 2573, 2617-18, 2647, 2714)).

The defendants note the change from "fund" to "funds" (p. 55), but this too cohered with Majidi's proffer statements going back to his first proffer. (*See* 3520-05, at 7 ("Securities were mismarked in the NEW ISSUE FUND (NEW ISSUE) and the hedge fund. The same strategy applied in the hedge fund and ERISA, so both were inflated. The mismarking evolved over time. The mismarking began with the NEW ISSUE portfolio, as early as the end of 2013. The phenomenon spread to the hedge fund in early 2015, as returns started to struggle in the hedge fund."); 3520-08, at 6 ("The mismarking of securities at PPI started in NEW ISSUE to mask the negative arbitrage.")). And, of course, Majidi testified repeatedly about how both the hedge fund and New Issue Fund were mismarked. (*See, e.g.*, Tr. 2017 (Mortgage Credit Fund mismarked); *id.* at 2159 (New Issue Fund mismarked)).

The suggestion to identify Shor by name in the allocution as one of Majidi's co-conspirators was equally unremarkable. (Mot. 56). The Draft Allocution said that Majidi participated in the scheme with Ahuja and "others" and that he pressured "traders" under his supervision to meet performance targets set by Ahuja. (Dkt. 428, Ex. C, at CR0059 & CR0061). All the Redline did was identify by name a co-conspirator to whom the Draft Allocution had

already alluded.[4]  Moreover, Majidi's counsel proffered to the Government that Majidi would say that Shor was involved in the scheme.  (*See* 3520-04 ("Dinucci had relationship with Shor & Dole; friendly source for marks — understood").  And Majidi named Shor as a co-conspirator at his first proffer and consistently thereafter. (*See* 3520-05, at 7 ("AHUJA, SHOR, and ASHISH DOLE (DOLE) were also involved in the mismarking of securities."); 3520-11 at 2, 5; 3520-13, at 4; 3520-21, at 1).  And, of course, Majidi testified to the same during trial.  (*See* Tr. 2103 (identifying as co-conspirators "Mr. Ahuja, Mr. Shor, Ashish Dole, Mark Ginsberg, . . . [and] James Nimberg"); Tr. 2106 (Shor's role was to get "false prices")).

The Second Draft Dinucci Allocution is also not *Giglio*.  As the Government noted during trial when it produced the first draft allocution, the change in the scheme's time frame to include 2014, which the Government properly suggested to Dinucci's counsel, was consistent with his proffer statements.  (*See* Tr. 774-778; 3520-57, at 1-2 ("In late 2014 and early 2015, it became a common practice for SHOR to tell DINUCCI where he (SHOR) wanted marks to be."); (3505-27, at 3 ("[I]t became a common practice very early on in the relationship for SHOR [who joined PPI in 2013] to tell DINUCCI, 'This where I want my securities marked.'"); 3520-31, at 1-2 ("DOLE worked as SHOR's junior trader and assistant at PPI. . . . From in or about the middle of 2014 through the end of DINUCCI's suspension, DOLE came to DINUCCI for 'friendly' marks")).  And, of course, Dinucci testified to the same during trial.  (Tr. 3279 (Dinucci testifying that he engaged in the mismarking scheme at PPI between "2014 and 2016"); *id.* at 3317-18 (Dinucci testifying that he began to provide Shor inaccurate marks in "late 2014," the "fourth

---

[4]     *See United States v. Taylor*, 802 F. App'x 604, 610 (2d Cir. 2020) ("On *de novo* review, we conclude that the Government did not violate its *Brady* obligations. Pinkney's statement at the plea allocution that he had conspired "*with other people*" is not exculpatory of Taylor, and is hardly 'material' given Pinkney's own statements in the MDC recording about Taylor's involvement in the murder." (internal citations omitted)).

quarter of 2014"); *id.* at 3327-29 (Dinucci testifying that Shor told him "[f]rom late 2014 through the duration of the pricing scheme" that Shor's "bosses[, . . . ] Amin Majidi and Neil Ahuja," wanted inflated marks to meet their fraudulent performance targets); *id.* at 3348, 3427-28, 3430)).[5]

### 2.    The Redline, Second Draft Dinucci Allocution, and Related Cross-Examination Would Have Been Inadmissible

The defendants contend, as they have repeatedly before, that they could have offered the Redline as "objective, documentary evidence that aligned with the defense theory and contradicted the cooperators' testimony." (Mot. 64). That is incorrect. The Redline would not have been admissible at trial. It is quintessential hearsay that is inadmissible under Rules 801 and 802(d)(1)(A), and the defendants cite no authority to the contrary. The Redline is not a "statement" by Majidi, was not made "under oath," and, as noted, was not "inconsistent" Majidi's trial testimony, or even his proffer statements. The defendants could not have offered it into evidence any more so than they could have offered FBI 302s, which are not admissible. *See United States v. DeLucia*, 125 F.3d 845, at *1 (2d Cir. 1997); *United States* v. *Ghailani*, 761 F. Supp. 2d 114,

---

[5]    The defendants' reliance on *United States v. Rivas*, 377 F.3d 195 (2d Cir. 2004), is unavailing. (Mot. 54-55). As the Second Circuit observed, that was "the *unusual case* where a late-disclosed statement can be viewed as having both an inculpatory and an exculpatory effect." *Rivas*, 377 F.3d at 199 (emphasis added). There, after trial, a translator disclosed to defense counsel that Pulgar, the key witness against Rivas, had told the Government, during a pre-trial meeting that had not previously been disclosed, that Pulgar was the one who had carried onto the boat the cocaine that had been found in Rivas' room. *Id.* at 198. As the Court observed, "In view of Rivas's defense that the narcotics belonged to Pulgar, the fact that Pulgar brought the narcotics on board might well have been viewed by the jury as a critical piece of evidence supporting the defense theory." *Id.* This is plainly not such an "unusual case."

116 (S.D.N.Y. 2011); *United States v. Amato*, 03 Cr. 1382 (NGG), 2006 WL 1495497, at *2 (E.D.N.Y. May 26, 2006).[6]   The same holds true for the Second Draft Dinucci Allocution.

Similarly, the Redline or any cross-examination concerning it would have been inadmissible under Rule 403.   There is nothing improper about the Government providing comments to defense counsel about a witness's allocution, so long as those comments are tethered to the witness's prior proffer statements.   As such and for the same reasons that the Court precluded evidence about cooperator plea allocutions in its June 10, 2019 ruling, cross-examination concerning the Redline would have been inadmissible because of the "potential for confusing the jury." (Dkt. 213, at 3).   In particular, evidence "that disclosed [proper] Government involvement could leave a misimpression with the jury that the Government acted improperly."   (*Id.*).   In addition, "[c]ross-examination on this topic would require the Court to provide the jury with a tutorial on the requirements of Rule 11, which would only exacerbate the risk of juror confusion." (*Id.* at 3-4).   Nothing about the Redline changes the correctness of the Court's decision.   And of course, nothing about the fact that there were two draft Dinucci allocutions does either.

Moreover, the defendants cannot avoid that cross-examination on the changes to the allocutions would necessarily intrude on the attorney-client privilege, as the Court also recognized in its June 10, 2019 decision, noting that permitting cross-examination "would result in a minefield of unrelated privilege and procedural issues." (Dkt. 213, at 4).   To try to get around this privilege issue, the defendants overstate the record, claiming that the Government "handed" Majidi the Redline "only minutes" before his plea and that he read it "virtually word for word." (Mot. 2, 26, 35, 68, 87).   There is no evidence in the record to support the assertion that the

---

[6]         Nor could the defendants have offered Majidi's Draft Allocution.

Government handed Majidi the Redline or that Majidi's experienced defense counsel then allowed him to make certain alterations to it on his own and then read it at his plea.[7]

### 3. The Redline and Second Draft Dinucci Allocution Are Not Material

The defendants' motion should also be denied because they cannot show that the Redline and Second Draft Dinucci Allocution were material. The documents were consistent with Majidi's and Dinucci's proffer statements, cumulative of other impeachment material, and immaterial in light of the overwhelming evidence of the defendants' guilt. Nothing about the Redline or Second Draft Dinucci Allocution comes close to showing that there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682; *see also Wong*, 78 F.3d at 79; *Payne*, 63 F.3d at 1208.

#### a. The Redline and Second Draft Dinucci Allocution Are Consistent with Majidi's and Dinucci's Respective Proffer Statements, and Cumulative of Other Impeachment Material

For substantially the same reasons that the Redline and Second Draft Dinucci Allocution are not *Brady* or *Giglio*, they are also not material. (*See supra* § B.1).

The defendants make no meaningful effort to argue that the Second Draft Dinucci Allocution is material. That is because it is plainly cumulative. After all, during trial, and prior to Dinucci's testimony, the Government disclosed that it suggested the change in the time frame of Dinucci's allocution. And, as noted, the Second Draft Dinucci Allocution was consistent with his proffer statements.

---

[7]    In their July 6, 2020 letter to the Court, Ahuja's counsel similarly claimed that Majidi read the Redline "verbatim without a single modification" during his allocution, a contention they repeated a dozen times in the letter. (Dkt. 385, at 3, 4, 6, 8, 12, 13, 14, 15, 24). In their July 15, 2020 letter to the Court, Ahuja's counsel conceded that this contention was factually incorrect. (Dkt. 389, at 3).

Similarly, the defendants have failed to show that the Redline was material.  As discussed above, the suggestions in the Redline were consistent with what Majidi had previously said in proffer sessions with counsel present, as the defendants effectively acknowledge.  (Mot. 53).  They therefore fall back on the argument that what they wanted to present to the jury was not the "substance" of the changes, but the "fact" that the Government communicated with defense counsel about the allocution.  (Mot. 56 ("More fundamentally, and most importantly, regardless of the materiality of the *substance* of the revisions, the *fact* of the revisions was itself relevant and material." (emphasis in original))).  That claim too fails.  As the Court noted in its June 10 Order, "there is nothing *per se* improper for a prosecutor to review, or event to comment on, a proposed plea allocution"; and evidence about such communications is not admissible under Rule 403.  (Dkt. 213).

The defendants also ignore that the Redline is cumulative of Majidi's other impeachment material, which allowed for extensive cross-examination.  That is because "a new trial is generally not required where the testimony of the witness is corroborated by other testimony, or when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *Payne*, 63 F.3d at 1210 (internal quotation marks omitted); *Spinelli*, 551 F.3d at 165 ("[I]f the information withheld is merely cumulative of equally impeaching evidence introduced at trial, so that it would not have materially increased the jury's likelihood of discrediting the witness, it is not material.").

Indeed, in denying bail pending appeal, the Court "emphasize[d] on this record how much impeachment material there was for Mr. Majidi":

> I am not going to suggest that my list is exhaustive or even comprehensive but just looking at the transcript there was cross-examination of Mr. Majidi on the number of meetings that he had had with the government and the fact that he had done a, quote, dry

> run of his testimony; the violations of the cooperation agreement
> that had nonetheless resulted in him being a government cooperator
> and not being charged with lying, despite it being criminal conduct;
> his desperate hope for a 5K; his wealth, including his watch
> collection and the possibility of customs violations relating to that;
> the fact that some of his statements were impugned by
> contemporaneous texts; his plotting with Mr. Nimberg to kick
> Hyung Peak out of trading, his resentment of Mr. Ahuja; Mr. Ahuja's
> allocation of time and his belief that Mr. Ahuja was somehow
> screwing him; the rather vulgar language he used in referring to
> people he worked with; his thoughts about leaving PPI for Meta
> Capital; the attorney proffers that his attorneys made that may have
> been incomplete; his problems during his plea allocution; his
> problems moving money using Standard Charter Bank; his shipment
> of marijuana across state lines; his lies and his employment
> certification form and his requests for unemployment benefits; the
> possibility that he may have been involved in capital gains tax
> problems; and the use of money that he had taken from his family
> without his father's knowledge or permission.

(Nov. 22, 2019 Tr. 16-17); *see also id.* at 17-18 (Court cataloguing Dinucci impeachment

material).

Any such value in questioning Majidi about the Redline would have been

cumulative of the extensive cross of Majidi about the Government's numerous meetings to prepare

him to testify — which is what ultimately matters and was put before the jury. (*See* Tr. 2249-50

(Majidi testifying that he met with Government between 20 and 25 times)). Indeed, Ahuja's

counsel made the exact argument to the jury in its summation — that the Government "scripted"

Majidi's testimony — that is the focus of their instant motion:

> They've got extraordinary leverage over those cooperators. Don't
> overlook that. They've met with them 25, 30 times. And the judge
> will tell you there's nothing wrong with meeting with witnesses to
> prepare them, but 25, 30 times for a three-hour testimony? Your
> common sense tells you that that's not necessary. If you tell the
> truth, it's not that hard to do. You don't need to rehearse that many
> times. I think you might be able to put on a Broadway show with
> fewer rehearsals than that. . . . And so they've met 30 times. They
> know what they're going to say. *It's all scripted.*

(Tr. 4779-80 (emphasis added)).  Moreover, as noted, the defendants were permitted to cross-examine Majidi about communications with the Government that took place during his actual allocution that resulted in a modification of one of his answers.  (Tr. 2362).

Simply put, the Redline and Second Draft Dinucci Allocution were cumulative of the other extensive impeachment evidence that was available to the defendants — including the argument that they put to the jury:  "It's all scripted."  (Tr. 4790).

> **b.**     **The Redline and Second Draft Dinucci Allocution Were Immaterial in Light of the Overwhelming Evidence of the Defendants' Guilt**

Relatedly, the defendants cannot show that the Redline and Second Draft Dinucci Allocution were material because the evidence at trial was overwhelming.  *See Gil*, 297 F.3d at 103 ("Where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilty is thin.");  *Payne*, 63 F.3d at 1210 (no *Brady* violation where undisclosed evidence was just one piece of evidence linking defendant to narcotics dealing and where testimony at issue was corroborated by other eyewitnesses and other physical evidence).

Notably, Dinucci's and Majidi's testimony that the scheme began in 2014 and Majidi's testimony that Shor was involved in the scheme were corroborated by other witnesses and documentary evidence.  (*See supra* pp. 3-12; *see also*, *e.g.*, Tr. 1529-31 (Nimberg testifying that he engaged in mismarking scheme "[b]etween 2014 and 2015," with, among others, "Neil Ahuja, Amin Majidi, Jeremy Shor and Ashish Dole"); Tr. 243, 246-47 (Dole testifying that the scheme began shortly after Shor joined PPI in April 2014, and that he committed engaged in the scheme with Shor and Ahuja, among others); GX 858-E (July 9, 2014 text message — Shor to Dole: "What are you assuming for Frank [Dinucci] and other bid/asks?  Mostly, what are you

assuming from Frank?" / Dole to Shor: "I can put in prices we want from [Dinucci]"); Tr. 285-86 (Dole testifying about spreadsheet referenced in GX 1058, a July 9, 2014 email, that Shor and Dole used to "reverse engineer" their marks); Tr. 319 (Dole testifying that and Shor discussed using inflated sector spreads to increase valuations in the middle of 2014); GX 855-E (Dec. 5, 2014 text message from Shor to Majidi and Dole: "I'm done giving frank a BJ.  Sorry to be crass boss."); GX 870-P (Dec. 11, 2014 text message — Nimberg to Majidi:  "Please call.  We have to chat. I think there's something stupid going on" in the New Issue Fund."  / Majidi to Nimberg:  "True. They[, including Ahuja,] don't lose money.  It's just that they mark shit up and show false returns." (discussed at Tr. 1592-97); GX 359 (Ahuja assuring the largest investor in the MCF over email that the positions in that portfolio were "dealer marked"); GX 859-G (Feb. 27, 2015 text message from Ginsberg to Dole:  "just told [Ahuja] we are mismarked by 500 [basis points] and [Ahuja's] asking for 60 [additional basis points].  This has to end."); GX 870-DD) (Mar. 5, 2015 text message from Nimberg to Majidi:  "Neil [Ahuja] has to stop ratcheting up the monthly stress."); GX 880-Z (Sept. 15, 2015 text from Dinucci to Shor:  "[t]ell [Dole] to chuck me a dam[ ] trade if I keep marking up all his bonds."); GX 840-Y (Jan. 26, 2016 text message from Majidi to Osman: "the reason the [MCF] is overmarked is because [Ahuja] would lie to [SkyBridge] about returns and [Majidi] would have to push [Shor] to mark things up.")).

And, of course, the Court denied Shor's Rule 29 motion that the Government had "not established the alleged conspiracy going back to January 2014."  (Tr. 4123-45).

Ahuja seeks to downplay the strength of the evidence at trial by asserting that the Government's case rested entirely on cooperator testimony, stressing the purported "absence of tangible evidence tying Mr. Ahuja to the mismarking scheme" and claiming "that the only evidence linking him to that scheme came from biased and pliant cooperating (and immunized)

witnesses." (Mot. 28-30). Not so. As set forth above, the Government introduced contemporaneous text messages and emails that corroborated witness testimony that Ahuja was aware of and directed the mismarking scheme. For example, in February 2015, Ginsberg texted Dole that Ginsberg had "*just told [Ahuja] we are mismarked* by 500 [basis points] and [Ahuja's] asking for 60 [additional basis points]. This has to end." (GX 859-G (emphasis added)). In May 2015, Ahuja texted Dole to "just force" the April month-end marks for the NIF. (GX 851-C). In June 2015, Dole texted Ahuja that "we took 3.5 mm *to mark up* New Issue io [referring to a sector of bonds held in the NIF] last month." (GX 851-D (emphasis added)). In October 2015, when Dole informed Ahuja that marking down certain bonds held in the NIF would impede PPI's ability to "show returns," *i.e.,* report positive investment performance, that month, Ahuja directed Dole to "bring [the marks] up." (GX 851-H). Ahuja expressed the hope that "printing returns" would convince investors to stay in the NIF for an extra year. (*Id.*).

Ahuja fails to engage with this devastating documentary evidence, instead making the conclusory assertion that Ahuja was "notably absent from most of those communications." (Mot. 29). Ahuja also argues that cooperator testimony explaining the text messages was necessary. These text messages speak for themselves, as do the numerous text messages between Shor and Dinucci demonstrating the *quid pro quo* relationship. (*See* GX 840; GX 855-E; GX 858-B; GX 858-E; GX 858-T; GX 852-H; GX 853-B).

The defendants similarly repeat Shor's arguments to the jury that the Government lacked "actual data to back up the cooperators' unsubstantiated claims of inflated valuations over an overbroad two-year period." (Mot. 30). In particular, the defendants point to evidence that Auriga's prices were sometimes lower than or equal to other reputable brokers. But the Government never argued that all of PPI's bonds were mismarked, nor that all of the Auriga prices

were inflated.  As the Government explained in closing: "[T]hat makes no sense.  The whole way the scheme worked is that you would pick a few bonds, inflate them a lot, and that would increase the final target and get them to their goal." (Tr. 46546).  In addition, many of the Auriga prices highlighted by Shor at trial were from the first quarter of 2014 before Shor joined PPI and began seeking inflated prices from Dinucci at Auriga.  (Tr. 1265-66).

Given the strength and corroboration of the evidence, the defendants cannot show that the verdict would have been different had they possessed the Redline or the Second Draft Dinucci Allocution.

Moreover, none of the cases cited by the defendants in support of their motion (pp. 60-61 & n.18) bears any resemblance to the circumstances here, because, as noted above, there is no authority supporting the defendants' request for relief.  *See United States v. Milles*, 363 F. App'x 506, 509 (9th Cir. Jan. 26, 2010) (memorandum) (government gave a trial witness 30 minutes before his testimony a sheet telegraphing the questions he would be asked and the answers he should give; affirming conviction for lack of prejudice ); *United States v. Cincotta*, 689 F.2d 238, 244 (1st Cir. 1982) (government mailed to prospective witnesses a letter asking them not to speak with defense counsel and urging them not to embarrass the prosecution; affirming conviction for lack of prejudice); *Maldonado v. Scully*, 1990 WL 102209, at *1-2 (S.D.N.Y. July 12, 1990) (declining to "sanction[] the conduct of the prosecution" where co-defendants' pleas may have been "coerced"; denying habeas petition for lack of prejudice); *United States v. Bautista*, 23 F.3d 726, 731-32 (2d Cir. 1994) (communication between government and witness between cross-examination and redirect); *United States v. Malik*, 800 F.2d 143, 149 (7th Cir. 1986) (communication between government and witness during direct examination); *Paul v. Giap*, 273

41

A.D.2d 54, 55 (1st Dep't 2000) (communication between government and witness during cross-examination).

Finally, even assuming that these documents could have come into evidence to somehow impeach Majidi and Dinucci, the defendants do not address the fact that the Government would then have properly been able to offer the myriad prior consistent statements in the FBI 302s noted above, rendering the materiality of this purported impeachment negligible at best. *See* Fed. R. Evid. 801(d)(1)(B); *United States v. Pierre*, 781 F.2d 329, 333-34 (2d Cir. 1986); *United States v. Purcell*, 967 F.3d 159, 196 (2d Cir. 2000).

*    *    *    *

Because the defendants cannot show that Redline and Second Draft Dinucci Allocution are "material," their Rule 33 motion fails. There is no basis for the Court to find that these documents would have made a difference to the jury's verdict. This is not a case where the defendants can seriously argue there is "a real concern that an innocent person may have been convicted." *Sanchez*, 969 F.2d at 1414.

**POINT II**

**THE COURT SHOULD DENY THE DEFENDANTS'
MOTION TO DISMISS THE INDICTMENT**

The defendants also ask the Court to dismiss the Indictment because of the Government's purported "reckless disregard" for its disclosure obligations. There is no basis for this claim or the exceptional remedy they seek, and this motion too should be denied.

### A.    Applicable Law

As the Second Circuit "has repeatedly emphasized, the exercise of a court's supervisory authority to dismiss an indictment is a 'drastic remedy' that should be utilized with caution and only in extreme cases." *United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018)

(citing *United States v. Brown*, 602 F.2d 1073, 1076 (2d Cir. 1979)); *see also United States v. Broward*, 594 F.2d 345, 351 (2d Cir. 1979) ("[T]he sanction [of dismissal] is so drastic that, especially where serious criminal conduct is involved, it must be reserved for the truly extreme cases."); *see generally United States v. Stein*, 541 F.3d 130 (2d Cir. 2008).

"To meet the very heavy burden of establishing a due process violation to dismiss an indictment for outrageous governmental misconduct, a defendant must show that the Government's conduct was so outrageous that common notions of fairness and decency would be offended were judicial process invoked to obtain a conviction." *Walters*, 910 F.3d at 27 (internal quotations omitted); *see also United States v. Connolly*, 16 Cr. 370 (CM), 2019 WL 2120022, at *1 (S.D.N.Y. May 2, 2019). "This inquiry turns on whether the governmental conduct, standing alone, is so offensive that it shocks the conscience." *Walters*, 910 F.3d at 27 (internal quotation omitted); *accord United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991); *United States v. Chin*, 934 F.2d 393, 398 (2d Cir. 1991). A defendant seeking to invoke this doctrine must demonstrate prejudice as a result of the Government's misconduct. *See Walters*, 910 F.3d at 23; *United States v. Gonzalez*, 529 F.3d 94, 98 (2d Cir. 2008) ("supervisory powers are not to be used to circumvent the harmless error rule"); *United States v. Magassouba*, 544 F.3d 387, 410 (2d Cir. 2008) ("[A] harmless error certainly would not warrant the relief Magassouba seeks: dismissal of the indictment.").

### B. Discussion

The defendants ask the Court to dismiss the Indictment because of the Government's purported "repeated disclosure failures and misrepresentations to the Court" and because it was purportedly "reckless" in lacking a "meaningful process to reasonably ensure" that the Government complied with its disclosure obligations. (Mot. 70-71). The record of

Government disclosures does not provide a basis to dismiss the Indictment — let alone a finding that the Government's conduct "shocks the conscience." *Walters*, 910 F.3d at 27.

To try to cobble together a narrative that the Government was "at least reckless" and had "no functioning process" for its disclosure obligations, the defendants rehash their complaints about the Government's pre-trial disclosures, the bulk of which were made between three and seven months before trial. (Mot. 5-19, 72). While the Government has acknowledged that certain of its searches could have been more thorough and disclosures more timely, that does not mean that the Government did not understand its obligations and take reasonable steps to discharge those obligations. The Government's disclosures reflect the Government's compliance with its obligations, and the defendants cannot seriously argue that they were prejudiced when they received those disclosures months before trial. The defendants do not address the extensive Section 3500 material that the Government produced before trial, again evidence of the Government's compliance with its disclosure obligations. Nor do they mention AUSA Metzner's two-month-long review of over 10,000 communications that found no documents that would support any basis for relief. Likewise, the defendants ignore that the Court has already found no evidence of "systemic disclosure problems or other issues warranting additional discovery or investigation" (Jan. 13, 2020 Order (Dkt. 424)), and that the Court has also concluded that it was "satisfied with [the] thoroughness [of the Government's declarations], and sees no basis for doubting the veracity of the explanations provided" (Feb. 19, 2021 Order (Dkt. 435)).

The defendants' motion to dismiss the Indictment thus reduces to a claim that the Government's failure to locate and produce the Redline and other Dinucci-related allocution material "shocks the conscience" and caused them "prejudice." *Walters*, 910 F.3d at 27. The record does not support such a "drastic" finding. *Id.* The Redline and Second Draft Dinucci

Allocution reflect entirely proper communications between the Government and defense counsel. That the Government did not locate the Redline during trial was the result of Government's understanding, as reflected in its June 8, 2019 letter, that it was being directed to search for all communications with defense counsel about allocutions, not internal emails.  (Dkt. 428, at ¶¶ 26-27; Dkt. 429, at ¶¶ 34-36; Dkt. 430, at ¶ 7(a)).  That the Government did not locate the Dinucci-related documents, which were cumulative of the other mid-trial disclosures, was similarly a good faith mistake.  (Dkt. 429, at ¶ 36).  The Government's October 31, 2018 email asking to meet with Majidi's counsel before his plea was a routine scheduling email to arrange for Majidi to sign his plea agreement.  (Dkt. 428, at ¶ 22).  The Government's incorrect responses to the Court's questions about Majidi's allocution was also a good faith mistake.  (Dkt. 428, at ¶¶ 28-44).

Finally, the defendants speculate that there must have been additional oral communications between the Government and counsel for cooperating witnesses, the substance of which was disclosable but which the Government failed to memorialize and disclose.  The defendants even accuse the Government of deliberately taking steps to avoid creating a record of those communications.  (Mot. 84-87).  That is an unfair inference in a case where the Government produced well over 200 pages of *Jencks* Act material for each of its cooperating witnesses — the very opposite of avoiding creating a record.  There is nothing improper about speaking with another lawyer by telephone or in person, and not every communication between attorneys gives rise to a disclosure, an argument the defendants repeatedly make without support in the law.

The Government understands that *Brady* and *Giglio* obligations apply to oral communications, as evidenced by many of its disclosures.  For example, the Government's January 30, 2019 disclosure letter included information from notes memorializing phone calls and in-

person meetings with counsel for witnesses, including disclosures from oral communications with counsel for Majidi and Dinucci.  (Ex. C).

The Government also appreciates that *Triumph Capital* covers those oral communications in which counsel relate to the Government their client's account of the facts. Indeed, the Government disclosed its notes of Majidi's counsel's attorney proffer (3520-04) and it was the Government that highlighted *Triumph Capital* for Dole's counsel in the context of information counsel wanted to provide to the Government.  While the defendants seek to twist the Government's mention of *Triumph Capital* into the notion the Government did not understand its obligations or was trying to avoid disclosures (Mot. 31), the opposite is true.  After the Government asked counsel to be mindful of *Triumph Capital* issues, counsel for Dole sent the Government two substantive letters carefully outlining both argument and factual information from Dole, all of which was produced by the Government to the defendants well in advance of trial.

There is no evidence that the Government's conduct "shocks the conscience" or "prejudiced" the defendants in any way.  *Walters*, 910 F.3d at 23.  The motion should be denied.

**CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should deny the defendants' motions in their entirety.

Dated: New York, New York
        April 23, 2021

                                        Respectfully submitted,

                                        AUDREY STRAUSS
                                        United States Attorney

                        By:     /s/ _____
                                Andrea M. Griswold
                                Joshua A. Naftalis
                                Assistant United States Attorneys
                                (212) 637-1205/2310

47