UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| UNITED STATES OF AMERICA | ORAL ARGUMENT REQUESTED |
| v. | No. S1 18 Cr. 328 (KPF) |
| ANILESH AHUJA, a/k/a "Neil," and JEREMY SHOR, | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE INDICTMENT OR FOR A NEW TRIAL**

WEDDLE LAW PLLC
Justin S. Weddle
Julia I. Catania
250 West 55th Street, Floor 30
New York, New York 11226
T: 212-997-5518

*Attorneys for Jeremy Shor*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Roberto Finzi
Richard C. Tarlowe
1285 Avenue of the Americas
New York, New York 10019-6064
T: 212-373-3000

KIRKLAND & ELLIS LLP
John P. Del Monaco
601 Lexington Avenue
New York, New York 10022
T: 212-446-4800

*Attorneys for Anilesh Ahuja*

May 14, 2021

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................1

ARGUMENT ...............................................................................................4

I.      THE COURT SHOULD GRANT THE MOTION FOR A NEW TRIAL..............4

        A.      The Suppressed Evidence Was Favorable to the Defense and
                Subject to Disclosure. .......................................................................4

        B.      The Suppressed Evidence Was Material. .......................................15

II.     THE COURT SHOULD GRANT THE MOTION TO DISMISS THE
        INDICTMENT ...............................................................................32

        A.      The Government's Repeated Disclosure Failures Are Not Cured by
                the Volume of the Government's Other Discovery.................................34

        B.      The Government's Failure to Maintain Any Disclosure Process
                Was at Least Reckless. .....................................................................38

        C.      The Government's Representations to the Court Were at Least
                Reckless. ....................................................................................40

        D.      The Government Offers No Justifications for its Failure to
                Memorialize Significant Communications. .............................................44

        E.      There is No Way to Remedy the Harm from the Disclosure
                Violations....................................................................................46

CONCLUSION.............................................................................................48

## PRELIMINARY STATEMENT

In a case reliant on accomplice testimony, the government admittedly did not disclose evidence demonstrating that, after receiving proposed plea allocutions from cooperating witnesses, the prosecutors changed them—in one case, providing a cooperator an entirely rewritten allocution—to favor its own view of the facts and undercut key defense arguments, and that the cooperators then adopted the government's changes and characterized them as their own. The withheld evidence—which to this day we would not know about absent extraordinary steps taken by the defense—shows that the government, in revising cooperators' statements to better fit its narrative of the facts—did precisely what it assured the Court and the defense it had not done (and would never do).

Although the government initially apologized for its various disclosure failures and related misrepresentations to the Court, it now advances the surprising claim that this evidence should never have been disclosed to the defense at all. The government's position is that its revisions were "appropriate" because they were "tethered" to prior proffer statements and therefore not subject to disclosure. Although both of those factual predicates—that the changes were appropriate and tethered to proffer statements—are at least debatable, they are in any event irrelevant because the probative value of the withheld evidence does not depend on the appropriateness (or inappropriateness) of the government's role in revising and rewriting the cooperators' sworn testimony.

The suppressed evidence would have established—in a way that none of the evidence available to the defense at trial could—that the government was willing to ask cooperators to make changes to their statements, and that the cooperators were willing to adopt them. And whether or not the suggestions were tethered to prior proffer statements, they were clearly more consistent with the government's framing of the facts. These facts—which are not

1

reasonably in dispute—would have cast doubt not only on the credibility of the witnesses, but on the reliability of the government's preparation and presentation of the evidence.  Importantly, the government does not dispute that the proposed allocutions (prepared by experienced counsel, who had attended the relevant proffer sessions, and approved by the cooperators, who had witnessed the underlying conduct) were themselves tethered to prior statements.

This is not a case in which the government corrected a typo or added references to a necessary element of the offense, and a simple review of the statements shows that the original statements drafted by counsel were perfectly adequate and at least as tethered to the witnesses' proffers as the government's changes.  The fact that the government nevertheless changed them— including by striking the consistent references to "2015" that *both* cooperating witnesses had *independently* included in their respective allocutions—was itself probative.  In fact, it would have been the most concrete and compelling evidence to support the defense's argument to the jury that the cooperators' testimony had been "scripted" by the government.

Ultimately, the government falls back on the claim that the withheld evidence would not have mattered because it was inadmissible hearsay that would have confused the jury, and because there was "overwhelming" evidence of guilt.  The argument about inadmissibility is just plain wrong, in that the evidence in question would not have been offered for the truth of the original statements or revisions, but rather for the fact that they occurred.  The argument about jury confusion is based on a ruling Your Honor made on a record that understated the evidence's probative value and overstated its potential to confuse the jury.  The facts as we know them today are simple, powerful, easy to prove, and not *unfairly* prejudicial.

The government's argument about the overwhelming evidence of guilt is dramatically overstated and in any event circular.  The inculpatory weight of the proof cited by the

government is dependent on the cooperating witnesses' interpretations and the assumed reliability of the government's presentation:  the ability to undermine both would have cast a shadow on the government's case.  The suppressed evidence was therefore material and the defendants are entitled, at a minimum, to a new trial on that basis alone.

More broadly, the government does not engage with the context in which the government's failures occurred.   The defendants' opening brief catalogued in detail the government's (i) repeated failures to timely disclose *Brady/Giglio*; (ii) lack of any system or process (in violation of its own policies) of memorializing, segregating, and disclosing substantive communications with counsel for witnesses; (iii) repeated and mistaken representations to the Court about reviews of its file; and (iv) a pattern of failing to memorialize key communications with counsel for cooperators.

In the limited instances in which the government tries to explain specific disclosure failures, it offers unconvincing excuses that do not withstand the slightest scrutiny.   The government also does not explain, or excuse, its failure to undertake any inquiry to ensure that its representations to the Court—including representations pertaining to constitutional protections— were grounded in fact, and it does not even attempt to address its demonstrated failure to memorialize substantive communications to which the defendants were entitled.   The government's conduct reflects at least a reckless disregard for the defendants' constitutional protections and warrants dismissal of the Indictment or, at a minimum, a new trial.

In sum, the record in this case—both as it relates to the cooperator allocutions in particular and to larger disclosure issues more generally—is largely undisputed.  What is in dispute is the import, effect, and consequences of the government's actions and inaction.  For the reasons that follow, we respectfully submit that the government's disclosure failures and inaccurate

representations were extraordinary, its conduct rendered the trial unfair, and the consequence of that conduct should be dismissal, or at a minimum, a new trial.

## ARGUMENT

### I.   THE COURT SHOULD GRANT THE MOTION FOR A NEW TRIAL

A new trial is warranted, regardless of the government's good faith, if the government "suppressed" evidence (as that term is used in the relevant case law) that is exculpatory or impeaching, and the defense was prejudiced. *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963). The government does not dispute that it "suppressed" (*i.e.*, did not produce) the allocution materials. It argues instead that the suppressed evidence: (i) is somehow not *Brady/Giglio*; (ii) would not have been admissible; and (iii) was in any event cumulative of other impeachment material and would not have mattered in light of the other evidence received. The government is wrong on all counts.

### A.   The Suppressed Evidence Was Favorable to the Defense and Subject to Disclosure.

After having claimed for months that it regretted certain disclosure failures, the government now takes the troubling position that it in fact had no duty to disclose *any* of the information or documents regarding the cooperator allocutions. The government's position is unsupportable, and again raises questions about the government's understanding and interpretation of its disclosure obligations.

Notably, upon learning of the existence of the allocution first proposed by Majidi's counsel (and even without knowing that the government had literally scripted the changes to Majidi's allocution), the Court stated that the proposed allocution "should have [been] produced."

4

Trial Tr. 478:19.[1]  The government's categorical statement to the contrary—that "communications with defense counsel about a proposed allocution [do not] constitute *Jencks* Act material or *Giglio* for the cooperating witnesses" as long as they are "tethered" to prior proffer statements, Opp. 17—is incorrect as a general matter and as applied to the particular facts of this case.

First, the proposed allocutions unquestionably fall within the scope of the *Jencks* Act, and it is difficult to understand how the government could contend otherwise.  Each of the proposed allocutions was "a written statement" that was "adopted or approved" by the witness.  18 U.S.C. § 3500(e)(1).  The proposed Majidi allocution was specifically titled "Approved," ECF 385-2, and Dinucci's counsel confirmed that his practice would have been to share the proposed allocution with Dinucci before sending it to the government.  *See* Trial Tr. 3137:14-15.

Second, there is also no support for the government's contention that communications with defense counsel about a proposed allocution—regardless of the substance of those communications—do not constitute *Giglio* as long as they are somehow tethered to prior proffer statements.  The defendants are not contending that *all* communications with a cooperator's attorney about an allocution necessarily need to be memorialized and disclosed.  But here, for example, the government caused at least two cooperating witnesses to make substantive changes to their allocutions and, in one case, actually rewrote the witness's proposed allocution and provided it as a script for him to read as his own.  It is remarkable for the government to suggest that those facts need not be disclosed to the defense.[2]

---

[1]   The government's claim that "[t]he Government promptly conducted a search to determine whether a draft allocution existed for Majidi" after the Court made "clear that draft allocutions received from counsel . . . should have been produced to the defense," Opp. 17–18, has it backwards.  The Court did not announce a new, case-specific rule regarding draft allocutions.  Rather, when the government (belatedly) produced the draft allocution at trial, the Court concluded that it "should have been disclosed" earlier.  Trial Tr. 472:2-6.

[2]   It is especially surprising for the government to take the position that it need not disclose a rewritten allocution provided to a cooperator's lawyer in light of recent assurances provided to other judges in this District regarding the government's revamped disclosure policies, implemented only a month before the Majidi

Even if the government were correct that "communications with defense counsel about a cooperating witness's allocution that are tethered to proffered statements are appropriate," Opp. 27, that statement would say nothing about the government's obligation to disclose those communications because the *Brady/Giglio* analysis does not turn on the "appropriateness" of the conduct in question..  Defense Mot. 44–45.  Indeed, many government interactions with witnesses that are entirely proper must be (and routinely are) disclosed to the defense, and many of those interactions figure prominently in both cross-examination of witnesses and in arguments about witness credibility and the merits of the case.

In this case, it is indisputable (and the government does not contest) that the government's revisions to the allocutions at a minimum favored the government's interpretation of the evidence.  And the proposed allocutions, which were presumably drafted by counsel for the cooperating witnesses who were present at the same proffer sessions, and were approved by the witnesses themselves, were certainly at least as tethered to prior proffer statements.

Yet, the government caused the cooperators to allocute to different facts.  That evidence—that the government was willing to make the changes and that cooperators were willing to go along with them—would itself have provided a compelling evidentiary basis for the defense to argue to the jury that key cooperator testimony was curated by the government, and to cast doubt on the government's preparation of its witnesses and framing of its evidence.  It also would have supported a new (and evidence-based) line of argument about both the cooperating witnesses and the government itself.

---

allocution, that purportedly emphasize the need for prosecutors to make "broad," "early" disclosure.  July 2, 2020 Gov't Ltr. at 17, *United States* v. *Nejad*, 18 Cr. 224, ECF 354; *see also* Dec. 18, 2020 Gov't Ltr. at 2, *United States* v. *Jain*, 19 Cr. 59, ECF 151 (reciting measures taken to "augment and reinforce updates to [the Office's] discovery policy that we[re] made in 2018").

1.     **The Revisions Supported the Government's Narrative.**

The government spends much of its brief attempting to show that its changes to the allocutions were consistent with certain excerpts of FBI 302s, but it does not (and cannot) contest that its changes collectively supported the government's framing of the case.  So, for example, in a detailed recitation of facts supporting two counts, Majidi's proposed allocution—drafted by an experienced defense lawyer with full knowledge of his client's statements (including proffer statements)—only referenced a scheme with Mr. Ahuja that accelerated in the "second half of 2015."  Defense Mot. App. at 026367–68.  When the prosecution revised the allocution, it removed the reference to the "second half of 2015," and replaced it with a sentence stating that Majidi participated in a scheme with Mr. Ahuja and Mr. Shor between 2014 and 2016.  *Id.*

Although the proposed allocution included, after the detailed factual recitation, one generic reference to Majidi's participation in a scheme to defraud investors "[b]etween 2014 and 2016," *id.* at 026369, the proposed allocution did not, as the government inaccurately claims, state in the "very first sentence" that the "scheme extended '[b]etween 2014 and 2016.'"  Opp. 29.  The first sentence of the proposed allocution actually stated: "Between 2014 and 2016, I was employed at Premium Point Investments as the portfolio manager for the mortgage credit hedge fund."  *Id.* at 026367.  No reference was made to the "scheme extend[ing]" into that period.  Opp. 29.  The statement did not, in other words, refer to mismarking at all, much less in 2014 (and indeed Majidi became portfolio manager only in 2014).  As it did before and during trial, the government continues even now to make inaccurate statements about material facts that could have been avoided with minimal diligence.  Regardless, even accepting the generic references to 2014, where "suppressed evidence is inculpatory as well as exculpatory, and its exculpatory character harmonizes with the theory of the defense case, a *Brady* violation has occurred."  *United States* v. *Mahaffy*, 693 F.3d 113, 130 (2d Cir. 2012) (internal quotation marks omitted).

Like Majidi's proposed allocution, Dinucci's proposed allocution—also presumably prepared by experienced counsel familiar with Dinucci's statements and approved by Dinucci himself—specifically referenced "2015" and, in particular, mismarking "*[b]eginning* in 2015." *See* Defense Mot. 40–41.  And, just as it had done with Majidi, the government caused Dinucci to change the time period from "2015" to "at some point after mid-2014." *Id.*  The government does not attempt to explain why both cooperators (and their lawyers), who certainly knew what they had said in their proffers, independently chose to highlight "2015" in their proposed allocutions.   Absent the government's influence, two government witnesses independently stressed (and would have sworn to) 2015 as the relevant date of their conduct, and at the government's suggestion, both excised all references to "2015" and changed them to 2014. That fact alone would have been significant.

Whether or not tethered to proffer statements, these changes by the government were clearly at odds with the defense case.  Based on objective evidence, including E&Y's extensive testing of PPI's marks in 2014 (in which it determined that the marks represented fair value), and E&Y's determination that no restatement of marks was necessary prior to September 2015, the defense emphasized that PPI's marks were not inflated before mid-2015.   Both defendants believed it important to place any mismarking in the second half of 2015:  At that time, as witness after witness testified, the market for PPI's specific bonds became extremely illiquid, such that it was difficult to determine "fair value" for bonds that were not trading.

It was in late 2015, both defendants argued, that an anxious Majidi began to pressure traders aggressively on marks, because he believed the illiquidity would help disguise any inflation in the marks, and that the "sector spread" methodology became susceptible to manipulation as liquidity increased spreads.  Trial Tr. 2384:17–2386:20, 2796:13-21, 2800:10-13,

4762:24–4763:3.  Mr. Shor argued that it was in late 2015 that he believed marks no longer reflected fair value, and he began pushing back on Majidi and raising concerns with PPI's compliance officer.  *Id.* at 3842:24–3843:6, 4812:1-18; 4850:10–4851:2.  (Indeed, it was in the second half of 2015 that Mr. Shor began recording interactions with others at PPI in which he expressed issues with valuations.)  Mr. Ahuja argued that the illiquidity made it very challenging to assign a specific "value" to marks and to identify inflation, and because responsibility over the valuation process belonged to PPI's independent valuation committee (staffed with lawyers and accountants), it was only when surprisingly large losses "crystallized" in early 2016 that he became aware that PPI might need to restate its prior marks.  *Id.* at 4771:15-23, 4785:23–4786:9, 4788:4–4789:35.  At a minimum, had the cooperators been left to their own devices and emphasized, in sworn statements, the emergence of issues in 2015, they would have provided significant support to the defendants' arguments.  Instead, the government intervened, eliminated that support, and introduced an emphasis on 2014 that undermined the defense narrative.[3]

The other changes made by the government likewise favored its narrative.  While Majidi's proposed allocution referenced mismarking only in the "Mortgage Credit Fund"—in which Mr. Ahuja argued he had limited involvement—the government's revisions implicated other PPI funds in which the government contended Mr. Ahuja was more involved.  Defense Mot. App at 026367–69.  Similarly, although the proposed Majidi allocution twice stated that Majidi pressured traders to meet targets, the allocution delivered in Court omitted both references, *see id.*, even though the defendants blamed PPI's mismarking on Majidi pressuring traders under his supervision.  And of course an allocution that expressly referenced Mr. Shor participating in

---

[3]     With respect to the idea that the 2014 date was somehow more consistent with the cooperating witnesses' proffer statements, we again note that the SEC (which was present for Majidi's early proffers), charged a scheme from "at least September 2015 through March 2016."  Defense Mot. 38.

mismarking was more aligned with the government's case than an allocution that referred to nameless "traders." *Id.*[4]

The government's current attempt to downplay the significance of the changes is also belied by its conduct in making those changes in the first place. If the government believed that the cooperators' proposed allocutions were consistent with their proffers and with the government's view of the case (and that they would provide no ammunition to the defense if delivered as proposed), then the government would not have sought to change them.[5]

AUSA Griswold said she reviews allocutions so the plea goes "smoothly," and AUSA Naftalis said he would never do more than suggest that counsel hit the elements or correct factual errors. Trial Tr. 768:15-769:24, 773:6-11. None of those motivations explains the changes made here, including the entire rewriting of Majidi's allocution. And while AUSA Naftalis now suggests, long after trial, that it is actually "good practice" to add "facts" to an allocution when a witness previously proffered them, Naftalis Decl. ¶ 29, that view only raises the questions of why the witness (and/or the witness's counsel) did not include those "facts" in the first place; why the government felt it needed to include them; and why the witness agreed to include them—questions that should have been in front of the jury. Setting aside whether the witnesses in fact proffered to the missing "facts" here—and whether or not editing allocutions is good practice—the revisions

---

[4]     The government says that Mr. Ahuja benefitted from the deletion of the phrase "[a]t the direction of Neil Ahuja," Opp. 29 n.3, but the government's revisions centered Mr. Ahuja in the alleged mismarking. The proposed allocution stated that Majidi acted at Mr. Ahuja's direction and that Mr. Ahuja set targets that he let influence marks. While the defense did not dispute that Mr. Ahuja set performance goals—and that traders may have felt pressure to achieve them—the revised allocution stated that Majidi "worked with" Ahuja to "mismark" securities in PPI's portfolios. Defense Mot. App. at 026368.

[5]     Indeed, the evidence now available regarding the prosecution team's concern with the proposed allocution contradicts AUSA Naftalis's June 10, 2018 confirmation to the Court that he "would [not] have cared" "[i]f Mr. Majidi had read into the record what was sent as a proposed allocution." Trial Tr. 768:20–769:1.

made in this case should have been disclosed.[6]  One of the defense's theories in this case was that the government and its cooperators were misstating (or at least coloring) the facts.  It should have been for the jury, not the government, to assess whether the government's changes to the allocutions—and the cooperators' acquiescence to those changes—supported that theory.

2.      **The Suppressed Evidence Was Compelling Evidence of Witness Malleability and Impeached the Government's Presentation of the Facts.**

The government argues that not "every communication between attorneys gives rise to a disclosure."  Opp. 45.  Clearly that is true, and the defense has never suggested otherwise. But it surely must be the case that *some* communications between the government and attorneys for witnesses *do* require disclosure, and it must also be the case that evidence of the government changing cooperators' proposed sworn statements to better align with a preferred narrative, and the cooperators accepting those changes, constitutes *Brady* and *Giglio*.  Significantly, this evidence would have been far more powerful than other communications that the government did disclose, such as notes of meetings with witnesses that merely identified the date and participants and contained a one-line notation stating "nothing new," or a disclosure that the government provided "pizza" to a witness.  *See infra* § II.D; Defense Mot. 73.  The government memorialized this comparatively less significant information because it was fodder for cross-examination and argument, and therefore *Giglio*.  And the government did so notwithstanding that it presumably considered these actions "appropriate."

Throughout its opposition, the government incorrectly assesses only the second draft of the Dinucci allocution and the revised Majidi allocution, and considers each document in

---

[6]      When questioned by the Court during trial, the prosecutors did not claim that they made changes to proposed allocutions as a matter of "routine," *see* Naftalis Decl. ¶¶ 31, 38.  In fact, AUSA Naftalis denied as much. Trial Tr. 767:16–768:10.

isolation.  *See* Opp. 27–42; *see also Kyles* v. *Whitley,* 514 U.S. 419, 436 (1995) (materiality of *Brady* evidence is "considered collectively, not item by item").  The suppressed evidence would include not only those two documents, but also the facts surrounding the revisions to the allocutions.  That would include evidence that Majidi was provided with (and read from) a script that was written by the government and handed to him or his counsel minutes before his plea.  It would include evidence that the changes made to Dinucci's allocution were consistent with those made to Majidi's, and that the government spoke to counsel for Dole just before his plea in conversations that clearly took place but were not memorialized.  This evidence would have figured prominently in cross-examination, but also would have been proven independently and formed the basis for arguments, not only about cooperator credibility, but also about the merits of the government's case.

Considering this evidence both individually and collectively, the jury could have determined that the cooperators were capable of changing their statements based on government influence.  This is an obvious, traditional area of cross-examination and argument.  *See Davis* v. *Alaska*, 415 U.S. 308, 316 (1974) ("The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony." (internal quotation marks omitted)); Jack B. Weinstein, et al., WEINSTEIN'S FEDERAL EVIDENCE § 607.04[1] (2d ed. 1999) ("[T]he trier of fact must be sufficiently informed of the underlying relationships, circumstances, and influences operating on the witness to determine whether a modification of testimony reasonably could be expected as a probable human reaction.").

The jury could also determine from this evidence that the testimony the cooperators presented at trial had been "shaped" by the government.  *See Kyles,* 514 U.S. at 443 (*Brady* claim based on suppressed witness statements that raised substantial implication of coaching); *Banks* v.

*Dretke*, 540 U.S. 668, 685 (2004) (*Brady* claim based on transcript of pretrial interview that provided "compelling evidence" that witness's testimony was "tutored").  It would have been powerful evidence to present to the jury, for example, that both cooperators highlighted "2015" in the allocutions *they* independently prepared and adopted, but eliminated all reference to "2015" after adopting the *government's* changes.

But the excluded evidence was not just relevant to the cooperators.  It was also relevant in order to make perfectly appropriate and customary arguments about the government's conduct of the prosecution and presentation of the evidence.  The defense would have proven, through documents and non-cooperator testimony (or by stipulation), that the government had intervened to change allocutions, and that proof would have supported the defense argument that the government was presenting an incomplete—or even inaccurate—depiction of the facts.  *See Silva* v. *Brown*, 416 F.3d 980, 988 (9th Cir. 2005) ("[T]he very fact that the prosecution had sought to keep evidence of [the witness's] mental capacity away from the jury might have diminished the State's own credibility as a presenter of evidence."); *see also Kyles*, 514 U.S. at 445.  Because these events would have served to undermine the reliability of the government's case and evidence generally, it would exculpate the defendants, and not solely impeach government witnesses.

The government fails to meaningfully distinguish the authority cited by the defendants in their opening brief, simply contending that those cases involved different "circumstances."  Opp. 41.  But the factual distinctions are immaterial.  Evidence that the government potentially sought to influence witness testimony is relevant not only to the assessment of witness and government credibility, but also to the reliability of the government's proof, and it should be presented to the jury.  Each of the cases cited in our opening brief stresses that the primary tool for coping with potential witness coaching is to "develop a record" of that coaching

through cross-examination, evidence, and argument. *Geders* v. *United States*, 425 U.S. 80, 89–90 (1976). Indeed, where evidence has surfaced of potential witness influence, courts have rejected challenges to convictions not because the underlying conduct was appropriate or inappropriate, but because it was put before the jury. *See* Defense Mot. 60–61 & nn.17–18.[7] That did not happen here.

The government identifies no case—and we are not aware of any—in which a court held that the government need not disclose, or that the jury is not entitled to hear, evidence that the government scripted—or even suggested—changes to a witness's testimony as long as the changes are tethered to the witness's proffer statements. In fact, in *United States* v. *Milles*, where a witness was handed an outline of the prosecutor's direct examination, the trial court noted that it was unable to find a case directly on point "because it would never cross" a prosecutor's "mind to hand [the witness] a script." Tr. 4:10-13, No. 08-cr-00162-HG, ECF 92 (D. Haw. April 2, 2019). But taking the government's argument to its logical conclusion, even the government handing a word-for-word script to a witness directly before her testimony at trial would not be a proper subject of cross-examination (and not disclosable under *Giglio*) as long as the script was tethered to the witness's proffer statements. Unsurprisingly, the government cites no authority to support that position.

Notwithstanding the government's current position, the record suggests that during trial the government was (at the very least) aware that the suppressed materials would have

---

[7]     *See also United States* v. *Malik*, 800 F.2d 143, 149 (7th Cir. 1986) (no error where conversation between AUSA and witness during direct examination was announced to jury and subject to cross-examination); *United States* v. *Nambo-Barajas*, 338 F.3d 956, 962–963 (8th Cir. 2003) (no new trial based on pretrial meetings between government and witnesses where meetings "were covered by [the defendant] during cross-examination and the jury was free to consider their impact on the [witnesses'] credibility"); *United States* v. *Yang*, 281 F.3d 534, 549 (6th Cir. 2002) (same); *United States* v. *Carrillo*, 16 F.3d 1046, 1050 (9th Cir. 1994), *as amended* (May 17, 1994) ("Coaching is a proper subject of impeachment in cross-examination.").

provided fodder for cross-examination.  *See* Defense Mot. 62.  Specifically, the prosecutor called Majidi's counsel in advance of the plea, received Majidi's allocution, called a meeting with his colleagues to discuss it, and rewrote it.  Then, rather than emailing the rewritten version to Majidi's counsel, the government arranged for a call and in-person meeting with Majidi's counsel at which the government now admits the allocution was discussed.  At the least—and knowing that the government failed to memorialize the substance of any of these communications with Majidi's counsel—it is reasonable to infer from these facts that the government itself was aware that the revised allocution would have been material to the defense.  *Silva*, 416 F.3d at 990 (government's own conduct in keeping information secret "highly relevant" to assessment of materiality).

The government next argues that "the premise that the Government was seeking to advance its theory of the case in a plea allocution makes no sense because the plea allocution itself was inadmissible hearsay."  Opp. 28.  But again that argument is belied by the government's efforts to rewrite the allocution.  If the government had not been concerned about the defendants' potential use of the proposed allocutions (including as prior inconsistent statements by the cooperators), it would not have bothered revising the allocutions, nor would it have had communications with cooperators' counsel about the content of Majidi's proposed allocution or about receiving the proposed Dinucci allocution in "hard copy."  Defense Mot. 35–36, 40.  For that reason, the government contemporaneously recognized that Majidi's proposed "allocution gives [the defense] some more questions on cross."  Defense Mot. Ex. E.

  **B.**  **The Suppressed Evidence Was Material.**

Like its arguments on whether the suppressed evidence was *Brady/Giglio*, the government's materiality arguments rest on a narrow and incorrect statement of the evidence's probative value.  Because the suppressed material provides definitive evidence of the government's willingness to propose changes to the cooperators' statements (and of the

cooperators' willingness to adopt them), it is not cumulative of other impeachment evidence, would be admissible as classic non-hearsay evidence, and would significantly undercut the government's case, which, as noted, relied heavily on cooperator testimony.

*Brady* does not require a "strong" or "overwhelming" probability of a different outcome, only a "reasonable probability that the Government's suppression affected the outcome of the case." *United States* v. *Thomas*, 981 F. Supp. 2d 229, 242 (S.D.N.Y. 2013) (quoting *United States* v. *Coppa*, 267 F.3d 132, 135 (2d Cir. 2001)). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434; *see United States* v. *Smith*, 77 F.3d 511, 515 (D.C. Cir. 1996) ("[T]he amount of additional evidence indicating guilt is not dispositive of our inquiry. Instead, we must decide whether the undisclosed information could have substantially affected the efforts of defense counsel to impeach the witness, thereby calling into question the fairness of the ultimate verdict.").

Here, the government relied heavily on the cooperators' testimony, and their credibility was critical in light of significant disagreements about the interpretation of key documents and facts. As a result, and under the applicable standard, the suppression of the allocution-related materials undermines confidence in the verdict.

## 1.   <u>The Suppressed Evidence Was Not Cumulative.</u>

The government, in support of its argument that the suppressed evidence was cumulative of other aspects of Majidi's cross-examination, cites various topics on which Majidi was impeached. Opp. 36–37. But the suppressed evidence relating to the allocutions was different in kind. The other impeachment material involved collateral matters that went to Majidi's general motivation to obtain leniency, his animus against the defendants, or his character flaws. *Id.* During summations, the government turned that material to its advantage, arguing that evidence that

cooperators had spoken falsely or crudely was further proof of the fraud.  *See* Trial Tr. 4891:23–4892:17 ("Mr. Dinucci is Mr. Shor's guy, Mr. Majidi is Mr. Ahuja's guy. . . .  When they attack the witnesses, these are the people that were hired at PPI. . . .  These are their people. . . .  We put the witnesses on the stand, but . . . the defendants picked them.  They picked them because that's who they did the fraud with.").

          In contrast, and because the suppressed evidence implicated the government's own interactions with Majidi and not just Majidi himself, the government would not have been able to simply dismiss its interactions with him as further proof that Majidi was a bad person, or by arguing that any of Majidi's shortcomings reflected exclusively on Mr. Shor or Mr. Ahuja.  Rather, the suppressed evidence would have directly supported an argument that Majidi was influenced by the government to say what the government wanted him to say about the alleged scheme, and to adopt the government's statements as his own.  That concrete proof would have generated unique and powerful impeachment evidence and arguments for which the defense otherwise lacked evidentiary support.  *See United States* v. *Cuffie,* 80 F.3d 514, 518 (D.C. Cir. 1996) ("[U]ndisclosed impeachment evidence can be immaterial because of its cumulative nature only if the witness was already impeached at trial by the same kind of evidence.").[8]  And by putting the facts surrounding the revised Majidi allocution in front of the jury—particularly in the form of a document written by a prosecutor and adopted by a cooperator—and then connecting those facts to a similar change in Dinucci's allocution and to the day-of-plea meetings with Dole's counsel, the defense could have argued that the suppressed evidence cast substantial doubt on the

---

[8]       *See also United States* v. *Kohring*, 637 F.3d 895, 904 (9th Cir. 2011) ("The fact that [a cooperator] might have had a motive to testify against [defendant] in order to gain leniency as to his corruption charges does not mean that evidence of a different bias or motive would be cumulative."); *United States* v. *Wilson*, 481 F.3d 475, 480 (7th Cir. 2007) ("[E]vidence that provides a new basis for impeachment is not cumulative."); *Silva*, 416 F.3d at 989 ("[T]he undisclosed evidence was not duplicative of the impeachment evidence actually presented, but rather was of a different kind.").

cooperators' testimony and interactions with the government, and on the government's presentation of the evidence more generally. *See United States* v. *Bagcho*, 151 F. Supp. 3d 60, 73–74 (D.D.C. 2015) (even where defense "cross-examined [the witness] at great length, probing his credibility with questions about 'his progressive truth telling,'" the undisclosed evidence was not cumulative because it "would have allowed the defense to not just generally impeach [the witness's] testimony, but also to cast doubt on the credibility of the DEA investigators who failed to properly receive and/or act upon notice of an unreliable informer"), *aff'd*, 923 F.3d 1131 (D.C. Cir. 2019); *see also Napue* v. *People of State of Ill.*, 360 U.S. 264, 270 (1959) (rejecting idea that "the fact that the jury was apprised of other grounds for believing that the witness . . . may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one").

It is true that, as the government notes, the defense argued that the government's leverage over cooperators and the number of times they met to prepare the witnesses showed that the cooperators' testimony was "scripted." Opp. 37. But the fact that the defense made that argument at trial only reinforces the significance of the suppressed evidence. The government hobbled the defense's ability to prove that point by suppressing the most compelling evidence of it: evidence that a prosecutor handed a cooperator a script that meaningfully differed from his proposed sworn testimony, and then the cooperator read that script under oath essentially word-for-word. *See United States* v. *Dvorin*, 817 F.3d 438, 451 (5th Cir. 2016) (plea agreement supplement indicating government agreed to file substantial assistance motion was material even though witness testified to cooperating with government and expected leniency); *United States* v. *Parker*, 790 F.3d 550, 562 (4th Cir. 2015) ("[E]ven if the defendants were aware of [cooperator's] alleged 'questionable business practices,' the impeachment value of such information would have

been far less than the value of showing that [cooperator] was the subject of an imminent civil fraud action and may have been testifying in an effort to receive favorable treatment from the government.").  Whereas the jury would need to infer from the cooperators' meetings with the government that their testimony may have been influenced by the government, the suppressed evidence would have given the jury tangible (and essentially incontrovertible) proof of the government's successful attempts to influence cooperator testimony.[9]

Similarly, the defense argued to the jury that the government was painting a misleading picture based on jargon-filled communications and complex valuation concepts.  So, for example, the defense highlighted in summations various examples where the government's presentation of particular communications or events was directly contradicted by evidence that the defense brought out on cross.  *See, e.g.*, Trial Tr. 4742:12–4743:17 (emphasizing instances in which the government on direct asked SkyBridge witnesses if they would have wanted to know certain information purportedly withheld by PPI, with the defense then demonstrating that PPI had in fact provided that information to the witness).

Likewise, the defense sought to portray the government as tailoring the evidence to its story, including by showing the jury the full context for the government's excerpts of communications and instances in which the government did not disclose a key fact underlying a

---

[9]    The government also notes the defendants were already permitted to cross-examine Majidi about "communications with the Government" that took place during Majidi's "actual allocution that resulted in a modification of one of his answers."  Opp. 13, 38.  The referenced exchange only demonstrates why the suppressed evidence would have been so helpful to the defense.  At his plea, Majidi had to pause and then modify his answer after the Court asked whether he understood his conduct to be illegal.  But at trial the defendants were entirely unaware that the phrase uttered by Majidi ("I knew what I was doing was wrong") that had triggered the Court's question was written by the government and likely seen by Majidi for the first time either just before his plea or while he was reading the allocution.  Defense Mot. 59 n.16.  The defense was not able to ask Majidi, for example, whether—having stumbled on the question—he actually believed the words "I knew what I was doing was wrong," or if he was simply reading the government's script.  Notably, Majidi's counsel, at his pre-indictment presentation, conveyed that Majidi had no knowledge of a corrupt relationship with Dinucci, and that Majidi felt it would have been reasonable to believe that Shor's marks were at fair value.  3520-02.

document, including the fact that it was actually authored by Majidi and not by Mr. Ahuja as the government said it was. *Id.* at 4741:22–4742:3. The suppressed evidence should have been available to the defense to substantiate its argument that the government was not presenting the evidence fairly.

### 2.   The Suppressed Evidence Would Have Been Admissible.

The government next claims that the suppressed evidence was "quintessential hearsay that is inadmissible under Rules 801 and 802(d)(1)(A) [*sic*]." Opp. 33. The government is wrong. As a threshold matter, it is black-letter law that the government's *Brady* obligation "applies regardless of whether the information would itself constitute admissible evidence." October 29, 2020 Order at 1, ECF 413; *see United States* v. *Gil*, 297 F.3d 93, 104 (2d Cir. 2002) (same). Whether or not the suppressed evidence itself was admissible is therefore immaterial.

In any event, the suppressed evidence was, in fact, quintessential *non*-hearsay to the extent that the revisions to the allocutions, and the facts surrounding those revisions, clearly would not have been offered to "prove the truth of the matter asserted." Fed. R. Evid. 801(c). So, for example, the script prepared for Majidi by the government would not have been used to prove the truth of either Majidi's statements or the government's edits to them. Rather, their significance rests primarily in the fact that they were written by a prosecutor and delivered by a cooperator. The government's *conduct* in writing the allocution and handing it to Majidi—like Majidi's *conduct* in accepting the changes and adopting them as his own—are both highly relevant and not statements at all. In addition, the words they each expressed are significant not for their truth, but "solely in the fact that [they were] made." Advisory Committee's Note to Fed. R. Evid. 801(c); *see also United States* v. *Certified Env't Servs., Inc.*, 753 F.3d 72, 89 (2d Cir. 2014) ("An out-of-court statement offered for some other purpose, such as to show that a statement was made, to demonstrate the statement's effect on the listener, or to show the circumstances under which

20

subsequent events occurred, is not hearsay." (internal citations omitted)).  The suppressed evidence also would have been admissible to demonstrate the witnesses' partiality towards the government. *See United States* v. *James*, 609 F.2d 36, 46 (2d Cir. 1979) ("[B]ias of a witness is not a collateral issue and extrinsic evidence is admissible to prove that a witness has a motive to testify falsely." (internal quotation marks omitted)).

Beyond arguing that the suppressed evidence would be inadmissible, the government goes even farther and argues that *even cross-examination* of the witnesses on the suppressed evidence would be prohibited under Rule 403.  Opp. 34.  Ignoring its earlier private acknowledgment made during trial that the proposed Majidi allocution "gives [the defense] some more questions on cross," Defense Mot. Ex. E., the government's support for this argument relies exclusively on the Court's June 10, 2019 Order finding that the probative value of any cross-examination would be outweighed by the risk of jury confusion.  Opp. 34.  But as explained in detail in our opening brief, that Order rested on a false and incomplete record.  *See* Defense Mot. 67–69.

The incomplete record went to both sides of the Rule 403 balancing test.  As to its probative value, the Court had been told that the government had not "handled the edits" to the allocution, Trial Tr. 2065:23–2066:18, that AUSA Naftalis did not speak with Majidi's counsel about the allocution on the day of Majidi's plea hearing, *id.* at 772:1-5, and that the government did not send anything to Majidi's counsel, *id.* at 2059:15-19, 2063:11-14, 2065:23–2066:2.[10]  As to unfair prejudice and possible jury confusion, the Court did not know who drafted the allocution read by Majidi at his plea, who had edited the document, or how those facts would be put to the witness and shown to the jury.

---

[10]     The Court also believed that it (and the defense) had received all additional relevant information based on the searches directed by the Court and certified by the government.  ECF 213 at 5.  That belief was misplaced.

Based on the government's post-trial disclosures (occasioned by a FOIA request), we now know that none of the underlying assumptions were true and that the sequence of events could easily be put to the witness and shown to the jury. AUSA Naftalis rewrote the allocution, discussed it with Majidi's counsel on the day of Majidi's plea, and handed the revisions either to Majidi or his counsel. *See* Defense Mot. 67–68. The probative value of the evidence is much greater than what it appeared to be when the Court issued its June 10, 2019 Order.

The government responds that the defense "overstate[s] the record" because there is "no evidence in the record to support the assertion that the Government handed Majidi the Redline." Opp. 34–35. Conspicuously, the government does not actually deny handing Majidi or his counsel the rewritten allocution. And any gap in the record is entirely of the government's own doing, first because it did not memorialize the discussions with Majidi's counsel, and second because it resisted the defendants' request to hold a hearing on these very questions, claiming that "[t]he record relating to the post-trial issues raised by the defendants has been sufficiently developed." ECF 410 at 2. The government—and not the defense—has access to the witnesses to those discussions (including, at a minimum, one or two AUSAs, Majidi's counsel, Majidi, and potentially an FBI agent or a paralegal from the U.S. Attorney's Office). Where the defense has "had no opportunity to challenge the prosecutors' statements" through cross-examination, and where the government itself has resisted the development of the record, the Court should not be asked to draw inferences from gaps in the record in the government's favor. *United States* v. *Spinelli*, 551 F.3d 159, 166 (2d Cir. 2008).

In fact, and despite opportunities to do so, the government has never provided an alternative explanation for how Majidi came to read the allocution that AUSA Naftalis wrote. AUSA Naftalis states that he now recalls that he in fact discussed the allocution with Majidi's

22

counsel on the day of the plea.   Naftalis Decl. ¶¶ 22, 44.   But the government's unwillingness to explain what was discussed at the pre-plea meeting and whether that meeting was used to hand Majidi or his counsel the revised allocution does not prevent a reconstruction of what actually occurred.   Given (a) the extensive revisions made to the proposed allocution; (b) the absence of any other evidence of the transmission of the revised allocution from the government to Majidi; and (c) how Majidi's actual allocution essentially tracked the rewrite word-for-word, *see* App., the only plausible conclusion is that the government handed the rewritten allocution to Majidi or his attorney shortly before the plea, and Majidi read it aloud in Court minutes later.

The probative value of this suppressed evidence substantially outweighs the risks of confusion previously identified by the Court in its June 10, 2019 Order.   Cross-examination or argument on this evidence would have required little or no explanation of Rule 11 and instruction about the propriety of the government's conduct.   *See* Opp. 34–35.   The overarching facts most important to the jury are straightforward: the cooperators had been prepared to make one statement under oath, and then made different ones at the government's prompting or scripting.   The evidence of those facts did not require that the defense delve into Majidi's relationship or communications with his counsel, as the government argues, *see id.*   It would be no different from other instances in which cross-examination is permitted to examine potential government influence on testimony. *See* Defense Mot. 60–61 & n.18; *United States* v. *Milles*, 363 F. App'x 506, 509 (9th Cir. 2010) (witness subject to cross-examination on outline he viewed before testifying); *United States* v. *Bautista*, 23 F.3d 726, 731–32 (2d Cir. 1994) (contact between government and witness subject to cross-examination); *United States* v. *Cincotta*, 689 F.2d 238, 245 (1st Cir. 1982) (court offered defense cross-examination on government mailings); *Malik*, 800 F.2d at 149 (conversation

23

between prosecutor and witness during direct—permitted under court rules—did not warrant reversal where defense could cross-examine the witness about it).

The government has no response to this point except to speculate that, after the government provided the revised allocution to Majidi or his counsel and before Majidi read it out loud, there must have been relevant privileged communications between Majidi and his counsel because the allocution Majidi read in court was not *exactly* the same as the one he was handed. Opp. 34–35.  Had the government timely disclosed AUSA Naftalis's email exchange reflecting that he met with Majidi's attorney before the plea so that the Court could have asked Majidi's attorney about it during trial, or had the government agreed to a post-trial evidentiary hearing at which the government and/or Majidi's attorneys testified, or had the government witnesses present for the relevant discussions provided the necessary information, we might know more about the extent of any such communications.  But a comparison of the rewritten allocution drafted by the government and Majidi's as-read allocution reflects that any differences were de minimis, with the only change of any significance being the omission of one generic sentence about use of interstate wires that, for all we know, Majidi skipped as he read.  *See* App.  On this record, it cannot reasonably be inferred that Majidi had *any* substantive discussion with his attorney about the contents of the revised allocution before reading it, or that the details of those discussions were required to fairly present the evidence to the jury.[11]

---

[11]     In briefing before the Second Circuit, the government argued that cross-examination could not have avoided implicating privileged discussions because "the cooperators did not communicate directly with the Government about their allocutions, but rather, communicated with their attorneys.  Their understanding of how their allocutions were finalized would have come from their lawyers and would not have been an appropriate subject of inquiry."  Aug. 3, 2020 Gov't App. Br. 52.  Notably, the government appears to have abandoned the claim that the cooperators did not communicate directly with the government about the allocutions or that the cooperators were not present for those discussions.  The government has not said why it is no longer making that assertion, but it may be the result of an (undisclosed) refreshed recollection that there were in fact communications with Majidi or at least that he was present when the government handed either him or his counsel the revised allocution before his plea.  If so, the government should say so.  In any

But again, and even if such discussions did occur, the defense needed only to inquire about the *fact* of the changes to the cooperator allocutions, which would not have raised privilege concerns. *See Silva*, 416 F.3d at 991 (regardless of whether deal between cooperator and government implicated government's attorney work product, the "fact of the deal itself" would have been admissible to impeach witness). In *Triumph Capital Group*, in which the Second Circuit held that an agent's notes of an attorney proffer on behalf of a cooperator should have been disclosed as *Brady,* the court recognized that the notes—which more clearly implicated privileged concerns than the suppressed evidence here—could have been used for cross-examining the cooperator, questioning the FBI agent, or even questioning the cooperator's attorney. 544 F.3d 149, 162 (2d Cir. 2008). And, ultimately, should the examination have ventured into privileged territory, the Court would have been able to limit the inquiry as it did with other witnesses. *See, e.g.*, Trial Tr. 1822:13-25 (Nimberg); 4202:4-11 (Todd Lee).

In addition, there is no substantial risk of confusion. Even if some limited instruction was required on the propriety of communications regarding plea allocutions, it would not have been any more complex than the explanation of accomplice testimony and cooperation agreements on which juries routinely receive instruction, or the standard jury instruction on the government meeting with its witnesses to prepare them for testimony, in which the Court instructs the jury that while it may be considered in evaluating witnesses' credibility, there is nothing unusual or improper about the government meeting with its witnesses to focus on the subjects of anticipated testimony. Trial Tr. 4951:18–4952:8. And the defense could have argued (and the

---

event, Majidi could easily have been crossed on the changes (and the revised allocution could have been offered in evidence) without intrusion into privileged communications.

Court might have concluded) that there was nothing *unfairly* prejudicial in permitting the jury to evaluate for itself the import of this conduct.[12]

### 3. The "Evidence" Relied on by the Government Required the Jury to Believe the Cooperators.

The government does not dispute that its case relied heavily on cooperator testimony, that it repeatedly cited that testimony in summations, and that it emphasized that finding reasonable doubt required disbelieving the cooperators.  Defense Mot. 28–30, 57–59; Trial Tr. 4639:25–4640:2 (government arguing in summation that not guilty verdict would require that jurors believe "that Mr. Nimberg lied to you, Mr. Majidi lied to you, Mr. Dole lied to you"); *see also Gil*, 297 F.3d at 103 (evidence material where "arguments and inferences [it] could support or reinforce . . . . bear importantly on the central issue at trial").

The government still claims that the suppressed evidence was not material because the evidence at trial was "overwhelming."  Opp. 38.  But its argument is circular:  To demonstrate the supposed "strength and corroboration of the evidence," *id.* at 41, the government cites the testimony of its cooperating and immunized witnesses, reiterating the importance of that testimony to its case.  *See id.* at 4–6, 7–9, 10–12, 38–39.  And while the government claims that the supposedly "devastating" contemporaneous text messages and emails it cites "speak for themselves," *id.* at 40, the opposite is true:  The communications by themselves do not demonstrate that either defendant was knowingly participating in a scheme to inflate marks above fair value. Certainly the defense argued and presented evidence at trial that the government was not

---

[12]     If a prosecutor could appropriately script cooperator plea allocutions, and do so without concern that it would be revealed to the jury or become the subject of cross-examination, the prosecutor might adopt a policy of writing all cooperator allocutions to ensure that they properly "hit the elements," contain no mistakes, are consistent with proffer statements, and track the government's theories of the case.  It is not clear why, under the government's argument, this is not the invariable practice, or why the prosecutor does not describe the conduct in court and simply have the pleading defendant agree to it.

interpreting these communications correctly. Only the cooperators' explanation of those texts—explanations that the defense would have argued were "shaped" by the government—turned them into evidence of the alleged fraud.

      **Mr. Ahuja:** Nearly all of the communications cited by the government as evidence of Mr. Ahuja's guilt are between other alleged co-conspirators, do not reference Mr. Ahuja, and do not on their face show that Mr. Ahuja was aware that marks were inflated above fair value. *See* Opp. 4–11. Thus, for example, the government claims that contemporaneous communications reflect that Mr. Ahuja set "inflated targets for monthly returns . . . that the fraudulent mismarking scheme was designed to meet," *id*. at 9, but the communications cited suggest only that Mr. Ahuja pressed traders for higher returns, which the defense argued he expected to be done through the legitimate "challenge" process, *see* GX 858-Q (text message from Dole to Mr. Shor saying "Big boss was here. Saying push for 2.5nm in hf"), or reflect others discussing challenging marks among themselves (without reference to Mr. Ahuja), *see* GX 870-H (text message from Majidi to Nimberg saying "We need another 300-400k. . . . The conversation [with dealers] is not like 'mark my bonds here.' It's more like we saw XYZ trade at this price yesterday and we have a similar bond."). Only by mixing in citations to the cooperating or immunized witnesses' testimony can the government draw the inference that PPI's estimates were fraudulent targets to be met through fraudulent means. *See* Opp. 6 (citing GX 870-H but citing Nimberg testimony to explain its meaning); *id.* at 9 (citing GX 858-Q but citing Majidi and Nimberg testimony to explain its meaning).[13] After the witnesses testified about these texts on direct examination, Mr. Ahuja drew

---

[13]    Indeed, as evidence of Mr. Ahuja setting fraudulent targets, the government cites to Dinucci's testimony about Mr. Shor feeling pressure from his "bosses," Opp. 33, even though it is the very kind of testimony—uncorroborated and contradicted by documentary evidence and mentioned only after many meetings with the government, *see* Defense Mot. 65–66—that would have been undermined by concrete evidence of Dinucci and other cooperators changing their allocutions to favor the government's view of the evidence.

out evidence on cross that suggested that the texts were about legitimate challenges: Nimberg admitted that he thought PPI's marks were "fine" at the time he had the exchange with Majidi in GX 870-H, and Dole testified that there would be "nothing wrong" with Mr. Ahuja saying "let's push" with respect to challenging marks. Trial Tr. 823:20-23, 1883:6-19, 1886:16-19. The jury would have been more inclined to believe Mr. Ahuja's position that these communications were not inculpatory had they seen concrete evidence of cooperators willing to alter their testimony to align with the government's interpretation of the evidence.

Similarly, the communications cited by the government do not themselves "reflect . . . pressure from Ahuja to *commit fraud*." Opp. 10 (emphasis added).[14] The government leans heavily on a text from PPI portfolio manager Mark Ginsberg to Dole in which Ginsberg says he had told Mr. Ahuja "we are mismarked by 400 bps."[15] Mr. Ahuja's interpretation of what Ginsberg (who did not testify) meant by his reference to being "mismarked by 400bps," or 4 percent, was that it referred to a handful of bonds that were being put out for sale that day and might trade below marks, and was not a reference to the fund being "mismarked;" in fact, the evidence indicated that PPI sold those bonds "flat to marks," DX 5271, meaning that PPI's marks for the bonds were by definition *not* inflated. Trial Tr. 627:18–639:4; 4776:3–4778:2 (arguing this explanation to jury).

---

[14]  The government cites texts on which Mr. Ahuja is not copied that they claim reflect others saying they warned Mr. Ahuja not to oversell PPI's performance to SkyBridge or complaining about Mr. Ahuja overselling PPI's performance to SkyBridge, *see* Opp. 6, 10 (citing GX 870-CC, GX 840-Y), but the government provided *no evidence of Mr. Ahuja in fact doing that*, despite having access to PPI's emails and SkyBridge's emails. The contemporaneous evidence showed Mr. Ahuja either passing along information he received to SkyBridge or telling SkyBridge that returns would be *lower* than what SkyBridge had anticipated. *See* GX 846-C, DX 10032, GX 1421, GX 1422; GX 357, DX 10041, DX 10061; DX 6271, DX 6272; DX 10016, GX 361.

[15]  The government misleadingly quotes the text as stating "Ginsberg had 'just told [Ahuja] we are mismarked by 500 [basis points] and [Ahuja's] asking for 60 [additional basis points]. This has to end.'" Opp. 10, 39, 40. The actual text states "We just told Neil we are mismarked by 400bps and *he's* asking for 60bps. This has to end." GX 859-G (emphasis added). The government nonetheless places "[*Ahuja's*] asking" in its brief in place of "he's asking" even though Dole, when shown the full context for Ginsberg's message on cross-examination, *see* DX 5271, admitted that he was no longer sure the "he's" referred to Mr. Ahuja at all in light of evidence that made clear it referred to either Majidi or portfolio manager Hyung Peak. Trial Tr. 621:2–627:4; 1206:1-3 (government acknowledging its witness was no longer sure who the "he" was).

28

Regardless of which interpretation is correct, the jury lacked critical, suppressed evidence going directly to its assessment of the cooperators' (and the government's) explanation.

Finally, the government cites only three messages with alleged co-conspirators on which Mr. Ahuja is actually copied. Two relate to the "io bonds" in the New Issue Fund. But despite the references to "marks," these messages (sent in the middle of the month and not during the "month-end" pricing process) referred to *internal* figures and not an effort to deceive investors. *See* GX 851-D (Dole text referring to marks "this month" and deferring decision to "month end"); GX 851-H (referring to measuring PPI's io bonds against "iOS" benchmark); *see also* Trial Tr. 4783:5–4785:12 (Mr. Ahuja's counsel explaining GX 851-H to jury). That interpretation was supported by contemporaneous communications which reflected that, after these texts, Dole told Mr. Ahuja they had traded bonds in the New Issue Fund and were "definitely" marked within the bid-offer spread, GX 851-K, and that PPI had told investors on multiple occasions that the io bonds would sell below marks, *see* DX 4082 (January 2016 meeting in which Mr. Ahuja told Blackrock that io bonds could sell 10-15% below marks); DX 6454 (June 2015 text in which Majidi says he told investor that io bonds would sell 5-6% below marks). The government interpreted the other message on which Mr. Ahuja is copied, GX 851-C, as Mr. Ahuja directing Dole to "just force" fraudulent marks, S1 ¶ 31, but on cross, Dole admitted that the exchange referred to the "whole loan book," which was marked exclusively by "big institutions like Wells Fargo" or "Credit Suisse," and not by any of the allegedly corrupt brokers. Trial Tr. 673:5-24, 823:24–825:6.

Again, our aim here is not to relitigate the meaning of these text messages, but rather to demonstrate that throughout trial Mr. Ahuja raised legitimate arguments, backed by contemporaneous communications, that the cooperators were interpreting documents incorrectly in a manner that favored the government. While Mr. Ahuja was sometimes able, using other

documentary evidence, to get witnesses to admit that their interpretation of evidence was wrong, Mr. Ahuja would have been able to cast doubt on all of the disputed interpretations had he had the benefit of concrete evidence of the witnesses' willingness to adopt the government's narrative. This would have been particularly powerful when combined with the fact (which the government does not dispute) that the only proof tying Mr. Ahuja to allegedly corrupt brokers was cooperator testimony, and the ample contemporaneous evidence reflecting that he was not aware of the mismarking scheme. That evidence included, among other things, Mr. Shor telling Mr. Ahuja when he resigned in March 2016 that information was "not relayed" to him "always accurately or fully," DX 1810-A1; that as they were preparing for PPI's internal investigation in March 2016, Dole and Majidi did not seek out Mr. Ahuja but rather went to talk "offsite," DX 5220; that when interviewed by Morgan Lewis, Dole blamed *only Majidi* for the mismarking, DX 4111; Trial Tr. 4232:5-9 (Todd Lee); that Dole and Mr. Shor messaged in late 2015 about a potential chance to tell Mr. Ahuja "the truth" that "amin told me to mark [the book] up," DX 5087 at 2; and that, with Mr. Ahuja's approval, PPI hired a leading auditor to independently review PPI's valuations, and a former prosecutor and enforcement attorney to serve as chief compliance officer at the peak of the alleged fraud.[16]

   **Mr. Shor:** The government's description of the evidence regarding Mr. Shor is similarly exaggerated and fully dependent on the say-so of cooperators. Thus, the government quotes two 2014 communications in a strained attempt to support its scripted narrative regarding the timing of mis-valuations. Neither does so. First, an April 2014 statement to "Give Frank

---

[16]    To the extent the government continues to press Mr. Ahuja's alleged "conceal[ment]" of the imputed mid methodology, Opp. 7, that theory was not even supported by its own cooperators. Instead, the government relies entirely on one section of a 2011 email that it could not prove that Mr. Ahuja read, GX 1004, and PPI's disclosure of its use of sector spreads for pricing purposes to its auditors, administrators, brokers, middle and back-office personnel who interacted with investors, and other investors, were all inconsistent with an intent to conceal sector spreads from anyone. DX 4049, DX 8082, DX 6153, DX 10901, DX 8053, DX 1414–25, DX 6147.

orders for day at your marks," GX 858-B, says nothing about inflated valuations; a person placing a trade order would typically specify a desired price for the trade.   Moreover, the actual data entered at trial showed that more than half of the marks provided by Auriga (Frank) at that time period were *lower* than those provided by other brokers.   DX 5; Trial Tr. 1124:15–1126:6 (Dole, on cross, admitting that communication relates to March 2014 prices, and confirming that DX 5 reflects the prices for the same period).   Second, the government quotes a July 2014 communication in which Dole states he "can put in prices we want from frank to get to 1mm up on hf," without mentioning that Dole's reference is to an internal spreadsheet used for analyzing challenges, and ignoring Mr. Shor's response stating that after he receives Dole's spreadsheet, Mr. Shor "can then adjust relative to where I think correct mark should be."   GX 858-E.   Moreover, the actual data entered at trial demonstrated that Dole's strained attempt to drag inflated valuations back into 2014 was false.   Dole offered his gloss on the communication (adopted by the government's brief):  "These are the prices that we were giving Frank so he could reply with them and then we would get to our targets."   Trial Tr. 1120:24–1121:1.   But in fact what happened in response to this communication is that Auriga (Frank) provided prices that were *lower*, often significantly so, than the prices purportedly proposed by Dole *on eleven out of eighteen bonds*. *Compare* GX 958 (showing Auriga prices for month-end June 2014) *with* GX 1058 (the referenced email with proposed pricing); *see* Trial Tr. 1121:17–1122:24.

The government then immediately pivots to 2015 communications, mixing together two arguably inculpatory ones from September and October 2015 (the same time period in which Mr. Shor was complaining about valuations and marking down his book in direct contravention of Majidi's instructions) with an earlier one from March 2015 *that does not involve Mr. Shor*.   Opp. 3–4.   Then, as it must, the government returns to the cooperators' testimony, and as it did in re-

writing Majidi's allocution, the government emphasizes 2014 and extensively quotes the cooperators' (uncorroborated) claims about a 2014 fraud. *Id.* at 4–5.  The government also leans heavily on Nimberg's conclusory claims that he participated in a "scheme" with Mr. Ahuja, Mr. Shor, and others beginning in 2014, yet the government nowhere acknowledges that the "scheme" in Nimberg's mind was the selective use of challenges, Trial Tr. 1559:15–1561:1, 1570:14-25—a theory that the government specifically and repeatedly represented *it would not rely upon*.  ECF 65 at 5; Apr. 16, 2019 Conf. Tr. 8.  In other words, even at this late date in the proceedings, the government has put the lie to its own representation by relying—indeed, highlighting—Nimberg's uncharged and disclaimed theory of the scheme.

Had the government produced *Brady/Giglio* material as required by law, and refrained from providing inaccurate information to the Court, the defense could have shown that only through scripting and "shaping" did the cooperators adopt an inculpatory gloss on innocuous 2014 text messages and on crude text messages that nowhere refer to fraudulent pricing.[17]

## II.     THE COURT SHOULD GRANT THE MOTION TO DISMISS THE INDICTMENT

In their opening brief, the defendants set forth a long series of instances in which the government, among other things: (i) failed to timely produce *Brady*/*Giglio* material that had been in its possession for months, even when requested by the defense; (ii) did not turn over impeachment and other material until specifically identified by the defense or the Court, or until triggered by the defense's issuance of Rule 17(c) subpoenas to the witnesses and their counsel; (iii) made multiple assurances to counsel and the Court about compliance with discovery

---

[17]     In light of the above, the government's argument that the defendants cannot "seriously argue there is a real concern that an innocent person may have been convicted," Opp. 42 (internal quotation marks omitted), is wrong and reveals a familiar but unwarranted self-assurance.  Defendants were entitled to a fair trial based on a complete record and adversarial testing of the evidence.  The government's actions in this case undermined confidence in the verdict and the evidence the jury relied on in reaching it.  *Kyles*, 514 U.S. at 434 (*Brady* is "not a sufficiency of evidence test").  The defendants are not guilty.

obligations that proved to be wrong; (iv) falsely accused the defense of trying to create a false record of non-disclosure; (v) failed to conduct (or at least complete) searches that it represented it would undertake; and (vi) did not produce—and but for a defense FOIA request would never have produced—the rewritten Majidi allocution.  *See* Defense Mot. 5–42, 70–89.

The government barely engages on most of these points, much less on the overall claim that they either lacked or did not follow practices, policies, or procedures designed to fulfill their disclosure obligations.  This overall claim is critical, because it demonstrates that, given the government's persistent failures to identify and timely produce even the easiest-to-find document—a government script for a cooperator delivered by the cooperator under oath—*we can have no assurance* that there is or was nothing more that should have been, but was not, memorialized and produced.  In other words, the government's track record calls into question the reliability of all of its claims.  The government thus assumes its own current reliability, and dismisses the extensive record of unreliability as the defense seeking to "cobble together a narrative" and "rehash . . . complaints" about pretrial disclosures, "the bulk of which were made between three and seven months before trial."  Opp. 44.

In making its arguments, the government ignores the fact that many of the most important "disclosures" at issue in these motions were made during—or, in some cases, after—trial, and even then only begrudgingly or when it became clear the defendants would obtain the same materials from another source.[18]  More importantly, the government largely ignores the defendants' detailed account of the government's failure to set up or maintain any process for

---

[18]    Although referred to as "disclosures," many of the government's productions were made only after specific and repeated requests by defense counsel, such that it is not clear whether they would have been made absent request or court order.  So, for example (and as noted in our moving papers), the government's initial response to the FOIA request did not include the rewritten Majidi allocution, and the defense was forced to follow up with the government (and eventually the Court) to get even that document.  Defense Mot. 32.  The government's position that its rewritten allocution is not *Brady/Gigilo*—and presumably did not need to be produced at all—is not comforting in this respect.

recording, preserving, and disclosing substantive communications with counsel; its failure to conduct the searches it was ordered to complete; and its repeated statements to the Court and the defense stating that it had completed those searches. Defense Mot. 5–42; 70–89. Instead, the government falls back on (i) its "extensive" (but irrelevant) production of "3500 material"; (ii) a post-trial review conducted by AUSA Metzner that was never intended to evaluate (much less adjudicate) the issues raised here; and (iii) certain specific instances in which the government produced notes memorializing calls or in-person meetings with counsel for cooperating witnesses. Opp. 42–43.

### A. The Government's Repeated Disclosure Failures Are Not Cured by the Volume of the Government's Other Discovery.

Largely ignoring the well-documented list of belated disclosures, failures to memorialize key communications, and erroneous representations made to the Court, the government points to the volume of material it did disclose, and that it made large productions well in advance of trial. Those disclosures are irrelevant, in that the volume of discovery actually produced is not a defense to material that was not produced.

And while the government presents its disclosures as having been produced timely and of its own volition, the record demonstrates otherwise. These disclosures often resulted from persistent efforts by the defense to require government compliance with its obligations. *See* July 24, 2020 Conf. Tr. 16:22–17:3 ("I'm taking very seriously [defendants'] argument to me that all of this information that's coming to me is coming to light because of work that you did, very thoughtful approaches that you took involving Rule 17(c) and FOIA and not, perhaps, where it should have come from, proactive, required, traditional disclosure by the government.").

*First*, and insofar as the government relies on the number of documents produced to suggest that it fulfilled its disclosure obligations, *see* Opp. 14–16, the quantity of disclosure—

most of which came from PPI's productions to the SEC and was simply forwarded to the defense—is irrelevant.  Where government productions omit key material subject to disclosure, the government has *not* discharged its disclosure obligations, no matter how voluminous its productions.  Here, and as set forth in detail in our opening brief, the government failed to timely disclose numerous *Brady/Giglio* statements from witnesses, notes from presentations by and communications with witnesses' counsel containing exculpatory or impeachment material, and proposed allocutions by its cooperating witnesses (and the government's revisions to those same allocutions).  No volume of disclosure can counterbalance these failings.

   *Second*, and as noted above, a significant amount of this material was produced only because the defendants persisted in seeking additional disclosure when it became clear to the defense that—notwithstanding government representations to the contrary—important documents, including key witness statements, were missing from the government's productions.  So, for example, the government reported on June 12, 2018 (the same day that it produced "[t]he majority of discovery in this case," Opp. 14) that it was "unaware of *any Brady* material."  *See* Defense Mot. 5.  But we now know that it possessed extensive statements from notes of witness interviews and presentations that had occurred months or even years earlier that would not be produced for several months, *see id.* at 8–12.  The government also highlights "four substantive disclosures" between November 5, 2018 and February 7, 2019, attributing these to a "review [of] its file," *see* Opp. 15, but does not mention the persistent defense requests leading up to these disclosures, including requests made in May, June, August, September, October, and November 2018, and the Court's January 2019 directive requiring the government to conduct additional review and "say something more specific" to defense counsel than, "We know our *Brady* obligations."  *See* Defense Mot. 5–8, 10–11.

To cite just one example, the government notes that its January 30, 2019 disclosure contained "information from a presentation by Majidi's counsel." Opp. 15. What the government does not say is that (i) the presentation took place in April 2018, nine months before the disclosure; (ii) the defense had repeatedly (five times) requested information transmitted to the government by witnesses or their counsel (including specifically Majidi or his counsel), *see* Defense Mot. 5–9; (iii) the government, in response to these requests, told the defense in December 2018 that it had already "thorough[ly] review[ed] [] its file . . . . with care," ECF 65 at 10–11; (iv) the Court pressed the government on whether information from Majidi's counsel's presentations had been turned over, January 17, 2019 Conf. Tr. 76:7–17; and (v) the "information" the government ultimately disclosed from that presentation—statements which contradicted core allegations in the Indictment—were omitted from a prosecution team member's notes of that presentation, as the prosecution team had reviewed its notes of the meeting and had not identified anything warranting disclosure, *see* Defense Mot. 10. And nowhere in these four disclosures was the rewritten Majidi allocution, even though the first of the four disclosures followed Majidi's plea by less than a week and even though the defendants had already repeatedly emphasized that communications with counsel were disclosable as *Brady/Giglio*.

The government also points to hundreds of pages produced by *cooperators'* counsel—rather than the government itself—in response to the defendants' Rule 17(c) subpoenas. *See* Opp. 16–17. Of course, the government cannot rely on third parties to satisfy its own disclosure obligations, nor should a defendant be required to file a third-party subpoena to precipitate the production of disclosure guaranteed by the Constitution and laws of the United States. In fact—and as the government does not actually contest—it was those Rule 17(c) subpoenas that ultimately gave rise to numerous material government disclosures, including the

April 2018 letter from Majidi's counsel conceding investors' knowledge of the "imputed mid" methodology, communications between the government and Dole's counsel where Dole's counsel questioned certain facts in Dole's draft Information, and the proposed Majidi and Dinucci allocutions. Defense Mot. 14–19. The government also does not dispute that at the same time it told the Court that the Rule 17(c) subpoena to Majidi's counsel had not prompted its production of the proposed Majidi allocution, its contemporaneous internal emails reflected that it had produced the document, at least in part, because it recognized that the defendants "otherwise" would "get it from" Majidi's counsel. *Id.* at 18–19. The government's insistence that it "specifically inquired" with its cooperators to ensure they had produced responsive material, Opp. 16, is irrelevant: the government did not have to ask the cooperators for communications that were in its own possession.[19]

The record shows that the defendants were repeatedly forced to expend extraordinary efforts and resort to unusual "self help" to pry evidence from the government through letter motions, Rule 17(c) subpoenas, and post-trial FOIA requests. In claiming that the defendants "cannot seriously argue that they were prejudiced when they received those disclosures months before trial," Opp. 44, the government ignores the point being made through this particular motion: that the government's disclosure obligations should not depend on the defense's ability to enforce them. *See Banks*, 540 U.S. at 695–96 (rejecting "the notion that defendants must

---

[19]    The government's emphasis on this point is also surprising given the lengths to which the defense was required to go to get the government to actually inquire whether its cooperators had relevant information. In April 2019, Mr. Ahuja was forced to move to compel the government to request, review, and produce relevant emails from Majidi's personal email account, because even though the government's own productions from other witnesses demonstrated that Majidi used his personal email account to discuss the subject matter of the conspiracy, Majidi had not produced any emails from his personal account to the government, and the government—despite multiple specific defense requests—had declined to ask Majidi for those emails. *See* ECF 102. As the government conceded in response to that motion, when the government finally asked Majidi's counsel for those materials, it learned that there were likely "several hundred electronic communications" responsive to Mr. Ahuja's requests. *See* ECF 115 at 1.

scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed," since "[a] rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process" (internal quotation marks omitted)); *Leka* v. *Portuondo*, 257 F.3d 89, 102 (2d Cir. 2001) ("[I]t is the prosecutor's burden to make full disclosure of exculpatory material, not the defendant's."); *Ogden* v. *United States*, 303 F.2d 724, 733 (9th Cir. 1962) ("The Court and the defendant must grope; only the government knows the content of its own files."). Again, and for the purposes of this part of the defense motion, the point is that the government, at least in this case, lacked any effective system or process designed to preserve or make the disclosures it was required to make.

**B.     The Government's Failure to Maintain Any Disclosure Process Was at Least Reckless.**

The government has acknowledged that its disclosure efforts were "wholly insufficient" in this case.   July 24, 2020 Conf. Tr. 24:7-8; *see, e.g.*, *id.* at 32:1-8 ("[W]e acknowledge that our searches -- and it wasn't intentional to be clear -- our searches were not sufficient to identify when you said to us:  Go back to your office and see if there are any more like this.  Tell me how we got from Point A to point B.  The work that we did to figure that out was not sufficient, and we acknowledge that."); Griswold Decl. ¶ 36 (recognizing that "email searches could and should have been more thorough, and that it would have been best to memorialize the steps [taken] to conduct them").  Now, relying on the Court's January 13, 2021 Order, the government claims that no relief is warranted because the Court already determined there were no "systemic disclosure" issues.  *See* Opp. 44.

But the issues raised here were not before the Court in connection with the January 13 Order.  The Order, rather, was based entirely on the government's more recent post-trial searches, which were conducted in response to the allocution issues, and after the rewritten Majidi

allocution and other documents had been discovered.  ECF 424 at 2.  The Order preceded this

motion, in which the suppression of the allocution evidence is placed in context and as a symptom

of a failure to implement a system reasonably designed to memorialize, preserve, and produce

disclosure to which the defendants were entitled.  The government's opposition does not

meaningfully engage on either the government's disregard for DOJ policies that required the

prosecutors to maintain and segregate substantive case communications, *see* Defense Mot. 77–78

& nn.22–24, or on the larger context in which the disclosure failures occurred.

Indeed, the government offers no response at all to the fact that the government

violated its own written policies requiring the segregation and preservation of potentially

discoverable electronic communications.  *Id.*  Had the government followed its own policies, each

of the letters from counsel containing exculpatory information, the email transmissions of draft

allocutions, the communications related to the pleas, and other belatedly disclosed or never-

disclosed communications would have been in a segregated "file" from the time they were sent or

received, and would have been produced to the defense in a timely fashion.  Further, had it adhered

to its policies the government would not have been able to repeatedly (and inaccurately) represent

to the Court and the parties that it had reviewed its entire "file" and complied with all of its

obligations.

With respect to the broader context, the prosecution team ignores the Office's own

statements about its awareness of related issues and steps it claimed to have taken to address them.

So, to cite one example, in response to issues that arose in the *Nejad* matter, the government

represented that:

> [f]ollowing (and substantially as a result of) issues in the *Pizarro* case, this Office,
> under [then-leadership], convened a committee that by September 2018 had
> completely updated [its] Discovery and Disclosure Policy.  The Policy stresses,
> among other things, how "[b]road, early disclosure is also in the prosecution's

> interest because it will leave the prosecutor less likely to be vulnerable after the case is over to the argument that a non-disclosure that seemed immaterial early in the case was in fact material at the end of the day." . . . .  AUSAs received Unit-level training on the Policy shortly after its adoption.

July 2, 2020 Gov't Ltr. at 17, 18 Cr. 224, ECF 354.  While the defense does not have access to that updated Discovery and Disclosure Policy, we note that the training referred to in this letter appears to have taken place shortly after the Policy's adoption in September 2018, right around the time of the government's revisions to the Majidi allocution, which the trial team neither memorialized nor disclosed.

Neither of these failures—the failure to follow its own policies or the failure to learn from its mistakes—is dispositive on the issue.  But both reflect the government's unfortunate and cavalier approach to its disclosure obligations, and to the actions it took (or did not take) before repeatedly representing to the Court and the defense that it was aware of and abiding by its disclosure obligations.

## C.   The Government's Representations to the Court Were at Least Reckless.

Along the same lines, the government also does not respond to the defendants' arguments regarding its repeated representations to the Court about its deficient searches and its handling of the cooperator allocutions.  Instead, it repeats (as it did many times before) that it complied with its obligations, *see* Opp. 44, and stresses that any mistakes were made in good faith, *id.* at 45.

But again, the record—which the government does not meaningfully dispute—demonstrates that its representations to the Court were at least "reckless." *United States* v. *Bundy*, 968 F.3d 1019, 1042 (9th Cir. 2020).  Over and over, the government represented that it had thoroughly reviewed its entire file, including communications with cooperators' counsel and notes memorializing oral communications. *See* Defense Mot. 9, 10, 12, 13, 15, 20.  The Court repeatedly

relied on the government's representations and assurances to deny the defendants relief, including on the defendants' November 2018 pretrial motions, their March 2019 letter requesting *in camera* review of the government's notes of communications with counsel for government witnesses, their March 2019 request for an adjournment, their April 2019 request for the government to request and produce relevant documents in the possession of its cooperating witnesses, their May 2019 request for specific categories of missing 3500 information, their mid-trial motion to dismiss the Indictment, and, of course, their mid-trial motion to introduce evidence and cross-examine cooperating witnesses on their proposed allocutions.  *See id.* at 10–11, 12, 13, 19, 25; *see also* March 11, 2019 Conf. Tr. 6:10-15 (denying adjournment request; in part, justifying denial because "I am telling myself [the government's January/February 2019 productions were] because the government took to heart the statements that I made at our last telephonic conference about making sure they had scoured their notes"); ECF 138 at 3 ("The Court expects that the Government has made appropriately robust inquiries of all of its potential witnesses for relevant documents and materials, and that future disclosures under Rule 16, *Giglio*, or *Brady* will be kept to a minimum.").

And yet, following each of these representations, the government was shown to be in possession of substantive and material information, up to and including many months after trial. *See* Defense Mot. 10 (government disclosing *Brady* materials on January 15, 2019, after previously saying it had thoroughly reviewed its file), 11 (same on January 30, 2019), 14 (same on May 30, 2019), 15–19 (same repeatedly the first week of trial), 32 (same one year after trial).

The government's opposition to these motions only further highlight its recklessness in making very serious representations to the Court about the defendants' constitutional rights.  In its June 12, 2018 Rule 16 production letter, for example, the government stated that it was "unaware of any *Brady* material," and during the July 25, 2018 pretrial

conference, the government took offense at the defense's suggestion that there might be *Brady* material.  *See id.* at 5–6; July 25, 2018 Conf. Tr. 16:4-12.  Implicit in those and other similar representations was that the government had looked for the requested material.  But the government now acknowledges that it "had not yet completed its review of its files for information potentially disclosable under *Brady*."  *See* Opp. 15; *see United States* v. *Chapman*, 524 F.3d 1073, 1085–86 (9th Cir. 2008) (dismissing the indictment where the trial prosecutor, in addition to failing to memorialize extensive discovery, "repeatedly represented to the court that he had fully complied with *Brady* and *Giglio*, when he knew full well that he could not verify these claims").

In the few instances in which the government attempts to address specific discovery failures, it offers unconvincing excuses.  So, for example, the government states that the October 31, 2018 email from AUSA Naftalis to Mr. Rosenberg arranging a meeting the day of Majidi's plea was not produced because it was a "routine scheduling email."  Opp. 45.  The government ignores, however, that in the context of the issues before the Court at the time, and the Court's focus on the allocutions in particular, the email was more than routine logistical correspondence; indeed, AUSA Naftalis now acknowledges, in his February 12, 2021 declaration, that he discussed the allocution at that meeting.  Naftalis Decl. ¶¶ 22, 44.  Nor does the government address the fact that on June 10, 2019, when AUSA Naftalis was asked directly by the Court whether he spoke to Mr. Rosenberg about the allocution on the day of the plea—just two days after certifying to the Court that he had reviewed "all" communications with counsel for witnesses—he said "No."  Trial Tr. 772:3-5.  In addition, the government's *other* contemporaneous disclosures belie the implicit claim that a "routine" email was outside the scope of its review or production:  other documents from its production on June 8, 2019 included housing forms, travel requests, and requests for modification for bail, *see* Defense Mot. 20.  Nor does the government explain how it could make

good faith representations to the Court about what did and did not occur with respect to the cooperators' allocutions without actually having done the review the Court ordered it to do. *See id.* at 82 (government stopped searching emails with Dinucci's counsel after finding a draft allocution).[20]

The government also points out that the rewritten Majidi allocution was not located during this review because it was in an "internal" email, and prosecutors apparently believed the Court only had directed them to review external communications. Opp. 45. But it is not the Court's responsibility to tell the government how to search its files for materials covered by *Brady* and *Giglio*. And the limitation of its mid-trial search to external communications does not explain its failure to segregate, locate, or produce that document until it received the FOIA request (and, even then, only after the defendants sought the Court's intervention). The government does not even bother to come up with excuses for other belated disclosures that should have been produced earlier if it had made the efforts it was telling the Court it was making. *See* Defense Mot. 15–19, 39–42.

The government also does not explain how it was able to make the representations it made to the Court, repeatedly and with certitude, about its role in Majidi's allocution, without having conducted even minimal diligence on the issue. *See* Trial Tr. 769:6-7, 770:1-3, 771:1-5 2065:23—2066:18. The government had not, at the time of those representations, conducted even a modest review of its own internal communications for documents or emails for allocution-related emails on the dates immediately surrounding Majidi's allocution. And as the Court recognized,

---

[20]     Similarly, the government excuses its failure to disclose the second draft Dinucci allocution because it would have been "cumulative," *see* Opp. 45, but the Court had ordered the government to review its files again for requisite disclosure, which included communications with witnesses' counsel, and subsequently certify to the Court its understanding of and compliance with its disclosure obligations. Trial Tr. 479:25–480:15. That order did not carve out material that the prosecutors deemed "cumulative."

after the representations were made, "nothing prevented the prosecution team from checking its files that evening (or over the ensuing five weeks of trial) to confirm their respective recollections—and, more pointedly, the accuracy of their representations to the Court." January 13, 2021 Order at 3, ECF 424. The government's willingness repeatedly to make unsupported and unsupportable representations to the Court evinces a lack of appreciation of the gravity of such representations and at least a reckless disregard for the defendants' constitutional protections.

    **D.**    **The Government Offers No Justifications for its Failure to Memorialize Significant Communications.**

        The defense agrees with the government that there is "nothing improper about speaking with another lawyer by telephone or in person, and not every communication between attorneys gives rise to a disclosure." Opp. 45. But that does not mean that no communication between attorneys can ever give rise to an obligation to disclose, and the government ignores critical instances in which it indisputably failed to memorialize substantive discussions with counsel, including its communications with Majidi's counsel regarding the allocution (*e.g.*, what was said on their October 30, 2018 call and during their October 31, 2018 pre-plea meeting), its communications with Dinucci's counsel regarding his allocution (*e.g.*, what was said on their April 5, 2017 call the day before Dinucci's plea), its communications with Dole's counsel regarding Dole's request for immunity and his plea (*e.g.*, the November 12, 2017 call with Dole's counsel the day before Dole's plea, and discussions between the trial team's supervisors and Dole's counsel on the day of Dole's plea). Defense Mot. 35–36, 40, 84–87, Ex. D. While there is nothing improper about oral communications, the government does not address why it is that all of these plea-related discussions took place orally (by phone or in-person) and none were communicated over email or otherwise memorialized. Nor does the government explain why prosecutors failed

to memorialize key, obviously exculpatory statements made by Majidi's attorneys at his pre-indictment "pitch" to the government. *See id.* at 84–87.

The government also does not explain why it failed to contemporaneously memorialize discussions regarding immunity with Nimberg or his counsel. *Id.* at 86. Rather, when the defense expressed surprise that the government had proposed a jury charge with instructions on immunized witnesses, the government belatedly attempted to "disclose" a full year of discussions by creating a one-page handwritten note that referred generically to "discussion about potential of applying to Court for immunity." *Id.* The actual substance of those discussions, which never were memorialized and therefore remain unknown, is classic *Giglio* material to which the defense has been denied access. *See United States* v. *Sudikoff*, 36 F. Supp. 2d 1196, 1203 (C.D. Cal. 1999) ("Though *Giglio* concerned the suppression of the very existence of a leniency agreement, information that illuminates the process leading up to the agreement may 'cast a shadow' on an accomplice witness's credibility in a manner that disclosure of only the agreement itself would not accomplish.").

The government states that because it produced substantial *Jencks* Act material before trial, it would be "an unfair inference" to assume the government deliberately failed to memorialize these communications. But there is nothing "unfair" about that inference. The government has neither provided an explanation for, nor suggested any other inference that could possibly be drawn from, its decision not to email the revised allocution back to Mr. Rosenberg (even though Mr. Rosenberg had emailed it to the government), but rather, to arrange for a phone call and then an in-person meeting to discuss the allocution and hand it to Majidi or his counsel in hard copy. The government thought it was fair at trial for it to urge the jury to draw negative inferences about the defendants' guilt from their desire not to memorialize communications, but

conveniently ignores that members of the trial team violated DOJ policies against using personal cellphones for work (intended, at least in part, to ensure records are appropriately preserved), Defense Mot. 78 n.24, 87–88 n.28, and engaged in other conduct that appeared designed to avoid discoverable communications.

Moreover, the government's deflection to other, unrelated *Jencks* disclosures only further suggests that the failure to memorialize key communications with cooperators' counsel was intentional or, at a minimum, reckless.  For example, the government repeatedly provided the defense with 3500 material related to meetings with its immunized witness Nimberg and cooperating witness Dinucci that referenced only an exhibit number and nothing else, or simply said "nothing new."  *See* 3525-18; 3525-19; 3525-20; *see also* 3505-81, 3505-85, 3505-86, 3505-87.  Yet the same prosecutor who appears to have written those notes failed to memorialize substantive conversations with Majidi's counsel about his allocution.  The law (and DOJ policy) imposes disclosure obligations with respect to communications with witnesses *or* their counsel, *Triumph Cap. Grp., Inc.*, 544 F.3d at 162, a fact that the government was acutely aware of when it cautioned Dole's counsel about the consequences of sending the government a written request for immunity, *see* Defense Mot. Ex. D.

**E.      There is No Way to Remedy the Harm from the Disclosure Violations.**

Viewed in its entire context, the prosecution team's absence of any functioning disclosure process, its failure to timely disclose materials (including *Brady/Giglio* materials), its reckless representations to the Court and the defense, and its failure to memorialize key communications reflect the government's "reckless disregard" for its discovery obligations, which in turn warrants dismissal of the Indictment under the Court's authority to remedy the violation of the defendants' constitutional rights, preserve judicial integrity, and correct the government's process going forward.  *Bundy*, 968 F.3d at 1031, 1042.

By repeatedly emphasizing the absence of a record, Opp. 34–35, 44–45, the government's opposition only highlights why it is "impossible" to eliminate prejudice to the defendants "by imposition of lesser sanctions" than dismissal of the indictment. *United States* v. *Broward*, 594 F.2d 345, 351 (2d Cir. 1979). Nearly two years after the verdict, there is no way to fill in the gaps in the record. Neither the defense nor the Court will ever see communications with cooperators' counsel that were not memorialized. And although dismissal is a drastic remedy, this is the rare case where it is "otherwise impossible to restore [defendants] to the position that [they] would have occupied but for the misconduct." *United States* v. *Barcelo*, No. 13 Cr. 38 (RJS), 2014 WL 4058066, at *7 (S.D.N.Y. Aug. 15, 2014), *aff'd*, 628 F. App'x 36 (2d Cir. 2015).

The government's claim that the defendants failed to "address the extensive Section 3500 material" or to "mention AUSA Metzner's two-month-long review" of communications, Opp. 44, is neither here nor there. The former is irrelevant, *see supra* § II.A. The latter, AUSA Metzner's review, was focused on a discrete topic—whether there were additional unproduced documents relating to cooperator allocutions—and discrete time periods. AUSA Metzner did not (to our knowledge) conduct a substantive inquiry, such as by interviewing all of the relevant witnesses, to try to develop a "complete understanding" of what happened. July 24, 2020 Tr. 15:25. He also was not asked to decide (and certainly did not rule on) either the propriety of the government's conduct or the consequences of its acknowledged failures, and his review was not designed to bless (or for that matter condemn) the government's disclosures generally. Certainly it did not address the question of whether the government maintained a process to ensure that disclosable information was being properly recorded, maintained, and disclosed. Finally, and in any event, AUSA Metzner's review made no attempt to, and could never, reconstruct

communications that were never memorialized.[21]

In *United States* v. *Nejad*, Judge Nathan described the government's conduct using words that could easily have been written about this case:

> [F]ederal prosecutors have by their own admission repeatedly violated their disclosure obligations and, at best, toed the line with respect to their duty of candor. Over the course of years in this prosecution—before, during, and after trial—the Government has made countless belated disclosures of arguably (and, in one instance, admittedly) exculpatory evidence.  For some pieces of evidence, the Government provides plausible explanations for its late disclosure.  For others, it provides no explanation at all.  And when the Court pressed for more information about one of these failures, the Government made a misrepresentation to the Court.  This serious dereliction requires a serious response.

487 F. Supp. 3d 206, 207 (S.D.N.Y. 2020).

In *Nejad*, the government recognized and took action to address its failings in its disclosures.  Here, it has not, and while it initially expressed regret for certain limited failures, it has not acknowledged the scope or severity of the issues before the Court.  Nor has it has conceded (or even addressed) the argument about the resulting harm being irreparable.  Unable (or unwilling) to take steps to address their failings, the prosecutors have invited the Court to do it for them.

## CONCLUSION

For the foregoing reasons, the defendants respectfully request that the Court grant their motion for dismissal of the Indictment, or in the alternative, for a new trial.

---

[21] The government does not dispute that even its post-trial review did not involve the searches the government had told the defense and the Court it would perform, which itself required follow-up from the defense to obtain necessary information.  And the government does not dispute that even those searches could not be completed because, for example, the government (except from one prosecutor's phone) was unable to recover text messages dating back to the cooperator pleas or to recover certain voicemails from cooperating witnesses' counsel.  Defense Mot. 33–34, 39.

Dated:  May 14, 2021

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

/s/ Roberto Finzi
Roberto Finzi
Richard C. Tarlowe
1285 Avenue of the Americas
New York, New York 10019-6064
T:  212-373-3000
rfinzi@paulweiss.com

KIRKLAND & ELLIS LLP
John P. Del Monaco
601 Lexington Avenue
New York, New York 10022
T:  212-446-4800
*Attorneys for Anilesh Ahuja*

WEDDLE LAW PLLC
Justin S. Weddle
Julia I. Catania
250 West 55th Street, Floor 30
New York, New York 11226
T:  212-997-5518

*Attorneys for Jeremy Shor*

# Appendix

Between 2014 and 2016 I was employed at Premium Point Investment~~s~~, or PPI, an investment advisor located in Manhattan. During that time, I was ~~the~~**a** portfolio manager for the mortgage credit fund, a hedge fund that invested in, among other things, residential mortgage backed securities. The month**'s** ~~-~~end net asset value of the funds that PPI managed was an important measure of the funds' performance and was disseminated to investors and potential investors through the mail and interstate wire communications. The funds' net asset value and their performance also determined PPI's management **fees** and performance fees.

Between 2014 and 2016, I participated in a scheme with, among others, Neil Ahuja, CEO of PPI, and Jeremy Shor, a trader at PPI, to fraudulently inflate the ~~month-end~~ net asset value of the funds that PPI managed. Instead of marking securities in PPI's portfoli~~os~~ at their fair market value, I worked with Ahuja, Shor, and others to mismark their value. I knew that the resulting monthly net asset value was inflated for the purpose of deceiving investors as to the funds' performance. ~~As part of this scheme, I used interstate emails and text messages.~~ I knew **that** what I was doing was wrong.