LCH3AHUD

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
              v.                          18 Cr. 328 (KPF)
4
    ANILESH AHUJA and JEREMY SHOR,
5
                   Defendants.            Decision
6   ------------------------------x
7                                         New York, N.Y.
                                          December 17, 2021
8                                         9:40 a.m.
9   Before:
10                    HON. KATHERINE POLK FAILLA,
                                          District Judge
11
12                         APPEARANCES
13  DAMIAN WILLIAMS
         United States Attorney for the
14       Southern District of New York
    BY:  ANDREA M. GRISWOLD
15       JOSHUA A. NAFTALIS
         Assistant United States Attorneys
16
    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
17       Attorneys for Defendant Anilesh Ahuja
    BY:  RICHARD TARLOWE
18       ROBERTO FINZI
         DAVID P. FRIEDMAN
19
20  KIRKLAND & ELLIS LLP
         Attorneys for Defendant Anilesh Ahuja
21  BY:  JOHN P. DEL MONACO
22  WEDDLE LAW PLLC
         Attorneys for Defendant Jeremy Shor
23  BY:  JUSTIN S. WEDDLE
         JULIA I. CATANIA
24
25

LCH3AHUD

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your name.

3          MS. GRISWOLD:  Good morning.  Andrea Griswold and Josh

4     Naftalis for the government, and we are joined by Special Agent

5     Matthew Mahaffey with the FBI.

6          MR. TARLOWE:  Good morning, your Honor.  Richard

7     Tarlowe on behalf of Mr. Ahuja.  With me is Roberto Finzi, John

8     Del Monaco, David Friedman, and Mr. Ahuja is present as well.

9          THE COURT:  Good morning to each of you and thank you,

10    all.

11         MR. FINZI:  I'm so sorry I was late.  I didn't realize

12    people were waiting for me.

13         THE COURT:  Sir, it's okay.  I didn't ask the followup

14    question that I should have.  I understood you to be in the

15    security line.

16         MR. WEDDLE:  Justin Weddle from Weddle Law PLLC.  I am

17    here with my client Jeremy Shor, and my colleague Julia

18    Catania.

19         THE COURT:  Good morning to each of you.  And I see

20    others who are familiar to me from this case.

21         As I mentioned in the robing room, I have in recent

22    months been in need of eyeglasses, so when I read the decision,

23    I will take off my mask so I don't fog them up.

24         Let me offer just a few thoughts at the outset,

25    recognizing what I imagine is some tense moments for everyone.

LCH3AHUD

1    At times in this case, we have had -- I am not sure if there
2    are moments of levity, but at least moments of civility.
3    Because I am reading this decision, I'm not afterwards going to
4    exchange pleasantries with you all.  So let me do it at the
5    outset.
6           It's been a while since we've seen each other.  There
7    has been a pandemic intervening.  There's been a lot of things
8    happening.  My hope for each of you and for your families is
9    that you have weathered this pandemic and continue to do so;
10   that you and your families are well; and that you are finding
11   some happiness and peace during this holiday season.
12          Let me also say that I am going to read this decision,
13   and I appreciate your patience as I read it.  I am asking you
14   to have no expressions until you leave this courtroom.  Someone
15   will be happy or sad or something, but not here.  Let me get
16   through this, and then you can have whatever expressions you
17   wish to have.
18          I also want to ask the parties this question.  A chunk
19   of this decision comprises legal standards that you all know,
20   because you gave them to me.  There is a section, for example,
21   on the standards for dismissal of the indictment.  There is a
22   section also for standards for a new trial.  I'd like to know
23   from counsel the degree of detail in which I have to go.  I can
24   read you all of the quotes that I have in here, although I
25   believe you're familiar with them.  I can tell you the cases

LCH3AHUD

| | |
|---|---|
| 1 | that I was looking at and give you the pinpoint cites, I can |
| 2 | just give you the names of the case, or I can not give any |
| 3 | legal standards at all.  It didn't make sense to me to read |
| 4 | word for word quotes from cases that you know, but I will do |
| 5 | what you want me to do. |
| 6 | So please tell me what degree of detail you would like |
| 7 | for the legal standards. |
| 8 | Mr. Finzi. |
| 9 | MR. FINZI:  As little as your Honor thinks is |
| 10 | appropriate.  We don't require anything, anything more than |
| 11 | that.  So we are not asking for cases or standards or anything |
| 12 | your Honor feels, if your Honor feels anything can be cut out, |
| 13 | you absolutely should proceed that way. |
| 14 | THE COURT:  All right.  Thank you. |
| 15 | Ms. Griswold. |
| 16 | MS. GRISWOLD:  That's fine, your Honor.  We don't need |
| 17 | any legal standards. |
| 18 | THE COURT:  I assumed, I didn't want to presume, but I |
| 19 | thought it was something with which we could dispense. |
| 20 | MR. WEDDLE:  I guess I am just not totally clear.  If |
| 21 | your Honor has written down a more fulsome description of the |
| 22 | legal standard, and then you are not going to read it, what's |
| 23 | going to happen to it? |
| 24 | THE COURT:  It remains in my oral decision.  It was |
| 25 | for me guideposts as I was writing the analysis, sir.  If you'd |

LCH3AHUD

1    like, I can tell you the cases that I was consulting and

2    looking at as I give you the analysis I then give you.

3         MR. WEDDLE:  I think it would be helpful at least to

4    get the case name, even in a short form.

5         THE COURT:  Of course, that's why --

6         MR. WEDDLE:  Would your Honor consider just taking the

7    legal standard portion and filing it as a document?

8         THE COURT:  No, I wouldn't do that.  But I'll give you

9    the names, of course.  All right.  We begin.

10        As I do sometimes with the jury charge, I will ask you

11   to take no offense if I don't look at you.  I wrote this

12   myself, and I've been writing this over a period of months, and

13   it to me is more important that I read what I've written here,

14   than that I make eye contact with you.  So take no offense if I

15   don't look at you.

16        I want to begin by recognizing the amount of time that

17   has passed since the verdict, since the disclosure of

18   information received from the FOIA request and succeeding court

19   orders, and since briefing was concluded on this motion.  I

20   truly needed the time to give these issues the thought and the

21   attention that they merit.

22        In this regard, I'd also like to speak directly to

23   Mr. Ahuja and to Mr. Shor.  I want you to understand that I did

24   not intend or mean to cause you any needless anxiety with any

25   delay in issuing this decision.  Had this been an easy

LCH3AHUD

1  motion -- more to the point, had this been an easy denial --

2  you would have heard from me sooner.  My feelings on this

3  motion have evolved over the months, and only when I revisited

4  more of the trial record did I have the requisite confidence in

5  my decision.

6          As the parties are aware, this case is currently on

7  appeal to the Second Circuit.  Federal Rule of Criminal

8  Procedure 37 provides in these instances that the Court can

9  defer considering the motion, deny the motion, or "state either

10 that it would grant the motion if the court of appeals remands

11 for that purpose or that the motion raises a substantial

12 issue."  I am quoting here from the case *United States v.*

13 *Fernandez*, a summary order issued this year from the Second

14 Circuit at 853 F.App'x 730.

15         For the reasons I will explain, I am denying the

16 motion for dismissal of the indictment, but I am providing an

17 indicative ruling that I would grant the motion for a new trial

18 as to both defendants if the case were remanded back to me.

19         I find myself saying not infrequently that this motion

20 did not need to happen, that these problems with the trial did

21 not need to occur.  And after every trial, I perform my own

22 postmortem, and that's often with the assistance of the jury,

23 and I consider what I could have done better as the presiding

24 judge, what issues I could have foreseen or addressed earlier,

25 what room, if any, there was to make the trial fairer.

LCH3AHUD

1          What has been frustrating for me in this process is

2      that because of the quality of counsel, the issues that bring

3      us here this morning were raised, and I made pointed inquiries

4      precisely to find out the information that was later revealed

5      by the FOIA requests.  I really don't know what other questions

6      I could have asked, or what other motions defense counsel could

7      have made, to get to the truth of the matter during the trial.

8          Turning now to the facts.  The parties generally don't

9      dispute what happened in the months leading up to the trial and

10     at trial.  For this reason, and because the portions that

11     discuss interactions with the Court accord largely with my own

12     recollection and review of the record, I am largely adopting

13     the timelines set forth by the defense at pages 5 through 42 of

14     their opening brief concerning both government interactions

15     with defense counsel or the Court and internal government

16     communications.  To be clear, however, I'm not necessarily

17     accepting the defense's spin on these facts.

18         My decision today springs from two disclosure issues,

19     one macro and one micro.  Beginning with the macro, the defense

20     suggests that the government's disclosure problems were

21     systemic, and it's hard for me to disagree with that

22     characterization.  However well-intentioned, the processes that

23     were put in place by the government to gather, organize, and

24     produce discoverable material did not work as they should have

25     in this case.

LCH3AHUD

1          To be clear, I don't think the prosecution team set

2     out to bury discoverable information, and I do understand that

3     hiccups in production can arise.  But the issues in this case

4     transcended mere hiccups.  As detailed in the defense's opening

5     brief, problems with disclosure were identified and discussed

6     with the Court in January 2019, March 2019, May 2019, the

7     weekend prior to the commencement of the trial, and at various

8     points during the trial.  The Court issued decisions on defense

9     motions in limine based on the government's representations

10    about the completeness of its file reviews for disclosable

11    information, and it now turns out that this Court made

12    decisions based on incorrect information.

13          The government has offered several benign explanations

14    for the failures to disclose, including typographical errors

15    and misfilings.  But there are certain arguably less benign

16    reasons as well, including the government's failure to retain

17    or memorialize certain information, as well as certain

18    restrictions that it read into my questions and my orders that

19    simply were not there.

20          I also accept the defense's position that, even

21    including adding in the materials obtained as a result of the

22    FOIA request and the materials obtained as a result of the

23    post-conviction motion, post-FOIA motion practice in 2020, the

24    government's production is necessarily incomplete, because

25    certain text messages cannot now be retrieved.

LCH3AHUD

1          Ultimately, however, I do not find that the government

2     systematically failed to memorialize or preserve evidence in

3     this case.  Rather, what I believe the record demonstrates is

4     that the government repeatedly failed to identify, locate, and

5     produce material information in accordance with its *Brady*

6     obligations and in response to both the defense's requests and

7     my own inquiries.

8          I pause here to discuss the involvement of defense

9     counsel in ferreting out discoverable information that should

10    have been produced in the ordinary course.

11         Here I'm telling you what you all already know.  The

12    criminal justice system does not presuppose that defendants

13    will have counsel with the wherewithal and the creativity of

14    Mr. Shor's and Mr. Ahuja's attorneys.  Instead, the

15    participants in that system assume that the government will

16    comply with its disclosure obligations and thus ensure a fair

17    trial.  If the government is going to respond categorically

18    that it is aware of its disclosure obligations and has complied

19    with them, such statements have to be correct.  In this case,

20    they were not.

21         Relatedly, while I thought that I was able during the

22    trial to address the material disclosed as a result of the Rule

23    7(c) subpoenas, the information disclosed as a result of the

24    FOIA request calls my earlier measures into question.

25         To put it more bluntly:  When I dismissed the jury

LCH3AHUD

1   with my thanks in July of 2019, I was confident that I had

2   provided all sides with a fair trial.  I no longer have that

3   confidence, and it troubles me that had the defense not filed

4   the FOIA request, I might have persisted in a misapprehension

5   of the trial's fairness.

6           I'll now turn to the more specific defense argument

7   concerning the government's disclosures to the Court.  I want

8   to be clear here that there are two separate issues addressed

9   by the parties in their submissions.  The first is whether it

10  is appropriate for the government to be involved in the plea

11  allocutions of its cooperating witnesses, and the second is

12  what was said to me about the government's involvement.

13          I disagree with the defense to the extent they are

14  suggesting that the government's arguments concerning the

15  propriety of their involvement are post hoc, fallback

16  positions.  My review of the record, and this includes both the

17  government's contemporaneous internal communications and their

18  submissions to me, indicates that the government consistently

19  took the position that participation in the plea allocutions of

20  cooperating witnesses was not improper, was not that big a

21  deal, and was not as probative as other evidence in the case.

22  You'll learn more about my views on this subject later on.  In

23  the continuum of impeachment evidence, I don't know that it

24  matches Mr. Majidi's money transfers or Mr. Dinucci's

25  looting -- for lack of a better term -- of his mother's trust

LCH3AHUD

1    account.  But I find that government involvement in the plea

2    allocutions here was important to the prosecution team, and

3    probative to the defense, both because of the involvement the

4    prosecution team had, and because of the substance of what it

5    failed to disclose, despite repeated opportunities to do so.

6         A key issue here is the accuracy of what was conveyed

7    to me, and I'm going to focus for the moment on what

8    Mr. Naftalis said to me, although it bears noting there were

9    instances in which his trial partners could and should have

10   spoken up.

11        I begin with Mr. Naftalis' statements during the

12   June 10, 2019, mid-trial conference, and if you look back on

13   the transcript of this day, you will see that I asked specific

14   questions of each of the prosecutors.  In the course of my

15   discussions with Mr. Naftalis, I asked -- and I am strangely

16   quoting myself -- "You're telling me, you're representing to me

17   as an officer of the court that in no way did you seek to shape

18   or modify the allocution."

19        Mr. Naftalis responded:  "Correct.  I don't remember

20   exactly what I said, but I would never suggest to a defense

21   lawyer, this is what he should say or not say."

22        After consulting with Mr. Nicholas and Ms. Griswold,

23   Mr. Naftalis clarified that he understood the verb "shape" to

24   mean doing something improper, and precisely for this reason I

25   asked different questions, after explicitly remarking, "Let's

LCH3AHUD

1    not use the term 'shape,'" and thus moving the conversation

2    away from any normative judgments.  To these questions

3    Mr. Naftalis responded that he might encourage defense counsel

4    to have their clients hit the elements, and that he might offer

5    corrections to information that was factually wrong, that he

6    did not ask Mr. Majidi's counsel to change the names of anyone

7    in the allocution, including in particular Mr. Shor, who did

8    not appear in the draft allocution; that there was no change in

9    date between the two versions; and that he did not discuss

10   Mr. Majidi's allocution with his counsel on the day of the plea

11   proceeding.

12           The Court renewed these discussions on June 19, 2019,

13   when it discussed Mr. Majidi's allocution with his counsel Seth

14   Rosenberg.  Mr. Rosenberg recalled sending a draft allocution

15   to the government and having a conversation with Mr. Naftalis

16   regarding the allocution, though he could not recall the

17   specifics of that consideration.  Mr. Rosenberg acknowledged a

18   difference between the draft allocution submitted to the

19   government and the allocution notes from which his client read

20   during the plea proceeding.  He could not recall specifically

21   how the allocution came to be modified, though he believed the

22   changes to be "the product of his discussions with the

23   government." Mr. Rosenberg did not recall himself or his

24   colleagues editing the Majidi allocution document, and his

25   firm's records included no receipt of an e-mail from the

LCH3AHUD

1    government with a revised allocution.  He also did not recall

2    receiving a revised allocution from the government by means

3    other than e-mail.

4         Mr. Naftalis and Mr. Nicholas both stated that the

5    government sent nothing to Mr. Rosenberg.  In speaking with

6    Mr. Nicholas, who again argued that there was nothing "improper

7    about discussing with a defense lawyer an allocution," the

8    Court made plain the purposes of its questioning, and again I

9    quote myself.  "Mr. Rosenberg suggested that maybe there was a

10   possibility that the government handled the edits.  So I'm

11   allowed to ask whether they handled the edits, and I'm being

12   told that they didn't."  No one on the prosecution team

13   corrected me.  And based on the evidence now before me, someone

14   should have.

15        In light of the evidence unearthed as a result of the

16   FOIA request, I now understand that certain of the government's

17   statements to me were misleading, and some were flat-out

18   incorrect.

19        The timeline, as revised, indicates that upon

20   receiving a draft Majidi allocution from Mr. Rosenberg on

21   October 29, 2018, the prosecutors began discussing the draft by

22   e-mail, and then scheduled a team meeting for 3 p.m. the

23   following day.

24        In advance of the internal meeting, Mr. Naftalis

25   circulated an edited version of the allocution in redline form.

LCH3AHUD

The edits go beyond a mere directive to hit the elements.  They include the replacement of a statement that the "scheme accelerated in the second half of 2015" with a statement that the scheme occurred "between 2014 and 2016"; the replacement of a statement that certain conduct was undertaken "at the direction of Neil Ahuja" with a statement that Mr. Majidi participated in the scheme with others including Messrs. Ahuja and Shor; the deletion of Mr. Majidi's acknowledgment that he pressured his traders to achieve targets; the inclusion of a reference to "funds" in the plural; and the removal of numerous details regarding the process of obtaining marks.

        After the October 30 team meeting, Mr. Naftalis participated in an approximately 10-minute call with Mr. Rosenberg.  The following day, Mr. Naftalis suggested a meeting with Mr. Rosenberg 10 minutes before the plea, which suggestion Mr. Rosenberg accepted.  The plea allocution ultimately given by Mr. Majidi is virtually identical to Mr. Naftalis' revised allocution.

        In a declaration dated February 12, 2021, Mr. Naftalis states that his recollection is not entirely refreshed by his review of the record, but believes that he may have suggested edits to Mr. Rosenberg during the October 30 telephone conference, and that when he met with Mr. Majidi and his counsel the next day, it was to discuss and sign the cooperation agreement.

LCH3AHUD

1          On the record currently before the Court, I believe

2     that Mr. Naftalis' statements are incorrect, and while he may

3     have discussed the allocution with Mr. Rosenberg on October 30,

4     he in fact provided the revised plea allocution to the defense

5     immediately prior to Mr. Majidi's plea.  It is the government's

6     version of the allocution, and not the original draft or a

7     draft edited by someone at the Clayman & Rosenberg firm, from

8     which Mr. Majidi read.

9          And that leads me to the 800-pound gorilla in the

10    room.  Mr. Naftalis was asked specific questions regarding his

11    practices with respect to plea allocutions, generally and in

12    this case, and he gave me answers that I now know to be

13    incorrect.  The hardest thing for me to wrap my head around is

14    why.  I understand that trials can be stressful and that

15    memories can differ.  The fact remains that on June 10 or 19,

16    or at any point over the ensuing several weeks, Mr. Naftalis or

17    other members of the prosecution team could easily have checked

18    their files and realized the inaccuracies of their

19    representations to the Court and the defense.

20         In his February 2021 declaration, which is notably

21    short on contrition, Mr. Naftalis seeks to explain himself.  He

22    acknowledges that he should have reviewed certain files, and

23    that such review would have led him to additional disclosures

24    and more accurate answers to the Court.

25         Separately, Mr. Naftalis suggests that he

LCH3AHUD

1    misapprehended certain of my questions, such that he was

2    responding to defense counsel's allegations of misconduct,

3    rather than my actual questions.  I do not understand how that

4    can be the case.

5        My initial questions about allocutions did not bespeak

6    agreement with defense counsel's arguments, and indeed they

7    followed Mr. Nicholas' proffer of the government's view that

8    there was nothing improper in such conduct.  Furthermore, after

9    answering several of my questions, Mr. Naftalis took a break,

10   conferred with his colleagues, and offered his concerns about

11   the use of the term "shape."  I then told Mr. Naftalis, "then

12   let's not use the term 'shape'" and proceeded to ask new,

13   different questions about his practices, as to which there

14   should have been no confusion.

15       Even if Mr. Naftalis were confused on June 10, that is

16   no excuse for the erroneous statements made to me on June 19,

17   nor for the prosecution team's failure to review the files and

18   to correct these earlier statements at any point thereafter --

19   particularly in light of my continued reliance on these

20   statements.

21       Because I don't find Mr. Naftalis' answers to be

22   satisfying, I sketched out in a prior draft of this opinion

23   several working theories as to why the government's answers to

24   me were incorrect, ranging from inattention to deliberate

25   falsity.  Let me just focus on the latter, because on that

LCH3AHUD

1    point, I have a number of hesitations.

2          To begin, in the scheme of all of the issues at trial,

3    and indeed, even in the more circumcised scheme of the

4    government's disclosure issues before and during the trial,

5    there isn't an obvious benefit to lying about this information.

6    And as I've noted, the government's contemporaneous e-mails

7    suggest that they would not have been troubled by the

8    disclosure of their participation in the allocution process.

9    More fundamentally, I have difficulty believing that an officer

10   of the court would lie to me, not me, qua me, but me as a

11   federal judge, and I just don't want to believe that that

12   happened here.

13         We are all shaped by our experiences.  Mr. Weddle and

14   I were, in different ways, shaped by a judicial finding of

15   prosecutorial misconduct that we will each go to our graves

16   thinking was unsupported by the record.  A finding that

17   Mr. Naftalis lied to a federal judge in a criminal prosecution

18   would -- and should -- follow him throughout his professional

19   career.  On this record, I am reluctant to make that finding.

20   Given my resolution of these motions, I don't believe that I

21   need to.  At the same time, I do not accept the reasons that

22   have been proffered to me to date about why Mr. Naftalis said

23   what he did.

24         Let me note as well there are issues with the Dinucci

25   and Dole allocutions.  I will discuss them later in this

LCH3AHUD

1    opinion, but I don't know -- in fact, I don't believe -- that I

2    would be granting the motion for a new trial or offering an

3    indicative ruling in that regard on those issues alone.

4         Let me return to the general issue of the government's

5    disclosures in connection with the trial.  There were

6    disclosure issues in the run-up to the trial, and certain of

7    those issues recurred during the trial.  At that time, I

8    believed that the fairest way to approach them was to inquire

9    as to what was being produced late and why, and then to direct

10   the government to go back to its files, rereview everything,

11   and certify to me that the files had been reviewed and

12   disclosures made.  With the information I have now, I question

13   whether my efforts were fair to the defense.

14        Putting this in metaphorical terms, I view myself as

15   plugging up holes in a leaking roof as each hole became

16   apparent.  And the problem I now have is I question whether

17   there weren't more structural problems with that roof that

18   foreclosed a piecemeal approach.

19        My concerns that exist today are also borne out in

20   other cases in this district addressing problems with the

21   government's compliance with its disclosure obligations,

22   including Judge Castel's problems with the *Jain* case, and Judge

23   Nathan's problems in the *Nejad* case.

24        The defense is correct to identify the issue as to

25   whether these deficiencies, in the aggregate, interfered with

LCH3AHUD

1   their right to a fair trial.  Ultimately I conclude that they

2   did.

3          I am now going to speak to the issue of the motion to

4   dismiss the indictments, and I'll give you some of the cases

5   that I looked at.  Again, now that you understand the

6   introduction to this, you have a sense of what I was focusing

7   on.

8          Cases include:  *United States v. Walters*, 910 F.3d 11

9   (2d Cir. 2018); *United States v. Brown*, 602 F.2d, 1073 (2d Cir.

10  1979); *United States v. Broward*, 594 F.2d 345 (2d Cir. 1979);

11  *United States v. Percoco*, 13 F.4th 158 (2d Cir. 2021); *United*

12  *States v. Casamento*, 887 F.2d 1141 (2d Cir. 1989); *United*

13  *States v. Brito*, 907 F.2d 392 (2d Cir. 1990); *United States v.*

14  *Jain*, 2020 WL 6047812, a decision from Judge Castel from

15  October of 2020, and the cases cited therein; and United States

16  v. *Nejad*, 487 F.Supp.3d 206, decision from Judge Nathan from

17  2020.

18          Mr. Weddle, is that sufficient?

19          MR. WEDDLE:  Yes, thank you, your Honor.  More than

20  sufficient.  I just need the names.  I can find the cites and

21  probably already have them.

22          THE COURT:  Thank you.

23          The government conduct that precipitated these motions

24  is unacceptable, and, as I stated earlier, consistent with

25  production failures that have plagued the government in at

LCH3AHUD

1    least two other cases recently in this district.  That said,

2    the conduct is neither sufficiently severe nor prejudicial to

3    warrant dismissal of the indictment.

4            Defendants begin by noting that the government's

5    disclosure failures were persistent, reckless (if not

6    intentional), and the product of a lack of "functioning process

7    for recording, preserving and disclosing substantive

8    communications with counsel for cooperating witnesses."  I am

9    citing here to the defense brief at page 72.  There is similar

10   language at page 76.

11           As noted earlier in this opinion, I agree that there

12   were repeated failures to disclose on the part of the

13   government, though I do not conclude that they were the product

14   of a concerted effort to avoid disclosure obligations, such as

15   the suggestion that the government deliberately refrained from

16   generating written communications.

17           I acknowledge than these failures took place over a

18   period of months, and it is significant to me that, despite

19   repeated questioning from defense counsel and the Court,

20   certain materials were only revealed as a result of heroic

21   defense efforts, here the Rule 7(c) subpoenas and the FOIA

22   request.  Having the government quantify for me the information

23   that has been produced is irrelevant if material information

24   has been simultaneously withheld.  That all said, I believe

25   that the unfairness to the defense can be addressed through a

LCH3AHUD

new trial, rather than the extraordinary remedy of dismissal of
the indictment.

On this point, I do not accept the defense's arguments
that the problems occasioned by the government's conduct or
misconduct cannot be cured by a new trial.  The defense
suggests in this regard that a new trial would give the
government an opportunity to refine its case after viewing the
defense's arguments.  Moreover, they add the government's
deficiencies in memorializing discussions with witnesses and
defense counsel suggests that no further documents will be
forthcoming.  Those points have merit.  But they overlook the
countervailing challenges for the government, which minimize
the prejudice identified by the defense.  To begin, the second
trial will take place years after the first, and even more
years from the 2014-2016 period of events at issue.  Witnesses'
memories have almost certainly faded.  One member of the trial
team has left the office.  The defense has also seen the
government's arguments and its evidence.  And while I am
deciding nothing now, I imagine that the defense would be able
to make use of the evidence it has gathered post-trial, and
would be able to ask me to reconsider certain of my prior in
limine rulings regarding the scope of cross-examination.

Another argument for dismissal concerns the
completeness and accuracy of the prosecution team's disclosures
to the Court.  Here, too, I am troubled, but given the fact

LCH3AHUD

1    that I have not found actual lies to the Court, I think it is
2    preferable to proceed by way of a new trial.  My review of the
3    government's most recent, court-ordered productions gives me
4    comfort that all relevant material in the government's
5    possession, custody, or control has been now been produced.
6    And with respect to that material that no longer exists, I
7    believe that includes certain text messages and voicemails, or
8    that was never memorialized, I believe those issues are better
9    addressed by further motions in limine, and as appropriate,
10   curative instructions from the Court.
11           Finally, I recognize that these events took place in
12   the shadow of other cases in this district involving
13   allegations of prosecutorial misconduct including the *Jain* and
14   *Nejad* cases I cited a few moments ago.  However, the conduct in
15   those cases postdates this one, and thus I cannot say that the
16   government should have learned from Judge Castel's or Judge
17   Nathan's admonishments, nor do I believe that the cases, even
18   considered in the aggregate, reflects, as *Broward* called it, "a
19   pattern of demonstrated and longstanding widespread or
20   continuous official misconduct."  But let me be clear:  The
21   government's conduct in these three cases is unacceptable and
22   cannot continue.  The government must take appropriate steps to
23   ensure that it meets its disclosure obligations and its duty of
24   candor to this and all other courts.  I trust that the
25   government will do so, and that it recognizes the tools

LCH3AHUD

 1    available to courts if it does not.

 2            Let me turn now to the motion for a new trial.  There

 3    are many cases in this regard.  I'll give a sampling.

 4            Judge McMahon in *United States v. Connolly*, 2019 WL

 5    2120022 (S.D.N.Y. May 2, 2019) contains a precis of that law.

 6    It includes such cases as *United States v. Sanchez*, 969 F.2d

 7    1409 (2d Cir. 1992); *United States v. McCourty*, 562 F.3d.  458

 8    (2d Cir. 2009); *United States v. Parkes*, 497 F.3d 220 (2d Cir.

 9    2007); *United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001).

10            I don't believe there is a question here, no one seems

11    to be challenging the timing of this motions, so I will skip

12    the section of my analysis that talks about the timing of the

13    motion.

14            There are certain cases that have focused on new trial

15    motions predicated on prosecutorial misconduct.  Another

16    decision of Judge McMahon's in which these cases are summarized

17    is *United States v. Santiago*, 2014 WL 4827883 (S.D.N.Y. Sept.

18    26, 2014).  As for cases involving new trial on the grounds of

19    newly discovered evidence, they are summarized in *United States

20    v. Jones*, 965 F.3d 149 (2d Cir. 2020).

21            With respect to newly discovered evidence, there are

22    certain cases summarized in a decision of Judge Preska's,

23    *Pizzuti v. United States*, 2019 WL 10371606 (S.D.N.Y. Sept. 30,

24    2019); and as well, *United States v. Martinez*, 388 F.Supp.3d

25    225 (E.D.N.Y. 2019), which speaks about new trial motions, and,

LCH3AHUD

1   as well, new trial motions predicated on violations of the

2   government's disclosure obligations in cases like *Brady*.

3           So, again, Mr. Weddle, are you satisfied?

4           MR. WEDDLE:  Yes, thank you, your Honor.

5           THE COURT:  Let me please proceed to the analysis

6   because I do believe that is more important here.

7           I want to begin by recognizing that these standards

8   are difficult to meet.  And I had struggles similar to I

9   believe the defense had in categorizing the basis for a new

10  trial.  The conduct that I've identified, which includes

11  repeated disclosure violations coupled with misleading and

12  erroneous statements to the Court, exists at the intersection

13  of several of these constructs.  It is more than newly

14  discovered evidence; it is more than mere impeachment; the

15  delays in production discussed in this opinion were partly the

16  product of government misconduct.  Ultimately, given the

17  standards I've just outlined, I think these failures to

18  disclose and to provide accurate information to the Court are

19  best described as *Brady* violations or disclosure violations.

20          What does that evidence include?  My principal focus

21  has been on the government's conduct and disclosures with

22  respect to the Majidi allocution, as evidenced by the amount of

23  detail with which I described that conduct in this opinion.

24  I'm not going to repeat that information here.  I would remind

25  you of it.

LCH3AHUD

1        As I suggested to you a little while ago, if I were

2    only dealing with the challenges to the Dinucci and Dole

3    allocutions, I would not be inclined to grant the motion for a

4    new trial.  But I do have some concerns about the Dinucci

5    allocution, and I will include them here for completeness.

6        During trial, the government produced a previously

7    undisclosed draft plea allocution sent to it by Mr. Dinucci's

8    counsel, which allocution focused on the 2015-2016 time period

9    and did not mention misconduct at PPI in 2014.  During a

10   conference outside of the presence of the jury, Ms. Griswold

11   acknowledged advising Mr. Dinucci's counsel that she thought

12   the accurate starting point was 2014, but recalled no other

13   changes.

14       One year later, in July of 2020, the government

15   produced an April 2017 e-mail in which one of the prosecutors

16   requested an opportunity to speak with the cooperator's

17   counsel, as well as a hard copy of the allocution to review.

18   The government also produced, for the first time, a revised

19   draft allocution that referred to mismarking beginning in 2015.

20   At the actual plea before Judge Hellerstein, Mr. Dinucci stated

21   that the criminal conduct occurred in or about mid-2014.

22       The defense argues, again with some force, that

23   because of the government's failure to memorialize

24   conversations with Mr. Dinucci's counsel, and the loss of

25   certain voicemails, the truth about those edits remains

LCH3AHUD

1   unknown.  For my part, I am more troubled by the fact that the

2   government did not search its files as I directed, but in this

3   case stopped looking after finding the first allocution.

4         I am less concerned about Mr. Dole's allocution, and

5   the record of communications regarding it doesn't inform my

6   decision.  In particular, I don't accept the defense's

7   suggestion that something untoward or even something worthy of

8   disclosure to the defense may have happened in brief meetings

9   between the then-unit chiefs and Mr. Dole's counsel after

10  Mr. Dole's guilty plea, or surrounding Mr. Dole's guilty plea.

11        At base, I agree with most of the defense arguments as

12  to why these communications were material to the defense, and

13  relatedly, why my mid-trial resolution of the defense's

14  cross-examination requests was incorrect.  Both the fact and

15  the content of these communications with cooperators and their

16  counsel were significant.  As to the former, I think it

17  significant that when the cooperating witnesses were thinking

18  about the precise criminal conduct in which they had engaged,

19  they drafted allocutions that accorded with certain defense

20  theories and undermined portions of their trial testimony and

21  the government's theory of the case.  As to the latter, the

22  malleability of the cooperating witnesses, plus the fact that

23  the government had a hand in drafting at least two, if not all

24  three allocutions, while not dispositive of any issue at trial,

25  were proper subjects of cross-examination that I curtailed

LCH3AHUD

1    based on incomplete and improper information.

2            Now, stepping back for a moment, I agree with the

3    government that there is nothing per se improper in the

4    involvement of prosecutors in drafting, editing, shaping the

5    plea allocutions of its cooperating witnesses.  An allocution

6    can be inadvertently incorrect as to a date or a place or it

7    can omit an element, like a tie to interstate commerce.

8            However, as with many things, allocutions and

9    prosecutors' involvement therewith exist on a continuum, and I

10   can think of circumstances in which either the fact of the

11   prosecutor's involvement, or the comparison of the before and

12   after allocutions, can constitute appropriate impeachment

13   evidence for the jury.  These circumstances include instances

14   in which the prosecutor scripts the allocution in its entirety,

15   or where the cooperator's initial allocution minimizes the

16   cooperator's conduct or suggests that the cooperator does not

17   truly believe himself to be guilty of the offense to which he

18   is pleading, or where the initial allocution contains flat-out

19   false statements.  And after considering what has happened in

20   this case, I think it also includes instances in which the

21   prosecutor edits the substance of the allocution in order to

22   preempt arguments that the government knows are at the heart of

23   the trial defendants' defense.

24           My resolution of this issue during trial focused on

25   Federal Rule of Evidence 403 issues, specifically, my concerns

LCH3AHUD

1    that the introduction of plea allocutions could invade the

2    cooperator's attorney-client privilege, or that I would have to

3    provide a companion disquisition on the requirements of Rule

4    11.  To be clear, I still have those concerns, and in many

5    cases, the probative value of the government's involvement in

6    the allocution won't overcome those concerns.  But the facts of

7    this case are different.  The prosecutors, contrary to their

8    representations to me, substantially edited Mr. Majidi's

9    allocution to bolster the prosecution theory while

10   simultaneously undermining the defense theory; they discussed

11   the redline of that allocution internally; they met with

12   counsel for the cooperator immediately prior to the plea to

13   communicate the revisions.  They then made analogous, though

14   less dramatic, edit to Mr. Dinucci's allocution.

15            Again, to be clear, I recognize there is a difference

16   between a plea allocution that isn't read into the record at

17   trial, and the actual trial testimony of a cooperator.  That

18   said, shaping the allocutions in this manner deprived the

19   defense of potentially powerful cross-examination

20   opportunities.

21            Not only was the defense deprived, but so was the

22   Court.  Had I been made aware of the nature and scope of the

23   government's involvement in Mr. Majidi's plea allocution, I

24   would very likely have decided the issue differently, and

25   provided the cross-examination sought by the defense.

LCH3AHUD

 1          On this point, in thinking about this, I analogize the

 2    probative value of differences between draft allocutions to

 3    statements made in proffer sessions with the government.  It is

 4    sometimes the case that a proffering witness's recollection

 5    evolves, as when a putative co-conspirator's name is not

 6    mentioned in the first proffer, but is mentioned later on.

 7    That omission may be attributable to imprecise questioning by

 8    the government, or to fear, or to a genuine failure to

 9    recollect.  Or, of greater concern, it could reflect the

10    witness's desire to please the prosecutors by saying what the

11    witness believes they want to hear.  In other words, there are

12    benign and less benign reasons why cooperating witnesses

13    proffer as they do, but counsel for a trial defendant may be

14    permitted to probe these issues in cross-examination, and to

15    make credibility arguments in jury addresses.  Given the Rule

16    403 issues just outlined, trial courts should not require

17    cooperators to produce all drafts of their allocutions.  But

18    where the government is involved in the allocution, and the

19    changes that result are sufficiently substantive, the defense

20    should be permitted to probe the fact and the substance of

21    those changes.

22          And that leads logically to the next issue, which is

23    that of impeachment evidence.

24          I recognize, as the cases to which I referred a few

25    moments ago make clear, that the belated disclosure of evidence

LCH3AHUD

1   that amounts to additional impeachment material is generally

2   not an adequate basis for a new trial.  But what was withheld

3   here was more than that.  And to me, this case is closer

4   analytically to cases like *Triumph Capital*, where disclosure

5   was warranted.

6          The government often argues in this context that there

7   was plenty of cross-examination material as to the cooperating

8   witnesses, and that the newly disclosed information would only

9   have been cumulative.  The cooperating witnesses here had ample

10  impeachment material on which they could be cross-examined, and

11  defense counsel made effective use of this material at trial.

12  There was also limited cross-examination concerning each

13  cooperator's plea allocutions.  However, the information that

14  was withheld by the government until recently, and the

15  information that was available at trial but as to which I

16  precluded cross-examination, presented a qualitatively

17  different basis of questioning.

18         This was a cooperator-driven case, particularly as to

19  Mr. Ahuja.  I'll concede that the government had more evidence

20  against Mr. Shor, but I am unable to say that the evidence

21  against him was so overwhelming that he is not entitled to a

22  new trial here.  At least two of the cooperating witnesses

23  prepared allocutions with their respective attorneys that

24  accorded with key defense arguments at trial.  And, to repeat,

25  while those allocutions would not have been admissible as

LCH3AHUD

1    direct evidence at trial, it would have been reasonable for

2    defense counsel to expect those cooperators to testify in

3    accordance with their allocutions, and to be prepared to

4    cross-examine the cooperators if they did not.  The record,

5    however, reflects that the government substantially redrafted

6    Mr. Majidi's allocution, and less substantially, redrafted

7    Mr. Dinucci's allocution, all with a view to cutting off

8    defense arguments at trial, without the defense knowing that

9    such arguments could have been made.  The content of these

10   changes, and the fact that the cooperators acceded to them,

11   were fair subjects for cross-examination.

12           I want to return to something I said at the beginning

13   of this opinion:  These motions didn't need to happen.  The

14   disclosure issues generally, and the allocution issues in

15   particular, were fleshed out by defense counsel before trial.

16   The government asseverated -- categorically, repeatedly, and

17   incorrectly -- that it knew of its disclosure obligations and

18   had complied with them.  But that wasn't quite accurate,

19   because the prosecution team produced key information

20   immediately prior to and during trial.  I repeatedly asked the

21   government to review its files.  The prosecution team told me

22   it had, and that everything that should have been produced had

23   been produced.  But that also wasn't quite accurate, because

24   things were produced in June and July of 2020.  And it

25   continues to trouble me that defense counsel had to employ

LCH3AHUD

1    extraordinary means in the form of Rule 7(c) subpoenas, FOIA

2    requests, and court-ordered productions of material in order to

3    force the government to comply with its disclosure obligations.

4         There remains the separate issue of the government's

5    involvement in the Majidi and Dinucci allocutions.  With

6    particular respect to the former, I asked direct questions, and

7    I received incorrect answers.  I do not accept the

8    justifications proffered by the government for these errors,

9    and I cannot understand why the prosecution team didn't conduct

10   a simple e-mail search during the remaining weeks of the trial

11   to confirm or refute the representations made to me,

12   particularly since I had made clear that my in limine decisions

13   were predicated on those representations.

14        The content of these allocutions was sufficiently

15   important, to the government at least, that at different times,

16   prosecutors sought out allocutions from cooperator counsel,

17   discussed them internally, conducted internal meetings

18   regarding their contents, redlined at least one allocution, and

19   provided edits to cooperator counsel.  How they could do all of

20   that and not disclose all of the relevant documents to the

21   Court or defense counsel until a year after the verdict, not

22   memorialize communications with cooperator counsel concerning

23   these efforts, and forget that all of these happened when a

24   district judge specifically questions them about it perplexes

25   me to no end.

LCH3AHUD

1          I tried my hardest to conduct a fair trial, and based

2     on the history of disclosure problems by the government, and

3     the incomplete and inaccurate information it provided to the

4     defense counsel and to me during the trial, I no longer have

5     confidence in its fairness.

6          Since I currently lack jurisdiction to grant a new

7     trial, I instead advise the parties of my indicative ruling

8     that I would grant such a motion if the case were remanded back

9     to me.

10         I believe the appropriate protocol here is for the

11    defense to promptly notify the circuit clerk of the U.S. Court

12    of Appeals for the Second Circuit of an order that will come

13    out later today.  I'm looking at Federal Rules of Appellate

14    Procedure 12.1 and Federal Rule of Civil Procedure 62.1.  I

15    will separately direct the clerk of court to deliver a copy of

16    my order and of the transcript of this decision, which I

17    presume someone is going to have transcribed, to the clerk of

18    the United States Court of Appeals for the Second Circuit.

19         Relatedly, there is an open motion from Mr. Shor's

20    counsel, it is an April 2, 2021, letter motion, to preserve for

21    appellate review a request for monetary sanctions.  That letter

22    notes that counsel believes the record before the Court does

23    not permit a finding that the prosecutors' actions were taken

24    for reasons of harassment or delay under cases such as *United*

25    *States v. Seltzer*, and thus the Court may not award attorneys'

LCH3AHUD

1    fees under 28 U.S.C. Section 1927.

2          Independent of *Seltzer*, I don't believe that

3    attorneys' fees are warranted in this case, but I understand

4    the defense's desire to preserve the issue and they have done

5    so.

6          I also know that there is an open motion filed by

7    counsel for Mr. Ahuja, a pre-surrender motion for compassionate

8    release pursuant to Section 3582(c)(1)(A) of Title 18.  That

9    motion is denied as moot.

10          That is the end of my opinion, and I recognize that

11    all of you have a lot to process.  The government, I imagine,

12    will want to consider its appellate options.  The defense has

13    been directed to address certain issues to the Second Circuit.

14    It may be the case that you would like to discuss with each

15    other these issues before advising me of what the parties

16    believe are appropriate next steps.  I will wait to hear from

17    you.

18          I am getting a bit ahead of myself, but I want to put

19    something on your radar screens.  I want you to be aware that

20    because of a series of rollovers of trials occasioned by this

21    district's centralized jury system, I do not have six

22    sequential trial weeks in the entirety of 2022.  So if we get

23    to the point of a new trial, it will have to be some time in

24    2023.  I can show you my trial calendar, but there are criminal

25    cases and civil cases.  Our criminal cases, they have the same

LCH3AHUD

1   priority as yours.  The civil are cases that have been

2   repeatedly rolled over and they have to be tried.  So, I wanted

3   you to keep that in mind as you thought about scheduling a new

4   trial in this case.  Again, I'm ahead of myself by several

5   steps here.

6            I thought about the possibility that you may decide

7   that you would want another judge to try this case because of

8   my schedule.  And if that is something that everybody wants,

9   you'll let me know.  My sense, and it's just anecdotal from

10  talking to my colleagues, is we all have very, very jammed up

11  schedules for 2022 because we can only pick one jury a day in

12  this district.

13           From my perspective, I've addressed everything that I

14  want to address today.  If there is anything anyone wants to

15  bring to my attention, please do so.

16           Ms. Griswold, anything from the government?

17           MS. GRISWOLD:  No, your Honor.

18           THE COURT:  Mr. Finzi, anything from Mr. Ahuja?

19           MR. FINZI:  No, your Honor.

20           THE COURT:  Mr. Weddle, anything from Mr. Shor?

21           MR. WEDDLE:  No, your Honor.

22           THE COURT:  Thank you.  We are adjourned.

23           (Adjourned)

24

25